**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TAMARA FIELDS, ESTATE OF LLOYD CARL FIELDS JR., by and through Tamara Fields as Personal Representative, HEATHER GAVINO, ESTATE OF JAMES DAMON CREACH, by and through Heather Gavino as Personal Representative, JACKSON CREACH, SAMANTHA CREACH, JAYEDON CREACH, KIMBERLY HARRIS, ESTATE OF SEAN COPELAND, by and through Kimberly Harris as Personal Representative, ESTATE OF BRODIE COPELAND, by and through Kimberly Harris as Personal Representative, AUSTIN COPELAND, MAEGAN COPELAND, KHALESI LOVE, RHASIA LOVE, and VEDA LOVE, | **Case No.** **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| LAFARGE S.A., | |
| Defendant. | |

**COMPLAINT**

Plaintiffs Tamara Fields, Estate of Lloyd Carl Fields Jr., by and through Tamara Fields as Personal Representative, Heather Gavino, Estate of James Damon Creach, by and through Heather Gavino as Personal Representative, Jackson Creach, Samantha Creach, Jayedon Creach, Kimberly Harris, Estate of Sean Copeland, by and through Kimberly Harris as Personal Representative, Estate of Brodie Copeland, by and through Kimberly Harris as Personal Representative, Austin Copeland, Maegan Copeland, Khalesi Love, Rhasia Love, and Veda Love (collectively, "Plaintiffs"), by and through their attorneys, allege the following against Defendant Lafarge S.A. ("Lafarge" or "Defendant") upon information and belief, except as to those allegations concerning Plaintiffs, which they allege based upon their personal knowledge.

1

**INTRODUCTION**

1.       Plaintiffs assert claims for wrongful death, personal injury and related torts pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, against the members of a terrorism-financing conspiracy spearheaded by Defendant Lafarge.

2.       The members of that conspiracy sponsored and carried out a series of heinous terrorist attacks, including the attacks Plaintiffs describe below.

3.       This action arises out of three terrorist attacks carried out by the Islamic State of Iraq and Syria ("ISIS"), also known as the Islamic State of Iraq and the Levant ("ISIL"), the Islamic State ("IS"), ad-Dawlah al-Islāmiyah fīl-ʿIrāq wash-Shām ("DAESH") and al-Qaeda in Iraq ("AQI"): (1) the November 9, 2015 shooting at the International Police Training Center ("IPTC") in Amman, Jordan (the "Amman Attack"); (2) the July 14, 2016 cargo truck attack in Nice, France (the "Nice Attack"); and (3) the August 17, 2017 van attack on La Rambla in Barcelona, Spain (the "Barcelona Attack").

4.       ISIS carried out these attacks with material support and resources provided by Defendant.  The substantial assistance that Defendant knowingly provided to ISIS included: (a) transferring significant sums of money to ISIS, its operatives, and its front organizations; (b) repeatedly transacting with ISIS for purchases of raw materials and supplies; and (c) entering into a revenue-sharing agreement with ISIS.

5.       As a result of the terrorist attacks carried out by ISIS and facilitated by Defendant, Plaintiffs have suffered severe physical and/or psychological injuries.

6.       Accordingly, Defendant is liable to Plaintiffs under the ATA for providing material assistance to ISIS, engaging in a conspiracy designed to support ISIS's terrorist activities, and aiding and abetting that unlawful conduct.

**PARTIES**

7.      Plaintiff Tamara Fields is a citizen of the United States domiciled in the State of Florida.  Ms. Fields was married to Lloyd Carl Fields, Jr. at the time of his death in the Amman Attack.

8.      Plaintiff the Estate of Lloyd Carl Fields Jr. is represented in this action by and through Tamara Fields, its Personal Representative as appointed under the laws of the State of Florida.  Lloyd Carl Fields Jr. was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Florida.

9.      Plaintiff Heather Gavino is a citizen of the United States domiciled in the State of Missouri.  Ms. Gavino was married to James Damon Creach at the time of his death in the Amman Attack.

10.     Plaintiff the Estate of James Damon Creach is represented in this action by and through Heather Gavino, its Personal Representative as appointed under the laws of the State of Florida.  James Damon Creach was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Florida.

11.     Plaintiff Jackson Creach, is a citizen of the United States domiciled in the State of Missouri.  He is the son of James Damon Creach.

12.     Plaintiff Samantha Creach, is a citizen of the United States domiciled in the State of Missouri.  She is the daughter of James Damon Creach.

13.     Plaintiff Jayedon Creach, is a citizen of the United States domiciled in the State of Missouri.  He is the son of James Damon Creach.

14.     Plaintiff Kimberly Harris is a citizen of the United States domiciled in the State of Texas.  Ms. Harris was married to decedent Sean Copeland at the time of his death in the

3

Nice Attack.  She is the mother of decedent Brodie Copeland, another victim of the Nice Attack.

15.     Plaintiff the Estate of Sean Copeland is represented in this action by and through Kimberly Harris, its Personal Representative as appointed under the laws of the State of Texas.  Sean Copeland was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Texas.

16.     Plaintiff the Estate of Brodie Copeland is represented in this action by and through Kimberly Harris, its Personal Representative as appointed under the laws of the State of Texas.  Brodie Copeland was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Texas.

17.     Plaintiff Austin Copeland is a citizen of the United States domiciled in the State of Texas.  Mr. Copeland is the son of decedent Sean Copeland and the brother of Brodie Copeland.

18.     Plaintiff Maegan Copeland is a citizen of the United States domiciled in the State of Texas.  Ms. Copeland is the daughter of decedent Sean Copeland and the sister of decedent Brodie Copeland.

19.     Plaintiff Khalesi Love is a citizen of the United States domiciled in the State of Wisconsin.  She is the daughter of decedent Jared Tucker, a victim of the Barcelona Attack.

20.     Plaintiff Rhasia Love is a citizen of the United States domiciled in the State of California.  She is the daughter of decedent Jared Tucker, a victim of the Barcelona Attack.

21.     Plaintiff Veda Love is a citizen of the United States domiciled in the State of Wisconsin.  She is the daughter of decedent Jared Tucker, a victim of the Barcelona Attack.

22.     Defendant Lafarge S.A. ("Lafarge") is a multinational building materials

business organized under the laws of France and headquartered in Paris, France.

## JURISDICTION AND VENUE

23.     Plaintiffs, all citizens of the United States, were killed or injured by acts of international terrorism that arose from the Defendant's conspiracy to support ISIS.

24.     As a result, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333(a) and 2338.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (d).

26.     Defendant is subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because, pursuant to a conspiracy, they: transacted business and committed tortious acts within the United States (and New York) by transferring funds through the United States (and New York) for ISIS's benefit; and purposefully availed themselves of the benefits and protections offered by the New York banking system and New York law in the course of committing the wrongful acts Plaintiffs allege.  In addition, throughout the course of the conspiracy, Defendant recognized that ISIS used its funding to carry out terrorist attacks designed to kill United States citizens.

27.     As explained in greater detail below, Lafarge's conduct had a substantial nexus to the United States and to New York, including by virtue of repeated and systematic use of U.S. dollar transactions and banks in New York to pay, conspire with, and aid and abet terrorists.  Lafarge thereby purposefully availed itself of U.S. jurisdiction to commit the tortious acts described in the Complaint, which enabled ISIS to carry out terrorist attacks that killed U.S. citizens, thereby injuring Plaintiffs.

28.     To carry out their conspiracy, Lafarge and its subsidiary Lafarge Cement Syria S.A. ("LCS") purposefully made U.S.-dollar payments to terrorist intermediaries and others

that were wired through New York.  Indeed, Defendant's "preferred option" for paying terrorists was to make "bank transfer[s] in USD," which were designed to avoid detection by Defendant's auditors and governmental entities.

29.     For example, on at least one occasion, Defendant knowingly accessed and utilized the banking system in the United States to pay a $210,000 invoice in furtherance of its conspiracy with ISIS.  The invoice was paid via a wire transfer from Lafarge's operating account at a financial institution in Paris, through the Eastern District of New York, to intermediary banks in New York City, which transmitted the wire to an account at a financial institution in Dubai held by a company acting as an intermediary between Defendant and ISIS. The contract pursuant to which that payment was made required Defendant to make ongoing monthly payments of $30,000.

30.     Defendant's executives sent emails confirming that numerous other payments in furtherance of their conspiracy with ISIS were made in U.S. dollars.  International U.S.-dollar banking transfers are cleared through financial institutions that deal in U.S. dollars in New York, known as intermediary banks.

31.     By routinely and purposefully engaging in U.S. dollar-denominated transactions that were processed through New York, Defendant purposefully availed itself of the benefit of doing business in New York.

32.     In addition, Defendant's executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their corporate email addresses, to coordinate and carry out elements of their partnership with ISIS.  U.S.-based email service providers are considered more secure than non-U.S.-based providers.

33.     Defendant is also subject to personal jurisdiction given its participation in a conspiracy with ISIS, whose actions were at all relevant times directed at the United States, including the killing of Americans.

34.     First, Defendant and ISIS were in a conspiracy to provide material support to FTOs in violation of U.S. criminal law, namely, 18 U.S.C. § 2339B.

35.     Second, Defendant participated in that conspiracy by making millions of dollars in payments to ISIS, which allowed ISIS to carry out terrorist attacks and engage in other unlawful acts.

36.     Third, ISIS's terrorist attacks were expressly directed at the United States.  For example, in August 2014, ISIS broadcasted its beheading of U.S. journalist James Foley, and threatened the life of another American journalist, Steven Sotloff, if President Obama did not end military operations in Iraq.  Tellingly, the beheading videos of both Foley and Sotloff (in September 2014) were titled "Message to America" and "A Second Message to America," respectively.  ISIS stated that its killing of Sotloff was specifically in response to U.S. airstrikes targeting it in Iraq.

37.     Likewise, in September 2014, ISIS spokesperson Shaykh Abu Muhammad Al-'Adnani ash-Shami gave a speech entitled "Indeed, Your Lord is Ever Watchful," in which he explicitly spelled out the anti-American objectives of the ISIS movement, stating, for example:

> O Allah, America, France, and their allies transgressed against us.
> They came with their legions to fight us out of their enmity for
> your religion.  They prevent us from establishing your religion and
> your hudūd (fixed punishments), and ruling by what you revealed.
> O Allah, you know our weakness.  We have no way to deal with
> their airplanes.  O Allah, you have said what is true, 'So do not
> weaken and do not grieve, and you will be superior if you are
> [true].  O Allah, we have believed in you and relied upon you.
> You are sufficient for us and the best disposer of affairs.  O Allah,

America and its allies disbelieve in you and associate partners with you.

38.     A leading terrorism expert testified before the Subcommittee on counterterrorism and Intelligence of the House Committee on Homeland Security that the "U.S. military has ostensibly become a primary target for the Islamic State."

39.     The United States has convicted ISIS terrorists based on their targeting of the United States.  For example, on September 2, 2021, former British citizen Alexanda Amon Kotey pleaded guilty in the Eastern District of Virginia to an eight-count indictment consisting of one count of conspiracy to commit hostage taking resulting in death; four counts of hostage taking resulting in the deaths of four Americans (James Foley, Kayla Mueller, Steven Sotloff and Peter Kassig); one count of conspiracy to murder U.S. citizens outside of the United States; one count of conspiracy to provide material support or resources to terrorists resulting in the deaths of U.S., British and Japanese nationals; and one count of conspiracy to provide material support or resources to a designated FTO resulting in the deaths of U.S., British, and Japanese nationals, for his participation in ISIS's hostage-taking and terrorist activities.

40.     On April 14, 2022, a federal jury in the Eastern District of Virginia convicted Kotey's co-conspirator, former British citizen El Shafee Elsheikh, for his participation in the same ISIS scheme.  Witnesses at the trial presented evidence from November 2012 through February 7, 2015, of Elsheikh's participation in torturing the hostages.

41.     ISIS's overt acts targeted the United States and U.S. citizens.  Defendant conspired with ISIS, including towards ISIS's targeting of American citizens.  As a result of the conspiracy between Defendant and ISIS, ISIS's overt acts targeting the United States and U.S. citizens, including the attacks detailed in this Complaint, are attributable to Defendant.

42.     Based on conduct that occurred "within the Eastern District of New York and

the extraterritorial jurisdiction of the United States," the Department of Justice charged Defendant and LCS with conspiring to provide material support to terrorists. The Department of Justice further charged that "the defendants were brought into and found in the United States, the offense occurred in part within the United States, the offense occurred in and affected interstate and foreign commerce, and the defendants conspired with a national of the United States." Based on these contacts with the United States, Lafarge "admit[ted] the Court's jurisdiction over the Defendants and the subject matter of such action . . . ."

## THE FACTUAL BASES FOR PLAINTIFFS' CLAIMS

### A.    Background on ISIS

43.    On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid Wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1 (b) of Executive order 13224.

44.    On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section l(b) of Executive Order 13224 to add the alias Islamic State of lraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS," which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-lslamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and AI-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS has remained a designated FTO. ISIS has claimed credit for numerous terrorist activities.

45.    In or around 2011, the combination of civil protests in Syria and the Syrian

government's violent suppression of those protests developed into a full-fledged civil war, which remains ongoing.  In or about September 2011, the European Union ("EU") imposed an embargo on Syrian petroleum products to further isolate and weaken the Syrian regime in response to its brutal crackdown on opposition groups within the country.  Under the new sanctions, all 27 EU member states were barred from buying, importing or transporting oil and other petroleum products from Syria, and from entering into financial or insurance services for such transactions.  On or about December 1, 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

46.     In 2012, ISIS gained control of territory in Syria and committed numerous terrorist acts, resulting in the deaths of numerous U.S. citizens among others.

47.     The EU sanctions and U.N.'s recognition of the Syrian civil war were followed by an exodus of multinational corporations from Syria.  For example, on December 2, 2011, a Dutch petroleum conglomerate announced that it was pulling out from Syria in response to the sanctions.  Three days later, one of the world's largest oil companies, headquartered in France, announced that it was halting operations in Syria due to, among other factors, safety concerns.  Other international corporations quickly followed suit.

48.     ISIS's leadership issued multiple public calls for attacks against U.S. and Western interests around the world, and the group made similar calls for attacks in its English-language magazine, Dabiq.  ISIS members and sympathizers planned and conducted attacks at a previously-unprecedented pace—at least 37 plots between February 2014 and July 2015.[1]

49.     As outlined above, ISIS has repeatedly targeted American citizens.  For instance, journalist and video reporter James Foley was working as a freelance war

---

[1] https://www.dni.gov/nctc/groups/isil.html

correspondent during the Syrian Civil War, when he was abducted on November 22, 2012, in northwestern Syria.  He was murdered by ISIS by decapitation in August 2014.  ISIS posted a video of the murder to YouTube.

50.    In August 2013, Steven Joel Sotloff, an American-Israeli journalist, was kidnapped in Aleppo, Syria, and held captive by ISIS militants.  On September 2, 2014, ISIS released a beheading video, showing one of its members murdering Sotloff.  Following Sotloff's murder, then-U.S. President Barack Obama stated that the United States would take action to "degrade and destroy" ISIS.

51.    To grow as quickly as it did from a small armed group in 2013 to an international terrorist organization with swathes of territory in 2014, ISIS needed money—and a lot of it.  Thus, ISIS robbed the resources under its control, including by exploiting manufacturing plants, looting banks, pumping oil and gas to sell on the black market, taxing agricultural products, selling humans as slaves, and demanding passage tolls and protection payments.

52.    Capturing cement plants was an essential part of ISIS's growth plan.  Between its territory in Syria and Iraq, ISIS seized five cement plants, which could produce a total of $583 million in annual revenue.  Cement plants were a particularly appealing target for a number of reasons, including that they generated significant revenue from which ISIS could pilfer; they contained raw materials that ISIS could use to create explosives; and ISIS had distribution networks it used to sell cement.

53.    Of the five cement plants ISIS seized, Lafarge's Cement Plant was by far the largest.  In fact, the production capacity of the Cement Plant was more than twice as much as that of the second largest plant.  And ISIS did not simply capture and rob the Cement Plant.

Rather, before ISIS overran the Cement Plant and seized all the materials Lafarge left behind,

Defendant and ISIS had become close business partners, generating millions of dollars in

profit for Lafarge, and millions of dollars in funding for ISIS.

**B.      Defendant's Guilty Plea**

54.      On October 18, 2022, the Department of Justice announced its first-ever

prosecution of a corporation for providing material support for terrorism.  According to

Deputy Attorney General Lisa O. Monaco, Defendant and LCS "partnered with [the Islamic

State in Iraq and Syria ("ISIS")], one of the most brutal terrorist organizations the world has

ever known, to enhance profits and increase market share— all while ISIS engaged in a

notorious campaign of violence during the Syrian civil war."

55.      Based on the heinous conduct underlying their guilty plea, Defendant and LCS

were sentenced to pay $778 million in criminal fines and forfeiture.

56.      As part of their plea agreement, Lafarge and LCS agreed to a 52-page

Statement of Facts detailing their unlawful conduct ("Statement of Facts").  *See United States*

*v. Lafarge S.A. et al.*, No. 1:22-cr-00444 (E.D.N.Y. Oct. 18, 2022), ECF No. 10.  Plaintiffs

incorporate the Statement of Facts into this Complaint in its entirety as though fully set forth

herein.  Lafarge agreed in its guilty plea that it "will not dispute the Statement of Facts . . . ."

**C.      Defendant Conspired to Fund ISIS**

57.      Lafarge maintained an indirect subsidiary organized under the laws of Syria and

headquartered in Damascus, Syria titled Lafarge Cement Syria S.A.  Lafarge indirectly owned

approximately 98.7% of LCS's issued and outstanding share capital through four separate

subsidiaries.  From approximately May 2010 to September 2014, Lafarge, through LCS,

operated a cement plant in the Jalabiyeh region of Syria, located in Northern Syria near the

Turkish border and between the cities of Manbij and Raqqah, Syria (the "Jalabiyeh Cement

Plant").

58.    Lafarge and LCS completed the construction of the Jalabiyeh Cement Plant in 2010 at a cost of approximately $680 million.

59.    In 2011, civil protests in Syria erupted into a full civil war.  In September 2011, the European Union barred its member states from buying, importing, and/or transporting oil and other petroleum products from Syria, and from entering into financial or insurance services for such transactions.  Similarly, the United States forbid import of its products into Syria, embargoed Syrian oil, and froze the assets of several Syrian individuals.  And in December 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

60.    In 2012, as the civil war continued, ISIS gained control over large swaths of Syria and committed brutal terrorist acts.  ISIS killed thousands, among them numerous U.S. citizens, including through graphic and well-publicized beheadings.

61.    Even though armed conflict had spread to the area immediately surrounding Lafarge's Cement Plant—indeed, LCS employees were being kidnapped and LCS trucks were being hijacked—Lafarge and LCS doubled down on their investment and joined forces with the terrorists, instead of ending their operations in Syria.  Not only did Lafarge and LCS want to gain protection from the terrorists, but they wanted to remain in Syria so that they would not lose their investment of over a half a billion dollars and would be positioned to sell cement for higher profits without competition from the businesses that had fled the country.

62.    LCS, with the knowledge and approval of Lafarge, conspired to engage in transactions, through intermediaries, with members and representatives of ISIS in the region of the Jalabiyeh Cement Plant.

63.     While other multinational corporations withdrew from and ceased operations in Syria, Lafarge and LCS executives, through intermediaries, negotiated agreements to pay ISIS to protect LCS employees, to ensure continued operation of the Jalabiyeh Cement Plant, and to obtain an economic advantage over their competitors in the Syrian cement market.

64.     Lafarge and LCS executives also conspired to make periodic security payments to ISIS and to purchase raw materials from ISIS-controlled suppliers who paid ISIS based on the amount of their sales to LCS.

65.     Moreover, for the explicit purpose of incentivizing ISIS to act in a manner that would promote Lafarge's and LCS's security and economic interests, Lafarge and LCS conspired to make payments to ISIS based on the volume of cement that LCS sold— effectively a revenue-sharing agreement that Lafarge and LCS executives likened to paying "taxes" to ISIS.  In exchange, ISIS permitted access to raw materials sourced from territory under its control so that the Jalabiyeh Cement Plant could continue to produce cement, and further allowed LCS employees, suppliers and customer-distributors to safely pass through ISIS checkpoints on the roads leading to the Jalabiyeh Cement Plant.  ISIS also agreed to impose costs on, and in some cases block the importation of, competing cement from Turkey.

66.     Specifically, from in or around August 2013, or earlier, through October 2014, Lafarge and LCS conspired to make various payments, through intermediaries, to and for the benefit of ISIS, which the U.S. government has estimated totaled the equivalent of approximately $5.92 million.  These payments consisted, at various times, of flat monthly "donation" payments totaling approximately $816,000, payments to ISIS-controlled suppliers to purchase raw materials needed to produce cement that totaled approximately $3,447,528, and variable payments based on the amount of cement LCS sold that totaled approximately

$1,654,466.

67.     In addition, Lafarge and LCS conspired to pay the equivalent of approximately $1,113,324 to third-party intermediaries for negotiating with and making payments to ISIS and and other terrorist groups on Lafarge's and LCS's behalf.  One such payment, totaling $210,000, was paid with a wire transfer from Lafarge's operating account at a financial institution in Paris, through the Eastern District of New York, to intermediary banks in New York City, which transmitted the wire to an intermediary's account at a financial institution in Dubai.

68.     During the time period from August 2013 to October 2014, LCS obtained the equivalent of approximately $70,295,820 in total sales revenue through its participation in the conspiracy, and the gross gains to all participants in the conspiracy, including LCS, the intermediaries, and ISIS totaled approximately $80,541,890.

69.     When LCS eventually evacuated the Jalabiyeh Cement Plant in September 2014, ISIS stole cement that LCS had produced in furtherance of the conspiracy, and ISIS sold the cement at prices that would have yielded ISIS approximately $3.21 million.

70.     Had Lafarge and LCS refused to deal with ISIS, LCS would not have been able to acquire the raw materials needed to operate the Jalabiyeh Cement Plant and produce cement, and ISIS would have used force and threats of force to prevent LCS's employees and customers from traveling there to do their jobs and purchase the cement that LCS had produced.

71.     LCS engaged in this conduct at the direction of Lafarge's and LCS's senior management for the specific purpose of protecting Lafarge's and LCS's employees, assets, and future economic opportunities in Syria.  As one Lafarge executive later wrote in an August 27,

2017 response to his August 25, 2017, termination from Lafarge, "All the local concessions that I had to make to this end were made with the clear and repeated approval of my hierarchy, regarding the details as well as the principle." The executive added, "Nothing I did was unknown to my hierarchy who methodically approved my initiatives, including all the details, and was satisfied about them."

72.     Defendant was fully aware that they were transacting with terrorists and that its conduct flagrantly violated U.S. law. Indeed, Defendant's executives frequently communicated about the challenges of dealing with armed militants who were "classified as terrorists by international organizations and the US."

73.     Lafarge and LCS executives actively attempted to conceal their conduct from others within and outside Lafarge and LCS, including by using third-party intermediaries to carry out negotiations and effect these agreements with ISIS, and by attempting to require ISIS not to include the name "Lafarge" on the documents memorializing and implementing their agreements. Many of the Lafarge and LCS executives involved in the offensive conduct also used personal email accounts serviced by U.S.-based email service providers, instead of their Lafarge corporate email addresses, to carry out some aspects of the conspiracy.

74.     Lafarge and LCS executives also created invoices with false descriptions for the third-party intermediaries they used to negotiate with ISIS, in order to conceal the nature of the work that the intermediaries had performed for Lafarge and LCS, and to allow Lafarge and LCS to later falsely deny knowledge of their activities.

75.     Defendant's payments to and business partnership with ISIS provided ISIS the seed capital it needed to transform from a fledgling militia in the early 2010s into a brutal terroristic behemoth with the capability and intent to kill Americans. They allowed ISIS to

create more explosives, capture more territory, recruit new members, and expand to new regions and countries.  Not only were these consequences a foreseeable risk of doing business with ISIS, they were inevitable.  Defendant put its economic self-interest above all else—ultimately making over $70 million in sales through its partnership with ISIS—even while ISIS was slaughtering innocent civilians, including Americans.

76.   Overall, Lafarge and LCS conspired to provide material support to the designated foreign terrorist organization ISIS, negotiated revenue-sharing agreements with ISIS to seek an economic advantage, and concealed their payments, falsified records, and backdated contracts in pursuit thereof.

**D.   The Terrorist Attacks**

**1.   The November 9, 2015 Shooting At The International Police Training Center In Amman, Jordan**

77.   Lloyd Carl Fields, Jr. travelled to Jordan on June 12, 2015, as a government contractor through DynCorp International.  His trip to Jordan was only supposed to last two weeks, but problems with his Israeli work visa kept him there longer.

78.   James Damon Creach arrived in Jordan on October 15, 2015, where he was working through the government contractor DECO, Inc.  Mr. Creach was scheduled to return home to Florida on December 5, 2015.

79.   While in Jordan, Carl and Damon were assigned to the International Police Training Center ("IPTC") in the Muwaqqar district of southeast Amman, Jordan—a facility run and funded in part by the U.S. State Department.  There, they both used their years of experience as police officers to train law enforcement personnel from Jordan, Iraq and the Palestinian Territories in basic police and security skills.  Carl had previously served as a Deputy Sheriff in Calcasieu Parish, Louisiana, and as a police advisor in both Iraq and

Afghanistan.  Damon was a graduate of the Virginia Beach Policy Academy, a former police officer in the Virginia Police Department and had trained police officers in Afghanistan, Kenya and other locations.

80.    Carl and his wife Tamara considered his assignment to Jordan a safe one because Jordan is a U.S. ally and it has not experienced the levels of terrorism and unrest that have spread throughout the Middle East in recent years.  Carl's mission appeared so safe, in fact, that he was not issued a weapon to carry with him.

81.    Damon and his wife Heather also believed that his trip to Jordan did not involve any great danger.  On the day of the attack in which he was killed, Damon was not armed, he was not wearing body armor or protective gear, and his vehicle was not armored.

82.    Anwar Abu Zaid was a 28-year old Jordanian police captain studying at the IPTC.  On November 9, 2015, Abu Zaid arrived at the IPTC smuggling a Kalashnikov assault rifle with 120 bullets and two handguns in his car.  As an officer, he was not searched as he entered.  After the noontime prayer, Abu Zaid shot at a truck that was moving through the facility, killing Damon.  Abu Zaid then entered the facility's cafeteria where he killed an additional four people eating lunch, including Carl.

83.    According to FBI investigators, Zaid did not know either Carl or Damon; he targeted them simply because they were U.S. citizens.

84.    ISIS claimed responsibility for the attack in a statement issued through their al-Battar Media Foundation: "Yes . . . we kill the Americans in Amman," the terror group said.  A few weeks later, ISIS reiterated this claim in its Dabiq Magazine, Issue 12: "And on '9 November 2015,' Anwar Abu Zeid—after repenting from his former occupation—attacked the American crusaders and their apostate allies, killing two American crusaders, two Jordanian

apostates, and one South African crusader.  These are the deeds of those upon the methodology of the revived Khilāfah.  They will not let its enemies enjoy rest until enemy blood is spilled in revenge for the religion and the Ummah."

85.     According to Israeli military intelligence, Abu Zaid was a graduate of al-Mutah University in al-Karak, Jordan where he was part of a clandestine ISIS terror cell.  That same cell was responsible for a suicide attack near Mosul, Iraq in 2015 and a shooting at the Sarona Market in Tel Aviv, Israel in 2016.

86.     On the day of the attack killing Carl and Damon, Tamara saw that she missed a call from the U.S. embassy and she knew that something was wrong.  Tamara called back and, when she eventually got through, she was told that Carl had been killed.  The murder of her husband Carl by an ISIS operative has caused her severe mental anguish, extreme emotional pain and suffering, and the loss of her husband's society, companionship, comfort, advice and counsel.  Furthermore, Carl provided substantial financial support to his wife.

87.     That same day, Heather was notified by her husband's company DECO that Damon had been killed.  She later received a call from the U.S. Embassy in Jordan confirming his death.  Heather was then tasked with telling her children that their father was dead.  The murder of their husband and father Damon by an ISIS operative has caused Heather, Jackson, Samantha, and Jayedon severe mental anguish, extreme emotional pain and suffering, and the loss of Damon's society, companionship, comfort, advice and counsel.  Furthermore, Damon provided substantial financial support to his wife and children.

## 2.     The July 14, 2016 Cargo Truck Attack In Nice, France

88.     On July 14, 2016, the Copeland family was enjoying their dream vacation in Nice, France, taking in the city's Bastille Day celebrations.  Kimberly Harris (then named Kimberly Copeland) and Sean Copeland, along with their three children Brodie, Austin and

Maegan, had all travelled to Europe.  Sean's life goal had been to take his family to Europe

and they celebrated multiple birthdays while there.  Sean, 51, was a devoted father of three

who prided himself on being a "dance dad," a "football dad," and a "baseball dad."  Brodie,

11, was a bright, fun-loving, "one-of-a-kind kid," with aspirations of becoming a professional

baseball player, a Hollywood actor, and U.S. President.  Brodie was Kimberly's only

biological child.

89.     Days earlier, the family had been in Pamplona, Spain, where Sean and Austin

ran with the bulls.  According to Austin, after running 200 yards his dad was the happiest he

had ever seen him.  "This was his moment.  I would never forget the joy on his face that day."

90.     After leaving Spain, the Copeland family traveled together to France.  Missing

home, they spent their last hours in France together at a Hard Rock Café.  After a family

dinner of burgers and beers, the family headed to the Promenade des Anglais along the

Mediterranean Sea with 30,000 others to take in the Bastille Day celebrations, music and

fireworks.

91.     At approximately 10:00 PM, shortly after the fireworks, ISIS operative

Mohamed Lahouaiej Bouhlel drove a 19-ton refrigeration truck through police barriers and

onto the crowded Promenade des Anglais, which had been closed off to all traffic.  Bouhlel

carried an automatic pistol, bullets, a fake automatic pistol, and two replica assault rifles (an

M16 machine gun and a Kalashnikov), as well as an empty grenade.

92.     Bouhlel started running over people slowly, until two police officers opened

fire, at which point he accelerated at full speed towards the dense crowd.  Witnesses described

the sounds of the truck hitting people "like empty thuds," as Bouhlel reached an estimated 56

miles per hour, surging through a sea of people.  Bouhel zigzagged through the crowd for over

a mile, aiming for as many people as possible.

93.     A witness on a motorcycle attempted to overtake Bouhlel's truck and even tried to open the driver's door, but was unsuccessful.  Bouhlel then began shooting through the cab window at police officers, firing several times on three police officers close to the Hotel Negresco.  Bouhlel was screaming out "Allahu Akbar" throughout the attack.

94.     The truck finally came to a halt near Nice's Palais de la Mediterranée, a hotel adjacent to the beach, and Bouhlel continued to fire at police with his handgun.  Two police officers fired repeatedly at the cabin of the truck and Bouhlel was killed.

95.     Two days after the Nice Attack, on July 16, 2016, ISIS issued a statement in its AMAQ publication claiming responsibility and describing Bouhlel as a "soldier of the Islamic State."  The statement read, "Executor of the deadly operation in Nice, France was a solider of the Islamic State.  He executed the operation in response to calls to target citizens of coalition nations, which fight the Islamic State."

96.     In the fifteenth issue of ISIS's propaganda magazine Dabiq, ISIS again boasted about the Nice Attack, listing Bouhlel among the "soldiers of the Caliphate" who has "succeeded in expanding the territory of the Caliphate, or terrorizing, massacring, and humiliating the enemies of Allah."  Citing Bouhlel's attack as an operation that "the Islamic State has conducted," ISIS praised the Nice Attack as an action "in response to the Islamic State's calls to target nations participating in the Crusader coalition fighting the Caliphate."

97.     Authorities believe Bouhlel carefully plotted and planned his attack for up to a year with accomplices and ISIS operatives.

98.     Bouhlel's 1.5-mile terrorist attack killed 86 people, injuring an additional 434.

99.     Among those killed were Sean and Brodie Copeland.  Kimberly, Austin and

Maegan only survived the attack because Sean heroically warned them as the truck careened towards the family.  Kimberly, Austin, and Maegan were devastated by the losses of Sean and Brodie.  They suffered and will continue to suffer severe psychological and emotional harm, as well as loss of consortium as a result of the terrorist attack that killed Sean and Brodie.  Furthermore, Sean provided substantial financial support to his wife and children.

**3.      The August 17, 2017 Van Attack On La Rambla In Barcelona, Spain**

100.     Jared Tucker, 42 years old, was a devoted father to three girls.  On August 17, 2017, Jared was in Barcelona on vacation.  On his way to a local beach, he stopped for sangria at a café on La Rambla, a crowded pedestrian mall popular with tourists.

101.     Minutes later, ISIS operative Younes Abouyaaqoub drove a three-ton van into the dense crowds on La Rambla, reaching speeds of up to 50 miles per hour.  Abouyaaqoub zigzagged through the sea of people, deliberately aiming to run over and kill as many as possible.  After 500 meters, the van finally came to a halt after hitting a newspaper kiosk, stopping at the famous Joan Míro mosaic.  Abouyaaqoub, wearing a fake explosive belt and carrying numerous knives, exited the van and blended in with the crowd, escaping.  Utilizing ISIS connections and safe houses, Abouyaaqoub evaded arrest for four days until he was found and killed by authorities.

102.     Among the 13 killed on La Rambla was Jared Tucker.  Another 130 were injured.

103.     The next day, on August 18, 2017, ISIS issued a statement claiming direct responsibility for the Barcelona Attack, describing Abouyaaqoub and others supporting him as "soldiers of the Islamic State."  The statement was published by the news agency AMAQ, which is frequently used and supported by ISIS.  The statement read, "the perpetrators of the attack in Barcelona are Islamic State soldiers and carried out the operation on command of

Khilafah of targeting coalition countries."

104.    ISIS has claimed responsibility for the Barcelona attack repeatedly since that time, including in its propaganda magazine, Rumiyah, and in videos featuring and praising Abouyaaqoub.

105.    Plaintiffs Rhasia Love, Veda Love, and Khalesi Love, Jared Tucker's daughters, were devastated by the loss of their beloved father.  They suffered and will continue to suffer severe psychological and emotional harm, as well as loss of consortium as a result of the terrorist attack that killed Jared Tucker.  Jared Tucker also provided each of his daughters with substantial financial support.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### AIDING AND ABETTING A FOREIGN TERRORIST
### ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2333(d)

106.    Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

107.    Plaintiffs assert this cause of action against Defendant under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.

108.    Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

109.    ISIS was a foreign terrorist organization ("FTO") when it committed, planned, and authorized the terrorist attacks that injured the Plaintiffs and killed their family members.

110.    Those terrorist attacks were acts of international terrorism, as defined by 18 U.S.C. § 2331.  The attacks: (a) involved violence and endangered human life; (b) would have violated federal and state criminal law, had they been committed in the United States; (c)

23

appeared to be intended to intimidate or coerce the civilian populations of the United States, to influence the policies of the American governments, and to affect the policies of those governments through violent action; and (d) occurred primarily outside the United States and transcended national boundaries in that ISIS raised money internationally, intended to impact the citizens and governments of the United States, operated internationally and sought asylum in multiple countries in the Middle East.

111.    Defendant knowingly provided substantial assistance to those acts of international terrorism.

112.    The substantial assistance that Defendant knowingly provided to ISIS included: (a) transferring significant sums of money to ISIS, its operatives, and its front organizations; (b) repeatedly transacting with ISIS for purchases of raw materials and supplies; and (c) entering into a revenue-sharing agreement with ISIS.

113.    Defendant's services and support provided encouragement to would-be terrorists and incentivized their future attacks, including the attacks that killed and injured Plaintiffs and their family members.

114.    At the time Defendant provided that substantial assistance to ISIS, Defendant knew that: (a) the U.S. government had designated ISIS as a terrorist organization; (b) ISIS and its operatives engaged in terrorism, including the attacks alleged herein; and (c) the financial assistance that Defendant was providing to ISIS was essential to its ability to carry out terrorist attacks, including the attacks that killed and injured Plaintiffs and their family members.

115.    Defendant knew that its substantial assistance would facilitate the ability of ISIS to carry out its terrorist attacks against Plaintiffs, their family members, and other

civilians.  As a result, Defendant recognized that it played an integral role in ISIS's terrorist activities.

116.    The assistance that Defendant provided to ISIS was a substantial factor in causing Plaintiffs' injuries.  Moreover, Plaintiffs' injuries were a foreseeable result of that substantial assistance.

117.    As a direct and proximate result of the substantial, knowing assistance that Defendant provided to ISIS, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

118.    Defendant knowingly aided and abetted ISIS within the meaning of 18 U.S.C. § 2333(d), which Congress enacted to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."  *See* JASTA, § 2b.

119.    Defendant is therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## SECOND CAUSE OF ACTION
## CONSPIRING WITH A FOREIGN TERRORIST
## ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2333(d)

120.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

121.    Plaintiffs assert this cause of action against Defendant under 18 U.S.C. § 2333(d) and JASTA § 2b.

122.    Plaintiffs are nationals of the United States or the estates, survivors or heirs of

U.S. nationals.

123.    Defendant conspired with LCS, ISIS, and others to bring about acts of international terrorism against Americans.

124.    Defendant Lafarge joined the conspiracy by agreeing, among other things, expressly or tacitly, to raise funds for ISIS although the U.S. government had designated ISIS as an FTO.  Lafarge additionally (a) transferred significant sums of money to ISIS, its operatives, and its front organizations; (b) repeatedly transacted with ISIS for purchases of raw materials and supplies; and (c) entered into a revenue-sharing agreement with ISIS.  By engaging in that conduct, Lafarge furthered the goals of its conspiracy with LCS and ISIS.

125.    Defendant knew that, by funneling money to ISIS, it was joining a conspiracy intended to commit acts of international terrorism, including the murder of Americans.

126.    Overall, Lafarge conspired to provide material support to a designated foreign terrorist organization, negotiated revenue-sharing agreements with ISIS to seek an economic advantage, and concealed their payments, falsified records, and backdated contracts in pursuit thereof.

127.    As a direct and proximate result of the Defendant's conspiracy and the steps it knowingly took in furtherance thereof, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

128.    Defendant is therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

<u>**THIRD CAUSE OF ACTION**</u>
**PROVIDING MATERIAL SUPPORT TO TERRORISTS**
**IN VIOLATION OF 18 U.S.C. §§ 2339A AND 2333(a)**

129.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

130.     Plaintiffs assert this claim against Defendant for violations of 18 U.S.C. §§ 2333(a) an 2339A.

131.     Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

132.     The financial assistance that Defendant provided to ISIS constituted material support of that terrorist organization and facilitated ISIS's efforts to engage in acts of international terrorism, including the attacks that killed and injured Plaintiffs and their family members.

133.     Defendant provided that material assistance to ISIS knowing or intending that ISIS would use that material assistance to prepare for or carry out terrorist attacks, such as the attacks that killed and injured Plaintiffs and their family members.

134.     The material assistance that Defendant provided to ISIS constituted activities dangerous to human life that violated 18 U.S.C. § 2339A and that were either unlawful under state law, including New York Penal Law §§ 490.10 and 490.15, or would have been unlawful under that state law if committed in the United States.

135.     The material assistance that Defendant provided to ISIS was dangerous to human life because that assistance enabled ISIS to finance its violent attacks and recruit individuals to carry out those attacks.  The financial assistance that Defendant provided to ISIS also enabled it to attract additional donors and recruits for its terrorist operations.

136.     The actual and apparent intent of the acts for which Defendant provided material assistance to ISIS was: (i) to intimidate or coerce the civilian populations of the

United States; (ii) to influence the policies of the United States by means of intimidation and coercion; or (iii) to affect the conduct of the government the United States by mass destruction, assassination, or kidnapping.

137.    The substantial financial assistance that Defendant provided to ISIS occurred primarily outside the United States and transcended national boundaries in that Defendant operated internationally in providing financial assistance to ISIS.

138.    As a result, Defendant committed acts of international terrorism, as defined by 18 U.S.C. § 2331.392.  ISIS did rely upon the financial assistance and material support provided by Defendant in carrying out its terrorist activities.

139.    ISIS engaged in acts of physical violence outside of the United States with the intent to kill or to cause serious bodily injuries to Plaintiffs, nationals of the United States. ISIS engaged in that illicit conduct pursuant to a joint plan and conspiracy with Defendant and others.

140.    ISIS's acts of violence caused the injuries that Plaintiffs suffered and the deaths of Plaintiffs' family members.

141.    The material support and substantial assistance that Defendant provided to ISIS was a substantial factor in causing Plaintiffs' injuries.  Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Defendant provided to ISIS.

142.    As a direct and proximate result of the material support and substantial assistance that Defendant knowingly provided to ISIS, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

143.    Defendant is therefore liable to Plaintiffs for damages in an amount to be

determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

### FOURTH CAUSE OF ACTION
### PROVIDING MATERIAL SUPPORT TO A FOREIGN
### TERRORIST ORGANIZATION IN VIOLATION OF
### 18 U.S.C. §§ 2339(B)(a)(1) AND 2333(a)

144.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

145.    Plaintiffs assert this claim against Defendant for violation of 18 U.S.C. §§ 2333(a) and 2339B(a)(1).

146.    Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

147.    At the time of the attacks that injured Plaintiffs, ISIS was an FTO.

148.    At that time, Defendant knew that ISIS was an FTO, that it engaged in terrorist activity (as defined in 8 U.S.C. § 1182(a)(3)(B)), and that it engaged in terrorism (as defined in 22 U.S.C. § 2656f(d)(2)).

149.    As Plaintiffs allege in detail above, Defendant provided material support to ISIS.

150.    That material support was integral to the ability of ISIS to carry out its terrorist attacks, including the attacks that injured Plaintiffs and killed their family members.  As Plaintiffs allege in detail above, the material support that Defendant provided to ISIS constituted acts of international terrorism, as defined in 28 U.S.C. § 2331(1).

151.    The material support that Defendant provided to ISIS was a substantial and foreseeable factor in causing Plaintiffs' injuries.

152.    Moreover, Plaintiffs' injuries were a foreseeable result of the material support

and substantial assistance that Defendant provided to ISIS.

153.    As a direct and proximate result of the material support and substantial
assistance that Defendant knowingly provided to ISIS, Plaintiffs have suffered significant
physical, psychological, and emotional injuries.

154.    Defendant is therefore liable to Plaintiffs for damages in an amount to be
determined at trial, treble damages, and the payment of the attorneys' fees and expenses
incurred by Plaintiffs in connection with this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)     Accept jurisdiction over this action;

(b)     Enter judgment against Defendant and in favor of Plaintiffs for compensatory
damages in amounts to be determined at trial, and pre-judgment interest thereon;

(c)     Enter judgment against Defendant and in favor of Plaintiffs for treble damages
pursuant to 18 U.S.C. § 2333(a), and pre-judgment interest thereon;

(d)     Enter judgment against Defendant and in favor of Plaintiffs for any and all costs
sustained in connection with the prosecution of this action, including attorneys' fees,
pursuant to 18 U.S.C. § 2333(a), and pre-judgment interest thereon; and

(e)     Grant such other and further relief as justice requires.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of
any and all issues in this action so triable.

Dated:  January 10, 2023                    Respectfully submitted,

                                            **BURSOR & FISHER, P.A.**

                                            By:  */s/ Joshua D. Arisohn*

                                            Joshua D. Arisohn
                                            Matthew A. Girardi
                                            888 Seventh Avenue

New York, NY  10019
Telephone: 646-837-7150
Facsimile:  (212) 989-9163
E-Mail: jarisohn@bursor.com
        mgirardi@bursor.com

*Attorneys for Plaintiffs*