**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| TAMARA FIELDS, ESTATE OF LLOYD CARL FIELDS JR., by and through Tamara Fields as Personal Representative, HEATHER GAVINO, ESTATE OF JAMES DAMON CREACH, by and through Heather Gavino as Personal Representative, JACKSON CREACH, SAMANTHA CREACH, JAYEDON CREACH, KIMBERLY HARRIS, ESTATE OF SEAN COPELAND, by and through Kimberly Harris as Personal Representative, ESTATE OF BRODIE COPELAND, by and through Kimberly Harris as Personal Representative, AUSTIN COPELAND, MAEGAN COPELAND, KHALESI LOVE, RHASIA LOVE, and VEDA LOVE, | **Case No. 1:23-cv-00169**<br><br>**JURY TRIAL DEMANDED** |
|                    Plaintiffs, |  |
|     v. |  |
| LAFARGE S.A., LAFARGE CEMENT HOLDING LIMITED, and LAFARGE CEMENT SYRIA S.A., |  |
|                   Defendants. |  |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Tamara Fields, Estate of Lloyd Carl Fields Jr., by and through Tamara Fields as Personal Representative, Heather Gavino, Estate of James Damon Creach, by and through Heather Gavino as Personal Representative, Jackson Creach, Samantha Creach, Jayedon Creach, Kimberly Harris, Estate of Sean Copeland, by and through Kimberly Harris as Personal Representative, Estate of Brodie Copeland, by and through Kimberly Harris as Personal Representative, Austin Copeland, Maegan Copeland, Khalesi Love, Rhasia Love, and Veda Love (collectively, "Plaintiffs"), by and through their attorneys, allege the following against Defendants Lafarge S.A. ("Lafarge"), Lafarge Cement Holding Limited ("Lafarge Cyprus"), and

Lafarge Syria S.A. ("LCS") (collectively, "Defendants") upon information and belief, except as to those allegations concerning Plaintiffs, which they allege based upon their personal knowledge.

## INTRODUCTION

1.      Plaintiffs assert claims for wrongful death, personal injury, and related torts pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, against the members of a terrorism-financing conspiracy spearheaded by Defendant Lafarge.

2.      The members of that conspiracy sponsored and carried out a series of heinous terrorist attacks, including the attacks Plaintiffs describe below.

3.      This action arises out of three terrorist attacks carried out by the Islamic State of Iraq and Syria ("ISIS"), also known as the Islamic State of Iraq and the Levant ("ISIL"), the Islamic State ("IS"), ad-Dawlah al-Islāmiyah fīl-ʿIrāq wash-Shām ("DAESH") and al-Qaeda in Iraq ("AQI"): (1) the November 9, 2015 shooting at the International Police Training Center ("IPTC") in Amman, Jordan (the "Amman Attack"); (2) the July 14, 2016 cargo truck attack in Nice, France (the "Nice Attack"); and (3) the August 17, 2017 van attack on La Rambla in Barcelona, Spain (the "Barcelona Attack").

4.      ISIS carried out these attacks with material support and resources provided by Defendants. Defendants have admitted that they paid ISIS and Al-Nusra Front ("ANF") nearly $6 million dollars between July 2012 and October 2014. Defendants also admitted that they let ISIS seize over $3.1 million dollars of cement. The money paid by Defendants to ISIS went directly to ISIS's operations, including its acts of international terrorism.

5.      The substantial assistance that Defendants knowingly provided to ISIS included: (a) transferring significant sums of money to ISIS, its operatives, and its front organizations; (b)

repeatedly transacting with ISIS for purchases of raw materials and supplies; and (c) entering into a revenue-sharing agreement with ISIS.

6.     More specifically, at the specific direction of the companies' highest management levels—including the CEOs of both Lafarge and LCS—Defendants entered into and sustained a multi-faceted and mutually beneficial conspiracy with ISIS and intermediaries at the same time ISIS was killing Americans. For the explicit purpose of incentivizing ISIS to act in a manner that would promote their common interests, Defendants' executives agreed to make monthly payments to ISIS and ANF, to pay ISIS based on the volume of cement LCS sold, to purchase raw materials from ISIS-controlled suppliers, and to sell its cement to ISIS. Defendants ultimately solidified their relationship with ISIS by entering into a formal revenue-sharing agreement. Transactions in furtherance of this criminal conspiracy were purposefully made in U.S. dollars and transferred through and processed in New York.

7.     Defendants received crucial benefits in exchange for these payments. ISIS permitted access to raw materials sourced from the expanding territory and markets under its control so that the Cement Plant could produce cement; ISIS allowed LCS employees, suppliers, and customer-distributors safe passage through terrorist checkpoints; and ISIS agreed to impose costs on, and in some cases block the importation of, competing cement from Turkey. ISIS—quite literally—agreed to take out Defendants' competition.

8.     Defendants' knowing provision of material support to ISIS enabled ISIS to expand the territories and markets under its control, fund low-cost acts of terrorism directed at Americans, and build the infrastructure necessary to kill Americans.

9.     Defendants referred to their "profit" as a "cake," and stated they were happy to "share" a slice with ISIS so long as ISIS continued to protect and enhance Defendants' interests.

10.     Defendants were fully aware that they were transacting with ANF and ISIS, and that their conduct flagrantly violated U.S. law. Indeed, Defendants' executives frequently and expressly communicated about the challenges of dealing with those who were "classified as terrorists by international organizations and the US."[1]

11.     To avoid detection, Defendants went to great lengths to conceal their relationship with ANF and ISIS. For one thing, rather than directly transacting with terrorists, Defendants worked through intermediaries. As one LCS security consultant admitted, "it was especially important that the relationship would be handled by [intermediaries], since an exposure of this sort would have been compromising for LCS. But via [intermediaries], we did in fact contribute to the economy of ISIS." Relatedly, Defendants ensured that documents regarding terrorist payments did not reference the word "Lafarge." For example, LCS's CEO instructed an intermediary that "the name of Lafarge should never appear for obvious reasons in any documents of this nature. Please use the words Cement Plant if you need but never the one of Lafarge." Finally, Defendants purposefully availed themselves of U.S. dollar transactions routed through the U.S. financial system and personal email addresses using services based in the United States—rather than Lafarge email addresses—to conceal their illegal activities from their auditors and French law enforcement authorities.

12.     Defendants have admitted making payments of at least $5.92 million to ISIS and ANF from 2012 through 2014. These payments consisted of at least $816,000 of monthly "donations" to ISIS; at least $3,447,528 in payments to ISIS-controlled suppliers; and at least $1,654,466 in payments based on the amount of cement LCS sold. Defendants have also admitted to leaving behind cement when they turned over the factory to ISIS, and that ISIS sold

---

[1] All citations to written correspondence include original spelling, punctuation, and grammar.

the cement at prices that would have yielded ISIS another $3.21 million.

13.     Defendants' payments to and partnership with ISIS provided ISIS capital to transform from a fledgling militia in the early 2010s into a brutal terroristic behemoth with the capability and intent to kill Americans. The revenue stream enabled the terrorist attacks that targeted Plaintiffs and their family members. Defendants' money translated directly into fighters, guns, and bombs the terrorists used to plan and execute their terrorist acts against Plaintiffs. It allowed ISIS to create more explosives, capture more territory, recruit new members, disseminate extensive propaganda, and expand to new regions and countries. According to a former U.S. Ambassador to the United Nations, funding enabled ISIS to "pay its followers," create a massive salaried military force that included snipers, planners, and suicide bombers, and "fund attacks around the world."

14.     Given the low costs of terrorist attacks, Defendants' payments had a substantial impact on ISIS's capabilities. Their multimillion-dollar bribes were enough to finance thousands of ISIS terrorist attacks—enough to kill and maim every Plaintiff in this case many times over. These attacks were the foreseeable, obvious and even intended results of doing business with ISIS. Terrorist attacks enabled ISIS to maintain and expand its control over territories and markets. The more territory and markets ISIS controlled, the greater the co-conspirators' profits.

15.     Defendants' payments were channeled to ISIS's leadership, under ISIS's centralized and carefully tracked system. ISIS's founder and leader Abu Bakr Al-Baghdadi supervised the collection and disbursement of the "taxes" Defendants paid to it. On information and belief, Al-Baghdadi's ISIS Leadership Cell (described *infra* § J.i.) skimmed 20% off the top of the money ISIS collected, including the payments made willingly by Defendants, to help plan, authorize, and commit the terrorist acts alleged below (*see infra* § M.). In addition, Defendants'

cement plant was located near the main ISIS headquarters in Raqqa. Raqqa was the largest city ISIS held, its de facto and self-described capital. The rest of Defendants' money would have gone to the Raqqa province, led by the Raqqa Cell. The Raqqa Cell, in turn, was run by Ali Musa Al-Shawakh, or Abu Luqman, and played a key role in maintaining fighters, funding, and planning the attacks described below. Defendants, through intermediaries and with knowledge and intent, directly conspired with Abu Luqman's Raqqa Cell, which controlled the local territory around Lafarge's cement plant in northern Syria. The Raqqa Cell collected funds from Defendants and directed, both directly and through dissemination of propaganda, the individual attacks that harmed Plaintiffs.

16.    Defendants' conspiracy with ISIS and intermediaries had substantial, purposeful connections to the United States.

17.    Defendants' executives knowingly and deliberately relied on the U.S. financial system, causing numerous U.S.-dollar denominated wire transfers to pass through New York banks. Their reliance on U.S. banks was deliberate and strategic: Defendants called "USD" their "preferred option." Using U.S. dollars and New York correspondent banks made Defendants' payments look legitimate, avoided the scrutiny of French auditors and law enforcement, avoided fluctuations in the value of the Syrian pound, and avoided sanctions complications associated with conducting banking transactions with persons located in Syria. Defendants knowingly used the U.S. banking system for these reasons.

18.    The conspiracy itself was integrally linked to the United States, as Defendants knew, foresaw, and intended. Harming and killing foreigners, especially Americans, whom ISIS referred to as "crusaders," was a potent way for ISIS to maintain and expand its grip on power, territory, and markets. By taking on the world's strongest power, the United States, and killing

Americans, ISIS terrorized its subjects, recruited new followers, and deepened its territorial reach. Defendants intentionally, purposefully, and foreseeably benefitted from ISIS's protection, strength, and terrorist acts against Americans as part of their partnership with ISIS to control local markets and increase profits.

19.     Thus, Defendants entered a conspiracy with ISIS and intermediaries whose overall object was to maintain and expand ISIS's territorial control of Syria and Iraq and thereby promote ISIS's control of and protection rackets within that territory. ISIS's acts of international terrorism targeting U.S. citizens, including the attacks that killed and injured Plaintiffs, furthered the overall object of Defendants' conspiracy by strengthening ISIS's perceived power.

20.     Plaintiffs—American citizens harmed by ISIS, and their family members—are entitled to recover for the economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their relatives' society, companionship, wages, comfort, advice, and counsel that they experienced as a result of Defendants' misconduct. Defendants aided and abetted the ISIS and ANF attacks that killed or injured Plaintiffs and their family members. Defendants also conspired with ISIS, ANF, and intermediaries, making Defendants liable for the terrorist attacks that ISIS foreseeably committed in furtherance of their conspiracy.

21.     As a result of the terrorist attacks carried out by ISIS and facilitated by Defendants, Plaintiffs have suffered severe physical and/or psychological injuries.

22.     Accordingly, Defendants are liable to Plaintiffs under the ATA for providing material assistance to ISIS, engaging in a conspiracy designed to support ISIS's terrorist activities, and aiding and abetting that unlawful conduct.

## **DEFENDANTS' GUILTY PLEA**

23.     On October 18, 2022, the Department of Justice announced its first-ever prosecution of a corporation for providing material support for terrorism. According to Deputy

Attorney General Lisa O. Monaco, Lafarge, Lafarge Cyprus, and LCS "partnered with [the Islamic State in Iraq and Syria ("ISIS")], one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share— all while ISIS engaged in a notorious campaign of violence during the Syrian civil war."

24.     As part of their plea agreement, Lafarge and LCS agreed to a 52-page Statement of Facts detailing their unlawful conduct ("Statement of Facts"). *See United States v. Lafarge S.A. et al.*, No. 1:22-cr-00444 (E.D.N.Y. Oct. 18, 2022), ECF No. 10. Plaintiffs incorporate the Statement of Facts into this First Amended Complaint in its entirety to the extent not inconsistent with the allegations herein.[2]  Lafarge and LCS agreed in the guilty plea that it "will not dispute the Statement of Facts."

25.     Based on the heinous conduct underlying their guilty plea, U.S. District Judge William F. Kuntz II sentenced Lafarge and LCS to terms of probation and to pay financial penalties, including criminal fines and forfeiture, totaling $777.78 million. At the conclusion of the sentencing hearing, Judge Kuntz said: "This case impacts global communities. This case impacts the national security of the United States. This case impacts the victims of terrorist acts perpetrated by ISIS and ANF."

26.     Among the facts to which Defendants admitted was that they paid ISIS and ANF nearly $6 million dollars between July 2012 and October 2014. Defendants also admitted that they let ISIS seize over $3.1 million dollars of cement.

---

[2] Plaintiffs' investigation has revealed additional facts beyond those to which Lafarge and LCS have admitted in connection with their guilty plea. Upon information and belief, the factual admissions in connection with the guilty plea were limited by design and carefully crafted in an effort to avoid civil liability like that threatened by the instant proceedings.

27.     Defendants' own documents indicate that Defendants paid millions of dollars more—exceeding $15 million according to media reports—starting before July 2012 and continuing after October 2014. Defendants did not take steps to unwind the conspiracy until years later, after the criminal conspiracy was publicly exposed. By way of example, a July 14, 2014 email written to LCS's CEO refers to even more payments "in addition to the ten millions that we pay directly to them, i.e. to ISIS" (*see infra* § E).[3] In addition, Lafarge entered into a written contract in October 2014, back-dated to September 2014, obligating it to continue to make U.S. dollar payments indefinitely, money destined for terrorists (described *infra* §§ G-H).

28.     Defendants were able to conceal their conspiracy with ANF, ISIS, and their intermediaries for so long because, among other things, they took extraordinary steps to repeatedly and systematically route financial transactions and email traffic in furtherance of the conspiracy through the United States. They undertook these activities in the United States purposefully to avoid the scrutiny of Lafarge's French auditors and French law enforcement officials, and to avoid having to engage in banking transactions in or through Syria and in Syrian currency.

29.     The factual admissions in the Statement of Facts established Defendants' criminal liability under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2339B(a)(1), and give rise to civil liability under 18 U.S.C. § 2333 and 18 U.S.C. § 2339.

## PARTIES

30.     Plaintiff Tamara Fields is a citizen of the United States domiciled in the State of Florida. Ms. Fields was married to Lloyd Carl Fields, Jr. at the time of his death in the Amman

---

[3] The email communication likely refers only to one type of payment to ISIS at one point in time. Lafarge made numerous types of payments to ISIS over a lengthy period of time (described *infra* §§ C-D).

Attack.

31.     Plaintiff the Estate of Lloyd Carl Fields Jr. is represented in this action by and through Tamara Fields, its Personal Representative as appointed under the laws of the State of Florida. Lloyd Carl Fields Jr. was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Florida.

32.     Plaintiff Heather Gavino is a citizen of the United States domiciled in the State of Missouri. Ms. Gavino was married to James Damon Creach at the time of his death in the Amman Attack.

33.     Plaintiff the Estate of James Damon Creach is represented in this action by and through Heather Gavino, its Personal Representative as appointed under the laws of the State of Florida. James Damon Creach was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Florida.

34.     Plaintiff Jackson Creach is a citizen of the United States domiciled in the State of Missouri. He is the son of James Damon Creach.

35.     Plaintiff Samantha Creach is a citizen of the United States domiciled in the State of Missouri. She is the daughter of James Damon Creach.

36.     Plaintiff Jayedon Creach is a citizen of the United States domiciled in the State of Missouri. He is the son of James Damon Creach.

37.     Plaintiff Kimberly Harris is a citizen of the United States domiciled in the State of Texas. Ms. Harris was married to decedent Sean Copeland at the time of his death in the Nice Attack. She is the mother of decedent Brodie Copeland, another victim of the Nice Attack.

38.     Plaintiff the Estate of Sean Copeland is represented in this action by and through Kimberly Harris, its Personal Representative as appointed under the laws of the State of Texas.

Sean Copeland was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Texas.

39.     Plaintiff the Estate of Brodie Copeland is represented in this action by and through Kimberly Harris, its Personal Representative as appointed under the laws of the State of Texas. Brodie Copeland was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Texas.

40.     Plaintiff Austin Copeland is a citizen of the United States domiciled in the State of Texas. Mr. Copeland is the son of decedent Sean Copeland and the brother of Brodie Copeland.

41.     Plaintiff Maegan Copeland is a citizen of the United States domiciled in the State of Texas. Ms. Copeland is the daughter of decedent Sean Copeland and the sister of decedent Brodie Copeland.

42.     Plaintiff Khalesi Love is a citizen of the United States domiciled in the State of Wisconsin. She is the daughter of decedent Jared Tucker, a victim of the Barcelona Attack.

43.     Plaintiff Rhasia Love is a citizen of the United States domiciled in the State of California. She is the daughter of decedent Jared Tucker, a victim of the Barcelona Attack.

44.     Plaintiff Veda Love is a citizen of the United States domiciled in the State of Wisconsin. She is the daughter of decedent Jared Tucker, a victim of the Barcelona Attack.

45.     Defendant Lafarge S.A. is a multinational building materials business organized under the laws of France and headquartered in Paris, France. Lafarge is the parent company of a multinational building materials business, which is organized under the laws of France and headquartered in Paris, France. At pertinent times, Lafarge, together with its subsidiaries, employed 63,000 people to manufacture and sell cement, construction aggregates, concrete, and

other building materials at 1,612 production sites in approximately 61 countries, including the United States.

46.     On July 10, 2015, Lafarge merged with its leading competitor, Holcim Ltd., a Zurich, Switzerland-based building materials business to create Lafarge Holcim. At the time of the merger, Holcim and Lafarge were the two largest multinational building materials companies in the world.[4]

47.     During all times pertinent to this First Amended Complaint, Lafarge oversaw and directed the conduct of two Defendant subsidiaries it wholly controlled, LCS and Lafarge Cyprus.

48.     Defendant LCS was a direct subsidiary of Lafarge Cyprus, organized under the laws of Syria and headquartered in Damascus, Syria. Lafarge indirectly owned 98.7% of LCS through four subsidiaries, primary among them Lafarge Cyprus. From approximately May 2010 to September 2014, Lafarge, through LCS, operated a cement plant in the Jalabiyeh region of Syria, located in northern Syria near the Turkish border and between the cities of Manbij and Raqqa, Syria. LCS made agreements and effectuated transactions with ISIS and ANF "at the direction of LAFARGE's and LCS's senior management," including Christian Herrault, a Lafarge Executive Vice President based in Paris. Lafarge executives were thoroughly informed of LCS's decisions and directions in interacting with terrorists. As Herrault wrote in 2017, LCS's "local concessions" to terrorists "were made with the clear and repeated approval" of senior Lafarge leadership. Thus, when allegations herein refer to LCS or LCS employees, the described conduct occurred at Lafarge's direction and for Lafarge's benefit.

---

[4] LafargeHolcim rebranded itself as Holcim Group in 2021.

49.     Defendant Lafarge Cyprus is the entity through which Lafarge held the majority of its shares in LCS until Lafarge's 2015 merger with Holcim Ltd. It is organized under the laws of Cyprus and headquartered in Cyprus. Lafarge Cyprus functioned as the corporate instrument through which Lafarge often routed money to LCS and intermediaries, including through international bank transfers that went through New York, and thereby financed Lafarge's payments to ISIS and ANF. Lafarge Cyprus's financing of LCS's transfers was done knowingly and at Lafarge's direction and with Lafarge's approval. In 2014, Lafarge Cyprus executed a consulting agreement with Firas Tlass to conceal Defendants' payments to ISIS.

### DEFENDANTS' PRINCIPAL CO-CONSPIRATORS

50.     Jean Claude Veillard is a citizen and national of France and was Vice President of Security for Lafarge from approximately October 2008 until September 2017. He was based at Lafarge's headquarters in Paris, France. Veillard was also a member of Lafarge's Security Committee.

51.     Christian Herrault is a citizen and national of France and was an Executive Vice President of Operations of Lafarge from approximately 2012 to December 2015. Herrault supervised Lafarge's operating subsidiaries in numerous countries, including Syria. Herrault was based at Lafarge's headquarters in Paris, France and reported directly to Lafarge's Chairman and CEO, Bruno Lafont. Herrault was a member of Lafarge's Security Committee and, beginning on July 4, 2013, served as Chairman of the Board of Directors of LCS.

52.     Bruno Pescheux is a citizen and national of France and was CEO of LCS from approximately 2008 to July 2014. While CEO of LCS, Pescheux was based at LCS's headquarters in Damascus, Syria before relocating to Cairo, Egypt in 2012 when LCS evacuated its foreign employees in the face of growing unrest around its plant. He reported directly to Herrault.

53.     Fredric Jolibois is a citizen and national of France who became CEO of LCS in approximately July 2014 and remained in that role until approximately January 2016, and reported directly to Herrault until Herrault left Lafarge.

54.     Guillaume Roux is a citizen of the United States and of France, and was an Executive Vice President of Lafarge until January 2016. Roux was also a member of Lafarge's Security Committee, and a member of LCS's Board of Directors until January 2016 and its Chairman from 2008 until July 4, 2013. Roux was based at Lafarge's headquarters in Paris, France and reported directly to Lafarge's Chairman of the Board of Directors and CEO, Bruno Lafont.

55.     Bruno Lafont is a citizen and national of France and was Lafarge's Chairman of the Board of Directors and CEO of Lafarge until the completion of the merger with Holcim Ltd. in 2015. Upon Lafarge's merger, he became Co-Chair of Lafarge Holcim's Board of Directors and served there until May 2017. He was based at Lafarge's headquarters in Paris, France.

56.     Firas Tlass is a citizen and national of Syria and was a minority shareholder in LCS until the Syrian government confiscated his shares in LCS in approximately 2012. Tlass was paid by LCS, with Lafarge's knowledge and approval, to provide "security" services to LCS, which included negotiating with various local terrorist groups, including ISIS and the ANF. Tlass was paid by LCS, with Lafarge S.A.'s knowledge and approval, to negotiate with and deliver payments to ISIS and ANF.

57.     Amro Taleb is a citizen of Canada and of Syria and a former consultant to LCS who held himself out as a broker capable of sourcing raw materials from ISIS-controlled territories. LCS paid Taleb to negotiate with and pay ISIS for raw materials, with Defendants' knowledge and approval. After ISIS raided the Cement Plant, Taleb negotiated the sale and

14

liquidation of its cement and equipment, while receiving payment from Defendants. As Defendants' paid consultant, he then visited Lafarge's headquarters in Paris in January 2015 to discuss Defendants' further cooperation and conspiracy with ISIS to re-open the Cement Plant.

58.     Defendants, through Veillard, Herrault, Pescheux, Jolibois, Roux, Lafont, Tlass, and Taleb, among others, acted in concert with, and for the purpose of furthering, Defendants, ISIS's, and ANF's common objectives. They conspired and worked in concert with ANF and ISIS, with the full knowledge of ANF's and ISIS's designation as Foreign Terrorist Organizations ("FTO" or "FTOs"), their terrorist acts, and their purposeful targeting of Americans and others.

<u>**JURISDICTION AND VENUE**</u>

59.     Plaintiffs, all citizens of the United States, were killed or injured by acts of international terrorism that arose from the Defendants' conspiracy to support ISIS.

60.     As a result, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(a)-(d) and 18 U.S.C. § 2338.

61.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), (c), and (d), and pursuant to 18 U.S.C. § 2334.

62.     Lafarge, Lafarge Cyprus, and LCS are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a) and N.Y. C.P.L.R. § 302. In the alternative, if the Court concludes that Defendants are not subject to jurisdiction in any state's courts of general jurisdiction, Lafarge, Lafarge Cyprus, and LCS are subject to personal jurisdiction under Fed. R. Civ. P. 4(k). Jurisdiction under these provisions is appropriate based on the following:

63.     Defendants' conspiracy with ISIS and intermediaries had a substantial nexus to the United States and to New York, including by virtue of Defendants' and its agents' deliberate, repeated, and systematic use of U.S. dollar transactions and banks in New York to pay, conspire

with, and aid and abet terrorists, including via intermediaries. Defendants' "preferred option" for paying terrorists was to make "bank transfer[s] in USD," because, among other things, it helped avoid detection by Lafarge's auditors and governmental entities.

64.     Specifically, Defendants directed their banks to complete U.S.-dollar-denominated wire transfers to support their scheme to fund ISIS and ANF, and Defendants' officials knew those directions required the use of New York banks. Defendants' wire instructions caused their payments to clear in New York, including through one admitted suit-related transaction in this District. Defendants' executives regularly received specific transaction confirmations alerting them to the particular U.S. correspondent and intermediary banks that routed their transactions. On information and belief, Defendants regularly requested and received confirmations from their banks notifying them of the New York banks involved in clearing their transfers, as part of Defendants' process of approving the transactions.

65.     By routinely, purposefully, and knowingly conducting transactions in U.S.-dollar-denominated transactions processed through New York, Defendants purposefully availed themselves of the benefit of doing business in the United States generally and New York specifically, and thus are subject to personal jurisdiction.

66.     As Defendants knew and intended, Defendants' aiding and abetting of and conspiracy with ANF and ISIS and intermediaries enabled ISIS to commit the acts of international terrorism that expanded ISIS's power and territorial control that benefitted Defendants, and that injured and killed victims in Jordan, France, Spain, and elsewhere, thereby injuring Plaintiffs.

67.     In addition, as described further below, Defendants conspired with ISIS and its intermediaries to (a) provide material support to ISIS, a designated terrorist organization,

knowing and intending that ISIS would use Defendants' material support to commit acts of violence that would endanger human life and would intimidate or coerce a civilian population, in violation of 18 U.S.C. 2333(a); and (b) commit acts of terrorism, knowing and intending that ISIS would target American citizens and American interests, in violation of 18 U.S.C. 2333(d). Defendants and their co-conspirators and agents' conspiracies had a substantial connection to and were in and affecting the United States and, in particular, New York.

68.     In furtherance of the conspiracies, Defendants purposefully made numerous U.S.-dollar payments to ISIS through intermediaries and to facilitate the conspiracy with ISIS and intermediaries, payments that were wired through New York. This was done at Lafarge's instruction and with its knowledge, in reliance on the U.S. financial system for efficiency, security, and secrecy.

69.     For example, Lafarge has admitted to making a lump sum wire transfer of $210,000 from its operating account at a financial institution in Paris to intermediary banks in New York City through this District. The contract pursuant to which that payment was made, and additional agreements made in the course of the conspiracy, required Defendants to make ongoing payments after October 2014. On information and belief, Defendants did so.

70.     Also in furtherance of the conspiracies, Defendants' executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their corporate email addresses, to coordinate and carry out elements of their partnership with ISIS. U.S.-based email service providers enabled Defendants to conceal their illegal conduct from French auditors and authorities. U.S.-based email service providers are considered more secure than non-U.S.-based providers.

71.     Further, Defendants are subject to personal jurisdiction given their participation in

a scheme and conspiracy with ISIS and intermediaries that was directed at the United States and whose overall object was to maintain ISIS's territorial control of Syria and Iraq.

72. ISIS was public about its intent to commit acts of terrorism against the United States as well as its intentional recruitment from the United States. In July 2012, Al-Baghdadi, ISIS's founder and leader, threatened to strike at the "heart" of America, proclaiming that the United States "will soon witness how attacks will resound in the heart of your land, because our war with you has now started." In January 2014, Al-Baghdadi announced to Americans: "Soon we will be in direct confrontation." And in June 2014, Al-Baghdadi threatened Americans: "You should know, you defender of the cross, that getting others to fight on your behalf will not do for you in Syria as it will not do for you in Iraq," and "soon enough, you will be in direct confrontation— forced to do so, God willing. And the sons of Islam have prepared themselves for this day. So wait, and we will be waiting, too."

73. The threat to U.S. citizens was well-known outside Syria. On June 27, 2014, U.S. senators observed publicly that "[t]he conflict in Syria has deteriorated and spread so dangerously that it is now the source of direct threats to the United States" and that "[t]he leader of ISIS, Abu Bakr al-Baghdadi, has already stated his ambitions to attack the U.S. homeland."

74. The threats to American citizens proved all too real. In August 2014, ISIS broadcasted its beheading of U.S. journalist James Foley, and threatened the life of another if President Obama did not end military operations in Iraq. Tellingly, the beheading videos of both Foley and Steven Sotloff (in September 2014) were titled "Message to America" and "A Second Message to America," respectively. ISIS announced that its killing of Sotloff was specifically in response to U.S. airstrikes targeting it in Iraq. Defendants nonetheless pressed ahead with making payments to ISIS.

75.     Likewise, in September 2014, ISIS spokesman Sheikh Abu Muhammad Al-'Adnani Al-Shami gave a speech entitled "Indeed, Your Lord is Ever Watchful," in which he explicitly spelled out ISIS's anti-American objectives, stating, for example:

> O America, O allies of America, and O crusaders, know that the matter is more dangerous than you have imagined and greater than you have envisioned. . . . O Obama, O mule of the Jews, you are vile. You are vile. You are vile. And you will be disappointed, Obama. Is this all you were capable of doing in this campaign of yours? Is this how far America has reached in incapacity and weakness? Are America and its allies from amongst the crusaders and atheists unable to come down to the ground? . . .

> O Allah, America, France, and their allies transgressed against us. They came with their legions to fight us out of their enmity for your religion. . . . We have no way to deal with their airplanes. O Allah, you have said what is true, 'So do not weaken and do not grieve, and you will be superior if you are [true].'

76.     A leading terrorism expert testified before the Subcommittee on Counterterrorism and Intelligence of the House Committee on Homeland Security that the "U.S. military has ostensibly become a primary target for the Islamic State."

77.     The United States has convicted ISIS terrorists based on their targeting of the United States. On September 2, 2021, former British citizen Alexanda Amon Kotey pleaded guilty in the Eastern District of Virginia to an eight-count indictment consisting of one count of conspiracy to commit hostage taking resulting in death; four counts of hostage taking resulting in the deaths of four Americans (Foley, Sotloff, Kayla Mueller, and Abdul-Rahman (Peter) Kassig); one count of conspiracy to murder U.S. citizens outside of the United States; one count of conspiracy to provide material support or resources to terrorists resulting in the deaths of U.S., British and Japanese nationals; and one count of conspiracy to provide material support or resources to a designated FTO resulting in the deaths of U.S., British, and Japanese nationals, for his participation in ISIS's hostage-taking and terrorist activities.

78.     On April 14, 2022, a federal jury in the Eastern District of Virginia convicted Kotey's co-conspirator, former British citizen El Shafee Elsheikh, for his participation in the same ISIS scheme. Witnesses at the trial presented evidence from November 2012 through February 7, 2015 of Elsheikh's participation in torturing the hostages.

79.     Other ISIS members have been tried and convicted in this District. For example, in 2013, Mirsad Kandic traveled from Brooklyn to a city outside of Aleppo, Syria to work directly with ISIS leadership. Kandic managed ISIS social media accounts and recruited thousands to ISIS, including from New York. In 2022, Kandic was convicted of five counts of providing material support to ISIS, and one count of conspiracy to do the same. Likewise, Ruslan Maratovich Asainov, a U.S. citizen from Bay Ridge, New York, was convicted in the Eastern District of New York for providing material support to ISIS. Asainov fought with ISIS as a sniper from 2013 until he surrendered in 2019, rising in ISIS's ranks to become the lead trainer and organizer of ISIS's sniper force. He ran a private chat group for ISIS members to sell and trade weapons called "Khilafah (Caliphate) Market," of which Raqqa governor Abu Luqman (*see infra* § J.ii.) was a member.

80.     ISIS's overt acts targeted the United States and U.S. citizens. Defendants bought protection and entered a complex conspiracy with ANF and ISIS and intermediaries, with the awareness that they were terrorist-classified groups. Defendants conspired with full knowledge of and intent to enable their terrorist acts, including their targeting of the United States and American citizens, in order to control markets and increase profits. As a result of the conspiracy between Defendants, intermediaries, and ISIS, ISIS's overt acts targeting the United States and U.S. citizens, including Plaintiffs and their loved ones, are attributable to Defendants.

81.     Based on conduct that occurred "within the Eastern District of New York and the

extraterritorial jurisdiction of the United States," the Department of Justice charged Defendants

with conspiring to provide material support to terrorists. The Department of Justice further

charged that "the defendants were brought into and found in the United States, the offense

occurred in part within the United States, the offense occurred in and affected interstate and

foreign commerce, and the defendants conspired with a national of the United States." Based on

these contacts with the United States, Lafarge and LCS "admit[ted] the Court's jurisdiction over

the Defendants and the subject matter of such action . . ."

82.     Additional allegations regarding the substantial nexus of Defendant's unlawful

conduct to New York can be found *infra* § K.

## THE FACTUAL BASES FOR PLAINTIFFS' CLAIMS

### A.     Background on ISIS

83.     On or about October 15, 2004, the United States Secretary of State designated al-

Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid Wa'al-Jihad, as a Foreign Terrorist

Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a

Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224.

84.     On December 11, 2012, the United States amended the FTO and Executive Order

(E.O.) 13224 designations for Al-Qaeda to include ANF, under the new aliases: Al-Nusrah

Front; Jabhat Al-Nusrah; Jabhet Al-Nusra; The Victory Front; and Al Nusrah Front for the

People of the Levant. In its accompanying press release, the Department of State warned that

ANF "has sought to portray itself as part of the legitimate Syrian opposition while it is, in fact,

an attempt by AQI to hijack the struggles of the Syrian people for its own malign purposes." To

date, ANF remains a designated FTO.

85.     Threatened by ANF's and Al-Julani's increasing power in May 2013, Al-

Baghdadi (the Al-Qaeda leader who had originally sent Al-Julani to Syria) declared the

formation of Al-Dawlah Al-Islamiyah fi Al-'Iraq wa Al-Sham (The Islamic State of Iraq and

Syria, "ISIS"). Al-Baghdadi declared that, under his leadership, ISI and ANF would merge into a

single Sunni Islamist organization, ISIS. ISIS's stated goal was to seize control first of Iraq and

Syria and then beyond, to form a unified religious state across national boundaries, a "caliphate."

However, Al-Julani, ANF's head, objected to Al-Baghdadi's declaration, and publicly pledged

allegiance to Al-Qaeda leadership.

86.     On or about May 14, 2014, the Secretary of State amended the designation of AQI

as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially

Designated Global Terrorist entity under section l(b) of Executive Order 13224 to add the alias

Islamic State of lraq and the Levant ("ISIL") as its primary name. The Secretary of State also

added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS,"

which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla

al-lslamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and AI-Furquan Establishment for

Media Production. At the same time, the Secretary also amended that designation to remove

ANF's aliases, and at the same time, separately designated ANF as its own FTO and Specially

Designated Global Terrorist.

87.     On September 21, 2015, the Secretary added the following aliases to the FTO

listing: Islamic State, ISIL, and ISIS. To date, ISIS has remained a designated FTO. ISIS has

claimed credit for numerous terrorist activities.

88.     In or around 2011, the combination of civil protests in Syria and the Syrian

government's violent suppression of those protests developed into a full-fledged civil war, which

remains ongoing. In or about September 2011, the European Union ("EU") imposed an embargo

on Syrian petroleum products to further isolate and weaken the Syrian regime in response to its

22

brutal crackdown on opposition groups within the country. Under the new sanctions, all 27 EU member states were barred from buying, importing or transporting oil and other petroleum products from Syria, and from entering into financial or insurance services for such transactions. On or about December 1, 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

89.    ANF and ISIS quickly became rivals in the jihadist community, competing for international legitimacy and Syrian and Iraqi territory. Through brute force, ISIS took the upper hand and rapidly seized Raqqa and other cities and villages across Syria and Iraq.

90.    In 2012, ISIS gained control of territory in Syria and committed numerous terrorist acts, resulting in the deaths of numerous U.S. citizens among others.

91.    Notably, unlike most of the other militant groups fighting in Syria in opposition to the Syrian government, ISIS did not target Syria alone: its goal, as Defendants knew, was the construction of a self-described "caliphate" or empire. The U.S. government and others categorically rejected any suggestion that ISIS, despite its name, was a "state," that it had any legitimate governmental function, or that it did anything other than propagate terrorist violence. ISIS maintained and expanded its control over civilian populations using violence and fear, rather than legitimate governance. It solidified its control by entering into criminal conspiracies like the one it had with Defendants, and by attacking foreign powers including the United States. Its acts of mass terrorist violence violated international law, including the laws of war, and included kidnapping, human trafficking, and murder.

92.    The EU sanctions and U.N.'s recognition of the Syrian civil war were followed by an exodus of multinational corporations from Syria. For example, on December 2, 2011, a Dutch petroleum conglomerate announced that it was pulling out from Syria in response to the

sanctions. Three days later, one of the world's largest oil companies, headquartered in France, announced that it was halting operations in Syria due to, among other factors, safety concerns. Other international corporations quickly followed suit.

93.     ISIS's leadership issued multiple public calls for attacks against U.S. and Western interests around the world, and the group made similar calls for attacks in its English-language magazine, Dabiq. ISIS members and sympathizers planned and conducted attacks at a previously-unprecedented pace—at least 37 plots between February 2014 and July 2015.[5]

94.     As outlined throughout this First Amended Complaint, ISIS has repeatedly targeted American citizens. For instance, journalist and video reporter James Foley was working as a freelance war correspondent during the Syrian Civil War, when he was abducted on November 22, 2012, in northwestern Syria. He was murdered by ISIS by decapitation in August 2014. ISIS posted a video of the murder to YouTube.

95.     In August 2013, Steven Joel Sotloff, an American-Israeli journalist, was kidnapped in Aleppo, Syria, and held captive by ISIS militants. On September 2, 2014, ISIS released a beheading video, showing one of its members murdering Sotloff. Following Sotloff's murder, then-U.S. President Barack Obama stated that the United States would take action to "degrade and destroy" ISIS.

96.     Many of ISIS's acts were intended to intimidate and silence its opponents. Its fighters patrolled the streets with weapons and suicide vests. To sow fear among the local populations, ISIS shot opponents from behind (including children), beheaded them, lit them on fire, and hung them in public squares. According to the U.N. Human Rights Council, ISIS "made calculated use of public brutality and indoctrination to ensure the submission of communities

---

[5] https://www.dni.gov/nctc/groups/isil.html

under its control."

97.     ISIS also kidnapped and murdered journalists and aid workers while Defendants were providing it material support. Their victims, including Americans, were frequently beheaded, sometimes on videos broadcasted online for Americans and others to watch in horror.

98.     It soon became clear ISIS would be more successful than ANF, in part because of its extreme brutality and global ambition, but also because of its greater resources, including money, weapons, and fighters. ANF leaders began defecting to ISIS.

99.     Lafarge was aware that foreign fighters and defectors from other terrorist groups were increasing ISIS's ranks. Its security consultant concluded that the group's membership came at first from Iraqi fighters and ANF defectors, but that as time went on, "jihadi tourists" (as Lafarge's security consultant called them) came to Syria and Iraq to join the group and commit terrorist attacks. It is with this group that Defendants chose to enter a complex set of multi-million dollar financial arrangements with ISIS for their mutual benefit.

100.    Throughout 2014, ISIS took over more and more territory in Iraq and Syria, ultimately controlling forty percent of Iraq and thirty percent of Syria, ruling over more than 11 million people.

101.    Lafarge's security advisor was aware of ANF's and ISIS's designations, observing publicly that "The ISI [Islamic State of Iraq] and later ISIS/ISIL had been listed as a terrorist group since 2004 by the USA, the UN, and the EU," and that moreover "in LCS we knew that Al-Nusra Front had been listed by the Americans . . ."

102.    To grow as quickly as it did from a small armed group in 2013 to an international terrorist organization with swathes of territory in 2014, ISIS needed money—and a lot of it. ISIS robbed the resources under its control, including by exploiting manufacturing plants, looting

banks, pumping oil and gas to sell on the black market, taxing agricultural products, selling humans as slaves, and demanding passage tolls and protection payments.

103.    Capturing cement plants was an essential part of ISIS's growth plan. Between its territory in Syria and Iraq, ISIS seized five cement plants, which could produce a total of $583 million in annual revenue. Cement plants were a particularly appealing target for a number of reasons, including that they generated significant revenue from which ISIS could pilfer; they contained raw materials that ISIS could use to create explosives, and cement to build tunnels and other structures used for attacks. ISIS had distribution networks that it used to sell cement.

104.    Of the five cement plants ISIS seized, Lafarge's Cement Plant was by far the largest. In fact, the production capacity of the Cement Plant was more than twice as much as that of the second largest plant. And ISIS did not simply capture and rob the Cement Plant. Rather, before ISIS overran the Cement Plant and seized all the materials Lafarge left behind, Defendants and ISIS had become close partners, pursuing common objectives, and generating millions of dollars in profit for each.

**B.    Defendants Form A Partnership With ISIS**

105.    Lafarge maintained an indirect subsidiary organized under the laws of Syria and headquartered in Damascus, Syria titled Lafarge Cement Syria S.A. Lafarge indirectly owned approximately 98.7% of LCS's issued and outstanding share capital through four separate subsidiaries. From approximately May 2010 to September 2014, Lafarge, through LCS, operated a cement plant in the Jalabiyeh region of Syria, located in Northern Syria near the Turkish border and between the cities of Manbij and Raqqah, Syria (the "Jalabiyeh Cement Plant").

106.    In 2007, Lafarge took a major step in its quest to dominate the Middle Eastern cement market. That year, Lafarge acquired Egyptian cement multinational Orascom Cement in a deal financed with over €7.4 billion in debt. As part of the deal, Lafarge purchased the Cement

Plant, which Orascom had started to build.

107.     Lafarge and LCS completed the construction of the Jalabiyeh Cement Plant in 2010 at a cost of approximately $680 million. When the Cement Plant finally opened for business in May 2010, Lafarge's CEO Bruno Lafont toured the facility with reporters and the French Ambassador to Syria. The plant produced 160 truckloads of cement a day, amounting to half a million dollars' worth of daily sales.

108.     At the beginning of LCS's operations, it faced strong competition from cheaper cement imported into northern Syria from Turkey. To address this issue, in December 2010, Pescheux (LCS's CEO) requested that then-minority shareholder Tlass, a Syrian citizen with close connections to the Syrian regime and local groups, intervene with the Syrian government to curtail imports of competing Turkish cement.

109.     But larger problems loomed. In 2011, civil protests in Syria erupted into a full civil war. In September 2011, in response to this, the European Union barred its member states from buying, importing, and/or transporting oil and other petroleum products from Syria, and from entering into financial or insurance services for such transactions. Similarly, the United States forbid import of its products into Syria, embargoed Syrian oil, and froze the assets of several Syrian individuals. And in December 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

110.     In 2012, as the civil war continued, ISIS gained control over large swaths of Syria and committed brutal terrorist acts. ISIS killed thousands, among them numerous U.S. citizens, including through graphic and well-publicized beheadings.

111.     As expected, the danger of operating in an active warzone, combined with the actions of the European Union, the United Nations, and the United States, prompted a mass

exodus of multinational corporations from Syria. For example, in December 2011, two of the largest oil companies in the world—Royal Dutch Shell and Total—announced that they were leaving Syria.

112.   Defendants, by contrast, saw an opportunity in partnering with the terrorists in the battle for territorial control. Even though armed conflict had spread to the area immediately surrounding the Cement Plant, Lafarge and LCS doubled down on their $680 million investment and joined forces with the terrorists to help them maintain and expand their control, instead of ending their operations in Syria.

113.   Pescheux (LCS's CEO) described the plan to Herrault (Lafarge's Executive Vice President of Operations) as follows:

> [p]reserving the integrity of our physical assets (avoiding the plant to be looted), keeping our personnel ready for the end of the crisis (knowing the huge investment we have made in terms of recruitment and competency development), staying in the market (to keep our distributors' network and to prevent to let Turkish imports flooding North and East of Syria), making some profit to at least repay the interests of the loan and giving some assurance to the lenders.

114.   Starting in the summer of 2012, Lafarge and LCS forged ahead with their plan to make financial payments to various armed factions.

115.   On September 23, 2012, Veillard and Tlass met in Gaziantep, Turkey with representatives of armed militants in areas surrounding the Cement Plant. Tlass recommended that LCS make payments to each of the armed militias based on the quantity of cement produced or according to monthly fee.

116.   By November 2012, Lafarge and LCS executives had approved a plan to establish relations with ANF through Tlass. On November 11, 2012, Tlass notified Pescheux that LCS was engaging directly with ANF: "gazi entab [Gaziantep, Turkey] was good we hav now conextion with jabhat al nosra [ANF]."

117. The situation became more critical in 2013. By March 2013, ISIS, ANF, and other armed groups had taken over the area around Raqqa and both groups quickly established checkpoints at access roads to the Cement Plant. ISIS and ANF guarded their checkpoints with snipers, rockets, and homemade artillery.

118. On April 7, 2013, Tlass recommended that LCS executives negotiate an agreement to pay ANF monthly or by the truckload to ensure continued access to the plant.

119. Several months later, on August 30, 2013, Pescheux reported to Veillard (Lafarge Vice President of Security) and Herrault: "It is clear that we have an issue with ISIS and Al Nusra and we have asked our partner [Tlass] to work on it."

120. Lafarge and LCS executives were fully aware at the time that they were dealing with terrorist organizations.

121. For example, in a December 10, 2012 email, Veillard wrote: "The Islamist group Jabhat Al-Nusra, which is on USA's list of terrorist organisations, has reportedly recruited several Norwegian citizens to fight in Syria."

122. Similarly, in a March 1, 2013 email, LCS's risk manager warned Pescheux that ANF "follow[s] a global jihadi ideology (similar to al-Qaida) and are more open to receive foreign fighters" and had "ties to al-Qaeda, exemplified by participating al-Qaida veterans, mainly from Iraq, and . . . some of their statements are quickly published in the main al-Qaida news outlet."

123. Likewise, notes from a September 11, 2013 meeting of Lafarge's Security Committee, which Veillard and Herrault received, stated: "It gets harder and harder to operate without having to directly or indirectly negotiate with networks classified as terrorists by international organizations and the US. The main challenge being to assess how far their

demands and threats will reach, and consequently, the limits that we want to impose for the site to operate."

124.    Despite this knowledge, Defendants decided to dispense with any "limits" and instead to conspire with the terrorists.

## C.    Defendants Begin Making Payments To Terrorists

125.    Recognizing that ISIS "demand[ed] that a 'tax be paid,'" Defendants proceeded to make millions of dollars in payments to terrorists. These payments came primarily through four mechanisms: (1) payments per truckload for buyer and supplier access to the plant; (2) volume-based payments for cement sold; (3) monthly fixed-rate payments; and (4) payments to ISIS-controlled suppliers. Defendants also knowingly sold cement to ISIS, which ISIS used to plan and carry out its acts of international terrorism.

126.    Instead of leaving Syria, as other multinational companies had done, LCS saw the collapse of the country and increasing power of ISIS as an opportunity for further mutual enrichment and entrenchment by cooperating to sell more cement, at higher margins. Defendants continued paying ISIS and ANF because doing so increased profits. Defendants' payments did not protect local employees—in fact, on information and belief, LCS threatened to fire employees who did not come to the factory, insisting that they travel through armed groups' checkpoints to and from Jalabiyeh, and to Aleppo to take out cash from banks. LCS fired an employee after he was abducted.

### i.    Lafarge And LCS Pay Terrorists $150 Per Truck To Pass Through Checkpoints

127.    On August 26, 2013, Pescheux emailed Tlass a map of the area around the plant and summarized the "strong improvement" "[o]n the west side of the plant towards Menbij, Al Bab, Aleppo, Idlib," but highlighted that "[o]n the east side of the plant towards Hassakeh and

Qamishli, [t]here are 2 check points held by jihadists (see the map) which are blocking the trucks to go to and from the plants," and "[o]n the south of the plant, in the region of Al Thawra, Raqqah, Sokhna: there is a check point held by jihadists between Al Thawra and Raqqah and also potential problems at Sokhna." Pescheux summarized the problem by stating "[g]enerally speaking, it is clear we have an issue with ISIS and Al Nusra in the east, especially in Raqqah."

128.    Tlass responded "no probleme let me work on it today . . . i cal u tomorow to breef you.". The next day Tlass emailed Pescheux, "We Negotiate with (DAWLET AL IRAQ WAL SHAM) AL ISLAMIA & AL NUSRA I got a News that the situation In the Plant is Very Good."

129.    The situation was "Very Good" because, by October, Lafarge began paying money directly to ANF and ISIS to ensure they would permit trucks to pass. In early September 2013, Pescheux asked Tlass for updates regarding truck passage to the east of the plant, and Tlass responded "better now Al Nusra do not obstruct Lafarge trucks ever as long as we pay them . . ." and on October 14, 2013, an LCS risk manager reported that "our customer has reached long term agreements with leading groups Islamic State in Iraq and al-Sham (ISIS) in Raqqa, the agreement let the trucks coming back and forth from the east side of the plant. Each cement truck has to pay 150$."

### ii.  **LCS Pays Terrorists Based On Cement Sold**

130.    As part of a separate agreement, LCS paid ISIS based on the amount of cement that it sold. This agreement, dated November 6, 2013, and on ISIS letterhead, was between ISIS and LCS. The agreement provided that ISIS would assess trucks 400 Syrian pounds[6] for each transported ton of cement and, in exchange, ISIS would ensure the safety and free access of the

---

[6] At this time, the exchange rate of Syrian pounds to U.S. dollars was approximately 112 to 1.

trucks to the cement plant.

131.    Additionally, an ISIS vehicle pass dated April 26, 2014, and bearing ISIS's letterhead and stamp, allowed LCS employees to "pass through after the required work. This is after they have fulfilled their dues to us."

### iii.  LCS Makes Fixed Monthly "Donations" To Terrorists

132.    LCS also made fixed monthly "donation" payments through Tlass to ISIS, ANF, and other armed groups that controlled the area surrounding the Cement Plant.

133.    These payments, which, according to Lafarge and LCS's plea, exceeded $816,000 in total, began as early as July 2012, when armed groups started taking over territory around the Cement Plant. Defendants initially gave Tlass between $80,000 and $100,000 per month to distribute to the armed groups around the factory. By February 2013, at Pescheux's request, Tlass had begun periodically providing lists identifying the armed groups to which he was making payments on Defendants' behalf and the amounts he was paying to the groups each month.

134.    Beginning in February 2013 and continuing through at least July 31, 2013, Tlass advised Pescheux that he was making payments of 200,000 Syrian pounds at first, and later 325,000 Syrian pounds per month to a group he identified as the "ALRAQA People," which was a reference to ANF.

135.    In a July 2, 2013 email with the subject line "Donations," Pescheux calculated that the new total of monthly payments to armed factions was 17.4 million Syrian pounds, or over $155,000 USD per month.

136.    In an August 5, 2013 email with the subject line "Update on donations," Pescheux wrote to Herrault that "some elements on the donations were are paying to [Tlass] and that he is supposed to channel to the various beneficiaries. As discussed in Dubai end of May and as

reminded in my recent mail to you and [Roux], these donations are distinct from the monthly remuneration of our partner."

### iv.  **LCS Pays Fixed Monthly Security Payments To Terrorists**

137.    In November 2013, Defendants decided that Tlass should make fixed monthly security payments to ISIS as well. In a November 29, 2013 email, Lafarge and LCS executives exchanged a list of "donations we are paying to [Tlass] and that he is supposed to channel to the various beneficiaries." The email contained a "List valid from November 1, 2013," which included a five million Syrian pound monthly payment for "Daesh (ISIS)." The list showed that the monthly donation payments to all armed groups now totaled 24 million Syrian pounds.

138.    On February 4, 2014, Pescheux directed Tlass to limit the monthly payments to armed groups to 20 million Syrian pounds, including limiting assessments on sales to 200 Syrian pounds per ton. Tlass responded that his representatives were meeting to discuss the payments with ISIS in Raqqa and with ANF in Aleppo.

139.    Following those meetings, Tlass advised LCS to increase payments to the terrorists. As Tlass explained in a March 31, 2014 email pointing out the extent of Defendants' investment and the scope of its current profit:

> Is Lafarge able to bear a loss of about $600 million, because we are operating in a difficult situation? … As long as we are selling and are able to overcome the obstacles, we should continue.
>
> … We currently sell for $8 to $10 million per month, with a $2 million profit, and pay less than 1/4 for protection. Other factories are paying for protection just to exist, without making the profits we are.... in this case we have to pay about 300milion SYP [approximately $2.7 million USD] monthly.

140.    Defendants' monthly payments to terrorists allowed it to continue producing and selling cement at the Cement Plant into 2014, earning millions of dollars in profits for it—and for ISIS.

141.    On May 8, 2014, Tlass emailed LCS executives advising that LCS's operations were not impeded by local armed groups, stating "(Daesh — PYD — Al Nusra — Abu Issa7 all we have good relations recently . . . ." Defendants maintained "good relations" with ISIS and ANF by paying them ever-increasing amounts.

142.    On September 15, 2014, LCS executives exchanged an email with Tlass's initials as the subject line, containing two attachments. The first attachment was a document named "List of donations last version.pdf," which listed a monthly payment of 10 million Syrian pounds to "Daesh" [ISIS] as of May 1, 2014. In a second attachment to the email, titled "Evolution of the security donations 2012-2013-2014," Pescheux listed, on top of the total amount of LCS's monthly "donation" payments, an additional "10 MSYP [10 million Syrian pounds] paid on April 23 to ISIS to unlock the West road."

### v.    Defendants Purchase Materials From ISIS-Controlled Suppliers And Sell Cement To ISIS

143.    In addition to making regular payments to terrorists, Defendants purchased materials from ISIS-controlled suppliers as part of its conspiracy with ISIS, making additional payments to terrorist-controlled suppliers totaling at least $3,447,528. They also sold cement to ISIS, knowing that ISIS intended to use the cement in terrorist activities.

144.    As ISIS expanded its control over northern Syria, it captured quarries of minerals LCS needed to continue to produce cement. LCS agreed to purchase raw materials from ISIS-controlled enterprises who paid ISIS based on the amount of their sales to LCS. Defendants also purchased oil from ISIS.

145.    On November 6, 2013, for example, LCS and ISIS entered into a written agreement on ISIS letterhead providing that LCS would purchase pozzolana—a type of volcanic ash used to make blended cement—from ISIS for 1,300 Syrian pounds per ton. Under the

34

agreement, ISIS would allow LCS's suppliers who mined and transported the pozzolana from ISIS-controlled quarries near Raqqa to retain some of LCS's payment for the raw material as profit.

146.    In late 2013, Taleb, an intermediary between Defendants and ISIS who had previously assisted LCS with environmental licensing, explained to LCS's board that he wished to discuss "[t]he security issue of Lafarge . . . in Syria. I build up strong relationships with civilian and Military Locals including FSA, Kurds and Islamic state which are in control of all logistic path in and out of . . . Lafarge . . . ." Taleb repeatedly and explicitly identified ISIS as the seller of the raw materials that he brokered.

147.    For example, in a September 24, 2013 email about a recent order with the subject line "Urgent Fuel pozzolana Coal petcoke/Islamic state," Taleb informed LCS executives that LCS had already agreed to accept pozzolana sold by ISIS and stated "FOR pozzolana 15000 tons ready to be shipped they are just waiting for signed P.O today max tomorrow please islamic state very senstive about this issue."

148.    In a separate email chain a few days later, Pescheux disputed the intermediary's assertion that LCS had already agreed to purchase, but nevertheless responded that "[a]fter my mail, our Purchasing team has contacted the contractor and the price is confirmed. We will place an order early next week for a limited quantity (probably around 5,000 tons) as we need to see how it will work. If it is OK we will increase the quantity."

149.    As another example, in a September 28, 2013 email, Taleb declared, "I OFFICIALLY REPRESENT ISLAMIC STATE FOR INVESTMENTS and Soon for Kurdish. You ll get letter for that . So far im on LCS side but please Im asking kindly to have my Fees ."

150.    Defendants' executives understood that transacting with ISIS in this manner was

illegal.

151.     In a December 7, 2013 email, Pescheux informed Herrault that the following activities likely violated Syrian government regulations: "Purchasing gypsum and pozzolana from rebellion," "Purchasing Heavy Fuel Oil from rebellion," and "Paying every month the various rebel entities." Nonetheless, Pescheux determined that these activities were "needed for business continuity."

152.     Thus, with Defendants' blessing, Tlass and Taleb negotiated deals in which Defendants purchased critical raw materials for use in the Cement Plant, including coal, fuel, and pozzolana, from ISIS-controlled sources.

153.     In early 2014, LCS agreed to purchase massive amounts of material from ISIS-controlled suppliers, including 100,000 tons of pozzolana at 1,650 Syrian pounds per ton; another 100,000 tons of pozzolana at 1,675 Syrian pounds per ton; 4,000 tons of heavy fuel oil at 39,000 Syrian pounds per ton; another 12,000 tons of heavy fuel oil at 26,500 Syrian pounds per ton; 15,000 tons of "dirt" fuel at 17,500 Syrian pounds per ton; and an option for 35,000 additional tons of dirty fuel at the same price, as well as yellow sand and coal. Pescheux reported these planned transactions to Defendants' executives and, on February 16, 2014, wrote to Herrault that the "situation with Daech (the jihadists of Islamic State in Iraq and Sham (ISIS)) is relatively calm and we are currently finalizing purchasing of pozzolana and fuel oil."

154.     Defendants did not hand only money to ISIS. They also provided ISIS cement, even before ISIS took over the Cement Plant (*see infra* § F). In a 2014 email to Jolibois, an LCS risk manager said ISIS was "looking for distributors in Syria like ours" for 150,000 tons of cement, and Defendants memorialized in an internal company note that ISIS was seeking such

cement for its "personal consumption" rather than for "market."[7] News reports confirm that Lafarge and LCS agreed to ISIS's request for cement. A former LCS employee stated in an interview, when the terrorists "needed cement to build their tunnels and trenches," an LCS "manager would give it to them." The same LCS employee continued that it was "not a simple business relationship between a company offering cement and terrorist groups that needed money and cement for their defensive positions and tunnels." Defendants "could do anything. They had deals with ISIS."

155.    A former French intelligence analyst testified that Defendants sold cement to ANF and ISIS in Syria. In his words, "ISIS needed primary resources provided by whatever actor. Lafarge was one of them." News reports stated that "With the supplied cement, [ISIS] reportedly constructed fortified shelters and tunnel networks against the US-led coalition." Lafarge's cement helped ISIS extend its reach and ability to commit acts of international terrorism. ISIS used Lafarge's cement to fortify its network of underground tunnels and bunkers, used for hiding from and launching attacks against U.S. and coalition counterterrorism forces, including in northern Syria and near the Syria-Iraq border. It built fortified tunnels—on information and belief, requiring high-grade cement only LCS could provide—to move terrorist operatives, hostages, weapons, and equipment without being detected by U.S. coalition forces and aerial imagery. Defendants' cement sales thus directly aided the attacks that injured or killed Plaintiffs and their family members.

156.    Likewise, as described below (*see infra* § L), Defendants knew and intended that

---

[7] Some documents referenced herein are discussed in *Foley et al. v. Lafarge S.A. et al.*, 23-cv-05691 (E.D.N.Y.) and/or *Finan et al v. Lafarge S.A. et al*, 1:22-cv-07831-NGG-PK (E.D.N.Y.) which are two cases related to this one based on similar acts of the same Defendants. Counsel has relied on the well-pleaded allegations as made in *Foley* and *Finan*.

it would receive concomitant benefits from their aid of and conspiracy with ISIS, including

ISIS's acts of international terrorism.

**D.      Defendants Go To Great Lengths To Conceal Their Partnership With Designated Terrorist Groups**

157.    Defendants' support for ANF and ISIS directly and via intermediaries allowed

them to dominate the cement market and increase profits. But the conspiracy was not without

risks. Fully aware that paying millions of dollars to terrorists violated several jurisdictions' laws,

including those of the United States, Defendants and their agents and co-conspirators took

numerous steps to conceal their partnership with ISIS.

158.    First, Defendants' executives ensured that any documents regarding these terrorist

payments did not reference the word "Lafarge." For example, on September 16, 2013, Pescheux

instructed Tlass that "the name of Lafarge should never appear for obvious reasons in any

documents of this nature," referring to checkpoint passes from ISIS. He continued, "[p]lease use

the words Cement Plant if you need but never the one of Lafarge."

159.    Similarly, on September 4, 2014, Jolibois, LCS's incoming CEO, complained to

Tlass about documents that specifically referred to "Lafarge" by name: "The name Lafarge and

the fact that Lafarge 'paid' appears on the laissez-passer passes issued by ISIS. This is

completely against our agreement with ISIS. It is clear that these passes were issued for the

distributors, not for Lafarge. Could you look into solving this issue?" Tlass agreed that "we have

to change the name or have an alias that all the laissez-passer passes use as well as the

distributors because ISIS cannot let all the cements get through, just ours."

160.    Second, and relatedly, Defendants had intermediaries—rather than Lafarge or

LCS executives—engage directly with ISIS and ANF. As one of LCS's security consultants put

it, "it was especially important that the relationship would be handled by [Tlass's] middlemen,

since an exposure of this sort would have been compromising for LCS." The LSC consultant

concedes: "But via [Tlass], we did in fact contribute to the economy of ISIS."

161.    Not only did Defendants prefer to work through intermediaries, but they took

steps to conceal the payments they made to them. In fact, Lafarge and LCS executives directed

Tlass and Taleb to submit invoices that did not reference their own names or the names of their

companies, and that instead referenced payments for donations, unspecified professional fees, or

personal expenses.

162.    For example, on December 13, 2012, Pescheux emailed Tlass and directed that

any future invoice should not be on Tlass's company's letterhead, but instead should be on that

of a company outside of Syria:

> I would like to remind you that we still need to receive correct
> invoices from [Tlass's company] for the months of September and
> October. We discussed this issue many times and you told me it is
> not a problem so please send them as soon as possible. For the
> November payment, we cannot take the documents you prepared
> with [the Intermediary 1 Company] in the title.
>
> As I told you, you need to send us the references of a [new]
> company located outside of Syria.
>
> This will avoid problems with the Syrian authorities and with our
> Auditors.
>
> We absolutely need to move forward before the end of the year to
> be able to present clean justifications for the [] closing of our
> accounts.

163.    Third, in connection with their efforts to conceal payments and falsify records,

Defendants purposely availed themselves of the U.S. financial system to funnel U.S. dollars to

straw-man companies outside Syria and Iraq. LCS executives made clear that they preferred to

transact through U.S. dollar bank transfers. On June 30, 2013, Pescheux emailed Tlass, "[W]e

cannot continue the way we are settling the turnover invoices. Our preferred option would be the

one we told you last October: a bank transfer in USD to the account of a duly registered

company," as opposed to a direct payment to Tlass in cash, which would appear more suspicious.

Thus, Defendants instructed Tlass, their ISIS intermediary, to create a new corporate entity in

Dubai so that Defendants could surreptitiously transact in U.S. dollars, transactions that

Defendants knew would transfer, clear, and be processed through New York.

164.    Pescheux also sent an internal email instructing several LCS employees that "we

all have to stop [using] the acronym of an organization which is on terrorist lists" and instead use

code words, indicating that he was both aware of and concerned about disclosure of Lafarge's

support for FTOs.

165.    Similarly, a February 2, 2014 "External Support Agreement" between LCS and a

new company created by Tlass in Dubai confirmed that payments should be made in U.S.

dollars. LCS agreed to pay the new company "a monthly remuneration of 75.000USD."

166.    Lafarge and LCS executives made similar efforts to disguise the nature of

payments to Taleb, including by directing that payments reference only environmental consulting

and be made using U.S. dollars. For example, on January 12, 2014, Pescheux emailed Taleb:

> Prepare an invoice from [Taleb's company], send to me by email
> and bring the original next week, for an amount of 4,402 USD just
> with "Environmental consultancy services for the months of
> October, November and December 2013" as a justification.
>
> For your understanding hereunder are the details of the calculation:
>
> - pozzolana: 18,270 tons equivalent to 914 USD (he has delivered
> the first order of 15,000 tons and 3,270 tons out of the order of
> 100,000 tons)
>
> - HFo: 3,488 tons equivalent to 3,488 USD (he has not yet
> completed the first order of 4,000 tons, it remains 512 tons to deliver
> and he has not started the 12.000 tons of standard quality)
>
> Total:4,402 USD

167.     A few weeks later, on February 5, 2014, Pescheux again required that payments reference only environmental consulting and be made in U.S. dollars:

> If you want to have a chance to get paid for pozzolana and HFO, you have to prepare an invoice following my instructions and not your imagination.
>
> So you have to issue an invoice mentioning only:
>
> Consultancy services performed up to January 31,2014 for a total amount of 4,836 USD
>
> This amount has been calculated as follows (up to 31-1-2014) HFO: 3,488 tons out of the order of 4,000tons= 3,488 USD
>
> Pozzolana: 15,000t out of the order of 15,000t (completed) plus 11,964t from the order of 100,000t i.e total 26,964/20= 1348 USD

168.     On February 13, 2014, Taleb sent Pescheux the invoice "[b]ase[d] on your instruction." The invoice, payable in U.S. dollars to the intermediary's company, purported to be for "[c]onsultancy services." International financial transactions denominated in U.S. dollars, unlike transactions denominated in Syrian pounds, are cleared through U.S.-based financial institutions located in New York.

169.     In addition, as another way to conceal their partnership with ISIS from French auditors and law enforcement authorities, Lafarge and LCS executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their Lafarge corporate email addresses, to coordinate and carry out elements of their partnership with ISIS.

170.     LCS's own legal counsel instructed LCS's CEO not to create business records concerning the company's illegal terrorist financing. On September 8, 2014, in connection with a discussion about documents received from ISIS, Jolibois wrote to Veillard, "Thank you for sharing this information with [Herrault], I don't want to write to him about this topic at his professional address (as recommended by [in-house counsel])." Lafarge executives used Gmail

accounts to communicate about the conspiracy, and thus avoided leaving incriminating evidence on corporate mail servers located in France that would be available to French auditors, regulators, and law enforcement officials.

**E.     Lafarge And LCS Negotiate A Long-Term Revenue Agreement With ISIS As Their Business Ties Deepen**

171.     In 2014, Defendants' executives saw an opportunity to capitalize further on their business relationship with ISIS. The opportunity was mutually beneficial: if ISIS could block or tax cement imported from Turkey into Syria, LCS's revenues would go up, and so too would ISIS's share of the revenues. Defendants negotiated a long-term revenue sharing and market control agreement with ISIS.

172.     Pescheux proposed that ISIS should "take a 'toll fee' on each truck loaded with Turkish cement." Such a toll would allow ISIS to gain revenue while simultaneously "reduc[ing] the attractiveness of Turkish cement. It would reinforce our competitiveness [and] therefore increase our volumes and increase the fees paid [to] our distributors or Da'ech [ISIS]."

173.     A July 14, 2014 Gmail message from Tlass to Pescheux discussed these "negotiations with ISIS," proposed providing ISIS with a "monthly statement," and sought input from Pescheux about how much Lafarge's distributors should pay the terrorists "in addition to the ten millions that we pay directly to them, i.e. ISIS."[8]

---

[8] It is unclear from the face of the email to what currency the sender is referring.

On Mon, Jul 14, 2014 at 9:38 AM, Firas Tlass <firastlass01@gmail.com> wrote:

Dear Bruno

Our negotiations with ISIS are going better now, and I'm confident that we can reach to a logical agreement with them.

What I need to know exactly:

· What are the payments that we have deducted from all the suppliers as compensations for the amounts that they usually pay to ISIS in addition to the ten millions that we pay directly to them, i.e to ISIS?

• Can we give them a monthly statement about the cars sold by the plant every month?

N0014R01-00001461-00001

174.    Negotiations continued throughout the summer and into fall 2014. In August 2014, Tlass emailed Jolibois, LCS's new CEO, to inform him that ISIS wanted a monthly fee in addition to an assessment on each ton of cement sold:

> Negotiations with ISIS are complex and not easy at all. In their last request yesterday, they asked us to pay S.P.100 million/month, but I told them today morning that they will gain more than 100 million/month from the factory in case the agreement includes the fixed monthly amount + the introduction amount + the amount of our purchases of pozolana, sand and fuel.

175.    Jolibois responded: "If ISIS wants higher tax from us, it's better for them to stop Turkish cement and Iraki cement, so that we may increase the price." In response, Tlass said that ISIS was prepared to stop importation of Turkish cement upon consummation of a revenue sharing agreement.

176.    On August 5, 2014, Tlass sent Jolibois a draft revenue-sharing agreement between
LCS and ISIS. The next day, Jolibois confirmed Lafarge's and LCS's agreement to a rate of ten
percent, in return for the free movement of LCS employees, customers and suppliers, as well as
ISIS's agreement to stop importation of Turkish cement in areas under its control, for the
following six months:

- As per our phone call today, hereafter what I understand from the agreement with ISIS, that I approve:

- ISIS will receive the payment of 750SP/ton, by customers, every two weeks

- ISIS ensure the security and the free movement of our customers and suppliers vehicles as well as our employees

- ISIS will stop import of Turkish cement in the areas under its control (as of today: Al Rakka, Dair El Zor, Hasaka, Qamishli and Al Mayaden, Srin, Menbij, Al-Bab, Deir Hafer and Maskaneh), or implement in those areas taxes as high or higher than to Jalabieyeh cement plant.

- The agreement is valid until February 5th, 2015.

    I hope the agreement to be signed today, and sales to restart tomorrow.

    ISIS needs to clarify which office (AlRaqqah or Membij) is certified to receive payments and deliver permission letters.

177.    While Lafarge was aware that ANF and ISIS were classified as terrorist groups by
the United States, United Nations, and European Union, business negotiations between
Defendants and ISIS became more complicated on August 15, 2014, when the United Nations
Security Council passed a resolution condemning ISIS, ANF, and Al-Qaeda, and calling on U.N.
members to prohibit all financial and trade relations with the groups. On August 18, 2014, the
United States Department of State added ISIS member Mohamed Al-Adnani and ANF member
Said Arif to its list of Specially Designated Global Terrorists.

178.    Defendants' executives were closely following these developments. On August 18, 2014, Veillard emailed Herrault and Jolibois with the subject heading "terrorist watch list" and wrote that the United States had designated ISIS's Al-Adnani and ANF's Arif to the list of Specially Designated Global Terrorists.

179.    On August 7, 2014, the United States began airstrikes against ISIS in Iraq, and in September 2014, began strikes against ISIS in Syria.

180.    On August 19, 2014, ISIS executed American journalist James Foley and released a video of the horrific act, entitled "Message to America," online. Advocates for Foley had approached LCS in 2012 to ask for LCS's assistance in negotiating for Foley's freedom when he was taken hostage. Two weeks later, on September 2, 2014, ISIS released a video of the beheading of Steven Sotloff, another American journalist, titled "A Second Message to America."

181.    Notwithstanding ISIS's heinous acts, including the televised murder of Americans, and the international community's universal condemnation of the terrorist group, LCS ironed out a final revenue-sharing agreement with ISIS on or about August 20, 2014—after consulting with Lafarge's in-house counsel.

182.    The executives involved in the negotiations with ISIS updated Lafarge's Executive Committee during a meeting on August 27, 2014. The notes from the meeting reflect that Herrault highlighted ISIS's agreement to impose costs on imported Turkish cement that were equal to the costs imposed on LCS: "In our agreement with Daesh [ISIS], we said that in terms of taxation we must have the same treatment as Turkish imports."

183.    The notes further reflect that Lafont, Lafarge's CEO, responded that "we have to make sure that what we do is risk free (also vis-à-vis the U.S.)." Also Lafarge's Chairman,

45

Lafont, knew that Defendants' partnership with ISIS was illegal under U.S. law and would have consequences in the United States. In response, Herrault replied that "the best protection is to keep the plant in operation, sales have resumed, we are maintaining contact with everyone."

184.    Lafarge had now solidified its shared objectives with ISIS. Each co-conspirator, including Defendants, intermediaries, and ISIS, would make money by having ISIS use force and violence to block cheaper imported cement to increase LCS's sales. The parties thus collaborated to directly finance ISIS's growing terrorist attacks, including those that killed or injured Plaintiffs or their family members.

**F.    ISIS Seizes The Cement Plant**

185.    As it turns out, terrorists are not trustworthy business partners.

186.    On September 10, 2014, President Obama outlined a strategy for the United States to lead an international coalition to "degrade and ultimately destroy" ISIS through direct military action. President Obama described ISIS as "a terrorist organization, pure and simple" with "no vision other than the slaughter of all who stand in its way."

187.    In the following days, ISIS advanced on the Cement Plant with an eye towards complete control of the region. Even in the face of this grave threat from ISIS, Lafarge and LCS executives wanted to continue with the conspiracy. Jolibois argued strenuously against shutting down the Cement Plant, saying that if LCS suspended operations "for the next few months until after the completion of the merger [with Holcim] we will surely be watched closely when we seek to resume them, and nothing says that the area will have been freed from the grip of ISIS, nor that it will be free from it for years."

188.    Likewise, on September 12, 2014, Veillard sent an email to Herrault saying, "I think it's imperative to maintain the plant in working order and to be able to restart quickly." Veillard went on to say, "[i]t seems to me that this option is totally doable…."

189.    Lafarge and LCS executives' desire to remain in the area despite ISIS's control, coalition airstrikes, and danger to their employees meant that they did not implement a safe evacuation plan to shut down the plant machinery and keep it from still being operational in terrorists' hands, or to safely evacuate local staff. When ISIS informed employees early in the morning of September 18, 2014 that it intended to advance on the plant, Jolibois ordered the remaining team to "prepare mattresses, food, water, sugar" and shelter in the plant's electrical tunnels rather than evacuate. Indeed, there were no cars at the plant with which the employees could evacuate. The employees who remained to oversee the plant's shutdown had to hitch rides with the fleeing canteen vendors and on local buses.

190.    In their departure, LCS employees left the plant entirely operational. All start-up technology and hard drives were left in place, and one diesel generator was still running as the machinery cooled when they left.

191.    ISIS completed its seizure of the Cement Plant on September 19, 2014, and promptly released propaganda videos showing its militants at the Cement Plant. In the Cement Plant, ISIS took what it wanted. ISIS seized the cement that Defendants had produced in furtherance of the conspiracy, and ISIS ultimately sold that cement for what Lafarge and LCS's plea deal admitted was approximately $3.21 million. The actual value of the cement and other materials was much higher. According to publicly available French intelligence reports and media reports, ISIS seized materials worth approximately $25 million. It seized raw materials at the Cement Plant that included hydrazine, a chemical that ISIS could use to produce explosives for terrorist attacks. Defendants' intermediary Taleb negotiated the disposition of these remaining materials for approximately $11.5 million. Thus, according to French intelligence, following October 2014, "[t]he dismantling of the Lafarge factory in Syria continues to the

financial benefit of both Daesh [ISIS] and the businessmen involved." In December 2014, Taleb visited Lafarge's headquarters in Paris to explain the ongoing negotiations relating to materials left at the plant.

### G. After Evacuating The Cement Plant, Defendants Attempt To Conceal Their Partnership With ISIS

192.    After Defendants' employees fled the Cement Plant, and as the international community stepped up its multi-front action against ISIS, Defendants took further steps to conceal their conspiracy with ISIS. They did so by drafting a backdated contract-termination agreement that would allow them to falsely claim that Tlass's relationship with LCS had been terminated before he conducted negotiations with ISIS in August and September 2014.

193.    Specifically, on September 29, 2014, Tlass informed Herrault and Jolibois that, in response to their prior requests, Tlass had opened a bank account in Dubai in the name of a new company that was not publicly linked to Tlass ("Tlass NewCo").

194.    On October 9, 2014, Jolibois sent an internal email to Pescheux and Lafarge's in-house counsel with the subject "New contract for [Tlass]" and saying that LCS owed Tlass "Monthly fees 2*75kUSD for services in July and August" plus "August sales tax to PYD, already paid by [Tlass] to PYD : 10.5 M SYP = 60kUSD)" totaling "210kUSD." Jolibois further wrote that the in-house lawyer "would like to terminate the previous contract [with Tlass] on the date of 18th August to show evidence of company reaction to UN resolution, and to get a new contract to start from September 1st, 2014." In a subsequent email on October 14, Herrault clarified Lafarge would not pay Tlass without a new backdated contract.

195.    Jolibois then sent an email to Tlass with the subject line "Agreement for Regional Security Consulting Services," which attached copies of (1) the new consulting agreement

between a holding company created by LCS ("LCS NewCo") and Tlass NewCo, and (2) the

backdated Termination Agreement between LCS and Tlass NewCo.

196.    In his cover email, Jolibois explained that the new consulting agreement was

"written in such a way as to" take "into account the compensation for termination of the previous

contract (210k USD for 202k USD which are actually due)." A $210,000 lump sum payment

compensated ISIS intermediary Tlass for work he had already performed negotiating an

agreement with ISIS, and to reimburse him for making fixed monthly "donation" payments to

terrorist groups, including ISIS.

197.    In addition to the lump sum payment to compensate him for work he had already

performed, Defendants continued to pay its intermediaries to work with ISIS. Those payments

for ISIS, including to or through Taleb, continued after Lafarge left the Cement Plant, according

to a post-dated contract and reports. The new consulting agreement with Tlass required the

Defendants to make monthly payments of $30,000 on a going-forward basis.

198.    The Termination Agreement with Tlass was backdated to August 18, 2014, the

day LCS employees fled the Cement Plant. The metadata of the backdated Termination

Agreement indicates that the document was not drafted by Lafarge's in-house lawyer until

October 3, 2014, two weeks after LCS had evacuated.

199.    On October 23, 2014, after the parties signed the new consulting agreement and

the backdated Termination Agreement, Tlass sent an invoice for $210,000. Lafarge paid the

$210,000 invoice with a wire transfer from Lafarge's operating account at a financial institution

in Paris, through the Eastern District of New York, to intermediary banks in New York City,

which transmitted the wire to Tlass NewCo's account at a financial institution in Dubai (*see infra*

§ K).

200.    On information and belief, any additional U.S. dollar payments due under the Consulting Agreement were paid after October 2014 in the same manner.

201.    Legal proceedings against Lafarge in France revealed that intermediary Taleb continued to negotiate with Lafarge for payment for materials in the plant. According to a publicly available French intelligence report, at a meeting between the parties in December 2014, Lafarge handed over 65,000 tons of cement, worth $6.5 million. At the meeting, ISIS representatives signed a contract for an additional $5 million of the cement left at the plant. Following October 2014, "[t]he dismantling of the Lafarge factory in Syria continues to the financial benefit of both Daesh [ISIS] and the businessmen involved," stated the intelligence report.

## H.    With Its Deep Pockets, ISIS Continues To Wreak Havoc

202.    Flush with cash from its dealings with Lafarge—at a minimum $5.92 million to as much as $15 million in cash and more in kind—ISIS continued to commit terrorist attacks.

203.    After gaining experience by joining ISIS's takeover and exploitation of major regions of Iraq and Syria, many of the tens of thousands of ISIS-trained foreign fighters returned to their home countries during this time. They planned to establish "provinces" of ISIS that would stretch far beyond Iraq and Syria.

204.    By this point, ISIS had established global notoriety. One key factor that helped propel ISIS's growth was its powerful propaganda machine, which can arguably be described as unprecedented for a violent non-state actor. Harnessing the power of social media and significant advances in DIY video production, ISIS spread horrific imagery throughout the globe. ISIS was particularly sadistic in its treatment of people unlucky enough to be captured by the militant group, including enemy soldiers, tribesmen, politicians, and journalists. For anyone who has watched ISIS's bloodiest propaganda, imagery will be seared into their mind of beheadings,

captives being immolated, people being thrown off of buildings, and ISIS hostages being drowned in cages. Furthermore, and of particular relevance here, ISIS's propaganda promoted specific techniques, tactics and procedures for terrorist attacks. The perpetrators of the attacks that harmed Plaintiffs used ISIS propaganda to inform their tactics and choice of weaponry.

205.    ISIS was not dislodged from Iraq until October 2017. It was finally pushed out of all the territory it controlled in Syria in March 2019.

## I.    LafargeHolcim Discloses That Lafarge And LCS Transacted With Terrorists

206.    In July 2015, after over a year of negotiations, Holcim completed its merger with Lafarge, which resulted in the combination of the two largest building materials companies in the world. The payments to terrorists were not disclosed to Holcim or its representatives during preacquisition due diligence meetings. Lafarge executives who had been aware of Lafarge's payments to ISIS remained in leadership positions in the newly formed company, LafargeHolcim.

207.    On February 19, 2016, a website run by an opposition group to the Syrian regime reported that Lafarge and LCS had purchased raw materials from and made other payments to ISIS. The report included partially redacted images of emails sent to and from Lafarge and LCS executives' email accounts, discussing payments to ISIS.

208.    On April 24, 2017, after retaining a U.S. law firm to conduct an investigation, LafargeHolcim issued a press release acknowledging for the first time that Lafarge and LCS made payments to terrorists: as "terrorist groups designated by the US and the EU were expanding into the area" of the Cement Plant, LCS made "payments" to intermediaries to "avoid direct contact with these armed groups." LafargeHolcim admitted that "LCS management kept Lafarge SA well-informed of developments."

**J.  Defendants' Payments And Cooperation Substantially Assisted The Acts Of International Terrorism That Injured Plaintiffs And Killed Their Family Members**

209.    Defendants made payments to ISIS that financed their operations, including acts of international terrorism that injured Plaintiffs. Without funding, terrorist attacks cannot be planned, fighters cannot be paid, and propaganda cannot be generated, edited, and distributed. But more than that, Lafarge sought to partner with ISIS because of its ruthlessness and brutality. Lafarge did not only pay into the protection racket ISIS enforced. It sought to partner as closely as possible with ISIS, to pay percentages of its sales to ISIS, to purchase materials from ISIS and sell its cement to ISIS, and ultimately to enter an agreement for ISIS to block its competitors in exchange for a slice of all of the Cement Plant's profit. In return, ISIS carried out exactly the types of attacks that had made it such an enticing business partner in the first place: terrorist attacks to expand and maintain its control of territory and markets.

210.    The millions of dollars Defendants gave ISIS materially enhanced ISIS's ability to expand or sustain their power and territorial control by committing the terrorist attacks described in this First Amended Complaint, as Defendants foresaw and intended for their own financial benefit. The cost of ISIS's individual attacks, and salaries for their fighters, paled in comparison to the funding provided to those groups by Defendants.

211.    ISIS fighters received a base pay of $200-400 per month. Just $5,000 to ISIS could have paid 20 terrorists (at $200 per fighter) and three commanders (at $333 per commander) in the field for a month. $5,000 could purchase dozens of bomb components or finance multiple complex attacks. ISIS publicly confirmed in a video that it deployed its "taxes," that is, money collected from its territory, including from Defendants, to support "[t]he mujahidin and jihad"—that is, its fighters and its fight. The money ISIS got from Lafarge was used to pay fighters, control territory and markets, and commit terrorist attacks.

212.     U.S. government studies confirm the dramatic impact of even marginal financial contributions to AQI and its progeny. For example, one DOD study found a statistically significant relationship between small-dollar contributions and terrorist attacks, concluding that each successful terror attack required on average only $2,732 to execute. The study thus demonstrated that even marginal reductions in AQI's terrorist funds corresponded with a statistically significant reduction in terrorist violence. The converse was also true. For every $2,700 (or its rough equivalent) Defendants gave to AQI's successors, they financed roughly one new terrorist attack. As a result, even just the $5.92 million Lafarge and LCS admittedly gave ISIS and ANF (the actual payment amount was likely higher) was more than enough to fund thousands of attacks – sufficient to kill every Plaintiff in this case multiple times over.

213.     Lafarge and LCS pleaded guilty and admitted giving ISIS and ANF $5.92 million, though the actual payments are believed to be much higher. Defendants also left millions of dollars of cement in ISIS's hands, or sold it to them directly. ISIS recruited tens of thousands of foreign fighters to commit attacks. The limiting factor on its attacks was money, not manpower.

214.     As Mustafa Abu al-Yazid, an al-Qaeda financing chief, said: "There are hundreds wishing to carry out martyrdom-seeking operations, but they can't find the funds to equip themselves. So funding is the mainstay of jihad." Defendants' payments, given at a time when ISIS was looking to expand and commit attacks, materially strengthened the terrorists' ability to commit the attacks that killed and injured Plaintiffs. This effect was linear. Simply put, more money equaled more acts of terrorism.

215.     Indeed, following the payments by Defendants, ISIS attacks against Americans increased. These attacks began with its beheadings of American journalists and humanitarian workers in 2014, which ISIS announced as horrific 'Message[s] to America.' ISIS's targeting of

Americans rapidly expanded, following and utilizing Defendants' payments, to killing Americans in Jordan, France, Spain, and other countries around the world.

216.     The money Defendants admitted to placing in ANF's and ISIS's hands from 2012-14 had a lasting impact. ISIS had sophisticated financial accounting and saving systems. As late as February 2019, according to a U.S. government report, ISIS continued to hold onto amounts of "stockpiled cash." Moreover, the cement that Defendants handed over to ISIS was durable, by its very nature. The tunnels and infrastructure ISIS built with Defendants' cement would have lasted past 2014. Defendants' admitted material support for ISIS in 2014 foreseeably contributed to ISIS's long-term savings and its ability to commit attacks multiple years later; material support in subsequent periods to which Defendants have not admitted contributed to ISIS's ability to commit attacks even later than that.

217.     ISIS's fundraising apparatus was organized and centralized, meaning that there was a strong link between Defendants' payments and ISIS's terrorist attacks. Terrorism scholars Dr. Colin Clarke and Dr. Phil Williams explain that "[m]uch like its predecessor, AQI, [ISIS] . . . adopted a top-down approach that maintained hierarchical control over and a high degree of accountability for its financial assets as it worked to keep an ironclad grip over the money it earned from a series of rackets." The U.N. Security Council's ISIS panel notes that ISIS's "core leadership" in Syria and Iraq exercised "systematic financial direction" over its provinces' financing. Such systematic financial direction ensured that Defendants' money in Syria supported ISIS's terrorist attacks in other areas.

218.     Because of ISIS's structure and organization, Defendants' payments were specifically funneled to certain cells – specifically, the Raqqa Cell and the ISIS Leadership Cell

(discussed *infra*). These ISIS cells played a key role in both handling Defendants' money and planning or committing the attacks that targeted Plaintiffs and their family members.

219.    Without the "financial resources" supplied by such payments, the Financial Action Task Force concluded, "the capability and activity of terrorist organizations such as ISIL [would have been] degraded."  As Juan Zarate, a former U.S. Treasury Department official, likewise explained in 2015, diversified "[f]inancial flows" were especially "important [to] groups like the Islamic State …. Money is their enabler but it's also their Achilles heel."  Had Defendants refused to pay, they could have materially curtailed ISIS's terrorist violence, impeding their ability to kill and injure Plaintiffs.

220.    Other government reports confirm the direct link between Defendants' payments and ISIS's terrorist attacks. For example, the State Department reported that "ISIL and AQ affiliates, including [ANF]," used "criminal activities to raise funds for operational purposes," observing that much of ISIS's and ANF's funding came from so-called "taxation" in Syria. Similarly, the U.N. Security Council documented that ISIS created "a sophisticated quasi-bureaucratic revenue-generating structure" in Syria – of which Defendants' payments were a material part – to generate "financial resources to support [its] ongoing military campaigns."

221.    Defendants knew that ISIS was using their money to commit terrorist acts. As noted above, Defendants were aware that ISIS was a U.S.-designated terrorist group; that is why they worked so hard to conceal their conduct. They also knew that, in 2012, ISIS and ANF had "gained control of territory in Syria and committed numerous terrorist acts, resulting in the deaths of numerous U.S. citizens." Against that backdrop, as a former LCS risk manager admitted, Lafarge "should have pulled out" of Syria but instead cooperated with ISIS and ANF, allowing "those groups [to] directly or indirectly benefit[] from our operations." And Defendants

were aware of why local terrorists were running protection rackets. The same LCS employee acknowledged that "their motivation seemed obvious: they wanted money! Money to use for arms, ammunition, and battalion funding."

222.　As shown by evidence gathered in the ongoing French criminal case against Lafarge and its executives, Defendants' payments were sufficiently pervasive and systemic that they substantially contributed to a range of ISIS terrorist attacks. The scale and repeated nature of Defendants' payments magnified the effect of their contributions. According to French criminal investigators, the "amount and duration" of Lafarge's multimillion-dollar bribes in Syria allowed ISIS to "plan and carry out violent operations in the area and abroad."

223.　U.S. prosecutors concurred in that assessment. As Deputy Attorney General Monaco noted, "through their support and funding, Lafarge enabled the operations of a brutal terrorist organization."

224.　Defendants' payments to ISIS in 2013-2014 also assumed an outsized role in financing ISIS violence through at least the end of 2017. For ISIS in particular, money had a multi-year shelf-life, given the way it hoarded cash and preserved it for future use. The U.S. government, for example, confirmed in February 2019 that "ISIS . . . in Syria . . . continue[d] to draw upon its cash reserves" from its older caliphate-era rackets with the terrorists continuing to stretch the "stockpiled cash" they collected many years earlier. This reflected, among other things, ISIS's strategic decision in 2014 to conserve resources – including its "tax" revenue and cement for fortifying underground tunnels – for future use years later. Similarly, Lafarge's provision of high-quality cement to ISIS had a long shelf-life. Given these unique-to-ISIS practices, Lafarge's material support in 2014 foreseeably contributed to ISIS attacks as late as 2017.

56

### i.  At Least Twenty Percent Of Lafarge's Money Was Used To Harm Plaintiffs

225.    ISIS's Leadership Cell, also called the "Shura Council," "Governance Council," or "Delegated Committee," was, during relevant periods, a unified leadership group that approved new ISIS membership, expansion plans, and strategy. ISIS's Leadership Cell was composed of Al-Baghdadi and several advisors. It ensured that all major ISIS actions worldwide were in accord with Islamic law and ISIS's overall strategy. ISIS's predecessor ISI's known funding structures required that twenty percent of all income derived from its taxation went to Al-Baghdadi and his Leadership Cell for use in planning and committing attacks, and ISIS continued the same practices.

226.    According to terrorism scholar Brian Fishman, the "provinces," or geographic areas under its control, "carefully tracked both revenue and expenditures and passed 20 percent of their income to the national-level ISI [al-Baghdadi and the group's leadership], which redistributed the funds as needed." ISIS was a remarkably centralized group, with the Leadership Cell commanding specific areas to expand or stop sending fighters and with all fighters loyal to the same authority under Al-Baghdadi.

227.    According to multiple sources, including its magazine Daqbiq and a guide to its "tax" practices, ISIS mandated payment amounts depending on its interpretation of Islamic law. This interpretation specified that twenty percent of goods such as spoils of war and of underground or mineral wealth be paid to ISIS's central funds. Non-Muslims permitted to remain in ISIS territory paid greater amounts than Muslims under ISIS's control. Thus, it is likely that twenty percent of the funds Defendants have admitted to paying ISIS went to Al-Baghdadi and the Leadership Cell (over $1.1 million U.S. dollars), to plan and execute the acts that harmed Plaintiffs.

228.    Al-Baghdadi and the Leadership Cell directed and therefore participated in the expansion of ISIS's territory and recruiting efforts beyond Iraq and Syria, by (1) supplying logistical, training, planning and financial support for ISIS's external attacks that harmed Plaintiffs; (2) spearheading, contributing to, and maintaining a powerful propaganda machine through which they reached, recruited, instructed, and controlled the individuals who carried out the attacks that harmed Plaintiffs; (3) contributing financially to ISIS leadership, which allowed ISIS's reach and influence to quickly extend far beyond Iraq and Syria, culminating in a global following of terrorist cells that committed atrocities such as the attacks in this case; and (4) targeting the United States through ISIS's external attacks.; Together, these acts of support enabled the deaths or injuries of Plaintiffs and their family members.

### ii.   Lafarge Channeled Funds Into ISIS's Center In Raqqa, Which Used The Money To Harm Plaintiffs

229.    The Cement Plant was in Raqqa, one of the first cities to fall to opposition groups during Syria's civil war. ISIS's Raqqa Cell attained prominence within ISIS itself because of its central location and the large population under its control. It became critical to planning ISIS's outward reach, and ISIS leadership flocked there. While ISIS was founded and led by Al-Baghdadi in Iraq, its expansionary military strategy and much of its operations and planning worldwide were centered in Raqqa. Al-Baghdadi declared that Raqqa would be the seat of his state, due to its proximity to both Iraq and Syria. According to LCS's former risk manager, Lafarge negotiated with ISIS's representatives in Raqqa.

230.    As the capital, ISIS's leadership and strategy were set in Raqqa. Secretary of State John Kerry stated in 2015 that Raqqa was "the core where they're [ISIS] planning" attacks. A Pentagon spokesperson likewise confirmed that ISIS's militant administration and leadership were based in Raqqa. As described by the Commander of U.S. Central Command, Raqqa was

"where [ISIS's] plotting takes place. . . . Raqqa is recognized as the financial, leadership and external ops center of the Islamic State." And indeed, the Pentagon has explicitly stated that "Raqqa was a key location for ISIS' planning, financing, execution, or inspiration of terrorist activities throughout the world, including attacks in Paris and Nice in France."

231. ISIS's Raqqa Cell was led by Abu Luqman, also known as Ali Musa Al-Shawakh, from early 2014 until his death in an airstrike in 2018. Abu Luqman had been a powerful ANF terrorist but then switched his allegiance to ISIS and recruited several hundred ANF fighters to join ISIS's ranks in Raqqa. He served on ISIS's Leadership Cell, as well as on ISIS's Intelligence Cell. Abu Luqman was head of ISIS's Directorate of General Security, which was responsible for intelligence gathering, detentions, state security, and external intelligence. Public reports state that Abu Luqman served on a "shadow board" of the Cement Plant. Abu Luqman also controlled ISIS's oil sales in northern Syria, which likely included sales of fuel to LCS.

232. In December 2014, Abu Luqman himself was present, alongside Lafarge's agent Taleb, to facilitate ISIS's purchase of remaining materials in Lafarge's factory, worth $11.5 million. The next month, at Defendants' expense, Taleb visited Lafarge's headquarters in Paris to report on the ongoing negotiations with Abu Luqman to re-open the plant under Lafarge's supervision.

233. The Raqqa Cell and Abu Luqman not only coordinated with Defendants or their agents and directly received their material support, but directly participated in the acts of international terrorism that injured Plaintiffs.

234. As the de facto capital, Raqqa was the center of ISIS's training and planning. Indeed, the Raqqa Cell served as a nerve center for ISIS operations worldwide. Raqqa was "where ISIS plans their external operations," stated the commander of U.S. Central Command.

Abu Luqman and the Raqqa leadership therefore participated in the expansion of ISIS's territory beyond Iraq and Syria. The Raqqa Cell was critical to determining when and how to recruit or accept additional members, where to expand, and how to commit attacks outside Raqqa by (1) serving as the bridge between ISIS's Leadership Cell and local cells on the ground in other locations; (2) maintaining ISIS propaganda network, which instructed, inspired, and motivated the attacks; and (3) supplying logistical, training, and financial support for ISIS's external attacks.

**K.  Defendants' Unlawful Conduct Had A Substantial Nexus To New York And The United States**

> ### i.  Defendants Purposefully Relied On New York Banks To Clear The U.S.-Dollar Transactions They Used To Finance Terrorism

235.    Defendants intentionally used the U.S. financial system and caused wire transfers to clear through New York banks, thereby purposefully availing themselves of New York's banking system. Specifically, Lafarge directed its banks to complete U.S.-dollar-denominated wire transfers to support its scheme to fund ISIS and ANF, and Lafarge's officials knew those directions required the use of New York banks. Defendants' wire instructions caused their payments to clear in New York, including through one admitted suit-related transaction in this District.

236.    Defendants' payments to terrorists relied on correspondent banks located in New York. Correspondent, or intermediary, banks are the conduit for a financial transaction when a sender's bank cannot perform a direct transfer in the desired currency with the recipient bank. Almost all correspondent banks that perform U.S. dollar transactions are located in New York, which allows them to use the U.S Clearing House Interbank Payments System ("CHIPS"). CHIPS estimates that in 2015 it was responsible for processing over 95 percent of cross-border transactions denominated in U.S. dollars.

237.    Defendants preferred transacting almost entirely in dollars, both because U.S. dollars were protected from the rapid depreciation of the Syrian pound and because the international transactions through the U.S. banking system masked the true purpose and intent of their transfers. Plaintiffs, on information and belief, believe that there have been at least 23 relevant transactions related to Defendants' terrorist-funding scheme that were denominated in U.S. dollars and used the New York financial system, although this is only a list of transactions available without discovery.

238.    Defendants made at least nine U.S.-dollar-denominated upstream payments and at least 14 U.S.-dollar-denominated downstream payments through the New York banking system. Upstream payments were the ones that Lafarge made, typically through Lafarge Cyprus, to send LCS money for operating expenses—including terrorist payments. Lafarge made downstream payments to Tlass and Taleb so that they could pay ISIS and ANF on Lafarge's behalf. The chart below, on information and belief, depicts each payment:

//

//

//

//

//

//

//

//

//

//

| Date | Category | Sender | Recipient | USD Amount |
|---|---|---|---|---|
| 4/28/2011 | Upstream | Lafarge Cyprus | LCS | $20,000,000 |
| 7/31/2011 | Upstream | Lafarge Cyprus | LCS | $5,000,000 |
| 8/25/2011 | Upstream | Lafarge Cyprus | LCS | $10,000,000 |
| 8/25/2011 | Upstream | Lafarge Cyprus | LCS | $5,000,000 |
| 3/18/2012 | Upstream | Lafarge Cyprus | LCS | $10,000,000 |
| 9/27/2012 | Upstream | Lafarge Cyprus | LCS | $16,500,000 |
| 12/27/2012 | Upstream | Lafarge Cyprus | LCS | $15,500,000 |
| July 2013 | Downstream | LCS | Tlass | $75,000 |
| August 2013 | Downstream | LCS | Tlass | $75,000 |
| September 2013 | Downstream | LCS | Tlass | $75,000 |
| 9/30/2013 | Upstream | Lafarge Cyprus | LCS | $5,000,000 |
| October 2013 | Downstream | LCS | Tlass | $75,000 |
| November 2013 | Downstream | LCS | Tlass | $75,000 |
| December 2013 | Downstream | LCS | Tlass | $75,000 |
| January 2014 | Downstream | LCS | Tlass | $75,000 |
| February 2014 | Downstream | LCS | Tlass | $75,000 |
| February 2014 | Downstream | LCS | Taleb | $4,836 |
| March 2014 | Downstream | LCS | Tlass | $75,000 |
| April 2014 | Downstream | LCS | Tlass | $75,000 |
| May 2014 | Downstream | LCS | Tlass | $75,000 |
| June 2014 | Downstream | LCS | Tlass | $75,000 |
| 6/10/2014 | Upstream | Lafarge Cyprus | LCS | $11,000,000 |
| 10/23/2014 | Downstream | Lafarge Cyprus | Tlass | $210,000 |

239.    On information and belief, the nine upstream payments, totaling $98 million, were disbursements made under an April 7, 2011 loan agreement between Lafarge Cyprus and LCS to give LCS operational funding, including for the purpose of maintaining its conspiracy with ISIS and ANF. Lafarge's General Counsel and Corporate Secretary signed the loan agreement on Lafarge Cyprus's behalf and oversaw the first seven disbursements, and Lafarge's Assistant General Counsel oversaw the final two disbursements. Lafarge Cyprus funded LCS at Lafarge's

direction and subject to its control. Indeed, Lafarge admitted it was responsible for the October 23, 2014 payment to Tlass although Lafarge structured that payment as nominally originating from Lafarge Cyprus. The other Lafarge Cyprus payments above similarly occurred at Lafarge's direction. Lafarge Cyprus sent the upstream payments in part by wiring U.S. dollars into accounts LCS maintained with Bank Audi in Lebanon and Syria. LCS in turn paid out the U.S. dollars to pay Taleb and Tlass to dole out to the terrorist groups with whom Lafarge conspired. Lafarge Cyprus's payment method was the best way for LCS to navigate sanctions on financial transfers to Syria.

240.    When Lafarge decided to make a $12 million disbursement on June 10, 2014 through Lafarge Cyprus, it had long known LCS was making payments to terrorists including ANF and ISIS through intermediaries—it was doing so with Lafarge executives' oversight and approval and for the purpose of continuing to make payments to terrorists. It also knew LCS was paying Tlass $75,000 in U.S. dollars monthly to compensate him for negotiating with ISIS. Lafarge still decided to pay LCS an additional $12 million in what, on information and belief, an email from its treasury manager called "fresh cash"—cash for terrorists.

241.    All but one of the 14 downstream payments was a monthly $75,000 payment LCS made to Tlass to enable his payments to ISIS and ANF. Lafarge's agreement with Tlass set that Tlass would "retain $50,000 and the remaining $25,000 would be disbursed to armed groups." The amounts were purposefully in U.S. dollars, for the purposes of stability and concealment described above. The payment of $210,000 included $150,000 to cover Tlass's monthly stipend from July and August 2014. On information and belief, U.S. dollar payments, which were required under the contract Defendants negotiated with Tlass, and which were also paid to

intermediary Taleb, continued after October 2014 as Defendants continued to try to regain control of the cement plant into and after early 2015.

242.    Lafarge's U.S. dollar transactions almost certainly cleared through CHIPS, and thus through New York banks. Participating in the clearing system requires U.S. presence, in part to ensure that U.S. law will govern cross-border U.S.-dollar transactions. Most such banks' U.S. presence is in New York, since U.S. dollar clearing almost always requires access to the Federal Reserve Bank of New York.

243.    On information and belief, Defendants' U.S.-dollar transactions followed the norm and were sent via the New York banking system. This allegation is based on the specific banks Defendants used to effectuate these transactions, and on at least three examples of transactions that Lafarge and Lafarge Cyprus specifically cleared through New York (beyond the one transaction to which it has admitted).

244.    Defendants may have used other banks, but they relied predominantly on three bank branches in funding their payments to terrorists: Bank Audi (Lebanon), Bank Audi (Syria), and BNP Paribas (Egypt). The use of these three banks supports the allegation that Defendants purposefully cleared their U.S.-dollar transactions through New York, because each cleared U.S.-dollar transactions through correspondent bank relationships with New York banks.

245.    LCS held accounts with Bank Audi SAL ("Bank Audi Lebanon") that it used to make many of its payments to Tlass and Taleb and to receive upstream funding from Lafarge and Lafarge Cyprus. Bank Audi Lebanon was based in Beirut and operated as the Lebanese branch of Bank Audi, a multinational bank. Bank Audi Lebanon maintained U.S.-dollar correspondent accounts at least at the following New York banks, all of which Bank Audi has publicly acknowledged:

| No. | Correspondent U.S. Bank Relationship in New York | Correspondent U.S. Bank SWIFT Code[9] |
|---|---|---|
| 1 | Standard Chartered Bank - NY | SCBLUS33XXX |
| 2 | JPMorgan Chase Bank, N.A. | CHASUS33XXX |
| 3 | The Bank of New York Mellon | IRVTUS3N |
| 4 | HSBC – NY | MRMDUS33XXX |
| 5 | Citibank, N.A. | CITIUS33XXX |

Bank Audi Lebanon does not have independent dollar clearing capabilities. It processed Defendants' U.S.-dollar transactions through the New York banking system by routing their funds through Bank Audi's correspondent accounts with these New York banks, including but not limited to JPMorgan Chase's New York branch.

246.    Bank Audi Lebanon's standard settlement instructions support the conclusion that Defendants' transactions relied on New York correspondent accounts. Standard settlement instructions detail the accounts a financial institution will use to complete transactions depending on the currency the institution's customer selects. Before the relevant time frame, Bank Audi published its standard settlement instructions in the Banker's Almanac, an authoritative and publicly available compendium of international banking information. Those instructions, available to Defendants, specified that Bank Audi Lebanon typically settled U.S.-dollar wire transfers through its correspondent accounts at "The Bank of New York, New York" and "JPMorgan Chase Bank, National Association, New York."

247.    On information and belief, from 2011 through 2015, LCS used Bank Audi Syria S.A. ("Bank Audi Syria") as Bank Audi's branch in Damascus. On information and belief, at all

---

[9] Some of these accounts were used for Eurodollar-related transactions that flowed through the U.S. banking system. On information and belief, Defendants likely used the same correspondent accounts to facilitate their U.S.-dollar-denominated transactions or used other correspondent accounts at the same banks to facilitate such transactions.

relevant times, Bank Audi Syria faced significant obstacles conducting cross-border U.S.-dollar-denominated transactions, which were impacted by U.S. sanctions. LCS relied on its U.S.-dollar accounts at Bank Audi Lebanon instead for U.S.-dollar transactions.

248.    On information and belief, in or about 2013, Lafarge and Lafarge Cyprus also instructed LCS to open an Egyptian bank account in the name of Lafarge's Egyptian subsidiary, Lafarge Middle East & Africa Building Materials, which Lafarge internally called "LMEA." On information and belief, LCS opened this LMEA Account at BNP Paribas's branch in Cairo. LCS regularly used its "LMEA Account" to make and receive U.S.-dollar payments, including by making a July 2013 payment of $75,000 from LCS to Tlass. Lafarge funded the account, via Lafarge Cyprus in U.S. dollars as needed, for LCS's benefit. On information and belief, Defendants used this account to make many suit-related U.S.-dollar payments, including several not listed among the twenty-three transactions in the table above.

249.    Like Bank Audi, BNP Paribas's subsidiaries clear their U.S. dollar transactions through New York. According to its 2012 Patriot Act certification, BNP Paribas's subsidiaries, including its Egyptian branch, relied on "correspondent banks in the United States." BNP Paribas's global Corporate and Investment Banking Group, of which it considered the LMEA Account a part, regularly relied on U.S. banks to clear the Group's U.S.-dollar transactions. Due to a highly publicized U.S. enforcement action in mid-2014, BNP Paribas was forced to suspend U.S.-clearing operations for a year. As a prominent French newspaper noted in reporting on that action, BNP Paribas recognized that its U.S.-dollar transactions for sanctioned entities exposed it to U.S. criminal penalties, because when "any dollar transfer passes through the United States to be cleared by the American financial system, [that] dollar transaction is automatically governed

by U.S. law." On information and belief, BNP Paribas's Egyptian branch cleared U.S. dollars the same way until that suspension.

250.    BNP Paribas's standard settlement instructions confirm that Defendants' transactions using the LMEA Account cleared in New York. Like Bank Audi, BNP Paribas published its standard settlement instructions in the Banker's Almanac. Before the relevant time frame, BNP Paribas Egypt advertised its "Correspondent Banking" service and identified "BNP Paribas SA" as its "correspondent" bank in "New York." The standard settlement instructions likewise specified that BNP Paribas Egypt typically settled U.S.-dollar wire transfers for its customers through its correspondent account with "BNP Paribas SA, New York."

251.    **Examples Of Defendants' New York-Linked Transactions.** Consistent with the allegations above, Plaintiffs are aware, on information and belief, of at least three transactions related to Defendants' terrorist-financing scheme that Defendants specifically cleared through New York banks. These examples are based on information Plaintiffs obtained without discovery. The details of such transactions rest within Defendants' exclusive control, so many more examples likely exist:

| Date | USD Amount | Originating Bank / Originator | Beneficiary Bank / Beneficiary | New York Correspondents |
|------|-----------|------------------------------|-------------------------------|-------------------------|
| 8/25/2011 | $5,000,000 | Citibank Dubai / Lafarge Cyprus | Bank Audi / LCS Citibank | New York JP Morgan Chase |
| 8/25/2011 | $10,000,000 | Citibank Dubai / Lafarge Cyprus | Bank Audi / LCS Citibank | New York JP Morgan Chase |
| 10/23/2014 | $210,000 | TBD (France) / Lafarge Cyprus | TBD - Dubai / Tlass | TBD – New York |

252.    On information and belief, when Lafarge chose to make these payments (through Lafarge Cyprus), it purposefully reached into New York to complete the transactions. For example, with the October 23, 2014 payment for Tlass's negotiations with ISIS, Jolibois directed

Tlass to issue a $210,000 invoice from a Dubai shell company. On information and belief, Lafarge paid the invoice by directing its Parisian bank to initiate a wire transfer on behalf of Lafarge Cyprus, which sent funds through New York correspondent banks – including at least one in this District – to Tlass's bank account in Dubai. On information and belief, and part and parcel with their efforts to conceal their conduct, Defendants knew and intended for this transaction to use the U.S. financial system and to clear through New York.

253.    Given that these transactions formed part of a common course of conduct involving U.S. dollars, Defendants likely used the same (or similar) New York banks to route other U.S.-dollar transfers through New York. In general, customers and their banks follow similar routing processes to complete similar transactions in the same timeframes for the same currencies. Given that standard practice, and the other allegations above, these three examples are likely illustrative of Defendants' broader practice of using New York banks to complete the U.S.-dollar transactions in which they systematically engaged as part of the conspiracy. Indeed, it is implausible that Defendants used New York banks for just these three transfers and not any of the myriad similar transactions alleged herein.

a)   *Defendants' Use Of New York Banks Was Material To Their Scheme*

254.    Using dollars made the conspiracy with ISIS and ANF easier and more efficient for participants, and more difficult for outsiders to detect. While ISIS and ANF were not always paid in U.S. dollars, dollars were their and Defendants' preferred currency. Defendants' regular and deliberate use of U.S. dollar transactions, which in turn depended on their access to the New York banking system, was vital to the scheme's concealment and success. Their conscious choice to use U.S. dollars and New York banks offered at least three benefits.

255.    First, using U.S. dollars and U.S. banks helped Lafarge conceal their payments

from outside auditors, regulators, and law enforcement officials. Concealment was of paramount importance, given the stringent U.S. and international sanctions targeting Syria at the time, and the legality of the payments to terrorists. Lafarge's Syrian operations faced significant financial scrutiny. The use of U.S. dollars helped Defendants avoid the scrutiny of LCS's external auditors. Transactions in Syrian pounds raised red flags among regulators, auditors, and bank-compliance departments, while U.S. dollars were associated with legitimate cross-border transactions, particularly when routed to companies outside Syria. Lafarge's executives thus "preferred" its payments for ISIS and ANF be made in "bank transfer[s] in USD," to give its wire transfers the imprimatur of legitimacy associated with U.S.-dollar transactions.

256.     On information and belief, Lafarge funneled payments through a web of 54 different bank accounts (mostly at Bank Audi), including several Pescheux routed through a personal account he could keep off Lafarge's books. Using such a large number of accounts made it even more difficult for others to detect the scheme. The excessive number of bank accounts, which Defendants actively created, demonstrates a broader point: secrecy was vital, and Defendants were affirmatively involved in the financial machinations that enabled their scheme.

257.     Second, transacting in U.S. dollars protected Defendants and their agents from foreign-exchange risk and the plummeting value of the Syrian pound. At the beginning of 2012, the Syrian pound was trading against the U.S. dollar at roughly 54:1. By the end of 2014, it had depreciated to roughly 180:1—losing more than two-thirds of its value. This made Syrian pounds unappealing for any long-term deal. Indeed, Tlass demanded that Lafarge pay his monthly fee in U.S. dollars in part because the Syrian pound was losing value so rapidly as to become effectively worthless.

258.     Third, ISIS's and ANF's preferred currency was U.S. dollars. U.S. currency made

the conspiracy flow. Real-time public reports linked ISIS's fundraising and recruiting success to

its stockpile of U.S. dollars, which is how ISIS fighters wanted to be paid. As *Business Insider*

reported in 2015:

> According to [an ISIS defector], a large number of people are joining ISIS because they need money. After joining [ISIS], people are paid in US dollars instead of Syrian [pounds]. . . . ISIS members receive additional incentives to fight for the group. "I rented a house, which was paid for by ISIS," Abu Khaled, who worked for ISIS's internal-security forces and "provided training for foreign operatives," [said]. "It cost $50 per month. [ISIS] paid for the house, the electricity. Plus, I was married, so I got an additional $50 per month for my wife. If you have kids, you get $35 for each. If you have parents, they pay $50 for each parent. This is a welfare state." And those financial benefits are not just limited to the organization's fighters.

259.     ISIS preferred U.S. dollars for goods it sold and to pay its fighters. According to

the *Independent*, ISIS "promoted the idea that it was hitting the US economy by issuing its own

currency but the organisation on the ground is doing exactly the opposite, having built a financial

system entirely dependent on the US dollar."

260.     Using New York banks in furtherance of the conspiracy enabled Defendants to

capture these benefits, and, through intermediaries, pass them along to ISIS. New York is the

global hub of cross-border U.S.-dollar transfers for good reason: companies that wire their U.S.

dollars through New York gain from the legitimacy, reliability, and speed offered by New York

clearing. Transacting through other clearing centers in Tokyo, Hong Kong, Singapore, and

Manila is theoretically possible, but these require extra cost and time, and raise questions about

why the transaction is exceptional – operational risks that New York clearing avoids.

261.     By routing their payments through New York, Defendants maximized the potency

and concealment of their terrorist funding. Had Defendants attempted to route their U.S.-dollar

payments differently, it would have stood out as unusual, risking the very type of outside attention from auditors and regulators Defendants were striving to avoid. Defendants knew that attempting to route U.S. dollar transactions through non-New York centers was inadvisable. In or around 2012, U.S. sanctions began impeding the ability to route U.S. dollars in and out of Syria. On information and belief, New York banks began refusing to process transactions they knew were for LCS or other Syrian actors. In 2013, when Taleb complained about LCS's lack of prompt payment, LCS employees said that New York correspondent banks were refusing to process their transactions, and tried to find other banks to complete the payment, creating further delays and expense.

262.    In response, Defendants structured transactions that would use the New York banking system to appear as though they were going somewhere other than Syria, for example through the LMEA Account in Egypt. Defendants told Tlass to create a Dubai company for Lafarge Cyprus's payment, to avoid Syrian contacts. These bank account locations enabled Defendants to route their U.S.-dollar payments through New York banks but still get money into Syria, which was faster and more reliable than the alternatives.

263.    For all the reasons above, had Defendants not chosen to reach into New York and use New York banks to transact in U.S. dollars, their scheme of sending payments to ISIS and ANF would have been less effective, more expensive, and harder to conceal.

### b) *Defendants' Use Of New York Banks Was Purposeful*

264.    Defendants' use of New York banks was deliberate. U.S. dollars were critical to Defendants' scheme with ANF and ISIS and intermediaries. Needing a safe, effective, and opaque means to transfer their cash, Defendants purposefully chose New York.

265.    Defendants' executives were aware of how Defendants' money was transferred quickly and effectively to and from LCS. A Lafarge email discussing its June 2014 loan to LCS

demonstrates the degree of that involvement. In that email, Lafarge's treasury managers discussed the need for Lafarge (through Lafarge Cyprus) to "increase its outstanding subordinated shareholder loan" to LCS by "US$12m to give LCS a small buffer" to cover its ongoing U.S.-dollar shortfalls. In that discussion, Lafarge employees demonstrated an awareness of how to route the money. As the same email explained, the wire-transfer "process must start in the few coming days due to time needed to channel the funds to Syria through Lebanon, to lower the risk of cash being trapped by banks' compliance policies linked to sanctions affecting Syria." The reference to "Lebanon," on information and belief, referred to LCS's account at Audi Bank Lebanon. Lafarge was thus aware of Bank Audi's correspondent-banking policies, and it sought to guard against the risk that using New York correspondent accounts would expose it to U.S. sanctions.

266.    The steps Defendants took to conceal their transactions confirm that their use of New York banks was deliberate, including by using an "LMEA Account" in Egypt, and ordering Tlass to open an account in Dubai. Both these accounts were intended to trick U.S. banks into completing transfers to circumvent U.S. sanctions against transactions in Syria, and to conceal the payments from French auditors and law enforcement officials. They made sense only if Defendants were actively seeking to use the New York clearing system. Indeed, if Defendants had the means to bypass New York clearing, for example, by operating solely in cash or by using offshore clearing, these accounts outside of Syria would have been entirely unnecessary.

267.    Defendants' executives regularly and purposefully received specific transaction confirmations alerting them to the particular New York correspondent and intermediary banks that routed their transactions. On information and belief, these confirmations typically took the form of SWIFT MT103 messages. SWIFT, which stands for the Society for Worldwide

Interbank Financial Telecommunication, is the standard communications system for sending cross-border wire-transfer messages between financial institutions. An MT103 (or Message Type 103) is a standard message confirming the details of an executed transaction. Fields 53, 54, and 56 in an MT103 typically disclose the correspondent and intermediary banks involved. On information and belief, Lafarge (acting through Lafarge Cyprus) and LCS regularly requested and received SWIFT confirmations from their banks notifying them of the New York banks involved in clearing their transfers, as part of Defendants' process of approving the transactions. On information and belief, Pescheux specifically approved at least one of the 2011 New York-cleared transactions alleged above, after personally requesting the SWIFT confirmation disclosing that JPMorgan Chase's and Citibank's New York branches were involved in routing the transaction.

### c)  *Defendants' Use of New York Banks was Knowing*

268.    Defendants paid and were therefore alerted to banking fees for the New York banks that cleared their transactions. Correspondent and intermediary banks typically charge a fee for each wire transfer that they process, which can be paid in three ways; the specific payment mechanism is typically reported at Field 71A of the SWIFT MT103. Option one—denoted by "OUR"—has the originator cover the fees separately, on top of the amount transferred. For example, on information and belief, the SWIFT message for the $10 million U.S.-dollar upstream payment denoted above (*see supra* ¶ 251) above used the "OUR" option in Field 71A, meaning that Lafarge Cyprus separately paid JP Morgan Chase's fees to compensate it for its New York clearing services. Option two, denoted by "BEN," covers the fees by deducting them from the amount transferred. Option three, denoted by "SHA," is a mix of the two. In each scenario, the sender wires the money to the intermediary or correspondent bank to compensate that bank for the service of processing the transaction. Thus, when Defendants

effectuated U.S. dollar transactions to pay terrorists and intermediaries, they knowingly elected how to pay those New York banks for the service. Defendants—not their originating banks— covered the payment of these fees into New York.

269.    Defendants' banks publicly advertised that they routed U.S. dollar transactions through New York. Bank Audi's public marketing also alerted Defendants to the New York connection. Specifically, Bank Audi's "Worldwide Correspondents" website disclosed that its U.S.-dollar transactions relied on banks in the "U.S.A." and "N.Y." (emphasis added):



270.    The Syrian government itself alerted Defendants that their U.S.-dollar transactions went through New York. In February 2006, the Syrian government issued Circular Number 810/15 requiring that all foreign-currency transactions for the government that had previously been denominated in U.S. dollars instead occur in Euros, specifically to avoid U.S.-dollar clearing by New York banks. That decision, of which Defendants knew, reflected the widespread understanding in Syria that any U.S. dollar transaction goes through U.S. banks.

271.    Even non-privileged client alerts published by Lafarge's counsel alerted Defendants that their transactions used the U.S. banking system. While Shearman & Sterling LLP was advising Lafarge, it published an alert warning all its clients, including Lafarge, that the United States Department of Justice and Securities and Exchange Commission's guidance indicated an "expansive assertion of territorial jurisdiction over non-U.S. defendants" including "overseas financial transactions involving US dollars," because "virtually all such transactions clear through correspondent banking accounts in the U.S." While Baker & McKenzie represented Lafarge, it alerted its clients about the same guidance, that "a wire transfer from or to a U.S. bank or otherwise using the U.S. banking system" may create U.S. jurisdiction based on the "use of correspondent bank accounts."

272.    Finally, decades of media reports about CHIPS and correspondent banking also alerted Defendants that their U.S.-dollar transactions used New York banks, as far back as articles in the American Banker in 1989,[10] the Los Angeles Times in 1991,[11] the Australian

---

[10] American Banker, *Glossary Of Computer Technology Terms* (Feb. 1, 1989), 1989 WLNR 1319450.
[11] Glas Frantz, *Lax Rules Blamed in Bank Schemes*, Los Angeles Times (Apr. 28, 1991), 1991 WLNR 3887729.

Financial Review in 2002,[12] the Mail on Sunday in 2004 (quoting a source as saying "[c]urrently, if you want to pay United States dollars from bank A to bank B, that transaction has got to go via New York"),[13] Newsweek international in 2006,[14] the Economist in 2013,[15] and Gulf News in 2014.[16]  Thus, Lafarge officials, who ran one of the largest and most sophisticated multinational corporations in France, were aware of the substance of these reports, even if they had not read any of the reports themselves.

### ii.   Defendants Used U.S.-Based Email Providers To Carry Out Their Terrorist-Financing Scheme

273.    To evade detection of their conspiracy with terrorist groups, Defendants also reached into the United States to use U.S.-based email services, reaping the benefit of their email providers' U.S. presence. Those U.S.-driven benefits also materially contributed to Defendants' scheme and enhanced their ability to pay terrorists.

274.    Lafarge's executives were explicitly instructed by their counsel to use personal email addresses, rather than their coprorate accounts. These email addresses were primarily Gmail accounts. On information and belief, Defendants sent and received hundreds of scheme-related communications through these and other such accounts:

//

//

---

[12] John Breusch, *US Patriot Law Could Involve Local Banks*, Australian Financial Review (Feb. 12, 2002), 2002 WLNR 15725873.

[13] John Mushayavanhu (Vice Chairman of Bankers Association of Zimbabwe), *quoted in* AllAfrica.com English, *Local Forex Clearance System Expected Soon* (Apr. 10, 2009).

[14] Christian Caryl et al., *Pocketbook Policing: Washington Has Finally Found A Strategy That Is Putting Real Pressure On The Regime – Going After Its Sources Of Cash, All Across The World*, Newsweek Int'l (Apr. 10, 2006), 2006 WLNR 5632771.

[15] Economist*, Digital Currencies: A New Specie* (Apr. 13, 2013), 2013 WLNR 8890628.

[16] Babu Das Augustine, *UAE To Sign FATCA Agreement Soon*, Gulf News (Mar. 13, 2014), 2014 WLNR 6929583

| Account Owner | Role of Account Owner | Email Address |
|---|---|---|
| Bruno Pescheux | CEO of LCS until July 2014 | brunopescheux@gmail.com |
| Firas Tlass | Defendants' agent and intermediary who paid ISIS on their behalf | Firastlass01@gmail.com |
| Mamdouh al-Khaled | LCS Purchasing Manager | Mamdouh.lafarge@gmail.com |
| Hassan al-Saleh | LCS Plant Manager | Hassan.cement65@gmail.com |
| Ahmad Jamal | ISIS representative who supplied materials to LCS | Ahmad.jamal1966@gmail.com |

275.    Carrying out a criminal conspiracy via Gmail, rather than corporate email, matched standard practice among terrorists and their funders, who rely on cheap and easily available technologies that are anonymous, such as Gmail. Defendants' use of Gmail relied on extensive U.S. infrastructure. Google operated the majority of its data centers in the United States, which enabled Defendants' conspiracy-related emails to reach their destinations securely and reliably, including through regular backups, and to be concealed from Defendants' auditors and French law enforcement authorities.

276.    Defendants and their agents agreed to numerous U.S. contacts by agreeing to and regularly using their U.S. based Gmail accounts. They reached into the United States to make a contract with a U.S. company, including by agreeing to Google's Terms of Service, which in 2013 made clear that Gmail was "provided by Google, Inc. ("Google"), located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States," regulated by the "laws of California, U.S.A. . . . " They also sent and received data and services from Google in the United States. Gmail relies on data-mining to serve targeted searches and sales to users. U.S. engineers provide the process to scrape data from emails for this customized advertising. That Gmail was an American company that was mining data from users' emails was no secret, even in 2014.

International news sources reported that Gmail was free, but that Google mined personal data from its users. Thus, when Defendants signed up for Gmail and used it to carry out their scheme, they knew they were paying an American company for the American service they were using. Rather than sending a wire transfer delivering cash to their U.S. counterparty, they delivered their data.

277.    Because Gmail is based in the United States and operates under U.S. law, it is more difficult for foreign prosecutors and regulators to access. U.S. law at the time constrained releases of customer data to foreign governments, making the evidence nearly impossible for European law enforcement to access. Had Defendants chosen to use non-U.S.-based email, such as a free European email service, their communications would have been more susceptible to access by French regulators and law enforcement.

**L.    Defendants Purposefully Entered into a Conspiracy With ISIS, Pursuant To Which ISIS Engaged In Acts That Targeted The United States**

278.    It is undisputed that Defendants conspired with ISIS via intermediaries by means of conduct and agreements impacting the United States. That is the primary basis for the guilty plea.

279.    Defendants recognized that ANF's and ISIS's terrorist activities were good for everyone's business. They expanded markets and drove out competition, leaving Lafarge to dominate. Lafarge's unusual willingness to pay FTOs gave it a unique opportunity to seize market share, and for the FTOs to expand their operations and commit more terrorist attacks.

280.    ISIS's protection racket also delivered Lafarge a more specific benefit: the ability to partner with terrorists who were willing and able to threaten Lafarge's competitors. That is why Defendants "commit[ted] to revenue sharing with ISIS" and sought to "incentivize the terrorist group to act in LCS's economic interest." Their commitment worked, at least for a time.

Defendants' Syrian business was profitable in part because ISIS "agreed to impose costs on, and in some cases block the importation of, competing cement."

281.    For the co-conspirators to continue to profit, ISIS needed to remain in control, expand its reach over territories and markets, and continue to tax and intimidate LCS's competitors. ISIS's constant violence, in turn, backed up its credible threat. Violence was crucial to the protection racket, because it made the population believe ISIS's willingness to back up its threats. When Defendants participated in ISIS's extortion and protection racket, it joined a conspiracy that was explicit in its purpose of making money through the perpetuation of terrorist violence. This became even more the case when Defendants made an anti-competitive profit-sharing agreement with ISIS via intermediaries.

282.    Unsurprisingly, and in line with its express statements, ISIS engaged in numerous overt acts both in and expressly aimed at the United States to further its terrorist aims. ISIS's global ambition and historical roots in al-Qaeda required that it target the United States and American citizens. These attacks ramped up as Defendants increased their payments, holding Americans captive and killing American hostages in gruesome video messages directed explicitly to the United States. As Deputy Attorney General Monaco stated in connection with Lafarge and LCS's guilty plea, during the Defendants' conspiracy, the rest of "the world watched in horror as ISIS murdered innocent journalists and aid workers," inflicting "unimaginable pain and suffering" on "American families whose loved ones were brutally murdered by ISIS." Defendants only redoubled their efforts to work with ISIS as American forces conducted air strikes against ISIS to stop its siege of Yazidis in August 2014, and after ISIS publicly beheaded American journalists. ISIS publicly celebrated its horrific acts and was open about the fact, before and during the conspiracy, that it was targeting the United States.

283.    The United States' status as a global superpower meant that victimizing Americans and killing American soldiers was an especially effective way to convey ISIS's authority. Brutally killing American citizens was intended to convey a message to the American people, and the rest of the world: stay away. This messaging extended to Defendants' competitors.

284.    Given the United States' unique military capabilities, ISIS's attacks on and crimes against U.S. citizens and their families in France, Spain, Jordan, and elsewhere, including Plaintiffs, furthered Defendants' conspiracy with ISIS and intermediaries. These acts had symbolic value and allowed ISIS to tout that it could challenge the most powerful country in the world.

285.    The existence of a Lafarge-ISIS conspiracy – reflected in Defendants' purposeful "agreements with ISIS" – is undisputed and apparent on the face of Lafarge's guilty plea. The plea confirmed, among other things, that Lafarge and LCS executives sought to actively partner with ISIS and "share the 'cake'" of their mutual enterprise – with Lafarge executives reasoning that it was important for ISIS to have a "vested interest to have the [Jalabiyeh] plant run well."

286.    That sentiment reflected Lafarge's recognition that ISIS could be good for business. As LCS's former risk manager admitted, Lafarge expected that "Nusra Front, later ISI[S]," would use their "effective and disciplined fighters" to "bring order to the chaos of corruption that reigned in northern Syria." The resulting relationship went beyond passive payments. And as Deputy Attorney General Monaco stated, Lafarge "partnered with ISIS, one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share."

287.     ISIS religious doctrine confirmed that violence underpinned the conspiracy Defendants joined. For example, official ISIS propaganda notified the public, including Defendants, that ISIS would spend protection payments to "support[] jihad"; and that ISIS's maintenance of the racket was backed by the threat of violence against others, including the potential to execute ISIS's enemies. Similarly, ISIS offered a purported religious mandate for its taxes, with punishments (including execution) threatened against those who did not pay. When Defendants cooperated with ISIS in advancing this protection racket, they joined a conspiracy whose stated rationale revolved around the perpetration of terrorist violence.

288.     ISIS's contacts with the United States were likewise foreseeable to Defendants. Defendants were aware that the U.S. government had designated ISIS as an FTO because of its shocking acts of violence against U.S. citizens. As Assistant Attorney General Olsen explained, Defendants partnered with ISIS and ANF "at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans." And Defendants were aware of ISIS's desire to eject U.S. forces from the region and of their frequent acts of violence to that end. That knowledge came in part from Defendants' long awareness of AQI, which they knew had conducted a brutal terrorist campaign against U.S. citizens in the Middle East. Indeed, Defendants specifically understood – in part through Tlass and LCS's former risk manager – that ISIS and ANF were AQI's successors and were continuing AQI's terrorist campaign against the United States. The attacks on Plaintiffs and their families, as well as ISIS's other U.S. contacts, were a foreseeable outgrowth of the conspiracy that Defendants voluntarily joined.

289.     Defendants knowledge is confirmed by their emails. "[W]e should not forget that ISIS is a terrorist movement," Jolibois admonished Herrault in the course of a negotiation. Defendants were also aware that the U.S. government had designated ANF and ISIS as FTOs.

Defendants were familiar with the history of Al-Qaeda in Iraq, through their security consultant and Tlass himself. Attacks on Americans took place while Lafarge was actively handing millions of dollars to ISIS and were an easily foreseeable result of a conspiracy with a terrorist organization that expressly targeted Americans.

## M.    The Terrorist Attacks That Resulted In Plaintiffs' Injuries Were Substantially Assisted By Defendants' Aid

290.    Defendants' aid substantially assisted and provided material support for the "external" ISIS attacks described herein. The attacks occurred either during or after Defendants began giving millions of dollars to ISIS and so benefited directly from Defendants' payments. Defendants' material support was linked directly to the three attacks described below, including but not limited to through the involvement of ISIS's Leadership Cell and Raqqa Cell. Furthermore, the aid provided by Defendants was critical to the financing of ISIS's powerful propaganda machine, which was run by ISIS's Leadership Cell and Propaganda cell. Each of the terrorists described below consumed ISIS propaganda and used it to inform their tactics and choice of weaponry in carrying out their heinous attacks.

### i.    The November 9, 2015 Shooting At The International Police Training Center In Amman, Jordan

291.    Lloyd Carl Fields, Jr. travelled to Jordan on June 12, 2015, as a government contractor through DynCorp International. His trip to Jordan was only supposed to last two weeks, but problems with his Israeli work visa kept him there longer.

292.    James Damon Creach arrived in Jordan on October 15, 2015, where he was working through the government contractor DECO, Inc. Mr. Creach was scheduled to return home to Florida on December 5, 2015.

293.    While in Jordan, Carl and Damon were assigned to the International Police Training Center ("IPTC") in the Muwaqqar district of southeast Amman, Jordan—a facility run

and funded in part by the U.S. State Department. There, they both used their years of experience as police officers to train law enforcement personnel from Jordan, Iraq, and the Palestinian Territories in basic police and security skills. Carl had previously served as a Deputy Sheriff in Calcasieu Parish, Louisiana, and as a police advisor in both Iraq and Afghanistan. Damon was a graduate of the Virginia Beach Policy Academy, a former police officer in the Virginia Police Department, and had trained police officers in Afghanistan, Kenya, and other locations.

294.    Carl and his wife Tamara considered his assignment to Jordan a safe one because Jordan is a U.S. ally and it has not experienced the levels of terrorism and unrest that have spread throughout the Middle East in recent years. Carl's mission appeared so safe, in fact, that he was not issued a weapon to carry with him.

295.    Damon and his wife Heather also believed that his trip to Jordan did not involve any great danger. On the day of the attack in which he was killed, Damon was not armed, he was not wearing body armor or protective gear, and his vehicle was not armored.

296.    Anwar Abu Zaid was a 28-year old Jordanian police captain studying at the IPTC. On November 9, 2015, Abu Zaid arrived at the IPTC smuggling a Kalashnikov assault rifle with 120 bullets and two handguns in his car. As an officer, he was not searched as he entered. After the noontime prayer, Abu Zaid shot at a truck that was moving through the facility, killing Damon. Abu Zaid then entered the facility's cafeteria where he killed an additional four people eating lunch, including Carl.

297.    According to FBI investigators, Zaid did not know either Carl or Damon; he targeted them simply because they were U.S. citizens.

298.    ISIS claimed responsibility for the attack in a statement issued through their al-Battar Media Foundation: "Yes . . . we kill the Americans in Amman," the terror group said. A

few weeks later, ISIS reiterated this claim in its Dabiq Magazine, Issue 12: "And on '9 November 2015,' Anwar Abu Zeid—after repenting from his former occupation—attacked the American crusaders and their apostate allies, killing two American crusaders, two Jordanian apostates, and one South African crusader. These are the deeds of those upon the methodology of the revived Khilāfah. They will not let its enemies enjoy rest until enemy blood is spilled in revenge for the religion and the Ummah."

299.     According to Israeli military intelligence, Abu Zaid was a graduate of al-Mutah University in al-Karak, Jordan where he was part of a clandestine ISIS terror cell. That same cell was responsible for a suicide attack near Mosul, Iraq in 2015 and a shooting at the Sarona Market in Tel Aviv, Israel in 2016.

300.     Defendants' financing of the Raqqa cell, ISIS leadership, and the ISIS propaganda machine was critical to the attack.

301.     The United States District Court for the District of Columbia held that ISIS's claim of responsibility for this attack was credible and that ISIS was responsible for the Jordan attack. *See Fields, et al. v. Syran Arab Republic*, (1:18-cv-01437-RJL) Dkt. No. 20 at *16.

302.     On the day of the attack killing Carl and Damon, Tamara saw that she missed a call from the U.S. embassy and she knew that something was wrong. Tamara called back and, when she eventually got through, she was told that Carl had been killed. The murder of her husband Carl by an ISIS operative has caused her severe mental anguish, extreme emotional pain and suffering, and the loss of her husband's society, companionship, comfort, advice, and counsel. Furthermore, Carl provided substantial financial support to his wife.

303.     That same day, Heather was notified by her husband's company DECO that Damon had been killed. She later received a call from the U.S. Embassy in Jordan confirming his

death. Heather was then tasked with telling her children that their father was dead. The murder of their husband and father Damon by an ISIS operative has caused Heather, Jackson, Samantha, and Jayedon severe mental anguish, extreme emotional pain and suffering, and the loss of Damon's society, companionship, comfort, advice and counsel. Furthermore, Damon provided substantial financial support to his wife and children.

### ii.  The July 14, 2016 Cargo Truck Attack In Nice, France

304.    On July 14, 2016, the Copeland family was enjoying their dream vacation in Nice, France, taking in the city's Bastille Day celebrations. Kimberly Harris (then named Kimberly Copeland) and Sean Copeland, along with their three children Brodie, Austin, and Maegan, had all travelled to Europe. Sean's life goal had been to take his family to Europe and they celebrated multiple birthdays while there. Sean, 51, was a devoted father of three who prided himself on being a "dance dad," a "football dad," and a "baseball dad." Brodie, 11, was a bright, fun-loving, "one-of-a-kind kid," with aspirations of becoming a professional baseball player, a Hollywood actor, and U.S. President. Brodie was Kimberly's only biological child.

305.    Days earlier, the family had been in Pamplona, Spain, where Sean and Austin ran with the bulls. According to Austin, after running 200 yards, his dad was the happiest he had ever seen him. "This was his moment. I would never forget the joy on his face that day."

306.    After leaving Spain, the Copeland family traveled together to France. Missing home, they spent their last hours in France together at a Hard Rock Café. After a family dinner of burgers and beers, the family headed to the Promenade des Anglais along the Mediterranean Sea with 30,000 others to take in the Bastille Day celebrations, music and fireworks.

307.    At approximately 10:00 PM, shortly after the fireworks, ISIS operative Mohamed Lahouaiej Bouhlel drove a 19-ton refrigeration truck through police barriers and onto the crowded Promenade des Anglais, which had been closed off to all traffic. Bouhlel carried an

automatic pistol, bullets, a fake automatic pistol, and two replica assault rifles (an M16 machine gun and a Kalashnikov), as well as an empty grenade.

308.    Bouhlel started running over people slowly, until two police officers opened fire, at which point he accelerated at full speed towards the dense crowd. Witnesses described the sounds of the truck hitting people "like empty thuds," as Bouhlel reached an estimated 56 miles per hour, surging through a sea of people. Bouhel zigzagged through the crowd for over a mile, aiming for as many people as possible.

309.    A witness on a motorcycle attempted to overtake Bouhlel's truck and even tried to open the driver's door, but was unsuccessful. Bouhlel then began shooting through the cab window at police officers, firing several times on three police officers close to the Hotel Negresco. Bouhlel was screaming out "Allahu Akbar" throughout the attack.

310.    The truck finally came to a halt near Nice's Palais de la Mediterranée, a hotel adjacent to the beach, and Bouhlel continued to fire at police with his handgun. Two police officers fired repeatedly at the cabin of the truck and Bouhlel was killed.

311.    Two days after the Nice Attack, on July 16, 2016, ISIS issued a statement in its AMAQ publication claiming responsibility and describing Bouhlel as a "soldier of the Islamic State." The statement read, "Executor of the deadly operation in Nice, France was a solider of the Islamic State. He executed the operation in response to calls to target citizens of coalition nations, which fight the Islamic State."

312.    In the fifteenth issue of ISIS's propaganda magazine Dabiq, ISIS again boasted about the Nice Attack, listing Bouhlel among the "soldiers of the Caliphate" who has "succeeded in expanding the territory of the Caliphate, or terrorizing, massacring, and humiliating the enemies of Allah."  Citing Bouhlel's attack as an operation that "the Islamic State has

conducted," ISIS praised the Nice Attack as an action "in response to the Islamic State's calls to target nations participating in the Crusader coalition fighting the Caliphate."

313.    Authorities believe Bouhlel carefully plotted and planned his attack for up to a year with accomplices and ISIS operatives.

314.    Bouhlel's 1.5-mile terrorist attack killed 86 people, injuring an additional 434.

315.    Defendants' financing of the Raqqa cell, ISIS leadership, and the ISIS propaganda machine was critical to the attack.

316.    As the Pentagon has explicitly stated: "Raqqa was a key location for ISIS' planning, financing, execution, or inspiration of terrorist activities throughout the world, **including attacks in Paris and Nice in France**."[17] (emphasis added).

317.    Additionally, multiple lines of evidence suggest that ISIS leadership, including virtual plotters, assisted in Bouhlel in carrying out the Nice attack. Further, the likely virtual plotter, Rachid Kassim, repeatedly traveled to Syria in advance of the attack in order to fight alongside ISIS. Kassim was a "senior ISIS operative" who, prior to his death, was "the single most active French remote attack planner for ISIS, working to drive dozens of radicalized individuals in France to commit attacks."[18]

318.    In short, the publicly available evidence supports the credibility of ISIS's claim of responsibility. Lahouaiej-Bouhlel supported ISIS, and the French government considered the

---

[17] U.S. Department of Defense, press release, "Syrian Democratic Forces Liberate Raqqa," October 20, 2017, https://www.defense.gov/Explore/News/Article/Article/1349213/syrian-democratic-forces-liberate-raqqa/.

[18] Ryan Browne and Paul Cruickshank, *US-led coalition targets top ISIS figure in Iraq strike*, CNN Politics, https://www.cnn.com/2017/02/10/politics/coalition-strike-mosul-isis/index.html (quoting Jean-Charles Brisard, director of the Paris-based Center for the Analysis of Terrorism).

Nice attack to be an ISIS attack. The evidence also indicates Rachid Kassim helped virtually plan the attack from Syria.

319.     The United States District Court for the District of Columbia held that this evidence "corroborates ISIS's claim of responsibility for the attack." *See Fields, et al. v. Syran Arab Republic*, No. 1:18-cv-01437-RJL (D.D.C.) Dkt. No. 20, at *5. Thus, the court held that "ISIS operatives were directly involved in planning, coordinating, and executing" the Nice Attack. *Id.* at *16.

320.     Among those killed in the Nice Attack were Sean and Brodie Copeland. Kimberly, Austin and Maegan only survived the attack because Sean heroically warned them as the truck careened towards the family. Kimberly, Austin, and Maegan were devastated by the losses of Sean and Brodie. They suffered and will continue to suffer severe psychological and emotional harm, as well as loss of consortium as a result of the terrorist attack that killed Sean and Brodie. Furthermore, Sean provided substantial financial support to his wife and children.

### iii.   <u>The August 17, 2017 Van Attack On La Rambla In Barcelona, Spain</u>

321.     Jared Tucker, 42 years old, was a devoted father to three girls. On August 17, 2017, Jared was in Barcelona on vacation. On his way to a local beach, he stopped for sangria at a café on La Rambla, a crowded pedestrian mall popular with tourists.

322.     Minutes later, ISIS operative Younes Abouyaaqoub, a member of ISIS's "Ripoll Cell," drove a three-ton van into the dense crowds on La Rambla, reaching speeds of up to 50 miles per hour. Abouyaaqoub zigzagged through the sea of people, deliberately aiming to run over and kill as many as possible. After 500 meters, the van finally came to a halt after hitting a newspaper kiosk, stopping at the famous Joan Míro mosaic. Abouyaaqoub, wearing a fake explosive belt and carrying numerous knives, exited the van and blended in with the crowd, escaping. Utilizing ISIS connections and safe houses, Abouyaaqoub evaded arrest for four days

until he was found and killed by authorities.

323.    Among the 13 killed on La Rambla was Jared Tucker. Another 130 were injured.

324.    The next day, on August 18, 2017, ISIS issued a statement claiming direct responsibility for the Barcelona Attack, describing Abouyaaqoub and others supporting him as "soldiers of the Islamic State."  The statement was published by the news agency AMAQ, which is frequently used and supported by ISIS. The statement read, "the perpetrators of the attack in Barcelona are Islamic State soldiers and carried out the operation on command of Khilafah of targeting coalition countries."

325.    ISIS has repeatedly claimed responsibility for the Barcelona attack repeatedly since that time, including in its propaganda magazine, Rumiyah, and in videos featuring and praising Abouyaaqoub.

326.    Defendants' financing of the Raqqa cell, ISIS leadership, and the ISIS propaganda machine was critical to the attack.

327.    Abdelbaki Es Satty, the Ripoll cell's leader, used ISIS propaganda in his recruitment and radicalization efforts, and other cell members, including Abouyaaqoub, consumed ISIS propaganda. This propaganda heavily influenced cell members.

328.    The Ripoll cell repeatedly referred to ISIS in writing and saw themselves as ISIS soldiers. Furthermore, Es Satty was well connected with members of ISIS's external operations wing.

329.    The Ripoll cell also followed ISIS's tactics, techniques, and procedures for its initial attack plan and backup attack plan.

330.    Just as it did with the Jordan and Nice attacks, the United States District Court for the District of Columbia held that "ISIS operatives were directly involved in planning,

coordinating, and executing" the Barcelona attack. *See Fields, et al. v. Syran Arab Republic*, No. 1:18-cv-01437-RJL (D.D.C.) Dkt. No. 20, at *16.

331.    Plaintiffs Rhasia Love, Veda Love, and Khalesi Love, Jared Tucker's daughters, were devastated by the loss of their beloved father. They suffered and will continue to suffer severe psychological and emotional harm, as well as loss of consortium as a result of the terrorist attack that killed Jared Tucker. Jared Tucker also provided each of his daughters with substantial financial support.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### AIDING AND ABETTING A FOREIGN TERRORIST
### ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2333(d)

332.    Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

333.    Plaintiffs assert this cause of action against Defendants under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.

334.    Defendants Lafarge S.A. and LCS pleaded guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

335.    Plaintiffs are nationals of the United States or the estates, survivors, or heirs of U.S. nationals. Plaintiffs were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct.

336.    ISIS was a foreign terrorist organization ("FTO") when it committed, planned, and authorized the terrorist attacks that injured the Plaintiffs and killed their family members. Indeed, the United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2004 under the name Al-Qaeda in Iraq.

337.     Those terrorist attacks were acts of international terrorism, as defined by 18

U.S.C. § 2331. The attacks: (a) involved violence and endangered human life; (b) would have

violated federal and state criminal law, had they been committed in the United States; (c)

appeared to be intended to intimidate or coerce the civilian populations of the United States, to

influence the policies of the American governments, and to affect the policies of those

governments through violent action; and (d) occurred primarily outside the United States and

transcended national boundaries in that ISIS raised money internationally, intended to impact the

citizens and governments of the United States, operated internationally, and sought asylum in

multiple countries in the Middle East.

338.     These acts included the destruction of U.S. property by fire or explosive,

conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees

performing official duties, hostage taking, rape, damaging U.S. government property, killing

U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism

transcending national boundaries, bombing government facilities, financing terrorism, forced

labor, and trafficking. ISIS's acts violated (or would have violated had been committed within

the jurisdiction of the United States) multiple laws, including but not limited to 18 U.S.C. §§

844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), 2339D,

1589, and 1590.

339.     Defendants and ISIS structured their transactions to disguise the nature of their

support, in further violation of 18 U.S.C. § 2339A.

340.     The substantial assistance that Defendants knowingly provided to ISIS included

but was not limited to: (a) transferring significant sums of money to ISIS, its operatives, and its

front organizations; (b) repeatedly transacting with ISIS for purchases of raw materials and

supplies; and (c) entering into a revenue-sharing agreement with ISIS. Defendants knew that their substantial assistance and material support was paid to a FTO and would be used to commit acts of international terrorism.

341.    Defendants' services and support provided encouragement to would-be terrorists and incentivized their future attacks, including the attacks that killed and injured Plaintiffs and their family members.

342.    At the time Defendants provided that substantial assistance to ISIS, Defendants knew that: (a) the U.S. government had designated ISIS as a terrorist organization; (b) ISIS and its operatives engaged in terrorism, including the attacks alleged herein; and (c) the financial assistance that Defendants were providing to ISIS was essential to its ability to carry out terrorist attacks, including the attacks that killed and injured Plaintiffs and their family members.

343.    Defendants knew that their substantial assistance would facilitate the ability of ISIS to carry out its terrorist attacks against Plaintiffs, their family members, and other civilians. As a result, Defendants recognized that they played an integral role in ISIS's terrorist activities.

344.    The assistance that Defendants provided to ISIS was a substantial factor in causing Plaintiffs' injuries. Moreover, Plaintiffs' injuries were a foreseeable result of that substantial assistance.

345.    As a direct and proximate result of the substantial, knowing assistance that Defendants provided to ISIS, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

346.    Defendants knowingly aided and abetted ISIS within the meaning of 18 U.S.C. § 2333(d), which Congress enacted to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign

organizations or persons that engage in terrorist activities against the United States." *See* JASTA, § 2b.

347.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

**SECOND CAUSE OF ACTION**
**CONSPIRING WITH A FOREIGN TERRORIST**
**ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2333(d)**

348.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

349.    Plaintiffs assert this cause of action against Defendants under 18 U.S.C. § 2333(d) and JASTA § 2b.

350.    Defendants Lafarge S.A. and LCS pleaded guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

351.    Plaintiffs are nationals of the United States or the estates, survivors, or heirs of U.S. nationals. Plaintiffs were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct.

352.    Defendants conspired with ISIS, their co-conspirators outlined *supra*, and others to bring about acts of international terrorism against Americans. The terrorist attacks committed by ISIS were intended to intimidate and coerce the civilian population of the United States and other countries; to influence through intimidation or coercion the policy of the governments of the United States and other countries; and to affect the conduct of the governments of the United States and other countries by means of mass destruction, assassination, and kidnapping.

353.    Defendants joined the conspiracy by agreeing, among other things, expressly or tacitly, to raise funds for ISIS although the U.S. government had designated ISIS as an FTO. Defendants additionally: (a) transferred significant sums of money to ISIS, its operatives, and its front organizations; (b) repeatedly transacted with ISIS for purchases of raw materials and supplies; and (c) entered into a revenue-sharing agreement with ISIS. By engaging in that conduct, Defendants furthered the goals of their conspiracy with ISIS.

354.    Defendants further conspired with ISIS to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within that territory, in violation of (among other statutes) 18 U.S.C. §§ 2339A, 2339B, and 2339C.

355.    Defendants knew that, by funneling money to ISIS, they were joining a conspiracy intended to commit acts of international terrorism, including the murder of Americans.

356.    Overall, Defendants conspired to provide material support to a designated foreign terrorist organization, negotiated revenue-sharing agreements with ISIS to seek an economic advantage, and concealed their payments, falsified records, and backdated contracts in pursuit thereof.

357.    As a direct and proximate result of the Defendants' conspiracy and the steps they knowingly took in furtherance thereof, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

358.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## THIRD CAUSE OF ACTION
## PROVIDING MATERIAL SUPPORT TO TERRORISTS
## IN VIOLATION OF 18 U.S.C. §§ 2339A AND 2333(a)

359.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

360.    Plaintiffs assert this claim against Defendants for violations of 18 U.S.C. §§ 2333(a) and 2339A.

361.    Plaintiffs are nationals of the United States or the estates, survivors, or heirs of U.S. nationals.

362.    The financial assistance that Defendants provided to ISIS constituted material support of that terrorist organization and facilitated ISIS's efforts to engage in acts of international terrorism, including the attacks that killed and injured Plaintiffs and their family members.

363.    Defendants provided that material assistance to ISIS knowing or intending that ISIS would use that material assistance to prepare for or carry out terrorist attacks, such as the attacks that killed and injured Plaintiffs and their family members.

364.    The material assistance that Defendants provided to ISIS constituted activities dangerous to human life that violated 18 U.S.C. § 2339A and that were either unlawful under state law, including New York Penal Law §§ 490.10 and 490.15, or would have been unlawful under that state law if committed in the United States.

365.    The material assistance that Defendants provided to ISIS was dangerous to human life because that assistance enabled ISIS to finance its violent attacks and recruit individuals to carry out those attacks. The financial assistance that Defendants provided to ISIS also enabled it to attract additional donors and recruits for its terrorist operations.

366.     The actual and apparent intent of the acts for which Defendants provided material assistance to ISIS was: (i) to intimidate or coerce the civilian populations of the United States; (ii) to influence the policies of the United States by means of intimidation and coercion; or (iii) to affect the conduct of the government the United States by mass destruction, assassination, or kidnapping.

367.     The substantial financial assistance that Defendants provided to ISIS occurred primarily outside the United States and transcended national boundaries in that Defendants operated internationally in providing financial assistance to ISIS.

368.     As a result, Defendants committed acts of international terrorism, as defined by 18 U.S.C. § 2331.392. ISIS did rely upon the financial assistance and material support provided by Defendants in carrying out its terrorist activities.

369.     ISIS engaged in acts of physical violence outside of the United States with the intent to kill or to cause serious bodily injuries to Plaintiffs, nationals of the United States. ISIS engaged in that illicit conduct pursuant to a joint plan and conspiracy with Defendants and others.

370.     ISIS's acts of violence caused the injuries that Plaintiffs suffered and the deaths of Plaintiffs' family members.

371.     The material support and substantial assistance that Defendants provided to ISIS was a substantial factor in causing Plaintiffs' injuries. Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Defendants provided to ISIS.

372.     As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to ISIS, Plaintiffs have suffered significant physical,

psychological, and emotional injuries.

373.   Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

**FOURTH CAUSE OF ACTION**
**PROVIDING MATERIAL SUPPORT TO A FOREIGN**
**TERRORIST ORGANIZATION IN VIOLATION OF**
**18 U.S.C. §§ 2339(B)(a)(1) AND 2333(a)**

374.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

375.   Plaintiffs assert this claim against Defendants for violation of 18 U.S.C. §§ 2333(a) and 2339B(a)(1).

376.   Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

377.   At the time of the attacks that injured Plaintiffs, ISIS was an FTO.

378.   At that time, Defendants knew that ISIS was an FTO, that it engaged in terrorist activity (as defined in 8 U.S.C. § 1182(a)(3)(B)), and that it engaged in terrorism (as defined in 22 U.S.C. § 2656f(d)(2)).

379.   As Plaintiffs allege in detail above, Defendants provided material support to ISIS.

380.   That material support was integral to the ability of ISIS to carry out its terrorist attacks, including the attacks that injured Plaintiffs and killed their family members. As Plaintiffs allege in detail above, the material support that Defendants provided to ISIS constituted acts of international terrorism, as defined in 28 U.S.C. § 2331(1).

381.   The material support that Defendants provided to ISIS was a substantial and foreseeable factor in causing Plaintiffs' injuries.

382.     Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Defendants provided to ISIS.

383.     As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to ISIS, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

384.     Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

(a)     Accept jurisdiction over this action;

(b)     Enter judgment against Defendants and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial, and pre-judgment interest thereon;

(c)     Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333, and pre-judgment interest thereon;

(d)     Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333, and pre-judgment interest thereon;

(e)     Enter judgment against Defendants finding them jointly and severally liable to Plaintiffs pursuant to 18 U.S.C. § 2333;  and

(f)     Grant such other and further relief as justice requires.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated:  September 8, 2023

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _____/s/ Joshua D. Arisohn_____

Joshua D. Arisohn
Matthew A. Girardi
1330 Avenue of the Americas
32nd Floor
New York, NY  10019
Telephone: 646-837-7150
Facsimile:  (212) 989-9163
E-Mail: jarisohn@bursor.com
            mgirardi@bursor.com

*Attorneys for Plaintiffs*