**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TAMARA FIELDS, ESTATE OF LLOYD CARL FIELDS JR., by and through Tamara Fields as Personal Representative, HEATHER GAVINO, ESTATE OF JAMES DAMON CREACH, by and through Heather Gavino as Personal Representative, JACKSON CREACH, SAMANTHA CREACH, JAYEDON CREACH, KIMBERLY HARRIS, ESTATE OF SEAN COPELAND, by and through Kimberly Harris as Personal Representative, ESTATE OF BRODIE COPELAND, by and through Kimberly Harris as Personal Representative, AUSTIN COPELAND, MAEGAN COPELAND, KHALESI LOVE, RHASIA LOVE, and VEDA LOVE, | **Case No. 1:23-cv-00169-NGG-PK** **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| LAFARGE S.A., LAFARGE CEMENT HOLDING LIMITED, and LAFARGE CEMENT SYRIA S.A., | |
| Defendants. | |

**SECOND AMENDED COMPLAINT**

Plaintiffs Tamara Fields, Estate of Lloyd Carl Fields Jr., by and through Tamara Fields as

Personal Representative, Heather Gavino, Estate of James Damon Creach, by and through

Heather Gavino as Personal Representative, Jackson Creach, Samantha Creach, Jayedon Creach,

Kimberly Harris, Estate of Sean Copeland, by and through Kimberly Harris as Personal

Representative, Estate of Brodie Copeland, by and through Kimberly Harris as Personal

Representative, Austin Copeland, Maegan Copeland, Khalesi Love, Rhasia Love, and Veda Love

(collectively, "Plaintiffs"), by and through their attorneys, allege the following against

Defendants Lafarge S.A. ("Lafarge"), Lafarge Cement Holding Limited ("Lafarge Cyprus"), and

Lafarge Syria S.A. ("LCS") (collectively, "Defendants") upon information and belief, except as to those allegations concerning Plaintiffs, which they allege based upon their personal knowledge.

## INTRODUCTION

1.      Plaintiffs assert claims for wrongful death, personal injury, and related torts pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, against the members of a terrorism-financing conspiracy spearheaded by Defendant Lafarge.

2.      The members of that conspiracy sponsored and carried out a series of heinous terrorist attacks, including the attacks Plaintiffs describe below.

3.      This action arises out of three terrorist attacks carried out by the Islamic State of Iraq and Syria ("ISIS"), also known as the Islamic State of Iraq and the Levant ("ISIL"), the Islamic State ("IS"), ad-Dawlah al-Islāmiyah fīl-ʿIrāq wash-Shām ("DAESH") and al-Qaeda in Iraq ("AQI"): (1) the November 9, 2015 shooting at the International Police Training Center ("IPTC") in Amman, Jordan (the "Amman Attack"); (2) the July 14, 2016 cargo truck attack in Nice, France (the "Nice Attack"); and (3) the August 17, 2017 van attack on La Rambla in Barcelona, Spain (the "Barcelona Attack").

4.      ISIS carried out these attacks with material support and resources provided by Defendants. Defendants have admitted that they paid ISIS and Al-Nusra Front ("ANF") nearly $6 million dollars between July 2012 and October 2014. Defendants also admitted that they let ISIS seize over $3.1 million dollars of cement. The money paid by Defendants to ISIS went directly to ISIS's operations, including its acts of international terrorism.

5.      The substantial assistance that Defendants knowingly provided to ISIS included: (a) transferring significant sums of money to ISIS, its operatives, and its front organizations; (b)

repeatedly transacting with ISIS for purchases of raw materials and supplies; and (c) entering into a revenue-sharing agreement with ISIS.

6.      More specifically, at the specific direction of the companies' highest management levels—including the CEOs of both Lafarge and LCS—Defendants entered into and sustained a multi-faceted and mutually beneficial conspiracy with ISIS and intermediaries at the same time ISIS was killing Americans. For the explicit purpose of incentivizing ISIS to act in a manner that would promote their common interests, Defendants' executives agreed to make monthly payments to ISIS and ANF, to pay ISIS based on the volume of cement LCS sold, to purchase raw materials from ISIS-controlled suppliers, and to sell its cement to ISIS. Defendants ultimately solidified their relationship with ISIS by entering into a formal revenue-sharing agreement. Transactions in furtherance of this criminal conspiracy were purposefully made in U.S. dollars and transferred through and processed in New York.

7.      Defendants received crucial benefits in exchange for these payments. ISIS permitted access to raw materials sourced from the expanding territory and markets under its control so that the Cement Plant could produce cement; ISIS allowed LCS employees, suppliers, and customer-distributors safe passage through terrorist checkpoints; and ISIS agreed to impose costs on, and in some cases block the importation of, competing cement from Turkey. ISIS— quite literally—agreed to take out Defendants' competition.

8.      Defendants' knowing provision of material support to ISIS enabled ISIS to expand the territories and markets under its control, fund low-cost acts of terrorism directed at Americans, and build the infrastructure necessary to kill Americans.

9.      Defendants referred to their "profit" as a "cake," and stated they were happy to "share" a slice with ISIS so long as ISIS continued to protect and enhance Defendants' interests.

10.     Defendants were fully aware that they were transacting with ANF and ISIS, and that their conduct flagrantly violated U.S. law. Indeed, Defendants' executives frequently and expressly communicated about the challenges of dealing with those who were "classified as terrorists by international organizations and the US."[1]

11.     To avoid detection, Defendants went to great lengths to conceal their relationship with ANF and ISIS. For one thing, rather than directly transacting with terrorists, Defendants worked through intermediaries. As one LCS security consultant admitted, "it was especially important that the relationship would be handled by [intermediaries], since an exposure of this sort would have been compromising for LCS. But via [intermediaries], we did in fact contribute to the economy of ISIS." Relatedly, Defendants ensured that documents regarding terrorist payments did not reference the word "Lafarge." For example, LCS's CEO instructed an intermediary that "the name of Lafarge should never appear for obvious reasons in any documents of this nature. Please use the words Cement Plant if you need but never the one of Lafarge." Finally, Defendants purposefully availed themselves of U.S. dollar transactions routed through the U.S. financial system and personal email addresses using services based in the United States—rather than Lafarge email addresses—to conceal their illegal activities from their auditors and French law enforcement authorities.

12.     Defendants have admitted making payments of at least $5.92 million to ISIS and ANF from 2012 through 2014. These payments consisted of at least $816,000 of monthly "donations" to ISIS; at least $3,447,528 in payments to ISIS-controlled suppliers; and at least $1,654,466 in payments based on the amount of cement LCS sold. Defendants have also

---

[1] All citations to written correspondence include original spelling, punctuation, and grammar unless otherwise noted.

admitted to leaving behind cement when they turned over the factory to ISIS, and that ISIS sold the cement at prices that would have yielded ISIS another $3.21 million.

13.     Defendants' payments to and partnership with ISIS provided ISIS capital to transform from a fledgling militia in the early 2010s into a brutal terroristic behemoth with the capability and intent to kill Americans. The revenue stream enabled the terrorist attacks that targeted Plaintiffs and their family members. Defendants' money translated directly into fighters, guns, and bombs the terrorists used to plan and execute their terrorist acts against Plaintiffs. It allowed ISIS to create more explosives, capture more territory, recruit new members, disseminate extensive propaganda, and expand to new regions and countries. According to a former U.S. Ambassador to the United Nations, funding enabled ISIS to "pay its followers," create a massive salaried military force that included snipers, planners, and suicide bombers, and "fund attacks around the world."

14.     Given the low costs of terrorist attacks, Defendants' payments had a substantial impact on ISIS's capabilities. Their multimillion-dollar bribes were enough to finance thousands of ISIS terrorist attacks—enough to kill and maim every Plaintiff in this case many times over. These attacks were the foreseeable, obvious and even intended results of doing business with ISIS. Terrorist attacks enabled ISIS to maintain and expand its control over territories and markets. The more territory and markets ISIS controlled, the greater the co-conspirators' profits.

15.     Defendants' payments were channeled to ISIS's leadership, under ISIS's centralized and carefully tracked system. ISIS's founder and leader Abu Bakr Al-Baghdadi supervised the collection and disbursement of the "taxes" Defendants paid to it. On information and belief, Al-Baghdadi's ISIS Leadership Cell (described *infra* § J.i.) skimmed 20% off the top of the money ISIS collected, including the payments made willingly by Defendants, to help plan,

authorize, and commit the terrorist acts alleged below (*see infra* § M.). In addition, Defendants' cement plant was located near the main ISIS headquarters in Raqqa. Raqqa was the largest city ISIS held, its de facto and self-described capital. The rest of Defendants' money would have gone to the Raqqa province, led by the Raqqa Cell. The Raqqa Cell, in turn, was run by Ali Musa Al-Shawakh, or Abu Luqman, and played a key role in maintaining fighters, funding, and planning the attacks described below. Defendants, through intermediaries and with knowledge and intent, directly conspired with Abu Luqman's Raqqa Cell, which controlled the local territory around Lafarge's cement plant in northern Syria. The Raqqa Cell collected funds from Defendants and directed, both directly and through dissemination of propaganda, the individual attacks that harmed Plaintiffs.

16.    Defendants' conspiracy with ISIS and intermediaries had substantial, purposeful connections to the United States.

17.    Defendants' executives knowingly and deliberately relied on the U.S. financial system, causing numerous U.S.-dollar denominated wire transfers to pass through New York banks. Their reliance on U.S. banks was deliberate and strategic: Defendants called "USD" their "preferred option." Using U.S. dollars and New York correspondent banks made Defendants' payments look legitimate, avoided the scrutiny of French auditors and law enforcement, avoided fluctuations in the value of the Syrian pound, and avoided sanctions complications associated with conducting banking transactions with persons located in Syria. Defendants knowingly used the U.S. banking system for these reasons.

18.    The conspiracy itself was integrally linked to the United States, as Defendants knew, foresaw, and intended. Harming and killing foreigners, especially Americans, whom ISIS referred to as "crusaders," was a potent way for ISIS to maintain and expand its grip on power,

territory, and markets. By taking on the world's strongest power, the United States, and killing Americans, ISIS terrorized its subjects, recruited new followers, and deepened its territorial reach. Defendants intentionally, purposefully, and foreseeably benefitted from ISIS's protection, strength, and terrorist acts against Americans as part of their partnership with ISIS to control local markets and increase profits.

19.    Thus, Defendants entered a conspiracy with ISIS and intermediaries whose overall object was to maintain and expand ISIS's territorial control of Syria and Iraq and thereby promote ISIS's control of and protection rackets within that territory. ISIS's acts of international terrorism targeting U.S. citizens, including the attacks that killed and injured Plaintiffs, furthered the overall object of Defendants' conspiracy by strengthening ISIS's perceived power.

20.    Plaintiffs—American citizens harmed by ISIS, and their family members—are entitled to recover for the economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their relatives' society, companionship, wages, comfort, advice, and counsel that they experienced as a result of Defendants' misconduct. Defendants aided and abetted the ISIS and ANF attacks that killed or injured Plaintiffs and their family members. Defendants also conspired with ISIS, ANF, and intermediaries, making Defendants liable for the terrorist attacks that ISIS foreseeably committed in furtherance of their conspiracy.

21.    As a result of the terrorist attacks carried out by ISIS and facilitated by Defendants, Plaintiffs have suffered severe physical and/or psychological injuries.

22.    Accordingly, Defendants are liable to Plaintiffs under the ATA for providing material assistance to ISIS, engaging in a conspiracy designed to support ISIS's terrorist activities, and aiding and abetting that unlawful conduct.

## DEFENDANTS' GUILTY PLEA

23.    On October 18, 2022, the Department of Justice announced its first-ever prosecution of a corporation for providing material support for terrorism. According to Deputy Attorney General Lisa O. Monaco, Lafarge, Lafarge Cyprus, and LCS "partnered with [the Islamic State in Iraq and Syria ("ISIS")], one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share— all while ISIS engaged in a notorious campaign of violence during the Syrian civil war."

24.    As part of their plea agreement, Lafarge and LCS agreed to a 52-page Statement of Facts detailing their unlawful conduct ("Statement of Facts"). *See United States v. Lafarge S.A. et al.*, No. 1:22-cr-00444 (E.D.N.Y. Oct. 18, 2022), ECF No. 10. Plaintiffs incorporate the Statement of Facts into this Second Amended Complaint in its entirety to the extent not inconsistent with the allegations herein.[2]  Lafarge and LCS agreed in the guilty plea that it "will not dispute the Statement of Facts."

25.    Based on the heinous conduct underlying their guilty plea, U.S. District Judge William F. Kuntz II sentenced Lafarge and LCS to terms of probation and to pay financial penalties, including criminal fines and forfeiture, totaling $777.78 million. At the conclusion of the sentencing hearing, Judge Kuntz said: "This case impacts global communities. This case impacts the national security of the United States. This case impacts the victims of terrorist acts perpetrated by ISIS and ANF."

---

[2] Plaintiffs' investigation has revealed additional facts beyond those to which Lafarge and LCS have admitted in connection with their guilty plea. Upon information and belief, the factual admissions in connection with the guilty plea were limited by design and carefully crafted in an effort to avoid civil liability like that threatened by the instant proceedings.

26.     Among the facts to which Defendants admitted was that they paid ISIS and ANF nearly $6 million dollars between July 2012 and October 2014. Defendants also admitted that they let ISIS seize over $3.1 million dollars of cement.

27.     Defendants' own documents indicate that Defendants paid millions of dollars more—exceeding $15 million according to media reports—starting before July 2012 and continuing after October 2014. Defendants did not take steps to unwind the conspiracy until years later, after the criminal conspiracy was publicly exposed. By way of example, a July 14, 2014 email written to LCS's CEO refers to even more payments "in addition to the ten millions that we pay directly to them, i.e. to ISIS" (*see infra* § E).[3] In addition, Lafarge entered into a written contract in October 2014, back-dated to September 2014, obligating it to continue to make U.S. dollar payments indefinitely, money destined for terrorists (described *infra* §§ G-H).

28.     Defendants were able to conceal their conspiracy with ANF, ISIS, and their intermediaries for so long because, among other things, they took extraordinary steps to repeatedly and systematically route financial transactions and email traffic in furtherance of the conspiracy through the United States. They undertook these activities in the United States purposefully to avoid the scrutiny of Lafarge's French auditors and French law enforcement officials, and to avoid having to engage in banking transactions in or through Syria and in Syrian currency.

29.     The factual admissions in the Statement of Facts established Defendants' criminal liability under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2339B(a)(1), and give rise to civil liability under 18 U.S.C. § 2333 and 18 U.S.C. § 2339.

---

[3] The email communication likely refers only to one type of payment to ISIS at one point in time. Lafarge made numerous types of payments to ISIS over a lengthy period of time (described *infra* §§ C-D).

## PARTIES

30.    Plaintiff Tamara Fields is a citizen of the United States domiciled in the State of Florida. Ms. Fields was married to Lloyd Carl Fields, Jr. at the time of his death in the Amman Attack.

31.    Plaintiff the Estate of Lloyd Carl Fields Jr. is represented in this action by and through Tamara Fields, its Personal Representative as appointed under the laws of the State of Florida. Lloyd Carl Fields Jr. was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Florida.

32.    Plaintiff Heather Gavino is a citizen of the United States domiciled in the State of Missouri. Ms. Gavino was married to James Damon Creach at the time of his death in the Amman Attack.

33.    Plaintiff the Estate of James Damon Creach is represented in this action by and through Heather Gavino, its Personal Representative as appointed under the laws of the State of Florida. James Damon Creach was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Florida.

34.    Plaintiff Jackson Creach is a citizen of the United States domiciled in the State of Missouri. He is the son of James Damon Creach.

35.    Plaintiff Samantha Creach is a citizen of the United States domiciled in the State of Missouri. She is the daughter of James Damon Creach.

36.    Plaintiff Jayedon Creach is a citizen of the United States domiciled in the State of Missouri. He is the son of James Damon Creach.

37.    Plaintiff Kimberly Harris is a citizen of the United States domiciled in the State of Texas. Ms. Harris was married to decedent Sean Copeland at the time of his death in the Nice Attack. She is the mother of decedent Brodie Copeland, another victim of the Nice Attack.

38.     Plaintiff the Estate of Sean Copeland is represented in this action by and through Kimberly Harris, its Personal Representative as appointed under the laws of the State of Texas. Sean Copeland was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Texas.

39.     Plaintiff the Estate of Brodie Copeland is represented in this action by and through Kimberly Harris, its Personal Representative as appointed under the laws of the State of Texas. Brodie Copeland was, at the time of the acts alleged, and at all other times relevant hereto, a United States citizen domiciled in the State of Texas.

40.     Plaintiff Austin Copeland is a citizen of the United States domiciled in the State of Texas. Mr. Copeland is the son of decedent Sean Copeland and the brother of Brodie Copeland.

41.     Plaintiff Maegan Copeland is a citizen of the United States domiciled in the State of Texas. Ms. Copeland is the daughter of decedent Sean Copeland and the sister of decedent Brodie Copeland.

42.     Plaintiff Khalesi Love is a citizen of the United States domiciled in the State of Wisconsin. She is the daughter of decedent Jared Tucker, a victim of the Barcelona Attack.

43.     Plaintiff Rhasia Love is a citizen of the United States domiciled in the State of California. She is the daughter of decedent Jared Tucker, a victim of the Barcelona Attack.

44.     Plaintiff Veda Love is a citizen of the United States domiciled in the State of Wisconsin. She is the daughter of decedent Jared Tucker, a victim of the Barcelona Attack.

45.     Defendant Lafarge S.A. is a multinational building materials business organized under the laws of France and headquartered in Paris, France. Lafarge is the parent company of a multinational building materials business, which is organized under the laws of France and

headquartered in Paris, France. At pertinent times, Lafarge, together with its subsidiaries, employed 63,000 people to manufacture and sell cement, construction aggregates, concrete, and other building materials at 1,612 production sites in approximately 61 countries, including the United States.

46.    On July 10, 2015, Lafarge merged with its leading competitor, Holcim Ltd., a Zurich, Switzerland-based building materials business to create Lafarge Holcim. At the time of the merger, Holcim and Lafarge were the two largest multinational building materials companies in the world.[4]

47.    During all times pertinent to this Second Amended Complaint, Lafarge oversaw and directed the conduct of two Defendant subsidiaries it wholly controlled, LCS and Lafarge Cyprus.

48.    Defendant LCS was a direct subsidiary of Lafarge Cyprus, organized under the laws of Syria and headquartered in Damascus, Syria. Lafarge indirectly owned 98.7% of LCS through four subsidiaries, primary among them Lafarge Cyprus. From approximately May 2010 to September 2014, Lafarge, through LCS, operated a cement plant in the Jalabiyeh region of Syria, located in northern Syria near the Turkish border and between the cities of Manbij and Raqqa, Syria. LCS made agreements and effectuated transactions with ISIS and ANF "at the direction of LAFARGE's and LCS's senior management," including Christian Herrault, a Lafarge Executive Vice President based in Paris. Lafarge executives were thoroughly informed of LCS's decisions and directions in interacting with terrorists. As Herrault wrote in 2017, LCS's "local concessions" to terrorists "were made with the clear and repeated approval" of senior

---

[4] LafargeHolcim rebranded itself as Holcim Group in 2021.

Lafarge leadership. Thus, when allegations herein refer to LCS or LCS employees, the described conduct occurred at Lafarge's direction and for Lafarge's benefit.

49.    Defendant Lafarge Cyprus is the entity through which Lafarge held the majority of its shares in LCS until Lafarge's 2015 merger with Holcim Ltd. It is organized under the laws of Cyprus and headquartered in Cyprus. Lafarge Cyprus functioned as the corporate instrument through which Lafarge often routed money to LCS and intermediaries, including through international bank transfers that went through New York, and thereby financed Lafarge's payments to ISIS and ANF. Lafarge Cyprus's financing of LCS's transfers was done knowingly and at Lafarge's direction and with Lafarge's approval. In 2014, Lafarge Cyprus executed a consulting agreement with Firas Tlass to conceal Defendants' payments to ISIS.

## DEFENDANTS' PRINCIPAL CO-CONSPIRATORS

50.    Jean Claude Veillard is a citizen and national of France and was Vice President of Security for Lafarge from approximately October 2008 until September 2017. He was based at Lafarge's headquarters in Paris, France. Veillard was also a member of Lafarge's Security Committee.

51.    Christian Herrault is a citizen and national of France and was an Executive Vice President of Operations of Lafarge from approximately 2012 to December 2015. Herrault supervised Lafarge's operating subsidiaries in numerous countries, including Syria. Herrault was based at Lafarge's headquarters in Paris, France and reported directly to Lafarge's Chairman and CEO, Bruno Lafont. Herrault was a member of Lafarge's Security Committee and, beginning on July 4, 2013, served as Chairman of the Board of Directors of LCS.

52.    Bruno Pescheux is a citizen and national of France and was CEO of LCS from approximately 2008 to July 2014. While CEO of LCS, Pescheux was based at LCS's headquarters in Damascus, Syria before relocating to Cairo, Egypt in 2012 when LCS evacuated

13

its foreign employees in the face of growing unrest around its plant. He reported directly to Herrault.

53. Fredric Jolibois is a citizen and national of France who became CEO of LCS in approximately July 2014 and remained in that role until approximately January 2016, and reported directly to Herrault until Herrault left Lafarge.

54. Guillaume Roux is a citizen of the United States and of France, and was an Executive Vice President of Lafarge until January 2016. Roux was also a member of Lafarge's Security Committee, and a member of LCS's Board of Directors until January 2016 and its Chairman from 2008 until July 4, 2013. Roux was based at Lafarge's headquarters in Paris, France and reported directly to Lafarge's Chairman of the Board of Directors and CEO, Bruno Lafont.

55. Bruno Lafont is a citizen and national of France and was Lafarge's Chairman of the Board of Directors and CEO of Lafarge until the completion of the merger with Holcim Ltd. in 2015. Upon Lafarge's merger, he became Co-Chair of Lafarge Holcim's Board of Directors and served there until May 2017. He was based at Lafarge's headquarters in Paris, France.

56. Firas Tlass is a citizen and national of Syria and was a minority shareholder in LCS until the Syrian government confiscated his shares in LCS in approximately 2012. Tlass was paid by LCS, with Lafarge's knowledge and approval, to provide "security" services to LCS, which included negotiating with various local terrorist groups, including ISIS and the ANF. Tlass was paid by LCS, with Lafarge S.A.'s knowledge and approval, to negotiate with and deliver payments to ISIS and ANF.

57. Amro Taleb is a citizen of Canada and of Syria and a former consultant to LCS who held himself out as a broker capable of sourcing raw materials from ISIS-controlled

territories. LCS paid Taleb to negotiate with and pay ISIS for raw materials, with Defendants'

knowledge and approval. After ISIS raided the Cement Plant, Taleb negotiated the sale and

liquidation of its cement and equipment, while receiving payment from Defendants. As

Defendants' paid consultant, he then visited Lafarge's headquarters in Paris in January 2015 to

discuss Defendants' further cooperation and conspiracy with ISIS to re-open the Cement Plant.

58.    Defendants, through Veillard, Herrault, Pescheux, Jolibois, Roux, Lafont, Tlass,

and Taleb, among others, acted in concert with, and for the purpose of furthering, Defendants',

ISIS's, and ANF's common objectives. They conspired and worked in concert with ANF and

ISIS, with the full knowledge of ANF's and ISIS's designation as Foreign Terrorist

Organizations ("FTO" or "FTOs"), their terrorist acts, and their purposeful targeting of

Americans and others.

## JURISDICTION AND VENUE

59.    Plaintiffs, all citizens of the United States, were killed or injured by acts of

international terrorism that arose from the Defendants' conspiracy to support ISIS.

60.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C.

§ 2338.

61.    Personal jurisdiction exists under Federal Rule of Civil Procedure 4(k)(1)(A) and

New York Civil Practice Law and Rules § 302(a)(1), based on Defendants' use of New York

banks in carrying out their scheme.  Alternatively, personal jurisdiction exists under Federal Rule

of Civil Procedure 4(k)(2), based on Defendants' use of New York banks and U.S.-based email

service providers in carrying out their scheme.  Rule 4(k)(2) jurisdiction also exists based on

Defendants' conspiracy with ISIS, a terrorist group that purposefully targeted the United States,

caused tortious effects on and within the United States, and carried out overt acts in furtherance

of the conspiracy within and targeting the United States.  If the Court were to find jurisdiction

lacking under New York's long-arm statute, Plaintiffs certify based on the reasonably available information that Defendants would not then be subject to suit in the courts of general jurisdiction of any other state, which would make Rule 4(k)(2) jurisdiction appropriate.

62.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2), based on Defendants' use of at least one bank in this District in carrying out their scheme.  Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b)(3) and/or § 1391(c)(3).

63.    Defendants' conspiracy with ISIS and intermediaries had a substantial nexus to the United States and to New York, including by virtue of Defendants' and its agents' deliberate, repeated, and systematic use of U.S. dollar transactions and banks in New York to pay, conspire with, and aid and abet terrorists, including via intermediaries. Defendants' "preferred option" for paying terrorists was to make "bank transfer[s] in USD," because, among other things, it helped avoid detection by Lafarge's auditors and governmental entities.

64.    Specifically, Defendants directed their banks to complete U.S.-dollar-denominated wire transfers to support their scheme to fund ISIS and ANF, and Defendants' officials knew those directions required the use of New York banks. Defendants' wire instructions caused their payments to clear in New York, including through one admitted suit-related transaction in this District. Defendants' executives regularly received specific transaction confirmations alerting them to the particular U.S. correspondent and intermediary banks that routed their transactions. On information and belief, Defendants regularly requested and received confirmations from their banks notifying them of the New York banks involved in clearing their transfers, as part of Defendants' process of approving the transactions.

65.    By routinely, purposefully, and knowingly conducting transactions in U.S.-dollar-denominated transactions processed through New York, Defendants purposefully availed

themselves of the benefit of doing business in the United States generally and New York specifically, and thus are subject to personal jurisdiction.

66.     As Defendants knew and intended, Defendants' aiding and abetting of and conspiracy with ANF and ISIS and intermediaries enabled ISIS to commit the acts of international terrorism that expanded ISIS's power and territorial control that benefitted Defendants, and that injured and killed victims in Jordan, France, Spain, and elsewhere, thereby injuring Plaintiffs.

67.     In addition, as described further below, Defendants conspired with ISIS and its intermediaries to (a) provide material support to ISIS, a designated terrorist organization, knowing and intending that ISIS would use Defendants' material support to commit acts of violence that would endanger human life and would intimidate or coerce a civilian population, in violation of 18 U.S.C. 2333(a); and (b) commit acts of terrorism, knowing and intending that ISIS would target American citizens and American interests, in violation of 18 U.S.C. 2333(d). Defendants and their co-conspirators and agents' conspiracies had a substantial connection to and were in and affecting the United States and, in particular, New York.

68.     In furtherance of the conspiracies, as laid out *infra* § K.i., Defendants purposefully made numerous U.S.-dollar payments to ISIS through intermediaries and to facilitate the conspiracy with ISIS and intermediaries, payments that were wired through New York. This was done at Lafarge's instruction and with its knowledge, in reliance on the U.S. financial system for efficiency, security, and secrecy.

69.     For example, Lafarge has admitted to making a lump sum wire transfer of $210,000 from its operating account at a financial institution in Paris to intermediary banks in New York City through this District. The contract pursuant to which that payment was made,

17

and additional agreements made in the course of the conspiracy, required Defendants to make ongoing payments after October 2014. On information and belief, Defendants did so.

70.     Also in furtherance of the conspiracies, Defendants' executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their corporate email addresses, to coordinate and carry out elements of their partnership with ISIS. U.S.-based email service providers enabled Defendants to conceal their illegal conduct from French auditors and authorities. U.S.-based email service providers are considered more secure than non-U.S.-based providers.

71.     Further, Defendants are subject to personal jurisdiction given their participation in a scheme and conspiracy with ISIS and intermediaries that was directed at the United States and whose overall object was to maintain ISIS's territorial control of Syria and Iraq.

72.     ISIS was public about its intent to commit acts of terrorism against the United States as well as its intentional recruitment from the United States. In July 2012, Al-Baghdadi, ISIS's founder and leader, threatened to strike at the "heart" of America, proclaiming that the United States "will soon witness how attacks will resound in the heart of your land, because our war with you has now started." In January 2014, Al-Baghdadi announced to Americans: "Soon we will be in direct confrontation." And in June 2014, Al-Baghdadi threatened Americans: "You should know, you defender of the cross, that getting others to fight on your behalf will not do for you in Syria as it will not do for you in Iraq," and "soon enough, you will be in direct confrontation— forced to do so, God willing. And the sons of Islam have prepared themselves for this day. So wait, and we will be waiting, too."

73.     The threat to U.S. citizens was well-known outside Syria. On June 27, 2014, U.S. senators observed publicly that "[t]he conflict in Syria has deteriorated and spread so

dangerously that it is now the source of direct threats to the United States" and that "[t]he leader of ISIS, Abu Bakr al-Baghdadi, has already stated his ambitions to attack the U.S. homeland."

74.     The threats to American citizens proved all too real. In August 2014, ISIS broadcasted its beheading of U.S. journalist James Foley, and threatened the life of another if President Obama did not end military operations in Iraq. Tellingly, the beheading videos of both Foley and Steven Sotloff (in September 2014) were titled "Message to America" and "A Second Message to America," respectively. ISIS announced that its killing of Sotloff was specifically in response to U.S. airstrikes targeting it in Iraq. Defendants nonetheless pressed ahead with making payments to ISIS.

75.     Likewise, in September 2014, ISIS spokesman Sheikh Abu Muhammad Al-'Adnani Al-Shami gave a speech entitled "Indeed, Your Lord is Ever Watchful," in which he explicitly spelled out ISIS's anti-American objectives, stating, for example:

> O America, O allies of America, and O crusaders, know that the matter is more dangerous than you have imagined and greater than you have envisioned. . . . O Obama, O mule of the Jews, you are vile. You are vile. You are vile. And you will be disappointed, Obama. Is this all you were capable of doing in this campaign of yours? Is this how far America has reached in incapacity and weakness? Are America and its allies from amongst the crusaders and atheists unable to come down to the ground? . . .
>
> O Allah, America, France, and their allies transgressed against us. They came with their legions to fight us out of their enmity for your religion. . . . We have no way to deal with their airplanes. O Allah, you have said what is true, 'So do not weaken and do not grieve, and you will be superior if you are [true].'

76.     A leading terrorism expert testified before the Subcommittee on Counterterrorism and Intelligence of the House Committee on Homeland Security that the "U.S. military has ostensibly become a primary target for the Islamic State."

77.     The United States has convicted ISIS terrorists based on their targeting of the

United States. On September 2, 2021, former British citizen Alexanda Amon Kotey pleaded guilty in the Eastern District of Virginia to an eight-count indictment consisting of one count of conspiracy to commit hostage taking resulting in death; four counts of hostage taking resulting in the deaths of four Americans (Foley, Sotloff, Kayla Mueller, and Abdul-Rahman (Peter) Kassig); one count of conspiracy to murder U.S. citizens outside of the United States; one count of conspiracy to provide material support or resources to terrorists resulting in the deaths of U.S., British and Japanese nationals; and one count of conspiracy to provide material support or resources to a designated FTO resulting in the deaths of U.S., British, and Japanese nationals, for his participation in ISIS's hostage-taking and terrorist activities.

78.     On April 14, 2022, a federal jury in the Eastern District of Virginia convicted Kotey's co-conspirator, former British citizen El Shafee Elsheikh, for his participation in the same ISIS scheme. Witnesses at the trial presented evidence from November 2012 through February 7, 2015 of Elsheikh's participation in torturing the hostages.

79.     Other ISIS members have been tried and convicted in this District. For example, in 2013, Mirsad Kandic traveled from Brooklyn to a city outside of Aleppo, Syria to work directly with ISIS leadership. Kandic managed ISIS social media accounts and recruited thousands to ISIS, including from New York. In 2022, Kandic was convicted of five counts of providing material support to ISIS, and one count of conspiracy to do the same. Likewise, Ruslan Maratovich Asainov, a U.S. citizen from Bay Ridge, New York, was convicted in the Eastern District of New York for providing material support to ISIS. Asainov fought with ISIS as a sniper from 2013 until he surrendered in 2019, rising in ISIS's ranks to become the lead trainer and organizer of ISIS's sniper force. He ran a private chat group for ISIS members to sell and trade weapons called "Khilafah (Caliphate) Market," of which Raqqa governor Abu Luqman

(*see infra* § J.ii.) was a member.

80.    ISIS's overt acts targeted the United States and U.S. citizens. Defendants bought protection and entered a complex conspiracy with ANF and ISIS and intermediaries, with the awareness that they were terrorist-classified groups. Defendants conspired with full knowledge of and intent to enable their terrorist acts, including their targeting of the United States and American citizens, in order to control markets and increase profits. As a result of the conspiracy between Defendants, intermediaries, and ISIS, ISIS's overt acts targeting the United States and U.S. citizens, including Plaintiffs and their loved ones, are attributable to Defendants.

81.    Based on conduct that occurred "within the Eastern District of New York and the extraterritorial jurisdiction of the United States," the Department of Justice charged Defendants with conspiring to provide material support to terrorists. The Department of Justice further charged that "the defendants were brought into and found in the United States, the offense occurred in part within the United States, the offense occurred in and affected interstate and foreign commerce, and the defendants conspired with a national of the United States." Based on these contacts with the United States, Lafarge and LCS "admit[ted] the Court's jurisdiction over the Defendants and the subject matter of such action . . ."

82.    Additional allegations regarding the substantial nexus of Defendant's unlawful conduct to New York can be found *infra* § K.

## THE FACTUAL BASES FOR PLAINTIFFS' CLAIMS

**A.    Background on ISIS**

83.    On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid Wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224.

84.     On December 11, 2012, the United States amended the FTO and Executive Order (E.O.) 13224 designations for Al-Qaeda to include ANF, under the new aliases: Al-Nusrah Front; Jabhat Al-Nusrah; Jabhet Al-Nusra; The Victory Front; and Al Nusrah Front for the People of the Levant. In its accompanying press release, the Department of State warned that ANF "has sought to portray itself as part of the legitimate Syrian opposition while it is, in fact, an attempt by AQI to hijack the struggles of the Syrian people for its own malign purposes." To date, ANF remains a designated FTO.

85.     Threatened by ANF's and Al-Julani's increasing power in May 2013, Al-Baghdadi (the Al-Qaeda leader who had originally sent Al-Julani to Syria) declared the formation of Al-Dawlah Al-Islamiyah fi Al-'Iraq wa Al-Sham (The Islamic State of Iraq and Syria, "ISIS"). Al-Baghdadi declared that, under his leadership, ISI and ANF would merge into a single Sunni Islamist organization, ISIS. ISIS's stated goal was to seize control first of Iraq and Syria and then beyond, to form a unified religious state across national boundaries, a "caliphate." However, Al-Julani, ANF's head, objected to Al-Baghdadi's declaration, and publicly pledged allegiance to Al-Qaeda leadership.

86.     On or about May 14, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section l(b) of Executive Order 13224 to add the alias Islamic State of lraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS," which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-lslamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and AI-Furquan Establishment for Media Production. At the same time, the Secretary also amended that designation to remove

ANF's aliases, and at the same time, separately designated ANF as its own FTO and Specially Designated Global Terrorist.

87.    On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS has remained a designated FTO. ISIS has claimed credit for numerous terrorist activities.

88.    In or around 2011, the combination of civil protests in Syria and the Syrian government's violent suppression of those protests developed into a full-fledged civil war, which remains ongoing. In or about September 2011, the European Union ("EU") imposed an embargo on Syrian petroleum products to further isolate and weaken the Syrian regime in response to its brutal crackdown on opposition groups within the country. Under the new sanctions, all 27 EU member states were barred from buying, importing or transporting oil and other petroleum products from Syria, and from entering into financial or insurance services for such transactions. On or about December 1, 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

89.    ANF and ISIS quickly became rivals in the jihadist community, competing for international legitimacy and Syrian and Iraqi territory. Through brute force, ISIS took the upper hand and rapidly seized Raqqa and other cities and villages across Syria and Iraq.

90.    In 2012, ISIS gained control of territory in Syria and committed numerous terrorist acts, resulting in the deaths of numerous U.S. citizens among others.

91.    Notably, unlike most of the other militant groups fighting in Syria in opposition to the Syrian government, ISIS did not target Syria alone: its goal, as Defendants knew, was the construction of a self-described "caliphate" or empire. The U.S. government and others categorically rejected any suggestion that ISIS, despite its name, was a "state," that it had any

legitimate governmental function, or that it did anything other than propagate terrorist violence. ISIS maintained and expanded its control over civilian populations using violence and fear, rather than legitimate governance. It solidified its control by entering into criminal conspiracies like the one it had with Defendants, and by attacking foreign powers including the United States. Its acts of mass terrorist violence violated international law, including the laws of war, and included kidnapping, human trafficking, and murder.

92.     The EU sanctions and U.N.'s recognition of the Syrian civil war were followed by an exodus of multinational corporations from Syria. For example, on December 2, 2011, a Dutch petroleum conglomerate announced that it was pulling out from Syria in response to the sanctions. Three days later, one of the world's largest oil companies, headquartered in France, announced that it was halting operations in Syria due to, among other factors, safety concerns. Other international corporations quickly followed suit.

93.     ISIS's leadership issued multiple public calls for attacks against U.S. and Western interests around the world, and the group made similar calls for attacks in its English-language magazine, Dabiq. ISIS members and sympathizers planned and conducted attacks at a previously-unprecedented pace—at least 37 plots between February 2014 and July 2015.[5]

94.     As outlined throughout this Second Amended Complaint, ISIS has repeatedly targeted American citizens. For instance, journalist and video reporter James Foley was working as a freelance war correspondent during the Syrian Civil War, when he was abducted on November 22, 2012, in northwestern Syria. He was murdered by ISIS by decapitation in August 2014. ISIS posted a video of the murder to YouTube.

95.     In August 2013, Steven Joel Sotloff, an American-Israeli journalist, was

---

[5] https://www.dni.gov/nctc/groups/isil.html

kidnapped in Aleppo, Syria, and held captive by ISIS militants. On September 2, 2014, ISIS released a beheading video, showing one of its members murdering Sotloff. Following Sotloff's murder, then-U.S. President Barack Obama stated that the United States would take action to "degrade and destroy" ISIS.

96.    Many of ISIS's acts were intended to intimidate and silence its opponents. Its fighters patrolled the streets with weapons and suicide vests. To sow fear among the local populations, ISIS shot opponents from behind (including children), beheaded them, lit them on fire, and hung them in public squares. According to the U.N. Human Rights Council, ISIS "made calculated use of public brutality and indoctrination to ensure the submission of communities under its control."

97.    ISIS also kidnapped and murdered journalists and aid workers while Defendants were providing it material support. Their victims, including Americans, were frequently beheaded, sometimes on videos broadcasted online for Americans and others to watch in horror.

98.    It soon became clear ISIS would be more successful than ANF, in part because of its extreme brutality and global ambition, but also because of its greater resources, including money, weapons, and fighters. ANF leaders began defecting to ISIS.

99.    Lafarge was aware that foreign fighters and defectors from other terrorist groups were increasing ISIS's ranks. Its security consultant concluded that the group's membership came at first from Iraqi fighters and ANF defectors, but that as time went on, "jihadi tourists" (as Lafarge's security consultant called them) came to Syria and Iraq to join the group and commit terrorist attacks. It is with this group that Defendants chose to enter a complex set of multi-million dollar financial arrangements with ISIS for their mutual benefit.

100.    Throughout 2014, ISIS took over more and more territory in Iraq and Syria, ultimately controlling forty percent of Iraq and thirty percent of Syria, ruling over more than 11 million people.

101.    Lafarge's security advisor was aware of ANF's and ISIS's designations, observing publicly that "The ISI [Islamic State of Iraq] and later ISIS/ISIL had been listed as a terrorist group since 2004 by the USA, the UN, and the EU," and that moreover "in LCS we knew that Al-Nusra Front had been listed by the Americans . . ."

102.    To grow as quickly as it did from a small armed group in 2013 to an international terrorist organization with swathes of territory in 2014, ISIS needed money—and a lot of it. ISIS robbed the resources under its control, including by exploiting manufacturing plants, looting banks, pumping oil and gas to sell on the black market, taxing agricultural products, selling humans as slaves, and demanding passage tolls and protection payments.

103.    Capturing cement plants was an essential part of ISIS's growth plan. Between its territory in Syria and Iraq, ISIS seized five cement plants, which could produce a total of $583 million in annual revenue. Cement plants were a particularly appealing target for a number of reasons, including that they generated significant revenue from which ISIS could pilfer; they contained raw materials that ISIS could use to create explosives, and cement to build tunnels and other structures used for attacks. ISIS had distribution networks that it used to sell cement.

104.    Of the five cement plants ISIS seized, Lafarge's Cement Plant was by far the largest. In fact, the production capacity of the Cement Plant was more than twice as much as that of the second largest plant. And ISIS did not simply capture and rob the Cement Plant. Rather, before ISIS overran the Cement Plant and seized all the materials Lafarge left behind, Defendants and ISIS had become close partners, pursuing common objectives, and generating

millions of dollars in profit for each.

**B.  Defendants Form A Partnership With ISIS**

105.    Lafarge maintained an indirect subsidiary organized under the laws of Syria and headquartered in Damascus, Syria titled Lafarge Cement Syria S.A. Lafarge indirectly owned approximately 98.7% of LCS's issued and outstanding share capital through four separate subsidiaries. From approximately May 2010 to September 2014, Lafarge, through LCS, operated a cement plant in the Jalabiyeh region of Syria, located in Northern Syria near the Turkish border and between the cities of Manbij and Raqqah, Syria (the "Jalabiyeh Cement Plant").

106.    In 2007, Lafarge took a major step in its quest to dominate the Middle Eastern cement market. That year, Lafarge acquired Egyptian cement multinational Orascom Cement in a deal financed with over €7.4 billion in debt. As part of the deal, Lafarge purchased the Cement Plant, which Orascom had started to build.

107.    Lafarge and LCS completed the construction of the Jalabiyeh Cement Plant in 2010 at a cost of approximately $680 million. When the Cement Plant finally opened for business in May 2010, Lafarge's CEO Bruno Lafont toured the facility with reporters and the French Ambassador to Syria. The plant produced 160 truckloads of cement a day, amounting to half a million dollars' worth of daily sales.

108.    At the beginning of LCS's operations, it faced strong competition from cheaper cement imported into northern Syria from Turkey. To address this issue, in December 2010, Pescheux (LCS's CEO) requested that then-minority shareholder Tlass, a Syrian citizen with close connections to the Syrian regime and local groups, intervene with the Syrian government to curtail imports of competing Turkish cement.

109.    But larger problems loomed. In 2011, civil protests in Syria erupted into a full civil war. In September 2011, in response to this, the European Union barred its member states

from buying, importing, and/or transporting oil and other petroleum products from Syria, and from entering into financial or insurance services for such transactions. Similarly, the United States forbid import of its products into Syria, embargoed Syrian oil, and froze the assets of several Syrian individuals. And in December 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

110.    In 2012, as the civil war continued, ISIS gained control over large swaths of Syria and committed brutal terrorist acts. ISIS killed thousands, among them numerous U.S. citizens, including through graphic and well-publicized beheadings.

111.    As expected, the danger of operating in an active warzone, combined with the actions of the European Union, the United Nations, and the United States, prompted a mass exodus of multinational corporations from Syria. For example, in December 2011, two of the largest oil companies in the world—Royal Dutch Shell and Total—announced that they were leaving Syria.

112.    Defendants, by contrast, saw an opportunity in partnering with the terrorists in the battle for territorial control. Even though armed conflict had spread to the area immediately surrounding the Cement Plant, Lafarge and LCS doubled down on their $680 million investment and joined forces with the terrorists to help them maintain and expand their control, instead of ending their operations in Syria.

113.    Pescheux (LCS's CEO) described the plan to Herrault (Lafarge's Executive Vice President of Operations) as follows:

> [p]reserving the integrity of our physical assets (avoiding the plant to be looted), keeping our personnel ready for the end of the crisis (knowing the huge investment we have made in terms of recruitment and competency development), staying in the market (to keep our distributors' network and to prevent to let Turkish imports flooding North and East of Syria), making some profit to at least repay the

interests of the loan and giving some assurance to the lenders.

114.    Starting in the summer of 2012, Lafarge and LCS forged ahead with their plan to make financial payments to various armed factions.

115.    On September 23, 2012, Veillard and Tlass met in Gaziantep, Turkey with representatives of armed militants in areas surrounding the Cement Plant. Tlass recommended that LCS make payments to each of the armed militias based on the quantity of cement produced or according to monthly fee.

116.    By November 2012, Lafarge and LCS executives had approved a plan to establish relations with ANF through Tlass. On November 11, 2012, Tlass notified Pescheux that LCS was engaging directly with ANF: "gazi entab [Gaziantep, Turkey] was good we hav now conextion with jabhat al nosra [ANF]."

117.    The situation became more critical in 2013. By March 2013, ISIS, ANF, and other armed groups had taken over the area around Raqqa and both groups quickly established checkpoints at access roads to the Cement Plant. ISIS and ANF guarded their checkpoints with snipers, rockets, and homemade artillery.

118.    On April 7, 2013, Tlass recommended that LCS executives negotiate an agreement to pay ANF monthly or by the truckload to ensure continued access to the plant.

119.    Several months later, on August 30, 2013, Pescheux reported to Veillard (Lafarge Vice President of Security) and Herrault: "It is clear that we have an issue with ISIS and Al Nusra and we have asked our partner [Tlass] to work on it."

120.    Lafarge and LCS executives were fully aware at the time that they were dealing with terrorist organizations.

121.    For example, in a December 10, 2012 email, Veillard wrote: "The Islamist group Jabhat Al-Nusra, which is on USA's list of terrorist organisations, has reportedly recruited

several Norwegian citizens to fight in Syria."

122. Similarly, in a March 1, 2013 email, LCS's risk manager warned Pescheux that ANF "follow[s] a global jihadi ideology (similar to al-Qaida) and are more open to receive foreign fighters" and had "ties to al-Qaeda, exemplified by participating al-Qaida veterans, mainly from Iraq, and . . . some of their statements are quickly published in the main al-Qaida news outlet."

123. Likewise, notes from a September 11, 2013 meeting of Lafarge's Security Committee, which Veillard and Herrault received, stated: "It gets harder and harder to operate without having to directly or indirectly negotiate with networks classified as terrorists by international organizations and the US. The main challenge being to assess how far their demands and threats will reach, and consequently, the limits that we want to impose for the site to operate."

124. Despite this knowledge, Defendants decided to dispense with any "limits" and instead to conspire with the terrorists.

**C.    Defendants Begin Making Payments To Terrorists**

125. Recognizing that ISIS "demand[ed] that a 'tax be paid,'" Defendants proceeded to make millions of dollars in payments to terrorists. These payments came primarily through four mechanisms: (1) payments per truckload for buyer and supplier access to the plant; (2) volume-based payments for cement sold; (3) monthly fixed-rate payments; and (4) payments to ISIS-controlled suppliers. Defendants also knowingly sold cement to ISIS, which ISIS used to plan and carry out its acts of international terrorism.

126. Instead of leaving Syria, as other multinational companies had done, LCS saw the collapse of the country and increasing power of ISIS as an opportunity for further mutual enrichment and entrenchment by cooperating to sell more cement, at higher margins. Defendants

continued paying ISIS and ANF because doing so increased profits. Defendants' payments did not protect local employees—in fact, on information and belief, LCS threatened to fire employees who did not come to the factory, insisting that they travel through armed groups' checkpoints to and from Jalabiyeh, and to Aleppo to take out cash from banks. LCS fired an employee after he was abducted.

### i. Lafarge And LCS Pay Terrorists $150 Per Truck To Pass Through Checkpoints

127. On August 26, 2013, Pescheux emailed Tlass a map of the area around the plant and summarized the "strong improvement" "[o]n the west side of the plant towards Menbij, Al Bab, Aleppo, Idlib," but highlighted that "[o]n the east side of the plant towards Hassakeh and Qamishli, [t]here are 2 check points held by jihadists (see the map) which are blocking the trucks to go to and from the plants," and "[o]n the south of the plant, in the region of Al Thawra, Raqqah, Sokhna: there is a check point held by jihadists between Al Thawra and Raqqah and also potential problems at Sokhna." Pescheux summarized the problem by stating "[g]enerally speaking, it is clear we have an issue with ISIS and Al Nusra in the east, especially in Raqqah."

128. Tlass responded "no probleme let me work on it today . . . i cal u tomorrow to breef you.". The next day Tlass emailed Pescheux, "We Negotiate with (DAWLET AL IRAQ WAL SHAM) AL ISLAMIA & AL NUSRA I got a News that the situation In the Plant is Very Good."

129. The situation was "Very Good" because, by October, Lafarge began paying money directly to ANF and ISIS to ensure they would permit trucks to pass. In early September 2013, Pescheux asked Tlass for updates regarding truck passage to the east of the plant, and Tlass responded "better now Al Nusra do not obstruct Lafarge trucks ever as long as we pay them . . ." and on October 14, 2013, an LCS risk manager reported that "our customer has

reached long term agreements with leading groups Islamic State in Iraq and al-Sham (ISIS) in Raqqa, the agreement let the trucks coming back and forth from the east side of the plant. Each cement truck has to pay 150$."

### ii.  LCS Pays Terrorists Based On Cement Sold

130.    As part of a separate agreement, LCS paid ISIS based on the amount of cement that it sold. This agreement, dated November 6, 2013, and on ISIS letterhead, was between ISIS and LCS. The agreement provided that ISIS would assess trucks 400 Syrian pounds[6] for each transported ton of cement and, in exchange, ISIS would ensure the safety and free access of the trucks to the cement plant.

131.    Additionally, an ISIS vehicle pass dated April 26, 2014, and bearing ISIS's letterhead and stamp, allowed LCS employees to "pass through after the required work. This is after they have fulfilled their dues to us."

### iii.  LCS Makes Fixed Monthly "Donations" To Terrorists

132.    LCS also made fixed monthly "donation" payments through Tlass to ISIS, ANF, and other armed groups that controlled the area surrounding the Cement Plant.

133.    These payments, which, according to Lafarge and LCS's plea, exceeded $816,000 in total, began as early as July 2012, when armed groups started taking over territory around the Cement Plant. Defendants initially gave Tlass between $80,000 and $100,000 per month to distribute to the armed groups around the factory. By February 2013, at Pescheux's request, Tlass had begun periodically providing lists identifying the armed groups to which he was making payments on Defendants' behalf and the amounts he was paying to the groups each month.

---

[6] At this time, the exchange rate of Syrian pounds to U.S. dollars was approximately 112 to 1.

134.     Beginning in February 2013 and continuing through at least July 31, 2013, Tlass advised Pescheux that he was making payments of 200,000 Syrian pounds at first, and later 325,000 Syrian pounds per month to a group he identified as the "ALRAQA People," which was a reference to ANF.

135.     In a July 2, 2013 email with the subject line "Donations," Pescheux calculated that the new total of monthly payments to armed factions was 17.4 million Syrian pounds, or over $155,000 USD per month.

136.     In an August 5, 2013 email with the subject line "Update on donations," Pescheux wrote to Herrault that "some elements on the donations were are paying to [Tlass] and that he is supposed to channel to the various beneficiaries. As discussed in Dubai end of May and as reminded in my recent mail to you and [Roux], these donations are distinct from the monthly remuneration of our partner."

### iv.  **LCS Pays Fixed Monthly Security Payments To Terrorists**

137.     In November 2013, Defendants decided that Tlass should make fixed monthly security payments to ISIS as well. In a November 29, 2013 email, Lafarge and LCS executives exchanged a list of "donations we are paying to [Tlass] and that he is supposed to channel to the various beneficiaries." The email contained a "List valid from November 1, 2013," which included a five million Syrian pound monthly payment for "Daesh (ISIS)." The list showed that the monthly donation payments to all armed groups now totaled 24 million Syrian pounds.

138.     On February 4, 2014, Pescheux directed Tlass to limit the monthly payments to armed groups to 20 million Syrian pounds, including limiting assessments on sales to 200 Syrian pounds per ton. Tlass responded that his representatives were meeting to discuss the payments with ISIS in Raqqa and with ANF in Aleppo.

139.     Following those meetings, Tlass advised LCS to increase payments to the

terrorists. As Tlass explained in a March 31, 2014 email pointing out the extent of Defendants'

investment and the scope of its current profit:

> Is Lafarge able to bear a loss of about $600 million, because we are operating in a difficult situation? … As long as we are selling and are able to overcome the obstacles, we should continue.

> … We currently sell for $8 to $10 million per month, with a $2 million profit, and pay less than 1/4 for protection. Other factories are paying for protection just to exist, without making the profits we are.... in this case we have to pay about 300milion SYP [approximately $2.7 million USD] monthly.

140.    Defendants' monthly payments to terrorists allowed it to continue producing and

selling cement at the Cement Plant into 2014, earning millions of dollars in profits for it—and

for ISIS.

141.    On May 8, 2014, Tlass emailed LCS executives advising that LCS's operations

were not impeded by local armed groups, stating "(Daesh — PYD — Al Nusra — Abu Issa7 all

we have good relations recently . . . ." Defendants maintained "good relations" with ISIS and

ANF by paying them ever-increasing amounts.

142.    On September 15, 2014, LCS executives exchanged an email with Tlass's initials

as the subject line, containing two attachments. The first attachment was a document named

"List of donations last version.pdf," which listed a monthly payment of 10 million Syrian pounds

to "Daesh" [ISIS] as of May 1, 2014. In a second attachment to the email, titled "Evolution of

the security donations 2012-2013-2014," Pescheux listed, on top of the total amount of LCS's

monthly "donation" payments, an additional "10 MSYP [10 million Syrian pounds] paid on

April 23 to ISIS to unlock the West road."

### v.   Defendants Purchase Materials From ISIS-Controlled Suppliers And Sell Cement To ISIS

143.    In addition to making regular payments to terrorists, Defendants purchased

materials from ISIS-controlled suppliers as part of its conspiracy with ISIS, making additional payments to terrorist-controlled suppliers totaling at least $3,447,528. They also sold cement to ISIS, knowing that ISIS intended to use the cement in terrorist activities.

144.    As ISIS expanded its control over northern Syria, it captured quarries of minerals LCS needed to continue to produce cement. LCS agreed to purchase raw materials from ISIS-controlled enterprises who paid ISIS based on the amount of their sales to LCS. Defendants also purchased oil from ISIS.

145.    On November 6, 2013, for example, LCS and ISIS entered into a written agreement on ISIS letterhead providing that LCS would purchase pozzolana—a type of volcanic ash used to make blended cement—from ISIS for 1,300 Syrian pounds per ton. Under the agreement, ISIS would allow LCS's suppliers who mined and transported the pozzolana from ISIS-controlled quarries near Raqqa to retain some of LCS's payment for the raw material as profit.

146.    In late 2013, Taleb, an intermediary between Defendants and ISIS who had previously assisted LCS with environmental licensing, explained to LCS's board that he wished to discuss "[t]he security issue of Lafarge . . . in Syria. I build up strong relationships with civilian and Military Locals including FSA, Kurds and Islamic state which are in control of all logistic path in and out of . . . Lafarge . . . ." Taleb repeatedly and explicitly identified ISIS as the seller of the raw materials that he brokered.

147.    For example, in a September 24, 2013 email about a recent order with the subject line "Urgent Fuel pozzolana Coal petcoke/Islamic state," Taleb informed LCS executives that LCS had already agreed to accept pozzolana sold by ISIS and stated "FOR pozzolana 15000 tons ready to be shipped they are just waiting for signed P.O today max tomorrow please islamic state

very senstive about this issue."

148.    In a separate email chain a few days later, Pescheux disputed the intermediary's assertion that LCS had already agreed to purchase, but nevertheless responded that "[a]fter my mail, our Purchasing team has contacted the contractor and the price is confirmed. We will place an order early next week for a limited quantity (probably around 5,000 tons) as we need to see how it will work. If it is OK we will increase the quantity."

149.    As another example, in a September 28, 2013 email, Taleb declared, "I OFFICIALLY REPRESENT ISLAMIC STATE FOR INVESTMENTS and Soon for Kurdish. You ll get letter for that . So far im on LCS side but please Im asking kindly to have my Fees ."

150.    Defendants' executives understood that transacting with ISIS in this manner was illegal.

151.    In a December 7, 2013 email, Pescheux informed Herrault that the following activities likely violated Syrian government regulations: "Purchasing gypsum and pozzolana from rebellion," "Purchasing Heavy Fuel Oil from rebellion," and "Paying every month the various rebel entities." Nonetheless, Pescheux determined that these activities were "needed for business continuity."

152.    Thus, with Defendants' blessing, Tlass and Taleb negotiated deals in which Defendants purchased critical raw materials for use in the Cement Plant, including coal, fuel, and pozzolana, from ISIS-controlled sources.

153.    In early 2014, LCS agreed to purchase massive amounts of material from ISIS-controlled suppliers, including 100,000 tons of pozzolana at 1,650 Syrian pounds per ton; another 100,000 tons of pozzolana at 1,675 Syrian pounds per ton; 4,000 tons of heavy fuel oil at 39,000 Syrian pounds per ton; another 12,000 tons of heavy fuel oil at 26,500 Syrian pounds per

ton; 15,000 tons of "dirt" fuel at 17,500 Syrian pounds per ton; and an option for 35,000 additional tons of dirty fuel at the same price, as well as yellow sand and coal. Pescheux reported these planned transactions to Defendants' executives and, on February 16, 2014, wrote to Herrault that the "situation with Daech (the jihadists of Islamic State in Iraq and Sham (ISIS)) is relatively calm and we are currently finalizing purchasing of pozzolana and fuel oil."

154.    Defendants did not hand only money to ISIS. They also provided ISIS cement, even before ISIS took over the Cement Plant (*see infra* § F). In a 2014 email to Jolibois, an LCS risk manager said ISIS was "looking for distributors in Syria like ours" for 150,000 tons of cement, and Defendants memorialized in an internal company note that ISIS was seeking such cement for its "personal consumption" rather than for "market."[7] News reports confirm that Lafarge and LCS agreed to ISIS's request for cement. A former LCS employee stated in an interview, when the terrorists "needed cement to build their tunnels and trenches," an LCS "manager would give it to them." The same LCS employee continued that it was "not a simple business relationship between a company offering cement and terrorist groups that needed money and cement for their defensive positions and tunnels." Defendants "could do anything. They had deals with ISIS."

155.    A former French intelligence analyst testified that Defendants sold cement to ANF and ISIS in Syria. In his words, "ISIS needed primary resources provided by whatever actor. Lafarge was one of them." News reports stated that "With the supplied cement, [ISIS] reportedly constructed fortified shelters and tunnel networks against the US-led coalition."

---

[7] Some documents referenced herein are discussed in *Foley et al. v. Lafarge S.A. et al.*, 23-cv-05691 (E.D.N.Y.) and/or *Finan et al v. Lafarge S.A. et al*, 1:22-cv-07831-NGG-PK (E.D.N.Y.) which are two cases related to this one based on similar acts of the same Defendants. Counsel has relied on the well-pleaded allegations as made in *Foley* and *Finan*.

Lafarge's cement helped ISIS extend its reach and ability to commit acts of international terrorism. ISIS used Lafarge's cement to fortify its network of underground tunnels and bunkers, used for hiding from and launching attacks against U.S. and coalition counterterrorism forces, including in northern Syria and near the Syria-Iraq border. It built fortified tunnels—on information and belief, requiring high-grade cement only LCS could provide—to move terrorist operatives, hostages, weapons, and equipment without being detected by U.S. coalition forces and aerial imagery. Defendants' cement sales thus directly aided the attacks that injured or killed Plaintiffs and their family members.

156.    Likewise, as described below (*see infra* § L), Defendants knew and intended that it would receive concomitant benefits from their aid of and conspiracy with ISIS, including ISIS's acts of international terrorism.

## D.    Defendants Go To Great Lengths To Conceal Their Partnership With Designated Terrorist Groups

157.    Defendants' support for ANF and ISIS directly and via intermediaries allowed them to dominate the cement market and increase profits. But the conspiracy was not without risks. Fully aware that paying millions of dollars to terrorists violated several jurisdictions' laws, including those of the United States, Defendants and their agents and co-conspirators took numerous steps to conceal their partnership with ISIS.

158.    First, Defendants' executives ensured that any documents regarding these terrorist payments did not reference the word "Lafarge." For example, on September 16, 2013, Pescheux instructed Tlass that "the name of Lafarge should never appear for obvious reasons in any documents of this nature," referring to checkpoint passes from ISIS. He continued, "[p]lease use the words Cement Plant if you need but never the one of Lafarge."

159.    Similarly, on September 4, 2014, Jolibois, LCS's incoming CEO, complained to

Tlass about documents that specifically referred to "Lafarge" by name: "The name Lafarge and the fact that Lafarge 'paid' appears on the laissez-passer passes issued by ISIS. This is completely against our agreement with ISIS. It is clear that these passes were issued for the distributors, not for Lafarge. Could you look into solving this issue?" Tlass agreed that "we have to change the name or have an alias that all the laissez-passer passes use as well as the distributors because ISIS cannot let all the cements get through, just ours."

160.    Second, and relatedly, Defendants had intermediaries—rather than Lafarge or LCS executives—engage directly with ISIS and ANF. As one of LCS's security consultants put it, "it was especially important that the relationship would be handled by [Tlass's] middlemen, since an exposure of this sort would have been compromising for LCS." The LSC consultant concedes: "But via [Tlass], we did in fact contribute to the economy of ISIS."

161.    Not only did Defendants prefer to work through intermediaries, but they took steps to conceal the payments they made to them. In fact, Lafarge and LCS executives directed Tlass and Taleb to submit invoices that did not reference their own names or the names of their companies, and that instead referenced payments for donations, unspecified professional fees, or personal expenses.

162.    For example, on December 13, 2012, Pescheux emailed Tlass and directed that any future invoice should not be on Tlass's company's letterhead, but instead should be on that of a company outside of Syria:

> I would like to remind you that we still need to receive correct invoices from [Tlass's company] for the months of September and October. We discussed this issue many times and you told me it is not a problem so please send them as soon as possible. For the November payment, we cannot take the documents you prepared with [the Intermediary 1 Company] in the title.
>
> As I told you, you need to send us the references of a [new] company located outside of Syria.

> This will avoid problems with the Syrian authorities and with our Auditors.
>
> We absolutely need to move forward before the end of the year to be able to present clean justifications for the [] closing of our accounts.

163.    Third, in connection with their efforts to conceal payments and falsify records, Defendants purposely availed themselves of the U.S. financial system to funnel U.S. dollars to straw-man companies outside Syria and Iraq. LCS executives made clear that they preferred to transact through U.S. dollar bank transfers. On June 30, 2013, Pescheux emailed Tlass, "[W]e cannot continue the way we are settling the turnover invoices. Our preferred option would be the one we told you last October: a bank transfer in USD to the account of a duly registered company," as opposed to a direct payment to Tlass in cash, which would appear more suspicious. Thus, Defendants instructed Tlass, their ISIS intermediary, to create a new corporate entity in Dubai so that Defendants could surreptitiously transact in U.S. dollars, transactions that Defendants knew would transfer, clear, and be processed through New York.

164.    Pescheux also sent an internal email instructing several LCS employees that "we all have to stop [using] the acronym of an organization which is on terrorist lists" and instead use code words, indicating that he was both aware of and concerned about disclosure of Lafarge's support for FTOs.

165.    Similarly, a February 2, 2014 "External Support Agreement" between LCS and a new company created by Tlass in Dubai confirmed that payments should be made in U.S. dollars. LCS agreed to pay the new company "a monthly remuneration of 75.000USD."

166.    Lafarge and LCS executives made similar efforts to disguise the nature of payments to Taleb, including by directing that payments reference only environmental consulting and be made using U.S. dollars. For example, on January 12, 2014, Pescheux emailed Taleb:

Prepare an invoice from [Taleb's company], send to me by email and bring the original next week, for an amount of 4,402 USD just with "Environmental consultancy services for the months of October, November and December 2013" as a justification.

For your understanding hereunder are the details of the calculation:

- pozzolana: 18,270 tons equivalent to 914 USD (he has delivered the first order of 15,000 tons and 3,270 tons out of the order of 100,000 tons)

- HFo: 3,488 tons equivalent to 3,488 USD (he has not yet completed the first order of 4,000 tons, it remains 512 tons to deliver and he has not started the 12.000 tons of standard quality)

Total:4,402 USD

167.   A few weeks later, on February 5, 2014, Pescheux again required that payments reference only environmental consulting and be made in U.S. dollars:

If you want to have a chance to get paid for pozzolana and HFO, you have to prepare an invoice following my instructions and not your imagination.

So you have to issue an invoice mentioning only:

Consultancy services performed up to January 31,2014 for a total amount of 4,836 USD

This amount has been calculated as follows (up to 31-1-2014) HFO: 3,488 tons out of the order of 4,000tons= 3,488 USD

Pozzolana: 15,000t out of the order of 15,000t (completed) plus 11,964t from the order of 100,000t i.e total 26,964/20= 1348 USD

168.   On February 13, 2014, Taleb sent Pescheux the invoice "[b]ase[d] on your instruction." The invoice, payable in U.S. dollars to the intermediary's company, purported to be for "[c]onsultancy services." International financial transactions denominated in U.S. dollars, unlike transactions denominated in Syrian pounds, are cleared through U.S.-based financial institutions located in New York.

169.   In addition, as another way to conceal their partnership with ISIS from French

auditors and law enforcement authorities, Lafarge and LCS executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their Lafarge corporate email addresses, to coordinate and carry out elements of their partnership with ISIS.

170.    LCS's own legal counsel instructed LCS's CEO not to create business records concerning the company's illegal terrorist financing. On September 8, 2014, in connection with a discussion about documents received from ISIS, Jolibois wrote to Veillard, "Thank you for sharing this information with [Herrault], I don't want to write to him about this topic at his professional address (as recommended by [in-house counsel])." Lafarge executives used Gmail accounts to communicate about the conspiracy, and thus avoided leaving incriminating evidence on corporate mail servers located in France that would be available to French auditors, regulators, and law enforcement officials.

**E.    Lafarge And LCS Negotiate A Long-Term Revenue Agreement With ISIS As Their Business Ties Deepen**

171.    In 2014, Defendants' executives saw an opportunity to capitalize further on their business relationship with ISIS. The opportunity was mutually beneficial: if ISIS could block or tax cement imported from Turkey into Syria, LCS's revenues would go up, and so too would ISIS's share of the revenues. Defendants negotiated a long-term revenue sharing and market control agreement with ISIS.

172.    Pescheux proposed that ISIS should "take a 'toll fee' on each truck loaded with Turkish cement." Such a toll would allow ISIS to gain revenue while simultaneously "reduc[ing] the attractiveness of Turkish cement. It would reinforce our competitiveness [and] therefore increase our volumes and increase the fees paid [to] our distributors or Da'ech [ISIS]."

173.    A July 14, 2014 Gmail message from Tlass to Pescheux discussed these "negotiations with ISIS," proposed providing ISIS with a "monthly statement," and sought input

from Pescheux about how much Lafarge's distributors should pay the terrorists "in addition to the ten millions that we pay directly to them, i.e. ISIS."[8]



On Mon, Jul 14, 2014 at 9:38 AM, Firas Tlass <firastlass01@gmail.com> wrote:

Dear Bruno

Our negotiations with ISIS are going better now, and I'm confident that we can reach to a logical agreement with them.

What I need to know exactly:

· What are the payments that we have deducted from all the suppliers as compensations for the amounts that they usually pay to ISIS in addition to the ten millions that we pay directly to them, i.e to ISIS?

· Can we give them a monthly statement about the cars sold by the plant every month?

174.    Negotiations continued throughout the summer and into fall 2014. In August 2014, Tlass emailed Jolibois, LCS's new CEO, to inform him that ISIS wanted a monthly fee in addition to an assessment on each ton of cement sold:

> Negotiations with ISIS are complex and not easy at all. In their last request yesterday, they asked us to pay S.P.100 million/month, but I told them today morning that they will gain more than 100 million/month from the factory in case the agreement includes the fixed monthly amount + the introduction amount + the amount of our purchases of pozolana, sand and fuel.

---

[8] It is unclear from the face of the email to what currency the sender is referring.

175.    Jolibois responded: "If ISIS wants higher tax from us, it's better for them to stop Turkish cement and Iraki cement, so that we may increase the price." In response, Tlass said that ISIS was prepared to stop importation of Turkish cement upon consummation of a revenue sharing agreement.

176.    On August 5, 2014, Tlass sent Jolibois a draft revenue-sharing agreement between LCS and ISIS. The next day, Jolibois confirmed Lafarge's and LCS's agreement to a rate of ten percent, in return for the free movement of LCS employees, customers and suppliers, as well as ISIS's agreement to stop importation of Turkish cement in areas under its control, for the following six months:

- As per our phone call today, hereafter what I understand from the agreement with ISIS, that I approve:

- ISIS will receive the payment of 750SP/ton, by customers, every two weeks

- ISIS ensure the security and the free movement of our customers and suppliers vehicles as well as our employees

- ISIS will stop import of Turkish cement in the areas under its control (as of today: Al Rakka, Dair El Zor, Hasaka, Qamishli and Al Mayaden, Srin, Menbij, Al-Bab, Deir Hafer and Maskaneh), or implement in those areas taxes as high or higher than to Jalabieyeh cement plant.

- The agreement is valid until February 5th, 2015.

  I hope the agreement to be signed today, and sales to restart tomorrow.

  ISIS needs to clarify which office (AlRaqqah or Membij) is certified to receive payments and deliver permission letters.

177.    While Lafarge was aware that ANF and ISIS were classified as terrorist groups by the United States, United Nations, and European Union, business negotiations between Defendants and ISIS became more complicated on August 15, 2014, when the United Nations

Security Council passed a resolution condemning ISIS, ANF, and Al-Qaeda, and calling on U.N. members to prohibit all financial and trade relations with the groups. On August 18, 2014, the United States Department of State added ISIS member Mohamed Al-Adnani and ANF member Said Arif to its list of Specially Designated Global Terrorists.

178.    Defendants' executives were closely following these developments. On August 18, 2014, Veillard emailed Herrault and Jolibois with the subject heading "terrorist watch list" and wrote that the United States had designated ISIS's Al-Adnani and ANF's Arif to the list of Specially Designated Global Terrorists.

179.    On August 7, 2014, the United States began airstrikes against ISIS in Iraq, and in September 2014, began strikes against ISIS in Syria.

180.    On August 19, 2014, ISIS executed American journalist James Foley and released a video of the horrific act, entitled "Message to America," online. Advocates for Foley had approached LCS in 2012 to ask for LCS's assistance in negotiating for Foley's freedom when he was taken hostage. Two weeks later, on September 2, 2014, ISIS released a video of the beheading of Steven Sotloff, another American journalist, titled "A Second Message to America."

181.    Notwithstanding ISIS's heinous acts, including the televised murder of Americans, and the international community's universal condemnation of the terrorist group, LCS ironed out a final revenue-sharing agreement with ISIS on or about August 20, 2014—after consulting with Lafarge's in-house counsel.

182.    The executives involved in the negotiations with ISIS updated Lafarge's Executive Committee during a meeting on August 27, 2014. The notes from the meeting reflect that Herrault highlighted ISIS's agreement to impose costs on imported Turkish cement that

were equal to the costs imposed on LCS: "In our agreement with Daesh [ISIS], we said that in terms of taxation we must have the same treatment as Turkish imports."

183.     The notes further reflect that Lafont, Lafarge's CEO, responded that "we have to make sure that what we do is risk free (also vis-à-vis the U.S.)." Also Lafarge's Chairman, Lafont, knew that Defendants' partnership with ISIS was illegal under U.S. law and would have consequences in the United States. In response, Herrault replied that "the best protection is to keep the plant in operation, sales have resumed, we are maintaining contact with everyone."

184.     Lafarge had now solidified its shared objectives with ISIS. Each co-conspirator, including Defendants, intermediaries, and ISIS, would make money by having ISIS use force and violence to block cheaper imported cement to increase LCS's sales. The parties thus collaborated to directly finance ISIS's growing terrorist attacks, including those that killed or injured Plaintiffs or their family members.

## F.     ISIS Seizes The Cement Plant

185.     As it turns out, terrorists are not trustworthy business partners.

186.     On September 10, 2014, President Obama outlined a strategy for the United States to lead an international coalition to "degrade and ultimately destroy" ISIS through direct military action. President Obama described ISIS as "a terrorist organization, pure and simple" with "no vision other than the slaughter of all who stand in its way."

187.     In the following days, ISIS advanced on the Cement Plant with an eye towards complete control of the region. Even in the face of this grave threat from ISIS, Lafarge and LCS executives wanted to continue with the conspiracy. Jolibois argued strenuously against shutting down the Cement Plant, saying that if LCS suspended operations "for the next few months until after the completion of the merger [with Holcim] we will surely be watched closely when we

seek to resume them, and nothing says that the area will have been freed from the grip of ISIS, nor that it will be free from it for years."

188.    Likewise, on September 12, 2014, Veillard sent an email to Herrault saying, "I think it's imperative to maintain the plant in working order and to be able to restart quickly." Veillard went on to say, "[i]t seems to me that this option is totally doable…."

189.    Lafarge and LCS executives' desire to remain in the area despite ISIS's control, coalition airstrikes, and danger to their employees meant that they did not implement a safe evacuation plan to shut down the plant machinery and keep it from still being operational in terrorists' hands, or to safely evacuate local staff. When ISIS informed employees early in the morning of September 18, 2014 that it intended to advance on the plant, Jolibois ordered the remaining team to "prepare mattresses, food, water, sugar" and shelter in the plant's electrical tunnels rather than evacuate. Indeed, there were no cars at the plant with which the employees could evacuate. The employees who remained to oversee the plant's shutdown had to hitch rides with the fleeing canteen vendors and on local buses.

190.    In their departure, LCS employees left the plant entirely operational. All start-up technology and hard drives were left in place, and one diesel generator was still running as the machinery cooled when they left.

191.    ISIS completed its seizure of the Cement Plant on September 19, 2014, and promptly released propaganda videos showing its militants at the Cement Plant. In the Cement Plant, ISIS took what it wanted. ISIS seized the cement that Defendants had produced in furtherance of the conspiracy, and ISIS ultimately sold that cement for what Lafarge and LCS's plea deal admitted was approximately $3.21 million. The actual value of the cement and other materials was much higher. According to publicly available French intelligence reports and

media reports, ISIS seized materials worth approximately $25 million. It seized raw materials at the Cement Plant that included hydrazine, a chemical that ISIS could use to produce explosives for terrorist attacks. Defendants' intermediary Taleb negotiated the disposition of these remaining materials for approximately $11.5 million. Thus, according to French intelligence, following October 2014, "[t]he dismantling of the Lafarge factory in Syria continues to the financial benefit of both Daesh [ISIS] and the businessmen involved." In December 2014, Taleb visited Lafarge's headquarters in Paris to explain the ongoing negotiations relating to materials left at the plant.

### G.   After Evacuating The Cement Plant, Defendants Attempt To Conceal Their Partnership With ISIS

192.   After Defendants' employees fled the Cement Plant, and as the international community stepped up its multi-front action against ISIS, Defendants took further steps to conceal their conspiracy with ISIS. They did so by drafting a backdated contract-termination agreement that would allow them to falsely claim that Tlass's relationship with LCS had been terminated before he conducted negotiations with ISIS in August and September 2014.

193.   Specifically, on September 29, 2014, Tlass informed Herrault and Jolibois that, in response to their prior requests, Tlass had opened a bank account in Dubai in the name of a new company that was not publicly linked to Tlass ("Tlass NewCo").

194.   On October 9, 2014, Jolibois sent an internal email to Pescheux and Lafarge's in-house counsel with the subject "New contract for [Tlass]" and saying that LCS owed Tlass "Monthly fees 2*75kUSD for services in July and August" plus "August sales tax to PYD, already paid by [Tlass] to PYD : 10.5 M SYP = 60kUSD)" totaling "210kUSD." Jolibois further wrote that the in-house lawyer "would like to terminate the previous contract [with Tlass] on the date of 18th August to show evidence of company reaction to UN resolution, and to get a new

contract to start from September 1st, 2014." In a subsequent email on October 14, Herrault

clarified Lafarge would not pay Tlass without a new backdated contract.

195.    Jolibois then sent an email to Tlass with the subject line "Agreement for Regional

Security Consulting Services," which attached copies of (1) the new consulting agreement

between a holding company created by LCS ("LCS NewCo") and Tlass NewCo, and (2) the

backdated Termination Agreement between LCS and Tlass NewCo.

196.    In his cover email, Jolibois explained that the new consulting agreement was

"written in such a way as to" take "into account the compensation for termination of the previous

contract (210k USD for 202k USD which are actually due)." A $210,000 lump sum payment

compensated ISIS intermediary Tlass for work he had already performed negotiating an

agreement with ISIS, and to reimburse him for making fixed monthly "donation" payments to

terrorist groups, including ISIS.

197.    In addition to the lump sum payment to compensate him for work he had already

performed, Defendants continued to pay its intermediaries to work with ISIS. Those payments

for ISIS, including to or through Taleb, continued after Lafarge left the Cement Plant, according

to a post-dated contract and reports. The new consulting agreement with Tlass required the

Defendants to make monthly payments of $30,000 on a going-forward basis.

198.    The Termination Agreement with Tlass was backdated to August 18, 2014, the

day LCS employees fled the Cement Plant. The metadata of the backdated Termination

Agreement indicates that the document was not drafted by Lafarge's in-house lawyer until

October 3, 2014, two weeks after LCS had evacuated.

199.    On October 23, 2014, after the parties signed the new consulting agreement and

the backdated Termination Agreement, Tlass sent an invoice for $210,000. Lafarge paid the

$210,000 invoice with a wire transfer from Lafarge's operating account at a financial institution in Paris, through the Eastern District of New York, to intermediary banks in New York City, which transmitted the wire to Tlass NewCo's account at a financial institution in Dubai (*see infra* § K.i.).

200.    On information and belief, any additional U.S. dollar payments due under the Consulting Agreement were paid after October 2014 in the same manner.

201.    Legal proceedings against Lafarge in France revealed that intermediary Taleb continued to negotiate with Lafarge for payment for materials in the plant. According to a publicly available French intelligence report, at a meeting between the parties in December 2014, Lafarge handed over 65,000 tons of cement, worth $6.5 million. At the meeting, ISIS representatives signed a contract for an additional $5 million of the cement left at the plant. Following October 2014, "[t]he dismantling of the Lafarge factory in Syria continues to the financial benefit of both Daesh [ISIS] and the businessmen involved," stated the intelligence report.

## H.    With Its Deep Pockets, ISIS Continues To Wreak Havoc

202.    Flush with cash from its dealings with Lafarge—at a minimum $5.92 million to as much as $15 million in cash and more in kind—ISIS continued to commit terrorist attacks.

203.    After gaining experience by joining ISIS's takeover and exploitation of major regions of Iraq and Syria, many of the tens of thousands of ISIS-trained foreign fighters returned to their home countries during this time. They planned to establish "provinces" of ISIS that would stretch far beyond Iraq and Syria.

204.    By this point, ISIS had established global notoriety. One key factor that helped propel ISIS's growth was its powerful propaganda machine, which can arguably be described as unprecedented for a violent non-state actor. Harnessing the power of social media and significant

advances in DIY video production, ISIS spread horrific imagery throughout the globe. ISIS was particularly sadistic in its treatment of people unlucky enough to be captured by the militant group, including enemy soldiers, tribesmen, politicians, and journalists. For anyone who has watched ISIS's bloodiest propaganda, imagery will be seared into their mind of beheadings, captives being immolated, people being thrown off of buildings, and ISIS hostages being drowned in cages. Furthermore, and of particular relevance here, ISIS's propaganda promoted specific techniques, tactics and procedures for terrorist attacks. The perpetrators of the attacks that harmed Plaintiffs used ISIS propaganda to inform their tactics and choice of weaponry.

205.    ISIS was not dislodged from Iraq until October 2017. It was finally pushed out of all the territory it controlled in Syria in March 2019.

## I.    LafargeHolcim Discloses That Lafarge And LCS Transacted With Terrorists

206.    In July 2015, after over a year of negotiations, Holcim completed its merger with Lafarge, which resulted in the combination of the two largest building materials companies in the world. The payments to terrorists were not disclosed to Holcim or its representatives during preacquisition due diligence meetings. Lafarge executives who had been aware of Lafarge's payments to ISIS remained in leadership positions in the newly formed company, LafargeHolcim.

207.    On February 19, 2016, a website run by an opposition group to the Syrian regime reported that Lafarge and LCS had purchased raw materials from and made other payments to ISIS. The report included partially redacted images of emails sent to and from Lafarge and LCS executives' email accounts, discussing payments to ISIS.

208.    On April 24, 2017, after retaining a U.S. law firm to conduct an investigation, LafargeHolcim issued a press release acknowledging for the first time that Lafarge and LCS made payments to terrorists: as "terrorist groups designated by the US and the EU were

expanding into the area" of the Cement Plant, LCS made "payments" to intermediaries to "avoid direct contact with these armed groups." LafargeHolcim admitted that "LCS management kept Lafarge SA well-informed of developments."

**J.    Defendants' Payments And Cooperation Substantially Assisted The Acts Of International Terrorism That Injured Plaintiffs And Killed Their Family Members**

209.    Defendants made payments to ISIS that financed their operations, including acts of international terrorism that injured Plaintiffs. Without funding, terrorist attacks cannot be planned, fighters cannot be paid, and propaganda cannot be generated, edited, and distributed. But more than that, Lafarge sought to partner with ISIS because of its ruthlessness and brutality. Lafarge did not only pay into the protection racket ISIS enforced. It sought to partner as closely as possible with ISIS, to pay percentages of its sales to ISIS, to purchase materials from ISIS and sell its cement to ISIS, and ultimately to enter an agreement for ISIS to block its competitors in exchange for a slice of all of the Cement Plant's profit. In return, ISIS carried out exactly the types of attacks that had made it such an enticing business partner in the first place: terrorist attacks to expand and maintain its control of territory and markets.

210.    The millions of dollars Defendants gave ISIS materially enhanced ISIS's ability to expand or sustain their power and territorial control by committing the terrorist attacks described in this Second Amended Complaint, as Defendants foresaw and intended for their own financial benefit. The cost of ISIS's individual attacks, and salaries for their fighters, paled in comparison to the funding provided to those groups by Defendants.

211.    ISIS fighters received a base pay of $200-400 per month. Just $5,000 to ISIS could have paid 20 terrorists (at $200 per fighter) and three commanders (at $333 per commander) in the field for a month. $5,000 could purchase dozens of bomb components or finance multiple complex attacks. ISIS publicly confirmed in a video that it deployed its "taxes,"

that is, money collected from its territory, including from Defendants, to support "[t]he mujahidin and jihad"—that is, its fighters and its fight. The money ISIS got from Lafarge was used to pay fighters, control territory and markets, and commit terrorist attacks.

212.    U.S. government studies confirm the dramatic impact of even marginal financial contributions to AQI and its progeny. For example, one DOD study found a statistically significant relationship between small-dollar contributions and terrorist attacks, concluding that each successful terror attack required on average only $2,732 to execute. The study thus demonstrated that even marginal reductions in AQI's terrorist funds corresponded with a statistically significant reduction in terrorist violence. The converse was also true. For every $2,700 (or its rough equivalent) Defendants gave to AQI's successors, they financed roughly one new terrorist attack. As a result, even just the $5.92 million Lafarge and LCS admittedly gave ISIS and ANF (the actual payment amount was likely higher) was more than enough to fund thousands of attacks – sufficient to kill every Plaintiff in this case multiple times over.

213.    Lafarge and LCS pleaded guilty and admitted giving ISIS and ANF $5.92 million, though the actual payments are believed to be much higher. Defendants also left millions of dollars of cement in ISIS's hands, or sold it to them directly. ISIS recruited tens of thousands of foreign fighters to commit attacks. The limiting factor on its attacks was money, not manpower.

214.    As Mustafa Abu al-Yazid, an al-Qaeda financing chief, said: "There are hundreds wishing to carry out martyrdom-seeking operations, but they can't find the funds to equip themselves. So funding is the mainstay of jihad." Defendants' payments, given at a time when ISIS was looking to expand and commit attacks, materially strengthened the terrorists' ability to commit the attacks that killed and injured Plaintiffs. This effect was linear. Simply put, more money equaled more acts of terrorism.

215.     Indeed, following the payments by Defendants, ISIS attacks against Americans increased. These attacks began with its beheadings of American journalists and humanitarian workers in 2014, which ISIS announced as horrific 'Message[s] to America.' ISIS's targeting of Americans rapidly expanded, following and utilizing Defendants' payments, to killing Americans in Jordan, France, Spain, and other countries around the world.

216.     The money Defendants admitted to placing in ANF's and ISIS's hands from 2012-14 had a lasting impact. ISIS had sophisticated financial accounting and saving systems. As late as February 2019, according to a U.S. government report, ISIS continued to hold onto amounts of "stockpiled cash." Moreover, the cement that Defendants handed over to ISIS was durable, by its very nature. The tunnels and infrastructure ISIS built with Defendants' cement would have lasted past 2014. Defendants' admitted material support for ISIS in 2014 foreseeably contributed to ISIS's long-term savings and its ability to commit attacks multiple years later; material support in subsequent periods to which Defendants have not admitted contributed to ISIS's ability to commit attacks even later than that.

217.     ISIS's fundraising apparatus was organized and centralized, meaning that there was a strong link between Defendants' payments and ISIS's terrorist attacks. Terrorism scholars Dr. Colin Clarke and Dr. Phil Williams explain that "[m]uch like its predecessor, AQI, [ISIS] . . . adopted a top-down approach that maintained hierarchical control over and a high degree of accountability for its financial assets as it worked to keep an ironclad grip over the money it earned from a series of rackets." The U.N. Security Council's ISIS panel notes that ISIS's "core leadership" in Syria and Iraq exercised "systematic financial direction" over its provinces' financing. Such systematic financial direction ensured that Defendants' money in Syria supported ISIS's terrorist attacks in other areas.

218.    Because of ISIS's structure and organization, Defendants' payments were specifically funneled to certain cells – specifically, the Raqqa Cell and the ISIS Leadership Cell (discussed *infra*). These ISIS cells played a key role in both handling Defendants' money and planning or committing the attacks that targeted Plaintiffs and their family members.

219.    Without the "financial resources" supplied by such payments, the Financial Action Task Force concluded, "the capability and activity of terrorist organizations such as ISIL [would have been] degraded."  As Juan Zarate, a former U.S. Treasury Department official, likewise explained in 2015, diversified "[f]inancial flows" were especially "important [to] groups like the Islamic State …. Money is their enabler but it's also their Achilles heel."  Had Defendants refused to pay, they could have materially curtailed ISIS's terrorist violence, impeding their ability to kill and injure Plaintiffs.

220.    Other government reports confirm the direct link between Defendants' payments and ISIS's terrorist attacks. For example, the State Department reported that "ISIL and AQ affiliates, including [ANF]," used "criminal activities to raise funds for operational purposes," observing that much of ISIS's and ANF's funding came from so-called "taxation" in Syria. Similarly, the U.N. Security Council documented that ISIS created "a sophisticated quasi-bureaucratic revenue-generating structure" in Syria – of which Defendants' payments were a material part – to generate "financial resources to support [its] ongoing military campaigns."

221.    Defendants knew that ISIS was using their money to commit terrorist acts. As noted above, Defendants were aware that ISIS was a U.S.-designated terrorist group; that is why they worked so hard to conceal their conduct. They also knew that, in 2012, ISIS and ANF had "gained control of territory in Syria and committed numerous terrorist acts, resulting in the deaths of numerous U.S. citizens." Against that backdrop, as a former LCS risk manager

admitted, Lafarge "should have pulled out" of Syria but instead cooperated with ISIS and ANF, allowing "those groups [to] directly or indirectly benefit[] from our operations." And Defendants were aware of why local terrorists were running protection rackets. The same LCS employee acknowledged that "their motivation seemed obvious: they wanted money! Money to use for arms, ammunition, and battalion funding."

222.    As shown by evidence gathered in the ongoing French criminal case against Lafarge and its executives, Defendants' payments were sufficiently pervasive and systemic that they substantially contributed to a range of ISIS terrorist attacks. The scale and repeated nature of Defendants' payments magnified the effect of their contributions. According to French criminal investigators, the "amount and duration" of Lafarge's multimillion-dollar bribes in Syria allowed ISIS to "plan and carry out violent operations in the area and abroad."

223.    U.S. prosecutors concurred in that assessment. As Deputy Attorney General Monaco noted, "through their support and funding, Lafarge enabled the operations of a brutal terrorist organization."

224.    Defendants' payments to ISIS in 2013-2014 also assumed an outsized role in financing ISIS violence through at least the end of 2017. For ISIS in particular, money had a multi-year shelf-life, given the way it hoarded cash and preserved it for future use. The U.S. government, for example, confirmed in February 2019 that "ISIS . . . in Syria . . . continue[d] to draw upon its cash reserves" from its older caliphate-era rackets with the terrorists continuing to stretch the "stockpiled cash" they collected many years earlier. This reflected, among other things, ISIS's strategic decision in 2014 to conserve resources – including its "tax" revenue and cement for fortifying underground tunnels – for future use years later. Similarly, Lafarge's provision of high-quality cement to ISIS had a long shelf-life. Given these unique-to-ISIS

practices, Lafarge's material support in 2014 foreseeably contributed to ISIS attacks as late as 2017.

i. **At Least Twenty Percent Of Lafarge's Money Was Used To Harm Plaintiffs**

225.    ISIS's Leadership Cell, also called the "Shura Council," "Governance Council," or "Delegated Committee," was, during relevant periods, a unified leadership group that approved new ISIS membership, expansion plans, and strategy. ISIS's Leadership Cell was composed of Al-Baghdadi and several advisors. It ensured that all major ISIS actions worldwide were in accord with Islamic law and ISIS's overall strategy. ISIS's predecessor ISI's known funding structures required that twenty percent of all income derived from its taxation went to Al-Baghdadi and his Leadership Cell for use in planning and committing attacks, and ISIS continued the same practices.

226.    According to terrorism scholar Brian Fishman, the "provinces," or geographic areas under its control, "carefully tracked both revenue and expenditures and passed 20 percent of their income to the national-level ISI [al-Baghdadi and the group's leadership], which redistributed the funds as needed." ISIS was a remarkably centralized group, with the Leadership Cell commanding specific areas to expand or stop sending fighters and with all fighters loyal to the same authority under Al-Baghdadi.

227.    According to multiple sources, including its magazine Daqbiq and a guide to its "tax" practices, ISIS mandated payment amounts depending on its interpretation of Islamic law. This interpretation specified that twenty percent of goods such as spoils of war and of underground or mineral wealth be paid to ISIS's central funds. Non-Muslims permitted to remain in ISIS territory paid greater amounts than Muslims under ISIS's control. Thus, it is likely that twenty percent of the funds Defendants have admitted to paying ISIS went to Al-

Baghdadi and the Leadership Cell (over $1.1 million U.S. dollars), to plan and execute the acts that harmed Plaintiffs.

228.     Al-Baghdadi and the Leadership Cell directed and therefore participated in the expansion of ISIS's territory and recruiting efforts beyond Iraq and Syria, by (1) supplying logistical, training, planning and financial support for ISIS's external attacks that harmed Plaintiffs; (2) spearheading, contributing to, and maintaining a powerful propaganda machine through which they reached, recruited, instructed, and controlled the individuals who carried out the attacks that harmed Plaintiffs; (3) contributing financially to ISIS leadership, which allowed ISIS's reach and influence to quickly extend far beyond Iraq and Syria, culminating in a global following of terrorist cells that committed atrocities such as the attacks in this case; and (4) targeting the United States through ISIS's external attacks.; Together, these acts of support enabled the deaths or injuries of Plaintiffs and their family members.

### ii.   Lafarge Channeled Funds Into ISIS's Center In Raqqa, Which Used The Money To Harm Plaintiffs

229.     The Cement Plant was in Raqqa, one of the first cities to fall to opposition groups during Syria's civil war. ISIS's Raqqa Cell attained prominence within ISIS itself because of its central location and the large population under its control. It became critical to planning ISIS's outward reach, and ISIS leadership flocked there. While ISIS was founded and led by Al-Baghdadi in Iraq, its expansionary military strategy and much of its operations and planning worldwide were centered in Raqqa. Al-Baghdadi declared that Raqqa would be the seat of his state, due to its proximity to both Iraq and Syria. According to LCS's former risk manager, Lafarge negotiated with ISIS's representatives in Raqqa.

230.     As the capital, ISIS's leadership and strategy were set in Raqqa. Secretary of State John Kerry stated in 2015 that Raqqa was "the core where they're [ISIS] planning" attacks. A

Pentagon spokesperson likewise confirmed that ISIS's militant administration and leadership were based in Raqqa. As described by the Commander of U.S. Central Command, Raqqa was "where [ISIS's] plotting takes place. . . . Raqqa is recognized as the financial, leadership and external ops center of the Islamic State."  And indeed, the Pentagon has explicitly stated that "Raqqa was a key location for ISIS' planning, financing, execution, or inspiration of terrorist activities throughout the world, including attacks in Paris and Nice in France."

231.    ISIS's Raqqa Cell was led by Abu Luqman, also known as Ali Musa Al-Shawakh, from early 2014 until his death in an airstrike in 2018. Abu Luqman had been a powerful ANF terrorist but then switched his allegiance to ISIS and recruited several hundred ANF fighters to join ISIS's ranks in Raqqa. He served on ISIS's Leadership Cell, as well as on ISIS's Intelligence Cell. Abu Luqman was head of ISIS's Directorate of General Security, which was responsible for intelligence gathering, detentions, state security, and external intelligence. Public reports state that Abu Luqman served on a "shadow board" of the Cement Plant. Abu Luqman also controlled ISIS's oil sales in northern Syria, which likely included sales of fuel to LCS.

232.    In December 2014, Abu Luqman himself was present, alongside Lafarge's agent Taleb, to facilitate ISIS's purchase of remaining materials in Lafarge's factory, worth $11.5 million. The next month, at Defendants' expense, Taleb visited Lafarge's headquarters in Paris to report on the ongoing negotiations with Abu Luqman to re-open the plant under Lafarge's supervision.

233.    The Raqqa Cell and Abu Luqman not only coordinated with Defendants or their agents and directly received their material support, but directly participated in the acts of international terrorism that injured Plaintiffs.

234.    As the de facto capital, Raqqa was the center of ISIS's training and planning. Indeed, the Raqqa Cell served as a nerve center for ISIS operations worldwide. Raqqa was "where ISIS plans their external operations," stated the commander of U.S. Central Command. Abu Luqman and the Raqqa leadership therefore participated in the expansion of ISIS's territory beyond Iraq and Syria. The Raqqa Cell was critical to determining when and how to recruit or accept additional members, where to expand, and how to commit attacks outside Raqqa by (1) serving as the bridge between ISIS's Leadership Cell and local cells on the ground in other locations; (2) maintaining ISIS propaganda network, which instructed, inspired, and motivated the attacks; and (3) supplying logistical, training, and financial support for ISIS's external attacks.

## K.    Defendants' Unlawful Conduct Had A Substantial Nexus To New York And The United States

235.    Defendants' scheme to finance ISIS and ANF relied on substantial touchpoints with New York and the United States.  In pleading guilty to conspiring to provide material support to ISIS and ANF, Lafarge and LCS admitted that their "offense occurred in part within the United States."   That concession reflected several U.S. contacts that Defendants formed in effectuating their scheme.  Those U.S. contacts included:  (1) Defendants' intentional use of New York banks to clear their U.S.-dollar transactions; (2) Defendants' intentional use of U.S.-based email services; and (3) Defendants' conspiracy with ISIS and ANF, designated terrorist groups that purposefully targeted the United States and reached into U.S. territory to further the scheme.[9]

---

[9] All exhibits referenced and cited to herein are attached to the First Amended Complaint filed on August 5, 2024 in *Foley et al. v. Lafarge S.A. et al.*, 23-cv-05691 (E.D.N.Y.), which is related to this case based on similar acts of the same Defendants.

### i.  **Defendants Purposefully Used New York Banks To Clear The U.S.-Dollar Transactions They Used To Finance Terrorism**

236.  Defendants purposefully availed themselves of New York's banking system by executing wire transfers they intentionally caused to clear through New York banks.

#### a)  *Defendants Executed U.S.-Dollar Transactions Using New York Correspondent Banks*

237.  Defendants' payments to terrorists relied on correspondent and intermediary banks located in New York.  Correspondent banking is often defined as "an arrangement under which one bank (correspondent) holds deposits owned by other banks (respondents) and provides payment and other services to those respondent banks."[10]  Such arrangements are needed when a sender seeks to transfer funds to a recipient whose bank lacks a direct relationship with the sender's bank.  In that scenario, the sender must rely on additional banks – typically called "correspondent" or "intermediary" banks – to establish a chain of banking relationships that can complete the transfer from sender to recipient.  Correspondent banking is "an essential component of the global payment system, especially for cross-border transactions."[11]

238.  New York banks are vital to this global system of correspondent banking.  As the Treasury Department reported in 2006, most cross-border transactions depended on "major funds transfer payment and messaging systems" located in New York.[12]  Those systems used a "relatively small number of major money center banks" that "specialize in facilitating international funds transfers" and thus "form a key link in the vast majority of all international

---

[10] Bank for International Settlements Committee on Payments and Market Infrastructures, *Correspondent Banking* at 9 (July 2016).

[11] *Id.* at 6.

[12] U.S. Dep't of Treasury, Financial Crimes Enforcement Network ("FINCEN"), *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System under the Bank Secrecy Act* at 57 (Oct. 2006).

funds transfers."[13]  The large money center banks that facilitate international U.S.-dollar transactions are based predominantly in New York.  Thus, when a company like Lafarge wires U.S. dollars to a recipient with which its bank lacks a direct banking relationship, it typically relies on New York correspondent banks to ensure that its dollars reach the intended recipient.

239.    New York banks typically perform the *clearing* process for U.S.-dollar wire transfers.  "Clearing" generally refers to the process of transmitting, reconciling, and confirming payment on electronic-funds transfers.  The Clearing House Interbank Payments System ("CHIPS") is the dominant electronic-funds-transfer system for clearing U.S.-dollar transfers among international parties.  Defendants' U.S.-dollar wires relied on CHIPS, which handled both the transmission of interbank messages and the settlement of payment for the wires.

240.    To use CHIPS's clearing services, a foreign money sender must involve a U.S. bank that is subject to supervision by U.S. banking regulators.  As the Treasury Department explained, access to CHIPS "is conditional upon a financial institution's U.S. presence," in part to ensure that U.S. law will govern cross-border U.S.-dollar transactions.[14]  And given New York's status as a global financial hub, the major U.S. banks responsible for clearing transactions through CHIPS reside overwhelmingly in New York.  For that reason, as *Reuters* reported, "[t]o legally transact (clear) the U.S. dollar globally, correspondent banks are required to maintain a New York branch and comply with U.S. [anti-money-laundering] regulations."[15]

241.    Defendants relied on New York banks to clear many of their transactions supporting ISIS and ANF.  That reliance reflected Defendants' choice to transact in U.S. dollars.

---

[13] *Id.*

[14] *Id.* at 62.

[15] Joshua Fruth (Thomson Reuters Regulatory Intelligence), *'Crypto-Cleansing:' Strategies To Fight Digital Currency Money Laundering And Sanctions Evasion*, Reuters (Feb. 14, 2018), https://tinyurl.com/4p27pwzs.

As Pescheux wrote in a June 30, 2013 email to Tlass, Defendants' "preferred option" for paying Tlass was to make "bank transfer[s] in USD to the account of a duly registered company" – and "USD" meant U.S. dollars.[16]  Consistent with that preference, Defendants specified in their contracts with Tlass that they would pay him in U.S. dollars.[17]  Defendants also often paid Taleb in U.S. dollars, knowing he would in turn use the U.S. dollars to pay ISIS.[18]  And Defendants at all times considered it a business imperative to combat the ▮▮▮▮▮▮▮▮ in Syria, going to extreme lengths to ensure LCS's liquidity in U.S. dollars specifically.[19]

242.    Defendants' decision to transact in U.S. dollars led them to use New York banks. That is the ordinary practice for sophisticated companies executing cross-border U.S.-dollar transactions.  Indeed, CHIPS estimated in 2015 that it "process[ed] more than 95 percent of U.S. dollar-denominated cross-border transactions."[20]  The dominance of a U.S. clearing center in processing U.S.-dollar wires was no accident.  As a practical matter, at the time of Defendants' unlawful conduct, "any financial institutional doing business in dollars need[ed] to hold accounts in correspondent U.S. banks in order to complete transactions."[21]  Because typically "all dollar

---

[16] Plea Statement ¶ 60; *see* Ex. 1 (7/1/2013 Tlass-Pescheux Email String) ("Preferred Option Email").

[17] Ex. 2 ("▮▮▮▮▮▮▮▮" ATA0020920 at -922) art. 4 ("▮▮▮▮▮▮"); Ex. 3 ("▮▮▮▮▮▮▮▮▮▮" ATA0010207 at -211) art. 4 ("▮▮▮▮▮▮"); Ex. 4 ("Feb. 2014 Tlass Agreement," ATA0021426 at -427) art. 4 ("▮▮▮▮▮"); Ex. 5 (Oct. 2014 Tlass Agreement) § 3.1 ("210,000US\$").

[18] *E.g.*, Plea Statement ¶ 63; Ex. 6 (ATA0000244) (paying Taleb "▮▮▮▮▮▮").

[19] Ex. 7 (ATA0009139); *see infra* ¶¶ 257-59.

[20] U.S. Dep't of Treasury, *National Money Laundering Risk Assessment* at 35 (2015).

[21] Christian Caryl et al., *Pocketbook Policing:  Washington Has Finally Found A Strategy That Is Putting Real Pressure On The Regime – Going After Its Sources Of Cash, All Across The World*, Newsweek Int'l (Apr. 10, 2006), 2006 WLNR 5632771.

transactions are cleared via the American banking system,"[22] nearly all U.S.-dollar wires

necessarily passed "through correspondent accounts" in New York.[23]

243.    Defendants chose to follow the norm and exploit New York banks in

orchestrating the U.S.-dollar wire transfers on which their conspiracy depended.  Plaintiffs have

identified at least 15 such transfers that Defendants executed in connection with their terrorist-

funding scheme.  All cleared through New York banks.  The chart below depicts each one:

| Date | Category | Originating Bank (Swift) | Beneficiary Bank (Swift) | NY Bank(s) (Swift) | USD Amount |
|---|---|---|---|---|---|
| | Upstream Equity | | | | |
| | Upstream Equity | | | | |
| | Upstream Equity | | | | |
| | Upstream Equity | | | | |
| | Upstream Equity | | | | |
| | Upstream Equity | | | | |
| | Upstream Equity | | | | |
| | Upstream Equity | | | | |
| | Upstream Loan | | | | $20,000,000 |
| | Upstream Loan | | | | $5,000,000 |

---

[22] Economist, *Digital Currencies:  A New Species* (Apr. 13, 2013), 2013 WLNR 8890628.

[23] *Role of U.S. Correspondent Banking in International Money Laundering:  Hearings Before the Permanent Subcomm. on Investigations of the S. Comm. on Governmental Affairs*, 107th Cong. 287 (Mar. 6, 2001) (quoting Minority Staff, *Report on Correspondent Banking: A Gateway For Money Laundering* (Feb. 5, 2001)).

| Date | Category | Originating Bank (Swift) | Beneficiary Bank (Swift) | NY Bank(s) (Swift) | USD Amount |
|---|---|---|---|---|---|
| ███ | Upstream Loan | ███ | ███ | ███ | $10,000,000 |
| | Upstream Loan | | | | $5,000,000 |
| | LMEA | | | | ███ |
| | LMEA | | | | |
| 10/24/14 | Tlass | BNPP Paris (BNPAFRPP) | Abu Dhabi Islamic Bank (ABDIAED) | **BNPP NY** (BNPAUS3) **JPM NY** (CHASUS33) | $210,000 |

244.     This chart is based on Defendants' bank records, SWIFT messages, and other transaction data and documents they maintained in the ordinary course of business. The "Date" column describes the transaction's value date. The "Category" column describes the transaction types: "Upstream Equity" means Lafarge's equity contributions to LCS through four affiliated LCS shareholders; "Upstream Loan" means loan disbursements by Lafarge (through Lafarge Cyprus) to LCS; "LMEA" means payments LCS accepted into its illegal bank account in Egypt; and "Tlass" means payments to Firas Tlass. The "Originating Bank" is the bank that initiated the wire transfer on the sender's behalf. The "Beneficiary Bank" is the bank that received the wire transfer on the recipient's behalf. And the "NY Bank" is the New York correspondent bank (or banks) that cleared the wire transfer. All were material to Defendants' terrorist payoffs.

245.     **Tlass Payments.** Tlass was an original LCS shareholder and Lafarge's first business partner in Syria.[24] Defendants initially transacted with Tlass through his Syrian

---

[24] Ex. 8 (ATA0031879) (████████████████████████████).

company, MAS Group ("MAS"), ████████████████████████████████████

████████████████ .[25]  The next year, LCS ████████████████████████

████████████████████████████████████████████████████

████████ [26]  In exchange, Tlass ████████████████████████████████

████████████████████████████████████████████████████

████████████████ ."[27]  Tlass ████████████████████████████ when paying

terrorists on Defendants' behalf.  It remained in force until February 2014, when Defendants

████████████████████████████████████████████████████

████████████████████████████████████ [28] ████████████████████

████████████████████████████████ , Defendants' payments to Tlass

were "explicitly conditioned on [his] continuing to make payments on LAFARGE's and LCS's

behalf to armed groups, which included ISIS and ANF."[29]

246.    Early in the scheme, Defendants used MAS – Tlass's company – to pay Tlass his

annual fees and to funnel him money to distribute onward to terrorists.[30]  To that end, Defendants

regularly transferred money into MAS's bank account, including in U.S. dollars. ████████████████

████████████████████████████████████████████████████████

---

[25] ████████████████████████ at -920.

[26] ████████████████████████ art. 4.  Starting in 2011, the contract called for LCS to pay Tlass in an amount equal to 1% of LCS's annual net sales.  *Id.*

[27] ████████████████████ arts. 1, 1(d).

[28] Plea Statement ¶ 61; ████████████████████████ art. 4. ████████████████████

████████████████████████████████ *Id.* at -426.

[29] Plea Statement ¶ 61.

[30] Ex. 9 ("Project Alpha Report," ATA0004181 at -226).  The Project Alpha Report was prepared by Baker McKenzie and PwC, which LafargeHolcim retained in 2016 to investigate their payments to terrorists.  *Id.* at -223.



and LCS funded the payment through the upstream dollars it sourced via New York banks, alleged below (*infra* ¶¶ 251-65).

247.    The final entry in Paragraph 243 depicts a payment to Tlass that Defendants cleared through New York.  In late 2014, Jolibois directed Tlass to issue a $210,000 invoice from North Logistics for his services negotiating with ISIS.[33]  To provide cover for that illegal payment, Lafarge's senior regional counsel Jean-Jerome Khodara drafted a sham consulting contract between LCS and Tlass, which the parties executed in conjunction with a back-dated agreement purporting to terminate their prior arrangement months earlier.[34]  Tlass then issued the $210,000 invoice Jolibois had requested from North Logistics.  It specified a new U.S.-dollar bank account at Abu Dhabi Islamic Bank that Tlass had opened to receive U.S.-dollar wires.[35]

248.    On October 24, 2014, Lafarge paid Tlass by wiring $210,000 through New York banks.  To initiate payment, ███████████████████████████████████████

███████████████████████████████████████████████[36] ███████████

███████████████████████████████████████

---

[31] Project Alpha Report at -260 (denoting "████████████" to "████████"); Ex. 10 (ATA0005778, Row 101) (████████████████████████████████); Ex. 11 (ATA0005465, Row 19) (████████████████████████████████)

[32] Ex. 10 (ATA0005778, Row 101) ("████████████████████████████").

[33] Plea Statement ¶¶ 97-102; Ex. 16 (ATA0000160 at -165) (identifying North Logistics).

[34] Plea Statement ¶¶ 97-102; Ex. 16 (ATA0000160 at -161-64); Ex. 17 (ATA0000032).

[35] Ex. 16 (ATA0000160 at -160).

[36] Ex. 18 (ATA0032474 at -474) (certified English translation).



249.

.[41]  Following Lafarge's directions, BNP Paribas's Paris branch executed the wire through its New York correspondent account at BNP Paribas's New York branch, which wired the money to JPMorgan Chase's New York branch, which transmitted the money to Tlass's U.S.-dollar account at Abu Dhabi Islamic Bank.[42]  As Defendants later admitted, the money passed through the "Eastern District of New York" and involved multiple "intermediary banks in New York City."[43]

---

[37] Ex. 19 (ATA0004739 at -739) (certified English translation).

[38] *Infra* ¶¶ 290-91.

[39] Ex. 18 (ATA0032474 at -474) (certified English translation) (telling Khodara and Jolibois, " ").

[40] Ex. 20 ("210k Wire Instruction," ATA0000071 at -075).

[41] 210k Wire Instruction at -071; Ex. 21 (Interrog. Resp. No. 4).

[42] Ex. 22 (BNPP-NY 000004, Rows 2913-2915); Ex. 23 (BNPP-NY 000001, Excerpt from JPMC Subpoena Response, Row 2).

[43] Plea Statement ¶ 103.

██████████████████████████████████████████████████

████████████████████████████████[44] Jolibois replied: "██████."[45]

250.    This $210,000 wire was instrumental to Defendants' terrorist-funding conspiracy. As Defendants admitted, "the $210,000 lump sum payment compensated [Tlass] for the work he had already performed negotiating an agreement with ISIS, and to reimburse him for making the fixed monthly 'donation' payments to armed groups, including ISIS."[46]  At ISIS's and ANF's going per-attack cost, the $210,000 alone was enough to pay for every attack in this case and many others.

251.    **Upstream Equity and Loan Payments.**  Paragraph 243 also includes 12 upstream U.S.-dollar payments to LCS:  eight equity contributions and four loan disbursements.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███[47] █████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████.[48]

252.    Lafarge paid the four U.S.-dollar loan disbursements under an April 7, 2011 loan agreement between Lafarge Cyprus and LCS.[49]  Lafarge's General Counsel and Corporate Secretary signed the loan agreement on Lafarge Cyprus's behalf and oversaw the disbursements

---

[44] Ex. 24 (ATA0032468 at -468) (certified English translation).

[45] Ex. 24 (ATA0032468 at -468) (certified English translation).

[46] Plea Statement ¶ 101.

[47] Ex. 25 (ATA0005192 at -200); Ex. 26 (ATA0005437 at -437-39).

[48] Ex. 12 (ATA0031866 at -866-68) (███████████████████████████); Ex. 26 (ATA0005437 at -442-43) (███████████████████ ██████); *id*. at -437 (confirming "████████████" routed each wire and charged fees for doing so).

[49] Ex. 27 (ATA0000316) ("2011 Loan Agreement").

it made.[50]  As his involvement demonstrates, Lafarge Cyprus funded LCS at Lafarge's direction and subject to its control.  Lafarge used Lafarge Cyprus to funnel money to LCS because the latter was LCS's majority shareholder, "through which LAFARGE held nearly all of its shares in LCS."[51]  Indeed, Lafarge admitted it was responsible for the October 24, 2014 payment to Tlass, even though it structured that payment as nominally originating from Lafarge Cyprus.[52]  The other Lafarge Cyprus payments similarly occurred at Lafarge's direction.

253.    Lafarge Cyprus made these loan disbursements by



[53]  For three of the four,

[54]  For the fourth,

[55]  In each instance,

Defendants obtained a SWIFT message confirming the New York banks' involvement.[56]

254.    This upstream funding was vital to Defendants' terrorist-funding scheme.  By injecting U.S. dollars into LCS, Lafarge enabled LCS to pay Tlass and Taleb in U.S. dollars.  Indeed,

[57]

---

[50] ▮▮▮▮▮▮▮▮ at -327; Project Alpha Report at -227.

[51] Plea Statement ¶ 99.

[52] Plea Statement ¶¶ 99, 103.

[53] Ex. 21 (Interrog. Resp. No. 4); Ex. 13 (ATA0000358 at -358).

[54] Ex. 21 (Interrog. Resp. No. 5, Transfer Nos. 1, 2, and 4).

[55] Ex. 21 (Interrog. Resp. No. 4, Transfer No. 3); Ex. 28 (ATA0000220 at -223-24).

[56] Ex. 13 (ATA0000358 at -358) (4/14/2011 transfer); Ex. 14 (ATA0000047 at -049-50) (7/7/2011 transfer); Ex. 28 (ATA0000220 at -223-24) (8/8/2011 transfer); Ex. 15 (ATA0000060 at -060) (8/15/2011 transfer).

[57] Project Alpha Report at -238-39.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ "[58]

255.    LCS routinely used the U.S. dollars it acquired to pay Tlass and Taleb.  Relying in part on the upstream dollars Defendants sourced through New York banks, LCS made many downstream payments to Tlass and Taleb in U.S. dollars.[59]  Nine were monthly $75,000 stipends LCS paid to Tlass via an agreement contemplating that Tlass would "retain $50,000 and the remaining $25,000 would be disbursed to armed groups."[60]  Under that agreement, Defendants paid Tlass a monthly $75,000 stipend at least from November 2013 to July 2014.[61]

256.    Defendants similarly used LCS's supply of U.S. dollars to make at least five "commission" payments to Taleb.  As PwC's forensic review concluded, "█████████████ ███████████████████████████████████████████" from ISIS-linked suppliers.[62]  The "██████████████████████████" was roughly "██████████."[63] ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[58] Project Alpha Report at -227.

[59] Project Alpha Report at -190-91 ("███████████████████████████████████ █████████████████████████████████████████████████████").

[60] Plea Statement ¶ 61.

[61] Ex. 29 (ATA0000256) (Nov. 2013); Ex. 30 (ATA0000291) (Dec. 2013); Ex. 31 (ATA0000289) (Jan. 2014 #1); Ex. 32 (ATA0000288) (Jan. 2014 #2); Ex. 33 (ATA0000292) (Mar. 2014); Ex. 34 (ATA0000293) (Apr. 2014); Ex. 35 (ATA0000294) (May 2014); Ex. 36 (ATA0000290) (June 2014); Ex. 37 (ATA0032008) (July 2014).

[62] Project Alpha Report at -190.

[63] Project Alpha Report at -190.

██████████████████████████████████████████ [64] ████████████████████

████████████████████████████████. As with the Tlass stipends, Lafarge's

upstream provision of U.S. dollars helped LCS finance these commissions.

257.    LCS's unique U.S.-dollar liquidity constraints amplified the nexus between

Lafarge's upstream payments and LCS's downstream payments to terrorists.  Starting in 2011,

LCS faced a severe liquidity crunch in U.S. dollars.[65]  For LCS to come up with the money to

pay terrorists, therefore, Lafarge had to devise a plan to ensure that LCS had a steady supply of

U.S. dollars.[66]  But it was difficult for LCS to raise money, given sanctions affecting Syria.[67]

The best way for LCS to access the capital it needed to pay terrorists was thus to obtain U.S.

dollars from Lafarge Cyprus and other affiliates.  ████████████████████

████████████████████████████████████████████

█████████████████████████████████████.[68]

---

[64] Ex. 38 (ATA0008287, In.Out Flow Tab, Rows 1838, 1840, 2550, 3143, 3144, 3195, 4194).
[65] Ex. 39 ("████████████████," ATA0059026 at -039) (describing "████████████
and challenges of "████████████████"); Ex. 40 ("Cash Shortfall Memo," ATA0009065
at -065-67) (noting need for "████████████" and "████████"); Ex. 41 (ATA0005040 at
-040) (stressing "████████████████" in U.S. dollars); Ex. 14 (ATA0000047 at -047) (noting
need for new "████████████████" to hold U.S. dollars to give LCS "████████████
████████").
[66] Ex. 42 (ATA0000938 at -938) (Pescheux emphasizing to CFO that ████████████████
████████████████████████████████████████████████████████████████");
*id*. at -940-42 (detailing cumbersome process "████████████████████████████████
████████████████████████████████").
[67] ████████████████ at -028, -039 (detailing challenges); *see* Exec. Order No.
13,573 (May 18, 2011); Exec. Order No. 13,572 (Apr. 29, 2011) (2011 sanctions orders).
[68] *E.g.,* Ex. 43 (ATA0018237 at -239) (describing need for "████████" cash infusion "████████
████████████"); Ex. 15 (ATA0000060 at -067-68) (demanding "████████" loan payment "
████████████████████████" to cover "████████████████ and to allow LCS "████
████████████████" in compliance with outstanding letter of credit); Cash Shortfall Memo at -065
(similarly noting "████████████" in February 2012 for "████████████████████" to avoid
"████████████████████"). If LCS missed a repayment to its external lenders, the
lenders could have cancelled their commitments and accelerated all remaining secured liabilities.

258.    U.S. and U.N. sanctions regimes targeting Syria were designed to promote just that sort of U.S. dollar scarcity, to restrict the flow of U.S. dollars to violent actors. U.S. Treasury Department officials publicly confirmed that intent. In 2011, for example, after a raft of counterterrorism sanctions, "[a] US Treasury spokeswoman said that 'designating' companies made it difficult for them to operate, especially if business involved US dollar transfers, which all passed through the New York banking system" when "payments[ ] were made in US dollars."[69] In 2014, likewise, senior Treasury official David Cohen explained how U.S. policymakers sought to leverage the power of New York's banking system to impede terrorists from raising money and funding their operations.[70]

259.    U.S. sanctions designations were similar. In 2014, for example, the Treasury Department emphasized that U.S. sanctions sought to deprive violent Syrian actors of U.S. dollars and force them to use the collapsing Syrian pound.[71] The United States reinforced that the same logic applied to ISIS when it sanctioned ISIS financiers from 2016 through 2019: allowing ISIS to access U.S. dollars through New York banks directly financed ISIS's attacks by giving ISIS more purchasing power than it would have had by using Syrian pounds.[72]

---

*See* Ex. 44 (ATA0020635 at -726, -731-32) §§ 33.1 ██████████████ ), 35.1 ( ██████ ██████████████ ).

[69] Keith Wallis, *Law Firms Cautioned On Iran Sanctions British Government Warns Companies*, South China Morning Post (Jan. 26, 2011), 2011 WLNR 1534856.

[70] *Interview with David Cohen; Interview with Nabil Fahmy; The Sultan and the Sharia Law*, Fareed Zakaria GPS (May 4, 2014), 2014 WLNR 11967166.

[71] *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions a Syrian Official Responsible for Human Rights Abuses in Syria and Syrian Regime Supporters and Officials* (Oct. 16, 2014).

[72] *See, e.g.*, Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Senior IsiL Financier and Two Money Services Businesses* (Dec. 13, 2016); Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Iraq-Based ISIS Financial Facilitation Network; Action Underscores Continued U.S. Collaboration with the Government of Iraq on Countering ISIS's Terrorism Financing Operations* (June 15, 2017).

260.    The 2011 upstream payments were likewise linked to Defendants' terror-financing scheme through their connection to Tlass.  When Defendants decided to go into business with Firas Tlass, his father Mustafa had been Syria's long-time defense minister and confidant of Bashar al-Assad's father.  Firas was himself close with the Assad family, too.  The Tlass family's long-established connections with and patronage of the al-Assad regime were lucrative.  Indeed, MAS's growth was largely attributable to contracts it received to supply the Syrian Arab Army with food, medicine, and clothing.[73]  Those connections to the Assad regime also made Tlass and MAS attractive to Lafarge as a joint-venture partner in Syria.

261.    When Defendants made their 2011 upstream payments while in business with Tlass, they knew terrorist violence was a foreseeable consequence.  From 2003 through 2014, many public sources – including U.S. and U.N. counterterrorism findings – alerted Defendants that the Syrian regime sponsored AQI attacks targeting the United States.  DOD, for example, reported that Syria provided "safe haven, border transit, and limited logistical support" to "Iraqi insurgents," including AQI.[74]  U.N. Security Council reports similarly highlighted the "nexus between large numbers of Al-Qaida affiliated foreign fighters and Jabhat-al-Nusrah" in Syria, which risked "new pan-Arab and pan-European networks of extremists emerg[ing]."[75]

---

[73] Ayman Aldassouky, *The Families of Rastan and the Syrian Regime:  Transformation and Continuity*, Wartime and Post-Conflict in Syria, Issue 2021/14, at 8-9 (Aug. 6, 2021).

[74] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2007 Report to Congress in Accordance with the Department of Defense Appropriations Act 2007 (Section 9010, Public Law 109-289)*, at 16-17 (Mar. 2, 2007); *see* U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, May 2006 Report to Congress in Accordance with the Department of Defense Appropriations Act 2006 (Section 9010)*, at 28 (May 26, 2006); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2009 Report to Congress in Accordance with the Department of Defense Supplemental Appropriations Act 2008 (Section 9204, Public Law 110-252)*, at vii, 8 (Jan. 29, 2010).

[75] U.N. Security Council, *Fifteenth Report of the Analytical Support and Sanctions Monitoring Team Submitted Pursuant to Resolution 2083 (2012) Concerning Al-Qaida and Associated Individuals and Entities* ¶ 8 (Jan. 23, 2014).

262.    Media reports also warned before 2011 that the Assad regime supported AQI attacks against the United States.  As early as May 2004, the *Washington Times* reported on the "mounting body of evidence link[ing] the Assad regime with the Zarqawi network and terrorist activities in Iraq."[76]  The *National Post* corroborated that point in February 2013, noting that "experts believe Mr. Assad provided critical support" for "weapons and money coming through Syria to . . . Iraq" for "extremists" who would "bring pain to the Americans."[77]  As "[n]umerous courts" later found after considering the evidence, "Syria supported ISIS and its predecessor organizations."[78]  Defendants' U.S.-dollar financing in 2011, used to pay a notorious Syrian regime fixer, thus was linked to Syrian terrorism from the very outset.

263.    The suite of U.S. and U.N. antiterrorism sanctions on Syria – which Defendants schemed to circumvent – strengthened the nexus between their 2011 payments and terrorism.[79]  Because Defendants knew that Tlass was a prominent Assad ally and regime cutout facilitating Defendants' business interests in a heavily sanctioned country, it was foreseeable that their dealings with him in 2011 would enable AQI/ISIS terrorist attacks against the United States.

---

[76] *Assad's Terror Network*, Wash. Times  (May 26, 2004) (Editorial), 2004 WLNR 777961; *see* Frederick W. Kagan & William Kristol, *Now Can We Fight the Enemy?*, Weekly Standard (June 4, 2007), 2007 WLNR 30043601 ("The Syrian regime permits al Qaeda terrorists to move into Iraq" to "kill as many Americans as possible.").

[77] Scott Barber, *Islamic Extremism Threatens Stability; Gaining Sympathy, Recruiting Radicals, Breeding Terrorists*, Nat'l Post (Canada) (Feb. 9, 2013), 2013 WLNR 3252489.

[78] *Fields v. Syrian Arab Republic*, 2021 WL 9244135, at *3 (D.D.C. Sept. 29, 2021).

[79] *See*, *e.g.*, White House (Office of the Press Secretary), *Fact Sheet:  Implementing the Syria Accountability and Lebanese Sovereignty Restoration Act of 2003* (May 11, 2004) (sanctions designed "to address the Syrian government's support for terrorist groups" and "actions to undermine U.S." efforts to stabilize Iraq), https://tinyurl.com/mr46kwf6; U.S. Dep't of Treasury, *Treasury Designates Commercial Bank of Syria as Financial Institution of Primary Money Laundering Concern* (May 11, 2004) (designating Commercial Bank of Syria as an institution of primary money laundering concern "in response to the Syrian government's continued support of international terrorism").

264. Defendants also knew Tlass personally (including through MAS) had facilitated AQI terrorism by brokering arms deals, participating in U.S.-dollar-denominated illicit Oil-for-Food program transactions, and channeling hundreds of millions in Iraqi oil revenue stranded in Syrian banks to terrorist financiers in Iraq and Syria.[80]  Those dollars and illicit weapons supported the Zarqawi network, which powered AQI's regional expansion and its evolution into ANF and ISIS.[81]  By funding a joint venture with a notorious AQI financier, Defendants' 2011 upstream payments implemented a scheme of which terrorism was a foreseeable consequence.  Had Defendants been unwilling to pay AQI or similar FTOs in Syria, they never could have hired Tlass because their ordinary due diligence would have never "cleared" him.

265. Although the specific identity of the terrorists Tlass supported evolved over the years, the core concept remained the same:  Lafarge and LCS continuously paid Tlass in U.S. dollars to maintain good relations with violent Syrian actors.  Those efforts focused at first on the Assad regime and AQI, and they later evolved to include ISIS and ANF.  All reflected a continuous course of conduct dating back at least to 2010.  When Lafarge used New York's banking system to cover LCS's payments to Tlass in 2011, therefore, it knew it was paying him

---

[80] David Rennie, *Tough Questions For 270 Named In Iraqi Documents*, Daily Telegraph (Apr. 23, 2004), 2004 WLNR 4205658 (reporting congressional testimony identifying Tlass as being on a "list" of "non-end users" who helped evade sanctions under Oil-for-Food and observing that Mr. Tlass was on a "list" containing "someone with a lot of explaining to do"); Niles Lathem, *Syrian Bigs Conned U.N.*, N.Y. Post (July 27, 2005), 2005 WLNR 23207829 (reporting IRS report documents naming Tlass as an "intermediar[y] in many Iraq-Syrian transactions that earned [him] 10 to 15 percent commissions on each deal [he] handled").

[81] *See*, *e.g.*, Daniel L. Glaser, *quoted in* U.S. Dep't of Treasury, *Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005) ("[T]he Zarqawi Network and other jihadist groups use a variety of classic al Qaida-type terrorist financing mechanisms, including:  Funds provided by charities, Iraqi expatriates, and other deep pocket donors, primarily in the Gulf, but also in **Syria**, Lebanon, Jordan, Iran, and Europe."), https://tinyurl.com/56j2r5t8.

to maintain LCS's relationships with Syrian terrorists. Lafarge's decision to extend that strategy to ISIS and ANF in 2013 and 2014 was a foreseeable outgrowth of the same conduct.

266.   **LMEA.**   The remaining two New York-cleared wires in Paragraph 243 were transfers LCS accepted into its LMEA account. Defendants opened that account in Egypt to allow LCS to make and receive illegal U.S.-dollar payments. They called it their "LMEA account" because it was held in the name of Lafarge's Egyptian subsidiary, Lafarge Middle East & Africa Building Materials.[82] But LCS was the one that controlled the money. The account's purpose, as described by Defendants' external forensic review, was to allow LCS ███████████████ ████████████████████████████████████████████████████████████████████[83]

267.   Defendants opened the LMEA account to circumvent U.S. sanctions on Syria. By July 2013, U.S. sanctions had caused a rapid "█████████████████████████."[84] The resulting foreign-exchange risks imperiled LCS's business.[85] Indeed, LCS struggled to acquire U.S. dollars – the currency in which it preferred to operate – because U.S. sanctions barred New York banks from clearing dollars for Syrian entities like LCS.[86] So LCS came up with a workaround: a U.S.-dollar account in Egypt that looked like it was for a non-sanctioned Egyptian affiliate instead.[87] It devised that workaround after ██████████████████████████████

---

[82] Project Alpha Report at -227.

[83] Project Alpha Report at -191.

[84] Ex. 45 (ATA0014297 at -302).

[85] Ex. 45 (ATA0014297 at -302) (noting "████████████████████████████████████ ████████████████████████████████████"); Ex. 7 (ATA0009139) (Pescheux describing LCS's "████████████████" as a "██████████" for LCS's business).

[86] Ex. 46 ("S&S Memo," ATA0018284 at -286-88) (noting that sanctions meant that "███████████████████████████████████████████████████████████████████████"); Ex. 47 (ATA0018291 at -291) (blaming "██████████████████ for inability to execute "██████████"").

[87] Ex. 48 ("LMEA Cooperation Agreement") § 2 ("LMEA to receive and deposit in its bank account such dues on behalf, and under the disposal, of Lafarge Syria.").

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████."[88]

268.    The LMEA account offered an elegant, if illegal, solution to that problem.  The Egyptian company nominally owned the account for compliance purposes, but "Lafarge Syria solely ha[d] all the rights on [the] amounts" in it.[89]  The point was to allow Lafarge to transact in U.S. dollars for LCS without external correspondent banks blocking the transfers as required by international sanctions.[90]  LCS and LMEA memorialized their arrangement in a July 10, 2013 contract.  The agreement enlisted LMEA's cooperation, among other things, in helping LCS satisfy its "external financial obligations."[91]  It required LMEA "to receive and deposit in its bank account" incoming payments "on behalf, and under the disposal, of Lafarge Syria," and to make payments from the account to "specified third part[ies]" as LCS directed.[92]

269.    ██████████████████████████████████████████

████████████████████████.[93]  Yet even then, ████████████████████████

████████████████████████████████████████████████

█████████████.[94]  ████████████████████████████████

---

[88] Ex. 45 (ATA0014297 at -302) (email from Mirakoff).

[89] LMEA Cooperation Agreement § 3.

[90] Ex. 49 (ATA0000503 at -506) ("████████████████████████

█████████████████████████████████████████████████").

[91] LMEA Cooperation Agreement at 1 (Preamble).

[92] LMEA Cooperation Agreement §§ 2, 4.

[93] Ex. 45 (ATA0014297 at -298) (LCS's CFO writing, "████████████████████

██████████████████████████████").

[94] Ex. 45 (ATA0014297 at -297).



[████████████████████████████]."[95]  A few weeks later, [████████████████████████████]

[████████████████████████████].[96]

270.    LCS officially opened [███████████████████].[97]  LCS held this U.S.-dollar-denominated account at National Societe Generale Bank's ("NSGB") branch in Egypt.[98]  LCS then [███████████████████████].[99]

271.    LCS used the LMEA account to execute hundreds of U.S.-dollar transactions. According to PwC's forensic review, [███████████████████]

[███████████████████████].[100] [████████]

[███████████████████████]

[███████████████]."[101]

272.    The report was correct.  NSGB Egypt maintained standard settlement instructions calling for U.S.-dollar clearing through New York.  Most banks maintain such standard instructions, which describe the bank's processes for routing electronic-funds transfers in various currencies.[102]  Those instructions detail the accounts a financial institution will use to complete

---

[95] Ex. 45 (ATA0014297 at -297).

[96] Ex. 50 (ATA0010065 at -065).

[97] Ex. 50 (ATA0010065 at -066).

[98] Ex. 50 (ATA0010065 at -066); Project Alpha Report at -237.

[99] Ex. 50 (ATA0010065 at -067) (LCS CFO asking for the LMEA "[██████████████████]

[███████████]").

[100] Project Alpha Report at -237.

[101] Project Alpha Report at -191.

[102] *E.g.*, Ex. 51 (ATA0058827 at -827) (Lafarge deputy international treasurer verifying bank's "[█████]," or [█████████████████████]); Ex. 52 (ATA0031601 at -602) (European

transactions depending on the currency the institution's customer selects. For example, if a customer instructs its bank to execute a U.S.-dollar-denominated wire transfer, the bank's standard settlement instructions provide the names, locations, and account numbers of the correspondent accounts the bank will use to complete the transfer. And those standard instructions typically remain consistent from transaction to transaction. That means that, if a financial institution transacts one U.S.-dollar-denominated transfer through a particular U.S. bank account, its other U.S.-dollar-denominated transfers will likely route via the same account.

273. Before the relevant period, NSGB Egypt published its standard settlement instructions in the Bankers Almanac, an authoritative compendium of international banking information. Those instructions, available and well-known to Defendants,[103] specified that NSGB Egypt settled U.S.-dollar wire transfers through "The Bank of New York, New York."[104] For that reason, when Defendants directed an LCS customer to wire U.S. dollars into the LMEA account, they knew the dollars would arrive via a New York correspondent account.

274. Paragraph 243 details two examples of New York-cleared wires LCS accepted into the LMEA account. The first was ████████████████████████████████ ████████[105] The second was ████████████████████████████████████

---

Investment Bank sending Lafarge its "████████████████████"); Ex. 53 (ATA0024767 at -767) (attaching Citibank's "████").

[103] Ex. 51 (ATA0058827 at -829) (Lafarge's deputy international treasurer writing to ask ████████████████████████" so he could verify "████████████████" for a counterparty); *id*. at -827 (after subordinate says he is unaware of Almanac, deputy international treasurer "████████████████████████████████████████").

[104] Ex. 54 (Bankers Almanac at 3216 (Vol. 2, 2008)) (identifying NSGB's "USD" standard settlement instructions as routing through "The Bank of New York, New York").

[105] Ex. 55 (ATA0035605) (████████████████████████████); Ex. 56 (ATA0008289, In.Out Flow Tab, Rows 120-21) (████████████████████████████████). ████████████████████████████ Ex. 57 (ATA0035592 at -592).

████████████████████████████████████████████████████.[106]  Both cleared via New

York, in accordance with NSGB Egypt's standard settlement instructions.  Indeed, ██████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████"[107]

275.    The LMEA account played a key role in Defendants' terrorist-funding scheme.

That account functioned as a slush fund that gave LCS a pool of U.S. dollars it could spend at

will, including for its criminal conspiracy.[108]  In fact, one of the first things Defendants planned

for the LMEA account was to pay Tlass's monthly $75,000 stipend for July 2013.  As Pescheux

emailed Herrault on August 5, 2013, Defendants intended to cover "the recently agreed

remuneration of FT" (*i.e.*, Firas Tlass) by wiring U.S. dollars "directly to his offshore account

from an account LCS is having through LMEA in Egypt."[109]  The reason for using the LMEA

account was simple.  Routing U.S. dollars from the LMEA account was how Defendants

"intend[ed] to proceed in the future to sever[] any suspicion in connecting LCS and FT."[110]

276.    Defendants considered the $75,000 payment to Tlass to be "██████████████

██████████."[111]  So LCS initiated a U.S.-dollar wire transfer from its LMEA account,

which was "██████████████" and which was going to clear through New York.[112]  But

LCS ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[106] Ex. 58 (ATA0024362 at -362-64); Ex. 57 (ATA0035592 at -592-93).

[107] Ex. 58 (ATA0024362 at -364).

[108] *See, e.g.*, Ex. 49 (ATA0000503 at -507-09) (identifying "██████████" via the "████
████████████" as one key way to "██████████████").

[109] Ex. 59 (8/5/2013 Pescheux-Herrault Email) ("Suspicion Email").

[110] Suspicion Email at 1.

[111] Ex. 60 (ATA0004874 at -876).

[112] Ex. 60 (ATA0004874 at -875).

████████████.[113] ████████████████████████████████████

███████████████████████████████████████████████████.[114]

277.   Defendants did not like paying in Euros and so immediately reverted to paying Tlass's monthly $75,000 stipend in U.S. dollars.  But because New York banks would not clear U.S.-dollar wires from Egypt to Tlass's account at Audi Lebanon,[115] Defendants had to come up with another way to pay him.  So they devised a new workaround in which LCS paid Tlass through an internal book transfer between Audi Lebanon accounts[116] and then reimbursed itself on the back-end out of the LMEA account.  PwC's forensic review identified ████████

████████████████████████████████████"[117] ████████████████████

███████████████████████████████████████████.[118]

278.   More broadly, LCS repeatedly used its LMEA slush fund to preserve its U.S.-dollar liquidity and cover its U.S.-dollar expenses, including by ████████████████

███████████.[119]  Without the supply of U.S. dollars from this account, LCS would have had a harder time covering its expenses and freeing up the U.S.-dollar cash it needed to pay Tlass, Taleb, and the terrorists they were paying.  Paying LCS's operating expenses from the LMEA

---

[113] Ex. 60 (ATA0004874 at -875).

[114] Ex. 60 (ATA0004874 at -874, -878).

[115] Ex. 47 (ATA0018291 at -291-92) (noting that "████████████████████████

██████," so "████████████████████████████████████████████████").

[116] *E.g.*, Ex. 32 (ATA0000288) (████████████████████████████).

[117] Project Alpha Report at -237-38; *see* Ex. 61 (ATA0003037, Rows 7510, 7511) (████████

████████████████████████).

[118] *See e.g.*, Project Alpha Report at -230, -237-38.

[119] Ex. 62 (ATA0003359, ████████████, Rows 120, 238, 268, 928, 964, 1138, 1183, 1194, 1248, 1625, 1739, 1952, 2016, 2105, 2244, 2387, 2416, 2502).

account also enabled the Jalabiyeh plant to manufacture the cement LCS sold to ISIS.[120]  And the U.S.-dollar wires LCS routed into that account – relying on NSGB's correspondent account with BNY Mellon – were vital to sourcing the U.S. dollars on which the whole scheme depended.

> **b) *Defendants Instructed Their Banks To Execute These U.S.-Dollar Transactions Knowing They Would Clear Through New York***

279.    When Defendants ordered the U.S.-dollar transfers in Paragraph 243, they instructed their banks to execute the wires knowing they would clear through New York.

280.    Defendants' internal documents reflected their understanding that U.S.-dollar wires typically require New York clearing.  In November 2011, ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████.[121] █████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████[122]  Lafarge emails echoed the same theme.

Defendants often expressed the view that ███████████████████████████

████████████████████████████████████████████████████[123]

---

[120] *E.g.*, Ex. 63 (ATA0018621 at -623) ("███████████████████████████████████

███████").

[121] Ex. 64 (ATA0018518 at -518) (███████████████████████████████████████

██████████ *see id.* at -540-46.

[122] S&S Memo at -287.

[123] Ex. 47 (ATA0018291 at -291); *see, e.g.*, Ex. 65 (ATA0002153 at -153) (LCS treasury manager telling counterparty, "██████████████████████████████████████

███████████."); Ex. 66 (ATA0005162 at -167) (same LCS official emphasizing that ████

████████████████████████); Ex. 67 (ATA0002227 at -229) (█████████████

██████████████████████████████").

281.    Defendants also revealed that understanding in other contexts. ██████ conveyed his knowledge of U.S. correspondent banks when wiring Lafarge's October 2014 payment to Tlass, informing his colleagues that he ███████████████████████████████████ ████████████████████████████████[124] The year before, BNP Paribas – Lafarge's main bank – had similarly ██████████████████████████████████████████ █████████████████████████[125] And a few months after, Lafarge's International Treasurer told a counterparty that, █████████████████████████████████████ ███████████████████████████████████████[126] Lafarge did not think a ██████████████████████████████████████████████████████ ████████████████████████[27] Lafarge thus recommended using ███████ ████████████████████████████████████████████████.[128]

282.    Defendants' experience with failed U.S.-dollar wires cemented that understanding.  In late 2011, for example, LCS tried to █████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████[129] The same month, LCS tried to ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████.[130] Mirakoff explained the reason: "████████████████

---

[124] Ex. 19 (ATA0004739 at -739) (certified English translation).
[125] Ex. 68 (ATA0032337 at -337) (certified English translation).
[126] Ex. 69 (ATA0025059 at -060) (certified English translation).
[127] *Id.*
[128] *Id.*
[129] Ex. 70 (ATA0002267 at -275).
[130] Ex. 71 (ATA0002156 at -156); *see id.* at -157 (██████████████████████ ████████████████).

█████████████████████" and "██████████████████████████," leading him to worry that "████████████████████."[131] Likewise, in 2015, Lafarge's Treasury Back Office team had a ████████████████████████████████ ████████████████████████[132] Lafarge quickly discerned that "█ ██████████████████████████."[133] So Lafarge's treasury team ████████████████████████████████[134]

283. Defendants fared better in executing other U.S.-dollar transactions through New York correspondent accounts. Lafarge often received invoices calling for U.S.-dollar execution through New York, such as ████████████████████████████████ ████████████████████████████████████ ██████[135] Lafarge also periodically received ██████████████████ ████████████████████████████████████[136] Lafarge even ████████████████████████████████████ ████████████████████████████[137] ████████ ████████████████████████████████████ ████████████████████████████ ████████████████████████[138]

---

[131] Ex. 72 (ATA0002286 at -286).

[132] Ex. 73 (ATA0024796 at -796).

[133] Ex. 73 (ATA0024796 at -796).

[134] Ex. 73 (ATA0024796 at -796).

[135] Ex. 74 (ATA0032118 at -219).

[136] *E.g.*, Ex. 52 (ATA0031601 at -602).

[137] Ex. 75 (ATA0009182 at -185).

[138] Ex. 76 (ATA0032717 at -717, -719-20) (certified English translation) (██████); Ex. 77 (ATA0027565 at -565, -569) (██████); Ex. 78 (ATA0039494 at -494, -503) (██████); Ex. 79 (ATA0060118 at -118, -121) (██████); Ex. 80 (ATA0023925 at -925) (██████).



284.    Lafarge's outside consultants had the same understanding.  LafargeHolcim retained Baker McKenzie and PwC in 2016 to review Lafarge's payments to Syrian terrorists, and they produced a report for Lafarge entitled "*Project Alpha* Forensic Transaction Review."[139] That report further manifested the view that U.S.-dollar transfers virtually always clear through U.S. correspondent banks. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄[140] Defendants shared that same presumption at all relevant times.

285.    Non-privileged client alerts by Defendants' counsel also alerted them that their transactions used the U.S. banking system.  For example, while Shearman & Sterling LLP was advising Lafarge, it published an alert warning its clients that U.S. courts endorsed an "expansive assertion of territorial jurisdiction over non-U.S. defendants," extending to "overseas financial transactions involving US dollars, premised on the fact that virtually all such transactions clear through correspondent banking accounts in the U.S."[141]  Similarly, Baker & McKenzie represented Lafarge during and after the scheme, and in the earlier period published a "client alert" warning that "a wire transfer from or to a U.S. bank or otherwise using the U.S. banking system" could confer U.S. jurisdiction based on "the use of correspondent bank accounts."[142]

---

[139] Project Alpha Report at -223.

[140] Project Alpha Report at -190.

[141] Shearman & Sterling LLP (Philip Urofsky, Stephen Fishbein, Danforth Newcomb, Patrick D. Robbins, Paula Howell Anderson, Richard Kreindler, Markus S. Rieder, Richard Kelly, Jo Rickard, Brian G. Burke & Brian C. Wheller), *Shearman & Sterling Client Publication:  The New FCPA Guide:  The DOJ and the SEC Do Not Break New Ground But Offer Useful Guidance and Some Ominous Warnings* at 3 (Nov. 15, 2012), https://tinyurl.com/5dx8mndc.

[142] Baker & McKenzie LLP (Paul J. McNulty, Joan E. Meyer, Robert W. Kent, Jr., John P. Cunningham, Crystal R. Jezierski, Peter B. Andres, and Erica C. Spencer), *Baker & McKenzie Client Alert:  Inside the U.S. Government's Highly-Anticipated FCPA Resource Guide* at 2 (Nov. 16, 2012), https://tinyurl.com/5n7xus77.

286.    Syrian government decrees likewise alerted Defendants that their U.S.-dollar transactions depended on the U.S. banking system.  For example, in February 2006, the Syrian government issued Circular Number 810/15, requiring that all foreign-currency transactions for the government that had previously been denominated in U.S. dollars instead occur in Euros, specifically to avoid U.S.-dollar clearing by New York banks.  That decision, of which Defendants knew, reflected the widespread understanding in Syria that "US laws stipulate that any dollar transfers must pass through the US banking system."[143]

287.    Defendants also received confirmations specific to the transactions in Paragraph 243.  Those confirmations typically took the form of SWIFT MT103 messages.[144]  SWIFT, which stands for the Society for Worldwide Interbank Financial Telecommunication, is the standard communications system for sending wire-transfer messages between financial institutions.  An MT103 (or Message Type 103) is a standard message confirming the details of an executed transaction.  Fields 53, 54, and 56 in an MT103 typically disclose the correspondent and intermediary banks involved.  ███████████████████████████████████

███████████████████████████████████████████████ [145]

---

[143] BBC International Reports (Middle East), *Syria Replaces Dollar With Euro For State Transactions* (Feb. 24, 2006) ("Text of report by Hayam Ali headlined 'The euro used in state transactions', published by Syrian newspaper Al-Thawrah website on 13 February [2006]").

[144] *See, e.g.*, Ex. 28 (ATA0000220 at -220) (LMEA treasury employee informing LCS that ███ ███"); *id.* at -223-24 (█████████████████████████).

[145] Ex. 81 (ATA0060033 at -034) (certified English translation) (Lafarge's back-office team telling BNP Paribas that ████████████████████████████████ ██████████████"); *see id.* at -033-34 (███████████); Ex. 82 (ATA0032366 at -367-68) (████████████████████████████████); Ex. 83 (ATA0021482 at -483-84) (██████████████████████ Ex. 84 (ATA0032193 at -193, -197) (attaching "██████████" confirming wire through █████ ██████"); Ex. 85 (ATA0001916 at -916) (requiring "██████ ███████"); Ex. 28 (ATA0000220 at -226) ("████████████████").

288.    Defendants have produced █████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████.[146]  Defendants likely once had, but have

since destroyed, ████████████████████████████████████████████████

█████████████████

289.    Defendants sometimes obtained the MT103 as part of their approval process for

the transaction.  For example, Pescheux specifically "██████████" the ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.[147]

290.    Defendants also typically verified the correspondent-bank routing before ordering

a wire.  They did so through ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████[148]  And that process of adding information to be "███████████████" required

Lafarge to ████████████████████████████████████████████████████████████

██████████.[149]  As Lafarge's International Treasurer confirmed, "████████████████████

█████████████████████████████," which was "████████████████████████████████████

---

[146] Ex. 12 (ATA0031866 at -866-68) (██████████████████); Ex. 26 (ATA0005437
at -442-43) (█████████████); Ex. 13 (ATA0000358 at -358) (███████████████); Ex. 14
(ATA0000047 at -049-50) (███████████████); Ex. 28 (ATA0000220 at -223-24) (████████
█████); Ex. 15 (ATA0000060 at -060) (███████████████); Ex. 58 (ATA0024362 at -364)
(███████████).

[147] Ex. 28 (ATA0000220 at -221) (██████████████); *id.* at -223 (██████████████████
██████████████████████████).

[148] Ex. 86 (ATA0050870 at -870).

[149] Ex. 86 (ATA0050870 at -870) (listing fields).





██████████████████████████████.”[150]  Defendants thus investigated ██

████████████████████████████████████████

██████████████████████.[151]  It was what Lafarge's back office demanded: "███████

████████," Lafarge "███████████████████████████████.”[152]

291.    ███████████████████████████████████████ ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

//

//

//

//

//

//

//

//

//

---

[150] Ex. 69 (ATA0025059 at -059) (certified English translation).

[151] Ex. 87 (ATA0024476 at -476); *see* Ex. 51 (ATA0058827 at -833) ("█████████████████

██████████████████"); Ex. 88 (ATA0025152 at -152); Ex. 89 (ATA0000383 at -383).

[152] Ex. 69 (ATA0025059 at -060) (certified English translation); *see* Ex. 51 (ATA0058827 at -833) ("██████████████████████████████████████

██████████████████████████").

[153] Ex. 90 (ATA0050876 at -876).



For each of the U.S.-dollar wires described in Paragraph 243, Defendants ▮▮▮▮▮▮



292.    Even apart from ▮▮▮▮, Defendants had bank-specific knowledge of the New York financial system's role in clearing their 15 suit-related U.S.-dollar wires.

293.    **BNP Paribas Paris.**  Defendants specifically knew that BNP Paribas's Paris branch – which originated the $210,000 wire to Tlass in October 2014 – used BNP Paribas's New York branch to clear Lafarge's U.S.-dollar wires.  Lafarge was telling its own counterparties as early as 2012 that ▮▮▮▮▮▮▮▮▮▮



.”[154]  In early 2013, Lafarge's International Treasurer reiterated that the "███████████████████ ███████████████████," with a "█████████████" of "█████████."[155]  In July 2013, BNP Paribas reminded Lafarge's International Treasurer █████████████████ ███████████████████████████████████████ █████████████.”[156]  And in 2015, Benattar told a law firm that █████████████ ███████████████████████████████████”[157] ████████ ███████████████████████████████████ ███████████████████████████████████.

294.     BNP Paribas's use of its New York branch to clear U.S.-dollar transfers also tracked its standard settlement instructions.  Before the relevant period, BNP Paribas published its standard settlement instructions for its Paris branch in the Bankers Almanac, which specified that it typically settled "USD" transfers through "BNP Paribas SA, New York."[158]

295.     **Bank Audi.**  Defendants likewise knew their U.S.-dollar transfers through Bank Audi relied on New York correspondent banks.  For the upstream payments Lafarge made into LCS's Audi Syria accounts, ███████████████████████████████████ █████████████████████[159]

296.     Defendants gained even more precise knowledge that their Audi Lebanon account relied on a New York correspondent bank.  The account-opening process made that clear.  In

---

[154] Ex. 91 (ATA0058766).

[155] Ex. 92 (ATA0057787 at -787).

[156] Ex. 68 (ATA0032337 at -337) (certified English translation).

[157] Ex. 93 (ATA0032069 at -069).

[158] Ex. 54 (Bankers Almanac at 1424 (Vol. 1, July 2008)).

[159] *Supra* ¶¶ 251-53 (███████████████████████████████).

July 2011, LCS ███████████████████████████████

███████████████████████████████████████,,160 ██████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████.161 ██████████████████████████████

███████████████████████████████████████████162

297.    █████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

█████████,,163 █████████████████████████████████



298.    █████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████.165 ████████

███████████████████████████████████████████

---

[160] Ex. 14 (ATA0000047 at -047).

[161] Ex. 14 (ATA0000047 at -047).

[162] Ex. 94 (ATA0002147 at -148-49).

[163] Ex. 94 (ATA0002147 at -148).

[164] Ex. 94 (ATA0002147 at -147).

[165] Ex. 95 (ATA0000186 at -187) (field 56A).

██████████████████████████ ."[166] █████████████████████████████████

███████████████████████████████████████████ [167]

299.    Audi Lebanon's use of JPMorgan Chase to route U.S.-dollar wires also matched its public settlement instructions.  Before the relevant period, Audi Lebanon published its standard instructions in the Bankers Almanac, which specified that it typically settled U.S.-dollar wire transfers through correspondent accounts at "The Bank of New York" and "JPMorgan Chase Bank, National Association," which is JPMorgan's New York branch.[168]

300.    U.S. government findings also alerted Defendants that Bank Audi relied on U.S. correspondent banks.  On February 17, 2011, for example, the Treasury Department published findings that "[t]here are 66 banks incorporated in Lebanon, and all major banks" – which included Bank Audi – "have correspondent relationships with U.S. financial institutions."[169]

301.    **NSGB Egypt.**  Defendants had similar knowledge about their LMEA account at NSGB Egypt.  Shortly after LCS opened the account, ██████████████████████

████████████████████████████████████████████████████████████ .[170]

Once again, ████████████████ tracked NSGB's standard settlement instructions, which publicly alerted Defendants to NSGB's practice of routing U.S. dollars through BNY Mellon.[171]

302.    As these transactions demonstrate, all three Defendants were intimately involved in directing and routing the U.S.-dollar transfers they executed.  They did not simply leave the

---

[166] Ex. 95 (ATA0000186 at -186).

[167] Ex. 95 (ATA0000186 at -192).

[168] Ex. 54 (Bankers Almanac at 772 (Vol. 1, 2008)).

[169] U.S. Dep't of Treasury (FinCEN), *Finding That the Lebanese Canadian Bank SAL Is a Financial Institution of Primary Money Laundering Concern*, 76 Fed. Reg. 9403, 9404 (Feb. 17, 2011) (footnote omitted), https://tinyurl.com/b2tpah7r.

[170] Ex. 58 (ATA0024362 at -364).

[171] *Supra* ¶ 273.

routing decisions to their banks; the details were too important to Lafarge.[172]  Defendants belonged to a sophisticated multinational conglomerate that employed large treasury and back-office teams to supervise their banks and to manage their currency exposure across several markets.[173]  For that reason, Defendants regularly communicated with their banks about how to route their money, including with respect to the correspondent banks used.[174]

303.    Defendants were not indifferent to the choice of correspondent banks.  LCS knew



"[175]

That recognition led LCS to observe, for all transactions touching Syria:  "

."[176]  Defendants thus often took steps to

.[177]

---

[172] *Compare*, *e.g.*, Ex. 94 (ATA0002147 at -147) (

) *with* Ex. 41 (ATA0005040 at -040) (

).

[173] *See*, *e.g.*, Ex. 69 (ATA0025059 at -059-60) (certified English translation) (

).

[174] *See*, *e.g.*, Ex. 96 (ATA0035568 at -568)

"); Ex. 97 (ATA0021174 at -176) (

).

[175] Ex. 47 (ATA0018291 at -292).

[176] Ex. 47 (ATA0018291 at -292).

[177] Ex. 68 (ATA0032337 at -337-38) (certified English translation); *see* Ex. 98 (ATA0005043 at -046) (                                                    "); Ex. 66 (ATA0005162 at -167) (                                                                      "); Ex. 63 (ATA0018621 at -627) (

); Ex. 99 (12/5/2013 Khayer-ElAnsary-Sandook Email String at 2) (identifying "correspondent bank to be transferred through"); Ex. 100 (ATA0018698 at -701) (

304.    When Defendants instructed their banks to process U.S.-dollar wires, they intended to (and did) cause their banks to wire money through New York correspondent accounts. And when Defendants' banks carried out those instructions, they did so as Defendants' agents. In a cross-border wire transfer, the originating bank – the bank that first receives the order from the wire originator – carries out the transfer on the originator's behalf. The originator also exercises substantial control over the originating bank. Among other things, Defendants here specified each transfer's date, amount, and currency denomination. Each time, Defendants' originating bank had to follow Defendants' instructions. Those instructions effectively mandated that the banks rely on New York's financial system, on Defendants' behalf.

305.    Defendants also had the right to dictate the use of specific correspondent or intermediary banks.[178] ███████████████████████████████████ ███████████████████████████████████████████████.[179] ████████████ ███████████████████████████████████████████████████████ ████████████████████.[180] Thus, for each of their U.S.-dollar transactions that cleared in New York, Defendants could have dictated use of a non-U.S. correspondent bank but consciously declined to do so. ████████████████████████████████████████

---

█████████████████████████████████████); Ex. 101 (ATA0014184 at -186-88) (████████████████████████████████████████████).

[178] Ex. 69 (ATA0025059 at -059) (certified English translation) (describing Lafarge's right to "████████████████████████████████████████████").

[179] Ex. 102 (ATA0024755 at -755) (LCS treasury manager "████████████████████████████████████," instead requesting use of "████████████████"); Ex. 103 (ATA0008980 at -985-87) (discussing strategy to ████████████████████████████); Ex. 101 (ATA0014184 at -190) (██████████████████████████████████████████).

[180] *E.g.*, Ex. 104 (ATA0032527 at -548) (██████████████████████████████████████ ████████████).

████████████████████████████████████████████████████████████████[181]

Defendants understood that those instructions here dictated the use of New York banks.

306.    Defendants' control extended still further over their outgoing wires, including for the $210,000 they wired to Tlass in October 2014.  For example, ████████████████████████ North Logistics' U.S.-dollar correspondent bank – JPMorgan Chase, New York – and instructed BNP Paribas to execute through that intermediary, thus requiring the use of New York's clearing services.[182]  In addition, Defendants knew BNP Paribas would route the money to JPMorgan Chase via its own New York branch, consistent with its standard settlement instructions.

307.    Defendants also paid banking fees to the New York banks that cleared their transactions.  Correspondent banks typically charge a fee for each wire transfer that they process.  Those fees can be paid in three ways; the specific payment mechanism is typically reported at Field 71A of the SWIFT MT103.  Option one – denoted by "OUR" – has the originator cover the fees separately, on top of the amount transferred.  Option two, denoted by "BEN," covers the fees by deducting them from the amount transferred.  Option three, denoted by "SHA," is a mix of the two.  In each scenario, the sender wires the money to the intermediary or correspondent bank to compensate that bank for the service of processing the transaction.  Thus, when Defendants relied on New York banks to clear their transactions, they knowingly sent money into New York to compensate those banks for the service.

308.    Defendants paid New York banking fees to clear every U.S.-dollar wire for which they have produced a SWIFT confirmation.  For 11 of those wires, the SWIFT message

---

[181] *Supra* ¶ 290.

[182] *Supra* ¶¶ 248, 290-91.

designated "███" in Field 71A, meaning that ████████████████████████.[183] In all but one of those 11 transfers, ████████████████████████ ████████████████████. For two more, Field 71A stated "████," meaning that ██████████████████████████.[184] In every instance, therefore, ██ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████ "[185] ██████████████ ████████████████████████████████████████████ ████████████████████████████

### c) *Defendants Purposefully Benefited From New York Clearing*

309.    Defendants' New York contacts enhanced the potency of the aid they gave to ISIS and ANF.  Not every payment made was in U.S. dollars.  But Defendants' preference was to pay in U.S. dollars when possible, and using U.S. dollars (even if not exclusively) was critical to the conspiracy.  Indeed, Defendants' ability to reliably transfer U.S. dollars – which depended on their access to New York's banking system – was vital to the scheme's success.  Defendants' conscious choice to use U.S. dollars and New York banks offered at least three benefits.

310.    *First*, transacting in U.S. dollars through U.S. banks helped Defendants legitimize their payments and reduce unwanted scrutiny from outside auditors.  Given the deteriorating security situation in Syria, and the resulting U.S. and international sanctions, Lafarge's Syrian

---

[183] Ex. 12 (ATA0031866 at -866-68); Ex. 26 (ATA0005437 at -437-42); Ex. 13 (ATA0000358 at -358); Ex. 14 (ATA0000047 at -050); Ex. 58 (ATA0024362 at -364).

[184] Ex. 28 (ATA0000220 at -224); Ex. 15 (ATA0000060 at -060).

[185] Ex. 26 (ATA0005437 at -437).

[186] Ex. 57 (ATA0035592 at -592).

operations faced significant financial scrutiny.[187]  To continue making payments to terrorists in that environment, Defendants had to design a system to "arouse less suspicion by LCS's external auditors and conceal the purpose of the payments."[188]  U.S. dollars helped Defendants avoid such suspicion.  At the time, Syria's financial system was in severe distress, plagued by rapidly spreading black markets for illicit financial activity.  By contrast, the U.S. dollar was the global reserve currency for legitimate transactions among established, multinational businesses.  Lafarge's "preferred option" was thus to make "bank transfer[s] in USD," so that its wire transfers would have the imprimatur of legitimacy associated with U.S.-dollar transactions.[189]

311.    Defendants' contract machinations confirm the point.  Until July 2013, LCS was paying Tlass in Syrian pounds by making so-called "turnover" payments equal to 1% of LCS's net revenue.[190]  But as Defendants' unlawful payments escalated, they grew uncomfortable with that arrangement.[191]  Defendants thus insisted on a new contract – not with Tlass personally, but with a Tlass-controlled shell company in Dubai – calling for payment in U.S. dollars.  And rather than structure those payments as a percentage of net revenue, they agreed on a flat $75,000 monthly fee, denominated in U.S. dollars.[192]  Pescheux explained the logic in an August 5, 2013

---

[187] *E.g.*, Ex. 105 (ATA0009218 at -218) (███████████████████████████████████████████████████ ).

[188] Plea Statement ¶ 56.

[189] *Id.* ¶ 60; Preferred Option Email at 2.

[190] ██████████████████ art. 4 (" ██████████████████████████ ").  In addition to the "█████████" payments, Defendants also "████████████ ██████████████████████████████████ " to terrorists.  Ex. 106 (ATA0000541 at -541).

[191] Preferred Option Email at 2 ("As discussed many times, we cannot continue the way we are settling the turnover invoices.").

[192] ██████████████████████ at -426 (contract with "████████ █"); *id.* art. 4 (████████████████████████ ); Ex. 107 (ATA0009228 at -228) (████████████ ████████████████ ).

email to Herrault, a Lafarge executive and his direct report. As Pescheux wrote, wiring $75,000 in "USD" from the "LMEA Account" to Tlass's "offshore account" was how Defendants wanted "to proceed in the future to sever[] any suspicion in connecting LCS and FT."[193]

312.     Defendants' use of U.S. dollars to mask their activities matched their broader concealment efforts. Among other things, Defendants funneled their payments through a web of 54 different bank accounts, █████████████████████████████████[194] By using so many accounts, Lafarge made it more difficult for others to detect the scheme.

313.     *Second*, transacting in U.S. dollars protected Defendants and their agents from foreign-exchange risk. Due to international sanctions and Syria's civil war, the value of the Syrian pound plummeted during Defendants' scheme.[195] When Defendants' arrangement with Tlass began, the Syrian pound was trading against the U.S. dollar at roughly 47:1. By the middle of 2013, it had depreciated to roughly 220:1 (having lost roughly 3/4 its value).[196] The Syrian pound's rapid "████████" prompted Tlass to demand payment from LCS in U.S. dollars.[197] Indeed, ████████████████████████████████████████████████ ████████████████."[198] And Defendants – which constantly monitored the USD-SYP exchange rate[199] – had similar preferences, ████████████████████████████████

---

[193] Suspicion Email at 1; *see* Plea Statement ¶ 62.

[194] Project Alpha Report at -227.

[195] Ex. 7 (ATA0009139) (identifying "████████████████████████" as a "████████" that ranked among LCS's "████████████████").

[196] Ex. 106 (ATA0000541 at -541).

[197] Ex. 106 (ATA0000541 at -541) ("████████████████████████████████ ████" in part due to "████████████████████████").

[198] Ex. 106 (ATA0000541 at -541).

[199] Ex. 108 (ATA0022737 at -738) ("████████████████████████████ ████████████████").

██████████████████████.[200]  LCS became so desperate for U.S. dollars that it was even willing to buy them on ████████████████████████████████.[201]

314.    *Third*, Defendants' payments satisfied ISIS's and ANF's general preference for U.S. dollars.  Real-time public reports linked ISIS's fundraising prowess – and its recruiting success – to its stockpile of U.S. dollars.  As *Business Insider* reported in 2015:

> According to [an ISIS defector], a large number of people are joining ISIS because they need money.  ***After joining [ISIS], people are paid in US dollars instead of Syrian liras***.  . . . ISIS members receive additional incentives to fight for the group.  "I rented a house, which was paid for by ISIS," Abu Khaled, who worked for ISIS's internal-security forces and "provided training for foreign operatives," [said].  "It cost $50 per month.  [ISIS] paid for the house, the electricity.  Plus, I was married, so I got an ***additional $50 per month*** for my wife.  If you have kids, you get ***$35 for each***.  If you have parents, they pay ***$50 for each parent***.  This is a welfare state."  And ***those financial benefits are not just limited to the organization's fighters.***[202]

315.    Investigative reports sourced to witnesses from inside ISIS's territory reinforce that connection.  For example, according to the *Independent*, a leading British newspaper that has covered ISIS extensively since its inception, the "Islamic State was already known to pay its recruits in [U.S.] dollars, sell[] oil and looted antiques for dollars, and accept extorted taxation and hostage money in dollars."[203]  ISIS "promoted the idea that it was hitting the US economy by

---

[200] Ex. 109 (ATA0020481 at -487) ("████████████████████████████████████████████████████.").

[201] Cash Shortfall Memo at -066 ("██████████████████████████████████.").

[202] Jeremy Bender, *An ISIS Defector Explained A Key Reason People Continue Joining The Group*, Bus. Insider (Nov. 18, 2015), https://tinyurl.com/3ced6xs5.

[203] Lizzie Dearden, *ISIS' Attempt To Topple US Economy With Own Currency 'Failing' As Reliance On American Dollars Increases*, Indep. Online (UK) (Mar. 26, 2016), 2016 WLNR 9336286.

issuing its own currency but the organisation on the ground is doing exactly the opposite, having **built a financial system entirely dependent on the US dollar**."[204]

316.    Defendants' reliance on New York banks helped them capture all these benefits of their U.S.-dollar payments.  New York is the global hub of cross-border U.S.-dollar transfers for good reason:  companies that wire their U.S. dollars through New York gain from the legitimacy, reliability, and speed offered by New York clearing.  Transacting through other clearing centers is possible – there are other ways to move U.S. dollars in theory – but all present operational risks that New York clearing avoids.  By routing the payments identified in Paragraph 243 through New York, Defendants maximized the potency of their terrorist funding.

317.    New York clearing enhanced the legitimacy of Defendants' U.S.-dollar payments and helped Defendants conceal their scheme from auditors.  As noted above, Defendants chose to transact in U.S. dollars in part to make their payments look like ordinary "bank transfer[s]."[205] New York clearing helped achieve that effect.  That is because the vast majority of U.S.-dollar transactions clear through CHIPS and flow through New York banks – so routing a U.S.-dollar payment through New York correspondent accounts would have represented business as usual for a legitimate company making legitimate business payments.  Had Defendants routed their U.S.-dollar payments some other way, it would have stood out as unusual – risking the very type of outside attention from auditors and regulators Defendants were striving to avoid.

318.    Defendants worried constantly about satisfying their "███████████."[206]  In 2012, Pescheux began discussing with Tlass the need to "draft invoices that would not raise red

---

[204] *Id.*
[205] Preferred Option Email at 2.
[206] Ex. 110 (ATA0009234 at -234).

flags,"[207] ███████████████████████████████████████████████

████████████."[208]  Pescheux thus demanded that █████████████████

██████████████████████████"[209]  Defendants

requested such formalism "████████████████████████████████."[210]  But

as Pescheux repeatedly made clear, settlement in Syrian pounds was not his preference.  He

knew that shifting into U.S. dollars offered a safer course for satisfying LCS's auditors.[211]  "█

████████," he concluded, was for Lafarge to █████████████████████████

███████████████████████████████████████.[212]

    319.    Defendants' ensuing efforts to pay Tlass demonstrate the value they ultimately

reaped from New York clearing.  On agreeing to pay Tlass in U.S. dollars, LCS first attempted to

pay him by wire originated from its LMEA account, through New York, ████████████████

█████████████████[213]  ████████████████████████████████████

███████[214]  ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



---

[207] Plea Statement ¶ 58.

[208] Ex. 110 (ATA0009234 at -234)

[209] Ex. 110 (ATA0009234 at -234).

[210] Ex. 110 (ATA0009234 at -234).

[211] Ex. 111 (ATA0015463) (████████████████████████████ Preferred Option Email at 2 (Pescheux reminding Tlass that "we cannot continue the way we are settling the turnover invoices" and that he "preferred" to make "a bank transfer in USD"); Suspicion Email at 1 (ordering U.S.-dollar "transfer[ ]" to Tlass's "offshore account" to "sever[ ] any suspicion in connecting LCS and FT");

[212] Ex. 111 (ATA0015463).

[213] Ex. 60 (ATA0004874 at -875).

[214] Ex. 60 (ATA0004874 at -874-75).



320.    Defendants expressed grave concerns about this book-transfer procedure and repeatedly pressured Tlass to change it.

321.

---

[215] *Supra* ¶¶ 275-78.

[216] *Infra* ¶ 327.

[217] Ex. 112 (ATA0021127 at -128) (certified English translation); *see*, *e.g.*, *supra* ¶ 167 & n.170 (collecting bank instructions).

[218] Ex. 112 (ATA0021127 at -128) (certified English translation).

[219] Ex. 113 (ATA0021905) (certified English translation).

[220] Ex. 113 (ATA0021905) (certified English translation).

[221] Ex. 113 (ATA0021905) (certified English translation).

[222] Ex. 114 (ATA0009220).

[223] Ex. 114 (ATA0009220).



322.    By early September, Lafarge and LCS had ███████████████
████████████████████.["227] While those discussions continued, Defendants announced "████████████" to make "████████████ to Tlass "████████████
██████."[228] Although Tlass still ████████████████████████████████

323.    Defendants immediately prepared to wire U.S. dollars into Tlass's new North Logistics account in Dubai.  But they realized they could not send the payments from Syria or Lebanon.  After opening the North Logistics account, Tlass asked LCS to promptly "transfer

---

[224] Ex. 115 (ATA0009216 at -216).
[225] Ex. 105 (ATA0009218 at -218).
[226] Ex. 115 (ATA0009216 at -216-17).
[227] Ex. 116 (ATA0022824 at -824) (certified English translation).
[228] Ex. 117 (ATA0000166 at -167) (certified English translation).
[229] Ex. 117 (ATA0000166 at -166) (certified English translation).
[230] Ex. 117 (ATA0000166 at -166) (certified English translation).
[231] Ex. 117 (ATA0000166 at -166) (certified English translation).

[the] overdue amounts" into his new "bank account" in Dubai.[232]  Herrault exclaimed:  "This can no longer be done from Syria!"[233]  And just a week earlier, Jolibois ████████████████████
████████████████████████████████████████████████████[234]

324.    That led Lafarge to send a bank wire through New York's financial system, described above.[235]  Having convinced Tlass to create a shell company outside Syria, Defendants finally made good on their desire to effect payment through "a bank transfer in USD to the account of a duly registered company."[236]  Their machinations had solved their auditor problem:  Defendants could now pay Tlass with an ordinary bank wire flowing through ordinary New York banking channels, rather than LCS's convoluted and highly suspicious book-transfer process.  They had also solved their U.S. sanctions problem:  by wiring money between Cypriot and Dubai companies, Lafarge duped BNP Paribas and JP Morgan Chase into processing the wire.[237]  Nobody else knew it was an illegal U.S.-dollar payment between two Syrian entities.[238]

325.    New York clearing also enhanced the speed and reliability of Defendants' U.S.-dollar transactions.  During Defendants' scheme, a limited number of non-U.S. banks were able to clear cross-border U.S.-dollar wire transfers.  These alternative U.S.-dollar clearing centers were in Tokyo, Hong Kong, Singapore, and Manila.  But each presented extra cost and risk.  Indeed, those banks were not commonly used by Western financial institutions, and the Federal Reserve allowed them to clear U.S.-dollar transfers only because of the time-zone difference

---

[232] Ex. 118 (9/29/2014 Jolibois-Block-Herrault Email String at 1).

[233] Ex. 118 (9/29/2014 Jolibois-Block-Herrault Email String at 1).

[234] Ex. 117 (ATA0000166 at -167) (certified English translation).

[235] *Supra* ¶¶ 247-50.

[236] Preferred Option Email at 2.

[237] Ex. 22 (BNPP-NY 000004, Rows 2913-2915); Ex. 23 (BNPP-NY 000001, Excerpt from JPMC Subpoena Response, Row 2).

[238] Plea Statement ¶¶ 96-103.

with East Asia. That arrangement did not permit Defendants to wire money from France into Dubai, Lebanon, Syria, or Egypt. Had Defendants routed those transactions through non-U.S. banks, rather than New York banks, they would have exposed themselves to credit and operational risk, and likely would have had to pay higher banking fees as well.

326.    Defendants experienced those operational risks first-hand. By August 2011, U.S. sanctions were substantially constricting Defendants' ability to route U.S. dollars in and out of Syria. Defendants strongly preferred to transact in U.S. dollars: that is how Lafarge made its upstream payments until August 2011, and it is how Defendants wanted to proceed even after President Obama ratcheted up sanctions in August 2011. But U.S. sanctions effectively blocked Lafarge and LCS from ██████████████████████████████████████████ .[239] In 2012, therefore, Lafarge ████████████████████████ ████████████████████████████[240]

327.    The need for LCS to buy U.S. dollars on shore in Syria created operational headaches. For one thing, the currency conversion process was complex, forcing LCS personnel to devote significant time to managing it.[241] For another, ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

[239] Ex. 89 (ATA0000383 at -392) ("████████████████████████████ ████████████████████████████████████████████████ ████████████████ .").

[240] Ex. 89 (ATA0000383 at -392); *see id.* at -383 ("████████████████████ ████████████████," even while Lafarge would "████" the loan "████████").

[241] Ex. 49 (ATA0000503 at -505-14) (████████████████████████████ ████"); Cash Shortfall Memo at -069 (similar); Ex. 42 (ATA0000938 at -938).

██████████████████████.[242] All this together compounded the financial challenges faced by Lafarge's Syrian business during the criminal conspiracy. ████████████████████ ████████████████████████████████████.[243] Wiring dollars through New York banks – which Defendants did whenever they could – was easier, faster, and cheaper.

328. Defendants knew from public U.S. enforcement actions that the sanctions regime they were flouting was designed to prevent U.S. banks from helping finance attacks by FTOs.[244] In 2015, moreover, the Treasury Department confirmed that FTOs like ISIS and ANF relied on their ability to leverage the U.S. financial system to facilitate U.S.-dollar transfers:

> Given the **central role U.S. banks play in facilitating global payments, the United States is vulnerable to the movement of funds associated with [terrorist financing]** through the banking system. To address this, the U.S. government has focused on developing and implementing preventive measures to reduce the vulnerability of these institutions to [terrorist financing], used additional tools and authorities to more effectively target [terrorist financing], and **imposed substantial financial penalties on noncompliant institutions**. Even with these measures, the U.S. banking system is exposed to residual [terrorist financing] risk, such as from foreign correspondents that may not have effective AML/CFT [i.e., Anti-Money Laundering/Countering the Financing of Terrorism] programs.[245]

329. The Treasury Department repeated a similar warning on October 16, 2014, eight days before Defendants' $210,000 wire to Tlass, when it sanctioned a violent, Syrian-regime-

---

[242] Ex. 63 (ATA0018621 at -621) ("████████████████████████████████████████ ████████████████████████████████████████████████."); Cash Shortfall Memo at -069-72 (detailing parallel-market FX deals); Ex. 49 (ATA0000503 at -507) (noting LCS "█████████████████████████████████"). By mid-2013, ████████ ████████████████████████████████████████████████████ Ex. 119 (ATA0005001 at -001).

[243] Ex. 7 (ATA0009139).

[244] *See, e.g.*, U.S. Dep't of Treasury, *National Terrorist Financing Risk Assessment* at 49 (Aug. 24, 2015).

[245] *Id.* at 60.

affiliated actor.  The designation emphasized that U.S. sanctions on Syria sought to deprive violent Syrian-related actors of U.S. dollars and force them to instead use a collapsing Syrian pound, reducing their ability to fund the kidnapping and murder of innocent victims in Syria.[246]

330.    New York prosecutors also pursued enforcement actions alerting Defendants that terrorist groups sought to leverage multinational corporations' choice to use the New York banking system.  In 2009, for example, after New York regulators announced counterterrorism-related enforcement actions against European banks, the Manhattan District Attorney told Bloomberg that New York was prosecuting "big cases," including "[o]ne involving Lloyd's [of London], where they were taking Iranian money, stripping the identification, and then sending it to U.S. . . . correspondent banks to get dollars to buy equipment for weapons" and observed that "[p]eople" – even terrorists – "still want to be paid in dollars," which was "the reason they go through U.S. banks."[247]  In 2014, likewise, the Manhattan District Attorney warned multinational corporations that, "if you are going to use the American banking system, particularly New York, for your dollar clearing transactions, you are going to have to abide by [America's] rules."[248]

331.    Defendants also witnessed the difference between speedy New York execution and unreliable foreign execution.  In March 2013, for example, ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[246] *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions a Syrian Official Responsible for Human Rights Abuses in Syria and Syrian Regime Supporters and Officials* (Oct. 16, 2014).

[247] Robert Morgenthau, *quoted in* Margaret Brennan, *Manhattan District Attorney Robert Morgenthau on Bloomberg TV*, CEO Wire (Sept. 11, 2009), 2009 WLNR 17857284.

[248] Cyrus Vance, Jr., *quoted in Manhattan DA Cyrus Vance Jr. Intvd on Bloomberg TV*, Bloomberg TV (Aug. 6, 2014), 2014 WLNR 21514304.



332.    When Defendants were able to exploit New York clearing, New York banks solved these problems for them.[254]  And Defendants valued the speed New York clearing delivered.  On many occasions, LCS's precarious cash position sparked a sense of urgency in demanding speedy upstream payment.[255]  And in October 2014, after Khodara had negotiated Defendants' illegal contract with Tlass, he too demanded urgency by instructing ▇▇▇▇ ▇▇▇▇▇▇▇▇[256]  New York routing allowed Lafarge to achieve that objective.  Had Defendants tried to execute their U.S.-dollar wire transfers through some other means, their scheme would have become less effective, more expensive, and harder to conceal.

---

[249] Ex. 101 (ATA0014184 at -190).

[250] Ex. 101 (ATA0014184 at -186-88).

[251] Ex. 101 (ATA0014184 at -187).

[252] Ex. 101 (ATA0014184 at -185).

[253] Ex. 120 (ATA0009942 at -942-43).

[254] *Supra* ¶¶ 237-78 (detailing New York-cleared transactions).

[255] Ex. 41 (ATA0005040 at -040) (conveying "▇▇▇▇▇▇▇▇▇▇▇" and stressing need to ▇▇▇▇▇▇); Ex. 28 (ATA0000220 at -222) (▇▇▇▇▇▇▇▇ *id*. at -227 ("▇▇▇▇▇▇▇▇▇▇▇").

[256] Ex. 24 (ATA0032468 at -468) (certified English translation).

ii. **Defendants Relied On U.S.-Based Email Providers To Carry Out Their Terrorist-Fianancing Scheme**

333.    In carrying out their scheme to pay ISIS and ANF, Defendants also reached into the United States to avail themselves of U.S.-based email services.  Defendants' use of those services formed additional U.S. touchpoints and allowed Defendants to reap the benefit of their email providers' U.S. presence.  Those U.S.-driven benefits also materially contributed to Defendants' scheme and enhanced their ability to pay terrorists.

334.    As Lafarge and LCS have admitted, their executives "used personal email accounts serviced by U.S-based email service providers, instead of their LAFARGE corporate email addresses, to carry out some aspects of the conspiracy."[257]  Mainly, that was Gmail. During at least 2013 and 2014, Defendants regularly used U.S.-based Gmail accounts to plan their conspiracy.  On information and belief, Defendants sent and received hundreds of scheme-related communications through these and other such accounts:

| Account Owner | Role of Account Owner | Email Address |
|---|---|---|
| Bruno Pescheux | CEO of LCS until July 2014 | brunopescheux@gmail.com |
| Firas Tlass | Defendants' agent and intermediary who paid ISIS on their behalf | Firastlass01@gmail.com |
| Mamdouh al-Khaled | LCS Purchasing Manager | Mamdouh.lafarge@gmail.com |
| Hassan al-Saleh | LCS Plant Manager | Hassan.cement65@gmail.com |
| Ahmad Jamal | ISIS representative who supplied materials to LCS | Ahmad.jamal1966@gmail.com |

335.    Defendants and their agents routinely advanced their scheme to pay terrorists by sending emails to and from these U.S.-based accounts.  Plaintiffs set forth a few examples of these communications below.  These examples are illustrative, not exhaustive, and again reflect

---

[257] Plea Statement ¶ 18.

information without discovery.  On information and belief, discovery will uncover many additional email communications using these and other U.S.-based accounts:

    a.    <u>Pescheux (Gmail) to Tlass (Gmail), July 2, 2013</u>:  Pescheux emailed Tlass to provide "clarifications" regarding Tlass's payments to armed groups in and around Jalabiyeh.  The email identified more than 10 groups Tlass was paying on Defendants' behalf – including ANF specifically – and conveyed Pescheux's understanding that "you are dealing with a lot of different people and I have no problem with that."  Pescheux sent this email from his Gmail account to Tlass's Gmail account.

    b.    <u>Tlass (Gmail) to Pescheux (Gmail), July 3, 2013</u>:  Tlass responded by providing Pescheux a "road map to know how we pay" the armed groups in and around the Jalabiyeh plant, listing at least 14 such groups, including ANF.  Tlass sent this email from his Gmail account to Pescheux's Gmail account.

    c.    <u>Tlass (Gmail) to Pescheux (Gmail), March 31, 2014</u>:  Tlass emailed Pescheux, among others, describing the "security situation in and around the plant area."  In his email, Tlass described the "Skype" calls he conducted with ISIS's "Amir Minbej or Raqa" [likely a reference to Abu Luqman] and noted that Lafarge made "$2 million profit" per month while "pay[ing] less than 1/4 for protection," including to ISIS.  Tlass sent this email from his Gmail account to, among other addresses, Pescheux's Gmail account.

    d.    <u>Tlass (Gmail) to Pescheux (Gmail), July 14, 2014</u>:  Tlass wrote to Pescheux updating him on Tlass's "negotiations with ISIS" and expressing "confiden[ce] that we can reach to a logical agreement with them."  Tlass sent this email from his Gmail account to Pescheux's Gmail account.

    336.    Defendants' use of these email accounts was purposeful.  As Lafarge and LCS admitted, their executives and agents used "U.S.-based email service providers," rather than their "corporate email addresses," in a conscious effort "to conceal their conduct from others within and outside of LAFARGE and LCS."[258]  That strategy implemented Lafarge's directive, conveyed by Khodara, to avoid creating discoverable email records of terrorist payoffs.  As Pescheux wrote in a September 8, 2014 email from his Gmail address to Jolibois's personal

---

[258] *Id.* ¶ 18.

email address, Khodara had instructed him not to email Herrault "at his professional address."[259] That instruction followed Khodara's broader dictate that he not "receive anything" about the conspiracy "by email."[260] That is why Pescheux used Gmail to communicate about the ISIS payoffs. It reflected a conscious choice, in line with guidance from Lafarge's headquarters.

337. Defendants' decision to carry out their criminal conspiracy via Gmail, rather than corporate email, matched standard practice among terrorists and their funders. According to security analysts quoted by the *Associated Press*, "super-encrypted corporate emails are unlikely to be used by militants, **who prefer more anonymous technologies, like Gmail**."[261]

338. Defendants' and their agents' use of these U.S.-based email accounts also entailed substantial U.S. contacts. In both opening and using those accounts, Defendants and their agents reached into the United States in several ways.

339. **Defendants Transacted With A U.S. Counterparty.** Defendants' agents relied on an email service owned and operated out of the United States by a U.S.-headquartered company. When they used their Gmail accounts, they agreed to Google's Terms of Service, which in 2013 made clear that Gmail was "provided by Google, Inc. ("Google"), located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States." Defendants thus knew that they were carrying out their conspiracy using a U.S.-based service "provided by" a U.S.-based company. Defendants also agreed that the "laws of California, U.S.A., excluding California's conflict of laws rules, will apply to any disputes arising out of or relating to these terms or the Services," including Gmail. Defendants further agreed that they would not "misuse" Gmail and

---

[259] *Id.* ¶ 88; *see* Ex. 121 (9/12/2014 Herrault-Veillard Email String) (certified English translation).

[260] Ex. 121 (9/12/2014 Herrault-Veillard Email String) (certified English translation).

[261] Assoc. Press, *republished in* Hamilton Spectator, *RIM Averts BlackBerry Ban In India* (Aug. 31, 2010).

that they would use Google's services "only as permitted by law."  Defendants conveyed those agreements into the United States as a condition of accessing Gmail's U.S.-based service.

340.    Defendants also obtained Gmail's services by sending their data to Google in the United States.  In using Gmail, Defendants knowingly allowed their data to be transferred into the United States for Google's data-mining activities, which were used in the United States for (among other things) targeted search suggestions and ad sales.  Defendants did so in part by agreeing that Google could scan the contents of their emails – a process directed by engineers in the United States – to "provide customized advertising to its email users."[262]

341.    Defendants knew they were providing their valuable data to an American company because it was widely reported at the time.  In one example, CNN reported in April 2014 that, although Google "may not charge for its Gmail accounts," it was "still collecting payment in the form of massive amounts of personal information about the people who use it."[263]  Thus, when Defendants signed up for Gmail and used it to carry out their scheme, they knew they were paying an American company for the American service they were using.  But rather than sending a wire transfer delivering cash to their U.S. counterpart, they delivered their data.

342.    **Defendants' Email Communications Relied On U.S. Infrastructure.**  By using Gmail to carry out and conceal their scheme, Defendants and their agents exploited a service that was created, engineered, and maintained in the United States.  During the time of Defendants' conspiracy, Google operated the majority of its data centers in the United States, which enabled Defendants' conspiracy-related emails to reach their destinations securely and reliably.  Those

---

[262] Anna Bernasek, *Encryption Protects Gmail From Everyone But Google*, Newsweek (July 4, 2014).

[263] Heather Kelly (CNN Money Reporter), *Why Gmail And Other E-mail Services Aren't Really Free*, CNN Business (Apr. 1, 2014), https://tinyurl.com/39jtbv83.

U.S.-based servers were important in part because they provided Google with the ability to back up Gmail customers' data in the United States, which minimized outages and enhanced reliability. On information and belief, the bulk of Defendants' conspiracy-related Gmail communications traveled through or were stored at least in part on U.S.-based servers.

343. **Defendants' Use Of U.S. Email Servers Offered Them The Benefits Of U.S. Law.** Gmail's status as a U.S.-owned and -operated service also afforded Defendants protection from foreign law enforcement, including French prosecutors. That is because U.S. law placed constraints on U.S.-based communications providers like Google when releasing customer data to foreign governments. As one British paper explained, European law enforcement officials generally could not "get[] access to the secret Gmail . . . messages of terrorists" because, "[c]urrently, US internet giants are banned from handing over emails and private messages to foreign law enforcement officials in all but a tiny number of cases."[264] That restriction was in place "[b]ecause Google is a US-based company," which meant that requests for Gmail data "f[ell] squarely under US law."[265] Defendants thus knew that, had they chosen to use non-U.S.-based email, their communications would have been more susceptible to surveillance by French law enforcement – the authority otherwise most likely to discover their scheme, stop it, and bring criminal charges against the individuals involved. Indeed, Lafarge and several of the executives outlined above are currently facing criminal charges in France for having funded terrorists.

---

[264] Ben Riley-Smith, *Britain On The Brink Of Gaining Access To Terrorists' Facebook And Gmail Messages For First Time*, Telegraph Online (Mar. 22, 2018), 2018 WLNR 8844426; *see* Daily Telegraph, *Net Closes On Terror As US Law Lifts Lid On Messaging* (Mar. 23, 2018), 2018 WLNR 8865323 ("[c]urrently, US internet giants hand over" "secret Gmail . . . messages sent by terrorists" "to foreign law enforcement bodies only in exceptional cases").

[265] Zack Whittaker, *What Google Does When A Government Requests Your Data*, ZDNet (Jan. 28, 2013), https://tinyurl.com/4ydf7v7j; *see id.* (when requests originated from "outside the US," Google "[didn't] really have the same level of requirement to hand over data to foreign governments or law-enforcement");

344.    The experience of India's counterterrorism agencies was typical of how terrorists leveraged Gmail's U.S. presence to stymie foreign law enforcement.  According to Indian officials, "since Google servers are based in US and their IP addresses are masked, it takes a long time to get the real IP addresses and log details of the culprits" who used Gmail for criminal purposes.[266]  For that reason, "Indian security agencies" had a "tough time in catching criminals and terrorists who are [customers] of Google-owned Gmail."  On information and belief, similar logic applied in France, Dubai, and Syria – where Defendants and their agents used Gmail to communicate about their criminal conspiracy with added protection from local law enforcement.

345.    These well-known features made Gmail especially attractive for terrorists and their funders.  In 2013, for example, the *Washington Post* published a high-profile story with the headline, "***Former NSA and CIA director says terrorists love using Gmail***."[267] The article then quoted General Michael Hayden observing, "***Gmail is the preferred Internet service provider of terrorists*** worldwide," and noting, "I don't think you're going to see that in a Google commercial, but it's free, it's ubiquitous, so of course it is" a frequently used platform for terrorist communications.[268]  As the *Post* reported, General Hayden also described "the Internet's origins in the United States" and stated, "We built it here, and it was quintessentially American."[269]  When Defendants used Gmail to advance their scheme, therefore, they knowingly exploited an iconic American service commonly used by terrorists around the globe.

---

[266] Economic Times, *Orkut Won't Let Cops Hack Terrorists* (Dec. 12, 2006), 2006 WLNR 27469168.

[267] Andrea Peterson, *Former NSA And CIA Director Says Terrorists Love Using Gmail*, Washington Post (Sept. 15, 2013) (emphasis added).

[268] *Id.*

[269] *Id.*

iii.    **Defendants Entered A Conspiracy With ISIS, Pursuant To Which ISIS Engaged In Acts That Targeted The United States**

346.    As alleged above, Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within those countries.

347.    ISIS was good for Lafarge's business in Syria.  Most fundamentally, ISIS's terrorist activities helped drive from Syria virtually every other Western company, leaving Lafarge with minimal competition for the Syrian market.  So long as the terrorists remained in power, Lafarge's unusual willingness to do business with them gave it a unique opportunity to seize market share.  ISIS's protection racket also delivered Lafarge a more specific benefit:  the ability to partner with terrorists who were willing and able to threaten Lafarge's competitors.  That is why Defendants "commit[ted] to revenue sharing with ISIS" and sought to "incentivize the terrorist group to act in LCS's economic interest."[270]  Their commitment worked, at least for a time.  Defendants' Syrian business was profitable in part because ISIS "agreed to impose costs on, and in some cases block the importation of, competing cement."[271]

348.    The existence of a Lafarge-ISIS conspiracy – reflected in Defendants' purposeful "agreements with ISIS"[272] – is undisputed and apparent on the face of Lafarge's guilty plea.  The plea confirmed, among other things, that Lafarge and LCS executives sought to actively partner with ISIS and "***share the 'cake'***" of their mutual enterprise – with Lafarge executives reasoning that it was important for ISIS to have a "vested interest to have the [Jalabiyeh] plant run well."[273]  That sentiment reflected Lafarge's recognition that ISIS could be good for business.  As LCS's

---

[270] Plea Statement ¶ 73.

[271] *Id.* ¶ 15.

[272] *Id.* ¶ 18.

[273] *Id.* ¶ 73 (emphasis added).

former risk manager admitted, Lafarge expected that "Nusra Front, later ISI[S]," would use their "effective and disciplined fighters" to "bring order to the chaos of corruption that reigned in northern Syria."  The resulting relationship went beyond passive payments.  As Deputy Attorney General Monaco stated, Lafarge "***partnered with ISIS***, one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share."[274]

349.    Terrorist violence was vital to that agreement.  For Lafarge to reap the benefits of its conspiracy with ISIS, two things had to be true:  (1) ISIS had to retain control of its territory; and (2) ISIS's protection rackets had to remain effective against Lafarge's would-be competitors.  Neither could work without terrorist violence and coercion.  For example, as *Janes*, the iconic defense industry publication, observed, ISIS "relies on informants and operatives who threaten and pressure the local population to pay extortion money.  Islamic State's ***frequent small arms and improvised explosive device (IED) attacks*** . . . ***act as a reminder*** of the imminent threat and presence of the militants."[275]  Violence thus was crucial to the racket, because it lent credence to ISIS "intimidation" and "pressure" on local entities to "pay levies" the group demanded.[276]

350.    ISIS religious doctrine confirmed that violence underpinned the conspiracy Defendants joined.  For example, official ISIS propaganda notified the public, including Defendants, that ISIS would spend protection payments to "support[] jihad"; and that ISIS's maintenance of the racket was backed by the threat of violence against others, including the potential to execute ISIS's enemies.  Similarly, ISIS offered a purported religious mandate for its

---

[274] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022) (emphasis added).

[275] Shady Alkhayer, *Money Flow:  Islamic State Continues To Finance Operations In Central Syria Through Extortion And Intimidation*, Janes (Sept. 2, 2022), 2022 WLNR 27802943 (emphasis added).

[276] *Id.*

taxes, with punishments (including execution) threatened against those who did not pay. When Defendants cooperated with ISIS in advancing this protection racket, they joined a conspiracy whose stated rationale revolved around the perpetration of terrorist violence.

351.    In furtherance of this conspiracy, ISIS engaged in numerous overt acts both in and expressly aimed at the United States. In building their territorial control and strengthening their protection racket, ISIS committed many terrorist attacks aimed at the United States. As Deputy Attorney General Monaco stated in connection with Lafarge's and LCS's guilty plea, during the Defendants' conspiracy, the rest of "the world watched in horror as ISIS murdered innocent journalists and aid workers," inflicting "unimaginable pain and suffering" on "American families whose loved ones were brutally murdered by ISIS."[277] ISIS publicly celebrated those acts and made clear, both before and during Defendants' conspiracy, that its efforts to grow its caliphate relied on an ongoing terrorist campaign aimed at the United States.[278]

352.    ISIS's specific attacks on Plaintiffs also furthered the conspiracy. The murder of these American citizens helped ISIS's conspiracy with Defendants by strengthening ISIS's territorial control and bolstering the credibility of ISIS's threats against others, including Lafarge's competitors.

353.    Likewise, ISIS captured and beheaded James Foley and Steven Sotloff to send a message of intimidation and control, including by publicizing the brutal murders in videos titled "A Message to America" and "A Second Message to America," respectively.[279]

---

[277] U.S. Dep't of Justice, *Deputy Attorney General Lisa O. Monaco Delivers Remarks Announcing A Guilty Plea By Lafarge On Terrorism Charges* (Oct. 18, 2022).

[278] *E.g. supra* § A; *infra* § L.

[279] *Supra* ¶¶ 74, 180.

354.    Scholarly analyses confirm the connection.  As terrorism scholars Clarke and Williams wrote, "Da'esh . . . used kidnapping as a weapon against its enemies—particularly the United States" given that the U.S. government "refused to pay[ ] ransoms for the release of its citizens" and therefore ISIS believed that attacks that targeted Americans could serve as "an important fund-raising method" like "was done with U.S. journalist James Foley" because "*the great virtue of kidnapping is that it can be used symbolically* to spread fear and deliver a message of defiance."  They continued:

> This was done with U.S. journalist James Foley who was captured in 2012; a video of his execution was released in August 2014. Although Da'esh in an e-mail communication with Foley's family had demanded millions for his release, how serious this was remains uncertain.  After Foley was executed, Da'esh, in what Cragin and Padilla contend was an attempt to *embarrass and humiliate the United States*, claimed that Obama was to blame.  Yet the profit motive might also have been present:  the *killing of Foley certainly increased the pressure to pay for the release of hostages* from other countries to ensure they did not share the same fate.[280]

As that analysis illustrates, protection rackets work only if the threat of violence is credible.  And ISIS could make good on its promise block competing cement only if it convinced Lafarge's competitors that there would be consequences if they said no.

355.    There was no more effective way for ISIS to accomplish those goals than to publicly kill and maim Americans such as Plaintiffs.  Given the United States' status as the sole global superpower, ISIS's public attacks on Americans conveyed unique credibility to its enemies.  For example, as Dr. Daniel Byman explained in 2014, ISIS perpetrated "[a]cts of senseless violence and unspeakable brutality" that targeted the United States because:

> Videos showing the beheadings of captured US . . . citizens in particular are *designed to send a message to American . . . people*: stay out of our business. . . . Islamic State believes that the people in

---

[280] Clarke & Williams, *Da'esh In Iraq And Syria* at 33 (emphasis added).

> [America] are reluctant to become entangled in yet another war in the Middle East and that savagely murdering an American . . . each time the US . . . government starts to get involved will make them even more so.  They [believe] that the United States does not have the stomach for a tough fight and will pull out of a conflict as soon as Americans start getting killed.[281]

356.    ISIS's attacks targeting the United States, including its attacks seeking to kill and maim Americans in the Middle East and Europe, including Plaintiffs, also uniquely powered ISIS's recruitment of jihadists to commit attacks because ISIS relied upon a recruitment narrative centered upon ISIS's purported jihad against America.  For example, as President Obama observed in 2015, "Al Qaeda and ISIL . . . are desperate for legitimacy" and "try to portray themselves as . . . holy warriors in defense of Islam":  "That's why ISIL . . . propagate[s] the notion that America . . . is at war with Islam.  That's how they recruit."[282]

357.    ISIS also reached into the United States to further the conspiracy.  For example, ISIS transmitted threats to citizens inside the United States (for example to the Foley, Sotloff, and Mueller families), as part of its strategy to intimidate the United States.  Other acts involved former residents of this District.  For example, on May 24, 2022, a federal jury in this District convicted Mirsad Kandic – a former Brooklyn resident – of providing material support to ISIS, including by assisting ISIS's media department and facilitating travel for ISIS terrorists.[283]  On February 7, 2023, another federal jury in this District convicted Ruslan Asainov, a former Brooklyn resident, of similar crimes for providing sniper training to ISIS fighters.[284]  ISIS also

---

[281] Daniel Byman, *Al Qaeda, The Islamic State, And The Global Jihadist Movement:  What Everyone Needs To Know* 175-77 (Oxford Univ. Press 2015).

[282] President Barack Obama, *Remarks by the President in Closing of the Summit on Countering Violent Extremism*, White House (Feb. 18, 2015), https://tinyurl.com/mr3ek3zz.

[283] Jury Verdict, *United States v. Kandic*, No. 17-cr-00449-NGG (E.D.N.Y. May 24, 2022), Dkt. 321.

[284] Jury Verdict, *United States v. Asainov*, No. 19-cr-00402-NGG (E.D.N.Y. Feb. 7, 2023), Dkt. 167.

sought to finance other attacks in the United States including by sending thousands of dollars to Maryland resident Mohamed Elshinawy in 2016 to encourage terror attacks.

358.    ISIS also enticed hundreds of U.S. citizens to join its ranks by targeting the United States for recruitment.  Roughly 300 U.S. citizens joined or attempted to join ISIS, in part because ISIS tailored its propaganda to U.S. audiences.  For example, ISIS members sought to capitalize on unrest in Ferguson, Missouri and Baltimore, Maryland, asking protestors in those cities to join ISIS.  ISIS also sent money to U.S. citizens to fund terror attacks on U.S. soil and sought and received funding from U.S. citizens to finance operations in Syria and Iraq.

359.    The U.S. government has recognized, on a bipartisan basis, that ISIS specifically targeted the United States and Americans for attack.  For example, in 2022, the White House observed that "ISIS has directed terrorist operations targeting Americans . . . in the Middle East, Africa, and in South Asia,"[285] which echoed a White House observation in 2018 that "ISIS remain[ed] the . . . primary transnational terrorist threat to the United States" . . . "and its senior leaders continue to call for attacks against the United States,"[286] similar to the view expressed by the U.S. government, in 2015, that ISIS's "strength and expansionist agenda pose an ongoing threat to . . . U.S. facilities and personnel in [] the Middle East."[287]

360.    ISIS's contacts with the United States were foreseeable to Defendants. Defendants were aware that the U.S. government had designated ISIS as an FTO because of its shocking acts of violence against U.S. citizens.  As Assistant Attorney General Olsen explained,

---

[285] President Joseph R. Biden, Jr., *quoted in* White House, *Remarks by President Biden on a Successful Counterterrorism Operation* (Feb. 3, 2022), https://tinyurl.com/4vcfbsd6.

[286] White House, *National Strategy for Counterterrorism of the United States of America*, at 8 (Oct. 1, 2018).

[287] U.S. Dep't of Treasury, *National Terrorist Financing Risk Assessment*, at 12 (Aug. 24, 2015).

Defendants partnered with ISIS and ANF "at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans."[288]  And Defendants were aware of ISIS's desire to eject U.S. forces from the region and of their frequent acts of violence to that end.  That knowledge came in part from Defendants' long awareness of AQI, which they knew had conducted a brutal terrorist campaign against U.S. citizens in the Middle East.  Indeed, Defendants specifically understood – in part through Tlass and LCS's former risk manager – that ISIS and ANF were AQI's successors and were continuing AQI's terrorist campaign against the United States.  The attacks on Plaintiffs and their families, as well as ISIS's other U.S. contacts, were a foreseeable outgrowth of the conspiracy that Defendants voluntarily joined.

361.    Given Defendants' knowledge of AQI's (and later ANF's and ISIS's) practice of targeting of U.S. nationals, including U.S. servicemembers, based on multiple U.S. government statements and warnings to that effect, Defendants' illegal payments directly to those groups independently constituted conduct that was expressly aimed at the United States.

**L.    The Terrorist Attacks That Resulted In Plaintiffs' Injuries Were Substantially Assisted By Defendants' Aid**

362.    Defendants' aid substantially assisted and provided material support for the "external" ISIS attacks described herein. The attacks occurred either during or after Defendants began giving millions of dollars to ISIS and so benefited directly from Defendants' payments. Defendants' material support was linked directly to the three attacks described below, including but not limited to through the involvement of ISIS's Leadership Cell and Raqqa Cell. Furthermore, the aid provided by Defendants was critical to the financing of ISIS's powerful propaganda machine, which was run by ISIS's Leadership Cell and Propaganda cell. Each of the

---

[288] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022).

terrorists described below consumed ISIS propaganda and used it to inform their tactics and choice of weaponry in carrying out their heinous attacks.

> ### i. The November 9, 2015 Shooting At The International Police Training Center In Amman, Jordan

363.    Lloyd Carl Fields, Jr. travelled to Jordan on June 12, 2015, as a government contractor through DynCorp International. His trip to Jordan was only supposed to last two weeks, but problems with his Israeli work visa kept him there longer.

364.    James Damon Creach arrived in Jordan on October 15, 2015, where he was working through the government contractor DECO, Inc. Mr. Creach was scheduled to return home to Florida on December 5, 2015.

365.    While in Jordan, Carl and Damon were assigned to the International Police Training Center ("IPTC") in the Muwaqqar district of southeast Amman, Jordan—a facility run and funded in part by the U.S. State Department. There, they both used their years of experience as police officers to train law enforcement personnel from Jordan, Iraq, and the Palestinian Territories in basic police and security skills. Carl had previously served as a Deputy Sheriff in Calcasieu Parish, Louisiana, and as a police advisor in both Iraq and Afghanistan. Damon was a graduate of the Virginia Beach Policy Academy, a former police officer in the Virginia Police Department, and had trained police officers in Afghanistan, Kenya, and other locations.

366.    Carl and his wife Tamara considered his assignment to Jordan a safe one because Jordan is a U.S. ally and it has not experienced the levels of terrorism and unrest that have spread throughout the Middle East in recent years. Carl's mission appeared so safe, in fact, that he was not issued a weapon to carry with him.

367.    Damon and his wife Heather also believed that his trip to Jordan did not involve any great danger. On the day of the attack in which he was killed, Damon was not armed, he was

not wearing body armor or protective gear, and his vehicle was not armored.

368.    Anwar Abu Zaid was a 28-year old Jordanian police captain studying at the IPTC. On November 9, 2015, Abu Zaid arrived at the IPTC smuggling a Kalashnikov assault rifle with 120 bullets and two handguns in his car. As an officer, he was not searched as he entered. After the noontime prayer, Abu Zaid shot at a truck that was moving through the facility, killing Damon. Abu Zaid then entered the facility's cafeteria where he killed an additional four people eating lunch, including Carl.

369.    According to FBI investigators, Zaid did not know either Carl or Damon; he targeted them simply because they were U.S. citizens.

370.    ISIS claimed responsibility for the attack in a statement issued through their al-Battar Media Foundation: "Yes . . . we kill the Americans in Amman," the terror group said. A few weeks later, ISIS reiterated this claim in its Dabiq Magazine, Issue 12: "And on '9 November 2015,' Anwar Abu Zeid—after repenting from his former occupation—attacked the American crusaders and their apostate allies, killing two American crusaders, two Jordanian apostates, and one South African crusader. These are the deeds of those upon the methodology of the revived Khilāfah. They will not let its enemies enjoy rest until enemy blood is spilled in revenge for the religion and the Ummah."

371.    According to Israeli military intelligence, Abu Zaid was a graduate of al-Mutah University in al-Karak, Jordan where he was part of a clandestine ISIS terror cell. That same cell was responsible for a suicide attack near Mosul, Iraq in 2015 and a shooting at the Sarona Market in Tel Aviv, Israel in 2016.

372.    Defendants' financing of the Raqqa cell, ISIS leadership, and the ISIS propaganda machine was critical to the attack.

373.    The United States District Court for the District of Columbia held that ISIS's claim of responsibility for this attack was credible and that ISIS was responsible for the Jordan attack. *See Fields, et al. v. Syran Arab Republic*, (1:18-cv-01437-RJL) Dkt. No. 20 at *16.

374.    On the day of the attack killing Carl and Damon, Tamara saw that she missed a call from the U.S. embassy and she knew that something was wrong. Tamara called back and, when she eventually got through, she was told that Carl had been killed. The murder of her husband Carl by an ISIS operative has caused her severe mental anguish, extreme emotional pain and suffering, and the loss of her husband's society, companionship, comfort, advice, and counsel. Furthermore, Carl provided substantial financial support to his wife.

375.    That same day, Heather was notified by her husband's company DECO that Damon had been killed. She later received a call from the U.S. Embassy in Jordan confirming his death. Heather was then tasked with telling her children that their father was dead. The murder of their husband and father Damon by an ISIS operative has caused Heather, Jackson, Samantha, and Jayedon severe mental anguish, extreme emotional pain and suffering, and the loss of Damon's society, companionship, comfort, advice and counsel. Furthermore, Damon provided substantial financial support to his wife and children.

### ii.  The July 14, 2016 Cargo Truck Attack In Nice, France

376.    On July 14, 2016, the Copeland family was enjoying their dream vacation in Nice, France, taking in the city's Bastille Day celebrations. Kimberly Harris (then named Kimberly Copeland) and Sean Copeland, along with their three children Brodie, Austin, and Maegan, had all travelled to Europe. Sean's life goal had been to take his family to Europe and they celebrated multiple birthdays while there. Sean, 51, was a devoted father of three who prided himself on being a "dance dad," a "football dad," and a "baseball dad." Brodie, 11, was a bright, fun-loving, "one-of-a-kind kid," with aspirations of becoming a professional baseball player, a Hollywood

actor, and U.S. President. Brodie was Kimberly's only biological child.

377.    Days earlier, the family had been in Pamplona, Spain, where Sean and Austin ran with the bulls. According to Austin, after running 200 yards, his dad was the happiest he had ever seen him. "This was his moment. I would never forget the joy on his face that day."

378.    After leaving Spain, the Copeland family traveled together to France. Missing home, they spent their last hours in France together at a Hard Rock Café. After a family dinner of burgers and beers, the family headed to the Promenade des Anglais along the Mediterranean Sea with 30,000 others to take in the Bastille Day celebrations, music and fireworks.

379.    At approximately 10:00 PM, shortly after the fireworks, ISIS operative Mohamed Lahouaiej Bouhlel drove a 19-ton refrigeration truck through police barriers and onto the crowded Promenade des Anglais, which had been closed off to all traffic. Bouhlel carried an automatic pistol, bullets, a fake automatic pistol, and two replica assault rifles (an M16 machine gun and a Kalashnikov), as well as an empty grenade.

380.    Bouhlel started running over people slowly, until two police officers opened fire, at which point he accelerated at full speed towards the dense crowd. Witnesses described the sounds of the truck hitting people "like empty thuds," as Bouhlel reached an estimated 56 miles per hour, surging through a sea of people. Bouhel zigzagged through the crowd for over a mile, aiming for as many people as possible.

381.    A witness on a motorcycle attempted to overtake Bouhlel's truck and even tried to open the driver's door, but was unsuccessful. Bouhlel then began shooting through the cab window at police officers, firing several times on three police officers close to the Hotel Negresco. Bouhlel was screaming out "Allahu Akbar" throughout the attack.

382.    The truck finally came to a halt near Nice's Palais de la Mediterranée, a hotel

adjacent to the beach, and Bouhlel continued to fire at police with his handgun. Two police officers fired repeatedly at the cabin of the truck and Bouhlel was killed.

383.    Two days after the Nice Attack, on July 16, 2016, ISIS issued a statement in its AMAQ publication claiming responsibility and describing Bouhlel as a "soldier of the Islamic State." The statement read, "Executor of the deadly operation in Nice, France was a solider of the Islamic State. He executed the operation in response to calls to target citizens of coalition nations, which fight the Islamic State."

384.    In the fifteenth issue of ISIS's propaganda magazine Dabiq, ISIS again boasted about the Nice Attack, listing Bouhlel among the "soldiers of the Caliphate" who has "succeeded in expanding the territory of the Caliphate, or terrorizing, massacring, and humiliating the enemies of Allah."  Citing Bouhlel's attack as an operation that "the Islamic State has conducted," ISIS praised the Nice Attack as an action "in response to the Islamic State's calls to target nations participating in the Crusader coalition fighting the Caliphate."

385.    Authorities believe Bouhlel carefully plotted and planned his attack for up to a year with accomplices and ISIS operatives.

386.    Bouhlel's 1.5-mile terrorist attack killed 86 people, injuring an additional 434.

387.    Defendants' financing of the Raqqa cell, ISIS leadership, and the ISIS propaganda machine was critical to the attack.

388.    As the Pentagon has explicitly stated: "Raqqa was a key location for ISIS' planning, financing, execution, or inspiration of terrorist activities throughout the world, **including attacks in Paris and Nice in France**."[289] (emphasis added).

---

[289] U.S. Department of Defense, press release, "Syrian Democratic Forces Liberate Raqqa," October 20, 2017,

389.    Additionally, multiple lines of evidence suggest that ISIS leadership, including virtual plotters, assisted in Bouhlel in carrying out the Nice attack. Further, the likely virtual plotter, Rachid Kassim, repeatedly traveled to Syria in advance of the attack in order to fight alongside ISIS. Kassim was a "senior ISIS operative" who, prior to his death, was "the single most active French remote attack planner for ISIS, working to drive dozens of radicalized individuals in France to commit attacks."[290]

390.    In short, the publicly available evidence supports the credibility of ISIS's claim of responsibility. Lahouaiej-Bouhlel supported ISIS, and the French government considered the Nice attack to be an ISIS attack. The evidence also indicates Rachid Kassim helped virtually plan the attack from Syria.

391.    The United States District Court for the District of Columbia held that this evidence "corroborates ISIS's claim of responsibility for the attack." *See Fields, et al. v. Syran Arab Republic*, No. 1:18-cv-01437-RJL (D.D.C.) Dkt. No. 20, at *5. Thus, the court held that "ISIS operatives were directly involved in planning, coordinating, and executing" the Nice Attack. *Id.* at *16.

392.    Among those killed in the Nice Attack were Sean and Brodie Copeland. Kimberly, Austin and Maegan only survived the attack because Sean heroically warned them as the truck careened towards the family. Kimberly, Austin, and Maegan were devastated by the losses of Sean and Brodie. They suffered and will continue to suffer severe psychological and

---

https://www.defense.gov/Explore/News/Article/Article/1349213/syrian-democratic-forces-liberate-raqqa/.

[290] Ryan Browne and Paul Cruickshank, *US-led coalition targets top ISIS figure in Iraq strike*, CNN Politics, https://www.cnn.com/2017/02/10/politics/coalition-strike-mosul-isis/index.html (quoting Jean-Charles Brisard, director of the Paris-based Center for the Analysis of Terrorism).

emotional harm, as well as loss of consortium as a result of the terrorist attack that killed Sean and Brodie. Furthermore, Sean provided substantial financial support to his wife and children.

### iii.   The August 17, 2017 Van Attack On La Rambla In Barcelona, Spain

393.    Jared Tucker, 42 years old, was a devoted father to three girls. On August 17, 2017, Jared was in Barcelona on vacation. On his way to a local beach, he stopped for sangria at a café on La Rambla, a crowded pedestrian mall popular with tourists.

394.    Minutes later, ISIS operative Younes Abouyaaqoub, a member of ISIS's "Ripoll Cell," drove a three-ton van into the dense crowds on La Rambla, reaching speeds of up to 50 miles per hour. Abouyaaqoub zigzagged through the sea of people, deliberately aiming to run over and kill as many as possible. After 500 meters, the van finally came to a halt after hitting a newspaper kiosk, stopping at the famous Joan Míro mosaic. Abouyaaqoub, wearing a fake explosive belt and carrying numerous knives, exited the van and blended in with the crowd, escaping. Utilizing ISIS connections and safe houses, Abouyaaqoub evaded arrest for four days until he was found and killed by authorities.

395.    Among the 13 killed on La Rambla was Jared Tucker. Another 130 were injured.

396.    The next day, on August 18, 2017, ISIS issued a statement claiming direct responsibility for the Barcelona Attack, describing Abouyaaqoub and others supporting him as "soldiers of the Islamic State."  The statement was published by the news agency AMAQ, which is frequently used and supported by ISIS. The statement read, "the perpetrators of the attack in Barcelona are Islamic State soldiers and carried out the operation on command of Khilafah of targeting coalition countries."

397.    ISIS has repeatedly claimed responsibility for the Barcelona attack repeatedly since that time, including in its propaganda magazine, Rumiyah, and in videos featuring and praising Abouyaaqoub.

398. Defendants' financing of the Raqqa cell, ISIS leadership, and the ISIS propaganda machine was critical to the attack.

399. Abdelbaki Es Satty, the Ripoll cell's leader, used ISIS propaganda in his recruitment and radicalization efforts, and other cell members, including Abouyaaqoub, consumed ISIS propaganda. This propaganda heavily influenced cell members.

400. The Ripoll cell repeatedly referred to ISIS in writing and saw themselves as ISIS soldiers. Furthermore, Es Satty was well connected with members of ISIS's external operations wing.

401. The Ripoll cell also followed ISIS's tactics, techniques, and procedures for its initial attack plan and backup attack plan.

402. Just as it did with the Jordan and Nice attacks, the United States District Court for the District of Columbia held that "ISIS operatives were directly involved in planning, coordinating, and executing" the Barcelona attack. *See Fields, et al. v. Syran Arab Republic*, No. 1:18-cv-01437-RJL (D.D.C.) Dkt. No. 20, at *16.

403. Plaintiffs Rhasia Love, Veda Love, and Khalesi Love, Jared Tucker's daughters, were devastated by the loss of their beloved father. They suffered and will continue to suffer severe psychological and emotional harm, as well as loss of consortium as a result of the terrorist attack that killed Jared Tucker. Jared Tucker also provided each of his daughters with substantial financial support.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### AIDING AND ABETTING A FOREIGN TERRORIST
### ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2333(d)

404. Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

405.    Plaintiffs assert this cause of action against Defendants under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.

406.    Defendants Lafarge S.A. and LCS pleaded guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

407.    Plaintiffs are nationals of the United States or the estates, survivors, or heirs of U.S. nationals. Plaintiffs were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct.

408.    ISIS was a foreign terrorist organization ("FTO") when it committed, planned, and authorized the terrorist attacks that injured the Plaintiffs and killed their family members. Indeed, the United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2004 under the name Al-Qaeda in Iraq.

409.    Those terrorist attacks were acts of international terrorism, as defined by 18 U.S.C. § 2331. The attacks: (a) involved violence and endangered human life; (b) would have violated federal and state criminal law, had they been committed in the United States; (c) appeared to be intended to intimidate or coerce the civilian populations of the United States, to influence the policies of the American governments, and to affect the policies of those governments through violent action; and (d) occurred primarily outside the United States and transcended national boundaries in that ISIS raised money internationally, intended to impact the citizens and governments of the United States, operated internationally, and sought asylum in multiple countries in the Middle East.

410.    These acts included the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees

performing official duties, hostage taking, rape, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, forced labor, and trafficking. ISIS's acts violated (or would have violated had been committed within the jurisdiction of the United States) multiple laws, including but not limited to 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), 2339D, 1589, and 1590.

411.    Defendants and ISIS structured their transactions to disguise the nature of their support, in further violation of 18 U.S.C. § 2339A.

412.    The substantial assistance that Defendants knowingly provided to ISIS included but was not limited to: (a) transferring significant sums of money to ISIS, its operatives, and its front organizations; (b) repeatedly transacting with ISIS for purchases of raw materials and supplies; and (c) entering into a revenue-sharing agreement with ISIS. Defendants knew that their substantial assistance and material support was paid to a FTO and would be used to commit acts of international terrorism.

413.    Defendants' services and support provided encouragement to would-be terrorists and incentivized their future attacks, including the attacks that killed and injured Plaintiffs and their family members.

414.    At the time Defendants provided that substantial assistance to ISIS, Defendants knew that: (a) the U.S. government had designated ISIS as a terrorist organization; (b) ISIS and its operatives engaged in terrorism, including the attacks alleged herein; and (c) the financial assistance that Defendants were providing to ISIS was essential to its ability to carry out terrorist attacks, including the attacks that killed and injured Plaintiffs and their family members.

415.    Defendants knew that their substantial assistance would facilitate the ability of ISIS to carry out its terrorist attacks against Plaintiffs, their family members, and other civilians. As a result, Defendants recognized that they played an integral role in ISIS's terrorist activities.

416.    The assistance that Defendants provided to ISIS was a substantial factor in causing Plaintiffs' injuries. Moreover, Plaintiffs' injuries were a foreseeable result of that substantial assistance.

417.    As a direct and proximate result of the substantial, knowing assistance that Defendants provided to ISIS, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

418.    Defendants knowingly aided and abetted ISIS within the meaning of 18 U.S.C. § 2333(d), which Congress enacted to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *See* JASTA, § 2b.

419.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## SECOND CAUSE OF ACTION
### CONSPIRING WITH A FOREIGN TERRORIST ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2333(d)

420.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

421.    Plaintiffs assert this cause of action against Defendants under 18 U.S.C. § 2333(d) and JASTA § 2b.

422.    Defendants Lafarge S.A. and LCS pleaded guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

423.    Plaintiffs are nationals of the United States or the estates, survivors, or heirs of U.S. nationals. Plaintiffs were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct.

424.    Defendants conspired with ISIS, their co-conspirators outlined *supra*, and others to bring about acts of international terrorism against Americans. The terrorist attacks committed by ISIS were intended to intimidate and coerce the civilian population of the United States and other countries; to influence through intimidation or coercion the policy of the governments of the United States and other countries; and to affect the conduct of the governments of the United States and other countries by means of mass destruction, assassination, and kidnapping.

425.    Defendants joined the conspiracy by agreeing, among other things, expressly or tacitly, to raise funds for ISIS although the U.S. government had designated ISIS as an FTO. Defendants additionally: (a) transferred significant sums of money to ISIS, its operatives, and its front organizations; (b) repeatedly transacted with ISIS for purchases of raw materials and supplies; and (c) entered into a revenue-sharing agreement with ISIS. By engaging in that conduct, Defendants furthered the goals of their conspiracy with ISIS.

426.    Defendants further conspired with ISIS to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within that territory, in violation of (among other statutes) 18 U.S.C. §§ 2339A, 2339B, and 2339C.

427.    Defendants knew that, by funneling money to ISIS, they were joining a conspiracy intended to commit acts of international terrorism, including the murder of

Americans.

428.    Overall, Defendants conspired to provide material support to a designated foreign terrorist organization, negotiated revenue-sharing agreements with ISIS to seek an economic advantage, and concealed their payments, falsified records, and backdated contracts in pursuit thereof.

429.    As a direct and proximate result of the Defendants' conspiracy and the steps they knowingly took in furtherance thereof, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

430.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

(a)    Accept jurisdiction over this action;

(b)    Enter judgment against Defendants and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial, and pre-judgment interest thereon;

(c)    Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333, and pre-judgment interest thereon;

(d)    Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333, and pre-judgment interest thereon;

(e)    Enter judgment against Defendants finding them jointly and severally liable to Plaintiffs pursuant to 18 U.S.C. § 2333;  and

(f)    Grant such other and further relief as justice requires.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated:  August 5, 2024              Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   */s/ Joshua D. Arisohn*

Joshua D. Arisohn
Matthew A. Girardi
1330 Avenue of the Americas
32nd Floor
New York, NY  10019
Telephone: 646-837-7150
Facsimile:  (212) 989-9163
E-Mail: jarisohn@bursor.com
       mgirardi@bursor.com

*Attorneys for Plaintiffs*

136